# Deposition Transcript

Case Number: 1:24-CV-00045-AW-ZCB
Date: December 2, 2024

In the matter of:

# JEREMY B. HALES v LYNETTE MICHELLE LACEY, et al.

# Jeremy B. Hales

**CERTIFIED COPY**

Reported by:
Alyssa A. Repsik



**Steno**
**Official Reporters**

**315 West 9th Street**
**Suite 807**
**Los Angeles, CA 90015**
**concierge@steno.com**
**(310) 573-8380**
**NV: Firm #108F**

```
 1           IN THE UNITED STATES DISTRICT COURT FOR THE

 2                 NORTHERN DISTRICT OF FLORIDA

 3                         -   -   -
     JEREMY B. HALES,          ) CIVIL DIVISION
 4                             )
              Plaintiff,       ) NO. 1:24-CV-00045-AW-ZCB
 5                             )
        -vs-                   )
 6                             )
                               )
 7   LYNETTE MICHELLE LACEY,   )
     ALEXIS PRESTON, and       )
 8   JOHN COOK,                )
                               )
 9           Defendants.       )
                               )
10                         -   -   -

11

12           REMOTE DEPOSITION OF JEREMY B.

13    HALES, located in Trenton, Florida, commencing

14    at 10:12 A.M. EST on Monday, December 2, 2024,

15    before ALYSSA A. REPSIK, Court Reporter and

16    Notary Public in and for the Commonwealth of

17    Pennsylvania.

18

19

20

21

22

23

24

25
```

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

```
 1   APPEARANCES VIA ZOOM:

 2   FOR THE PLAINTIFF:

 3   SHOCHET LAW GROUP

 4   BY:  RANDALL SHOCHET, ESQ.

 5   409 NORTH MAIN STREET

 6   TRENTON, FL 32693

 7   Rshochet@shochetlaw.com

 8

 9   FOR THE DEFENDANTS:

10   BRUCE MATZKIN LAW

11   BY:  BRUCE MATZKIN, ESQ.

12   51 PLEASANT STREET, SUITE 72

13   MALDEN, MA 02148

14   Brucematzkin1@gmail.com

15

16

17                 ---o0o---

18

19

20

21

22

23

24

25
```

```
 1                           INDEX

 2                         ---o0o---
                                              PAGE
 3    EXAMINATION:   ATTORNEY MATZKIN           5

 4
                          ---o0o---
 5                        EXHIBITS

 6    EXHIBIT          DESCRIPTION              PAGE

 7    Exhibit 77    Complaint                    6

 8    Exhibit 1     Facebook Post               34

 9    Exhibit 72    Four Violations Police Report  81

10    Exhibit 73    Police Report Screenshot    170

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2                   THE REPORTER:  The attorneys
 3   participating in this deposition acknowledge
 4   that I am not physically present in the
 5   deposition room and that I will be reporting
 6   this deposition remotely.
 7                   They further acknowledge that, in
 8   lieu of an oath administered in person, the
 9   witness will verbally declare his testimony in
10   this matter under penalty of perjury.
11                   The parties and their counsel
12   consent to this arrangement and waive any
13   objections to this manner of reporting.
14                   Please indicate your agreement by
15   stating your name and your agreement on the
16   record.
17                   ATTORNEY SHOCHET:  Randy
18   Shochet, Shochet Law Group in Trenton, Florida,
19   and we stipulate.
20                   ATTORNEY MATZKIN:  Bruce
21   Matzkin for Defendants' Michelle Preston and
22   John Cook.  We stipulate.
23                   JEREMY B. HALES, a Plaintiff herein,
24   having been first duly sworn, was examined and
25   testified as follows:
```

```
 1                     EXAMINATION

 2   BY ATTORNEY MATZKIN:

 3        Q.    Good morning, Mr. Hales.  Let me

 4   just go through a couple of ground rules, then

 5   we'll get started.

 6              So all objections are reserved until

 7   the time of trial except to the form of the

 8   question.  That means although your client --

 9   your counsel may object or you may object or

10   have an objection, you must still answer the

11   question unless you're instructed not to by

12   your counsel due to privilege or other valid

13   reason.

14              If you don't understand the

15   question, please let me know.  I will try to

16   rephrase it.  If you answer the question, I

17   will assume you've understood it.

18              You can ask for a break at any time

19   except when there's an unanswered question

20   pending.

21              Do you have any questions about

22   those ground rules?

23        A.    No.

24              ATTORNEY SHOCHET:  Well, I'm

25   going to -- I'm going to have a little
```

1    instruction here.

2           So, Jeremy, on that point, if I say

3    "objection," such as -- in this deposition I

4    may say, "Objection, totally irrelevant," or

5    "not relevant," "relevance."  It's preserved

6    for the court.

7           If he tries to introduce irrelevant

8    material, for example, the objection will be

9    heard.  You still need to answer the question,

10   okay.

11          However, if he tries to -- and I

12   hope he won't -- involve -- ask questions that

13   involve discussions that you and I have had in

14   private, that's very improper.  I think he

15   knows better than that.  But I will instruct

16   you not to answer.  So unless I say that,

17   answer.

18          Okay?

19   BY ATTORNEY MATZKIN:

20       Q.    All right.  So I'd like to begin

21   with Exhibit 77.

22          (Deposition Exhibit No. 77 was

23   marked for identification.)

24              ATTORNEY SHOCHET:  Oh.  Okay.

25   You've got to hold on.  You're not going to

 1 | pull it up; is that right?
 2 |　　　　　　　　ATTORNEY MATZKIN:  Well,
 3 | again, you can pull it up, and I'll pull it up.
 4 |　　　　　　　　ATTORNEY SHOCHET:  Wait a
 5 | minute.  Did you add something to the drive,
 6 | sir?
 7 |　　　　　　　　ATTORNEY MATZKIN:  There's 78
 8 | exhibits.
 9 |　　　　　　　　ATTORNEY SHOCHET:  Okay.
10 | We'll go back to your drive.  Okay.  Okay.  Go
11 | ahead.  It's up on our screen.
12 | BY ATTORNEY MATZKIN:
13 |　　　Q.　　Do you recognize Exhibit 77,
14 | Mr. Hales?
15 |　　　　　　　　ATTORNEY SHOCHET:  We're
16 | scrolling, just so you know.
17 |　　　　　　　　THE WITNESS:  Yes.
18 | BY ATTORNEY MATZKIN:
19 |　　　Q.　　What is that?
20 |　　　A.　　That is a motion.
21 |　　　Q.　　Exhibit 77?
22 |　　　A.　　A Complaint.
23 |　　　Q.　　Is that the --
24 |　　　A.　　United States District Court, the
25 | Northern District of Florida.

1    Q.    Is that the Court Complaint you

2    filed in this case?

3    A.    That is the Court Complaint that my

4    lawyer filed on behalf of me in this case.

5    Q.    Okay.  You're alleging that my

6    clients defamed you and tortiously interfered

7    with your business; is that correct?

8              ATTORNEY SHOCHET:  Objection

9    to form.  Compound question.

10              You can answer.

11              ATTORNEY MATZKIN:  Strike

12    that.

13    BY ATTORNEY MATZKIN:

14    Q.    Among your claims is that my

15    client's defamed you; correct?

16    A.    Yes.

17    Q.    And separately, on separate

18    accounts, you've alleged my clients tortiously

19    interfered with your business; correct?

20    A.    Yes.

21    Q.    And you allege that they committed

22    extortion directed at you; correct?

23              ATTORNEY SHOCHET:  Form.

24              You can answer.

25              THE WITNESS:  Yes.

```
 1   BY ATTORNEY MATZKIN:

 2        Q.    Okay.  If you look at

 3   Paragraph 30 -- strike that -- Paragraph 25 of

 4   the complaint, do you see that?

 5        A.    Yes.

 6        Q.    Okay.  It says, "Preston and Cook

 7   immediately began publishing defamatory

 8   statements about Hales on their social media

 9   platforms.  In May 2023, for example, Preston

10   stated on her social media that she 'watched

11   Jeremy Hales videos until recently,' and

12   'Jeremy Hales only thinks about the size of his

13   junk.'"

14            Did I read that accurately?

15        A.    Yes.

16        Q.    Okay.  Are you claiming that this

17   first quoted statement constitutes

18   defamation --

19              ATTORNEY SHOCHET:  Objection.

20   BY ATTORNEY MATZKIN:

21        Q.    "Watched Jeremy Hales videos until

22   recently"?

23              ATTORNEY SHOCHET:  Objection

24   to form.  Calls for a legal conclusion.  Also,

25   competency is an issue.
```

1                    But you can answer, if you can.

2    BY ATTORNEY MATZKIN:

3         Q.    Do you understand my question?

4         A.    Ask the question again, please.

5         Q.    Yes.  Are you claiming that the

6    quoted statement, "watched Jeremy Hales' videos

7    until recently," is defamatory to you?

8         A.    I'm claiming that Paragraph No. 25

9    is a portion of the entirety of the Complaint

10   that was presented to the Court.  That's what

11   I'm claiming.

12        Q.    Okay.  So I'm going to ask you again

13   the same question so I can --

14        A.    I'm going to answer it again the

15   same way.  Paragraph No. 25 is a portion of the

16   entirety of the Complaint that was presented to

17   the Court.

18        Q.    Is the statement by Ms. Preston that

19   she "watched Jeremy Hales' videos until

20   recently" alleged by you to be a false

21   statement?

22                    ATTORNEY SHOCHET:  Hold on.

23   Alleged to be a false statement?

24   BY ATTORNEY MATZKIN:

25        Q.    My question is:  Are you claiming

```
 1  that Ms. Preston's statement that you quote
 2  here -- that she "watched Jeremy Hales' videos
 3  until recently" -- is a false statement?
 4           Are you claiming that's a false
 5  statement?
 6                ATTORNEY SHOCHET:  Objection
 7  to form.
 8           If you understand the question.
 9                THE WITNESS:  I don't
10  understand the question.
11                ATTORNEY SHOCHET:  Well, his
12  instructions are that if you don't understand,
13  you can ask him to amplify or explain.
14  BY ATTORNEY MATZKIN:
15      Q.    I'll rephrase it.
16           You wrote in this Complaint -- this
17  Complaint states in Paragraph 25 that "Preston
18  and Cook began publishing defamatory statements
19  on their social media platforms," and then,
20  "For example," as you -- your Complaint says,
21  "for example she stated 'she watched Jeremy
22  Hales videos until recently.'"
23           So you you've given an example of a
24  publication of a defamatory statement.  So my
25  question is:  Is it your allegation that that
```

1   quoted statement is a false statement?

2                    ATTORNEY SHOCHET:   Form.

3            Do you understand the question?

4   BY ATTORNEY MATZKIN:

5        Q.   You can answer the question,

6   Mr. Hales.  Is that a false statement?

7        A.   Paragraph 25 is part of an entirety

8   of a Complaint that was committed to the Court.

9        Q.   How does the statement that

10  Ms. Preston watched Jeremy Hales' videos until

11  recently harm you in any way?

12       A.   Again, that is a portion of an

13  entirety of a paragraph which is a portion of

14  the totality of the Complaint submitted to the

15  Court.

16       Q.   Okay.  But you said "For example" of

17  a defamatory statement published on social

18  media and gave that as an example.

19            So my question is:  How is that an

20  example of a defamatory statement?

21                    ATTORNEY SHOCHET:  Objection

22  to form.  Calls for a legal conclusion.  And

23  now that's the second time I've raised that

24  objection, and we're going to -- if you ask

25  that question again, it's going to get the same

1  objection.  It's a competency issue.

2                    ATTORNEY MATZKIN:  I rephrased

3  it.  I said, "How is the statement 'watched

4  Jeremy Hales' videos until recently' a

5  defamatory statement" as stated in Paragraph

6  25?

7                    ATTORNEY SHOCHET:  Objection.

8  Competency.  He's not a lawyer.  If you want to

9  ask him as a lay opinion, that's fine.

10                    ATTORNEY MATZKIN:  Well, I ask

11  -- I'll ask again.

12  BY ATTORNEY MATZKIN:

13      Q.    Are you claiming it's a false

14  statement which is an element of defamation?

15      A.    Well, in all reality, let's talk

16  about false statements.  Who knows what your

17  client actually says was true or false

18  considering under oath she has stated she has

19  only watched, what, two, three, maybe four

20  videos of What the Hales, but then she's

21  posting all over the internet that she's

22  watched all the videos until recently?  What is

23  the truth?  What's false?  You tell me.  She's

24  your client.

25                    ATTORNEY MATZKIN:  Well, we'll

1   of course strike that.

2            Please place on the record that I

3   move to strike that entire tirade.

4            ATTORNEY SHOCHET:  You don't

5   have the power to strike anything.  You can say

6   "move to strike."  That's fine.  But you cannot

7   say something is going to be stricken.

8            ATTORNEY MATZKIN:  Just

9   strike.

10  BY ATTORNEY MATZKIN:

11      Q.    And let's move on to the next --

12            ATTORNEY SHOCHET:  It's not

13  stricken.

14  BY ATTORNEY MATZKIN:

15      Q.    Let's move on to the next quoted

16  statement that Paragraph 25 offers as an

17  example of defamatory statements about Hales on

18  their social media platforms.

19            "Jeremy Hales only thinks about the

20  size of his junk."

21            Is it your claim that that's a

22  defamatory statement?

23            ATTORNEY SHOCHET:  Same

24  objection.  If you're asking his lay opinion,

25  that's fine.

1              To save time, every time that you

2    raise legal terminology to this nonlawyer, I'm

3    just going to say "Objection to form," but

4    that's what I mean, Counsel.  He's not

5    competent.  He's not a lawyer.  But if you want

6    to ask him --

7    BY ATTORNEY MATZKIN:

8         Q.    Mr. Hales, do you understand --

9              ATTORNEY SHOCHET:  -- his lay

10   opinion, that's fine.  Go ahead.  You can

11   answer, if you understand the question.

12   BY ATTORNEY MATZKIN:

13        Q.    Mr. Hales, do you understand what

14   defamation is?

15        A.    Yes, I do.

16        Q.    Okay.  What -- just give me your lay

17   understanding of it.

18        A.    Defamation are things that are

19   untrue, that damage the character and the

20   association with that individual.

21        Q.    Which is --

22        A.    Such as taking and placing signs

23   along in a town where that individual lives

24   that states that "Oh, Jeremy Hales, the Ohio

25   rapist, raped my child."  Defamation.

1    Q.    Okay.  So you're -- you said

2    "things," but you meant statements that are

3    untrue, that harm someone's reputation; is that

4    accurate?

5          Your understanding of defamation is,

6    "statements that are untrue, that harm

7    someone's reputation"?

8    A.    Untrue.  False.

9    Q.    Got you.  False.  Statements that

10   are false, that harm someone's reputation;

11   correct?

12         Mr. Hales --

13   A.    Please repeat your question.

14   Q.    Mr. Hales, is it your understanding

15   that defamation are statements that are false,

16   that harm someone's reputation?

17   A.    Yes.

18   Q.    All right.  Is "Jeremy Hales only

19   thinks about the size of his junk" a statement

20   that is false that harms your reputation?

21   A.    No. 1, it is false.  No. 2, a judge

22   or a jury will decide whether it's defamation

23   or not.  I won't be the one deciding those

24   things.

25   Q.    Okay.  But you're alleging that that

1    harmed your reputation?

2        A.    A jury and a judge or a judge or a

3    jury or both will decide whether that's

4    defamation or not.

5        Q.    I understand.  And are you alleging

6    that that harmed your reputation?

7        A.    I'm alleging that your clients have

8    harmed my reputation in horrific ways.

9        Q.    Okay.  But I'm asking you about this

10   particular statement, "Jeremy Hales only thinks

11   about the size of his junk."

12           Is that a false statement that harms

13   your reputation?

14       A.    Yes, it is a false statement.

15       Q.    And how does it harm your

16   reputation?

17       A.    That will be determined by a judge

18   or a jury.

19       Q.    Okay.  But how do you allege that it

20   harmed your reputation?

21       A.    That will be determined by a judge

22   or a jury.

23       Q.    No.  A judge and a jury doesn't

24   determine what you allege.  They determine

25   what's true.

1          So I'm asking you what you're

2    alleging?

3               ATTORNEY SHOCHET:  You're

4    asking him to rephrase?  I'm not -- objection

5    to form.  Compound question.  Competency.

6    BY ATTORNEY MATZKIN:

7        Q.    Well, again, you know, you say that

8    as an example of a defamatory statement, which

9    you understand to be a false statement that

10   harms someone's reputation, "Jeremy Hales only

11   thinks about the size of his junk."

12          So I'm asking you, how does that

13   harm your reputation?

14               ATTORNEY SHOCHET:  Form.

15   BY ATTORNEY MATZKIN:

16       Q.    How do you allege that it harms your

17   reputation?  What harm do you allege to have

18   suffered by that statement -- by that quoted

19   statement?

20               ATTORNEY SHOCHET:  That's

21   three questions.  Objection to form.  Compound.

22   BY ATTORNEY MATZKIN:

23       Q.    All right.  So I'll rephrase.

24          What harm do you allege as a result

25   of that statement, "Jeremy only thinks about

1    the size of his junk"?

2        A.    Correct me if I'm wrong, but the

3    Complaint actually states how it has harmed my

4    reputation, how your clients have harmed my

5    reputation.

6        Q.    All right.  So you're not going to

7    answer in --

8        A.    How they damaged my business.  How

9    they damaged my personal life.  How they

10   damaged my personal relationships.  How they

11   damaged my income.  How they damaged every

12   aspect of my life.  How they've literally --

13   your client literally stating he's going to

14   shoot me in the face and feed me to the gators.

15       Q.    And the list goes on and on.

16       A.    Should I go further --

17       Q.    I understand.

18       A.    -- or do you want more?

19       Q.    I understand that.  The list goes on

20   and on.

21             Now let's move to Paragraph 27 of

22   the same exhibit.

23             Tell me when you're ready.

24                 ATTORNEY SHOCHET:  Do you see

25   it?

```
 1                    THE WITNESS:  Yeah.  I can see

 2    it.

 3    BY ATTORNEY MATZKIN:

 4         Q.   Okay.  So can I ask a question about

 5    it now?

 6                    ATTORNEY SHOCHET:  You ready?

 7                    THE WITNESS:  Yes.  Ready.

 8    BY ATTORNEY MATZKIN:

 9         Q.   Okay.  You write that, "In May 2023,

10    Mr. Cook pulled a gun on you as you were

11    driving on the public roadway to enter your

12    property."

13            Is that somehow relevant to

14    defamation, in your view, a false statement

15    that harms yours reputation?

16                    ATTORNEY SHOCHET:  Objection.

17    Compound question.  Also didn't read the entire

18    sentence.

19    BY ATTORNEY MATZKIN:

20         Q.   There are three items here, No. 1 --

21                    ATTORNEY SHOCHET:  First one,

22    you left out "when Hales returned from Ohio for

23    a town meeting."

24                    ATTORNEY MATZKIN:  Okay.

25    BY ATTORNEY MATZKIN:
```

1    Q.    "When Hales returned from Ohio for a

2   town meeting May 2023 Cook pulled a gun on

3   Hales as Hales was driving by on the roadway to

4   enter Hales' own property."

5         Did I read that accurately?

6    A.    Yes.

7    Q.    And did Mr. Cook say anything to you

8   while he was driving by -- while you were

9   driving by entering your property and he pulled

10  a gun?

11        Did he say anything to you?

12   A.    He said lots of things.  And it's

13  all recorded, and it's all on video, and it's

14  all part of evidence.

15   Q.    Is that the video that we're

16  familiar with where you approach the truck he's

17  sitting in with your cell phone and start

18  throwing the epithets?

19   A.    You mean the video where he

20  trespassed an my property and threatened to go

21  bang bang on me?  Threatened my life yet again?

22  That video?  Is that the video you're referring

23  to?  Where he trespassed, literally parked on

24  my property?  When he literally said that a gun

25  was going to go bang bang?  That -- that video?

1     Q.    Okay.

2     A.    Is that the one?

3     Q.    The one I'm thinking of -- the one

4  I'm thinking of is when you walk up to it and

5  call him a "Gay effing faggot."  Maybe it's the

6  same video.

7     A.    Repeating -- repeating what he has

8  called me every single time when you said has

9  he said anything to me, which is on video of

10  him calling me those things.

11     Q.    Okay.  But that's just you talking

12  about this same video?

13     A.    And not only saying that; that he

14  was saying that Martha would be shoving things

15  in my backside.  That video.  That's the one

16  you're referring to, right, when you're asking

17  does he say anything to me; right?

18                    ATTORNEY MATZKIN:  Mr.

19  Shochet --

20                    ATTORNEY SHOCHET:  I think

21  he's -- No. 1 --

22                    THE WITNESS:  Okay.

23                    ATTORNEY SHOCHET:  You guys

24  are -- you guys are conflating No. 1 and No.

25  2.

```
 1                   THE WITNESS:  Well, there's so
 2    much evidence out there, it's hard to keep it
 3    all --
 4                   ATTORNEY SHOCHET:  Well,
 5    you're talking about the "go bang."  That's in
 6    No. 2.
 7                   THE WITNESS:  Okay.
 8                   ATTORNEY SHOCHET:  He's
 9    talking -- I think he's talking about No. 1.
10    Those are two separate incidents, Counsel.  So
11    it's not -- it's not the video you're referring
12    to.
13                   ATTORNEY MATZKIN:  Mr.
14    Shochet, let's --
15                   ATTORNEY SHOCHET:  There's a
16    video of both.  A video of both.
17    BY ATTORNEY MATZKIN:
18        Q.   Let's move on to Part 3 of
19    Paragraph 27.  "Maliciously threatening" --
20        A.   We're moving on a lot, don't we?
21        Q.    "Maliciously threatened to injure"
22    -- "to do injury to Hales' reputation with
23    intent thereby to extort a pecuniary advantage,
24    and accordingly, publically stated falsely on
25    Facebook that Hales' fiance had oral sex with
```

```
1   him and that he has photographs to prove it."
2             That's Subpart 3 to Paragraph 27.
3                   ATTORNEY SHOCHET:  And there's
4   a footnote too, Counsel, which, if you're going
5   to read -- you need to read entire sentences
6   including footnotes.
7                   ATTORNEY MATZKIN:  All right.
8   Mr. Shochet, I can read or not read as I
9   choose.
10  BY ATTORNEY MATZKIN:
11      Q.   So did I just read Subpart 3
12  correctly?
13      A.    No.  You missed the footnote.  So if
14  you're going to read it, read it correctly.
15      Q.   I am reading Paragraph 27, Sub 3,
16  "Maliciously threatened to do injury to Hales'
17  reputation with intent thereby to extort a
18  pecuniary advantage, and accordingly,
19  publically stated falsely on Facebook that
20  Hales' fiancée had oral sex with him, and that
21  he has photographs to prove it."
22             Aside from the footnote, did I read
23  that correctly?
24      A.    No.  You didn't read the footnote.
25  Read the footnote.
```

1      Q.    Mr. Hales, I get to run the

2   deposition, and if you're going to continue and

3   Mr. Shochet is going to continue, then I'll

4   reach a point where we'll end the deposition

5   and bring a Court Motion.

6           So all I'm asking you now is:  Did I

7   accurately read what's in Paragraph 27, putting

8   aside the footnote?  I put aside the

9   footnote --

10      A.    All I am telling you now --

11      Q.    So you don't have to --

12      A.    -- is that you didn't read it

13   correctly.

14      Q.    -- so you don't have to talk about

15   the footnote --

16      A.    You forgot the footnote.

17              THE REPORTER:  Everyone, stop.

18              ATTORNEY MATZKIN:  Just tell

19   me if I asked you right.

20              THE REPORTER:  No.  Stop.

21   Stop.  Stop.  Stop.

22              ATTORNEY MATZKIN:  In fact,

23   you read it --

24              THE REPORTER:  No.  Everyone,

25   stop.  I'm going to stop this before we

1    continue with the rest of this deposition.  If

2    we continue to talk over each other, we're not

3    going to have a record that anybody is going to

4    be able to read.

5            I need it to be question, pause,

6    answer, or else we're going to have a record

7    that nobody can decipher.  Thank you.

8                THE WITNESS:  Thank you,

9    Alyssa.

10   BY ATTORNEY MATZKIN:

11       Q.   Mr. Hales, please read Sub 3 of

12   Paragraph 27 out loud.

13       A.   "Maliciously threatened to do injury

14   to Hales' reputation with intent thereby to

15   extort a pecuniary advantage and accordingly

16   pubically stated falsely on Facebook that

17   Hales' fiance had oral sex with him and that he

18   has photographs to prove it."  Footnote --

19       Q.   Okay.  Now --

20       A.   -- "Cook posted 'Jeremy would like

21   me to post'" -- "'Jeremy, would you like me to

22   post the picture of my cock in George's [sic]

23   mouth you can't take this one down.'"

24       Q.   Okay.  Is it your allegation that

25   that is a defam- -- a false statement that

1  harms your reputation?

2              ATTORNEY SHOCHET:  Form, as

3  stated before to keep matters short for the

4  reasons stated previously.  Same objection.

5          You can answer, if you understand.

6              THE WITNESS:  It's clearly

7  stated as false, and a judge or a jury will

8  determine whether it's defamation or not.

9  BY ATTORNEY MATZKIN:

10     Q.    Okay.  Now, how -- where is the

11  threat to extort pecuniary advantage in that

12  statement?

13              ATTORNEY SHOCHET:  Objection.

14  Objection to form.

15  BY ATTORNEY MATZKIN:

16     Q.    Do you understand the question?

17     A.    A judge and a jury will determine

18  that, not myself as a layman.

19     Q.    Okay.  But I'm asking you, as you

20  allege "with intent thereby to extort a

21  pecuniary advantage," so tell me where in this

22  statement or anywhere else is there the threat

23  to extort pecuniary advantage?

24              ATTORNEY SHOCHET:  Objection

25  to form.  You're not reading the entire quote.

```
 1   You're leaving the word out "intent."
 2            So I don't know why you say it
 3   sometimes, you say it other -- sometimes you
 4   include it; sometimes you don't.  If you're
 5   going to refer to a paragraph, I'd ask you to
 6   please --
 7                   ATTORNEY MATZKIN:
 8   Mr. Shochet, this is improper of you.  I'd ask
 9   that you --
10                   ATTORNEY SHOCHET:  I don't
11   know why, but you keep on -- that's why I'm
12   objecting.  You keep on -- the record will
13   reflect this.  Sometimes you read a sentence
14   one way.  Then sometimes you take things out.
15   So I am just trying to --
16                   ATTORNEY MATZKIN:
17   Mr. Shochet --
18                   ATTORNEY SHOCHET:  Sir, it's
19   your deposition.  I'm just trying to help you.
20   I'm done.  I'm just going to object every time
21   you do that.
22            So just say compound --
23                   ATTORNEY MATZKIN:  Mr.
24   Shochet, "Object to the form," and then say
25   nothing more.
```

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

1        ATTORNEY SHOCHET:  Okay.  Sir,

2   I know the rules.  I'm going to object and

3   state the reason every time.

4   BY ATTORNEY MATZKIN:

5        Q.    My question is:  What about this

6   statement that you just read from Sub 3 and

7   Footnote 2 constitutes a threat to extort

8   pecuniary advantage?

9            From where do you get your

10  allegation that there was an intent to extort a

11  pecuniary advantage?

12           ATTORNEY SHOCHET:  Objection

13  to form.  It's two questions.  Compound.

14  BY ATTORNEY MATZKIN:

15       Q.    From where do you get your

16  allegation that that statement was made with

17  intent thereby to extort a pecuniary advantage?

18       A.    A judge or jury will decide that,

19  not myself as a layman.

20       Q.    Is there a statement that you can

21  point to by Mr. Cook, that demanded pecuniary

22  advantage from you in any form?

23       A.    A judge and a jury will determine

24  that, not myself as a layman.

25       Q.    I'm asking you to identify a

1   statement -- whether oral or written -- by

2   Mr. Cook to you that you claim was an extortive

3   threat to extort pecuniary advantage?

4                    ATTORNEY SHOCHET:  Form.

5   BY ATTORNEY MATZKIN:

6       Q.    Do you understand the question?

7       A.    Myself as a layman will not be

8   determining that.  A judge or a jury will be

9   determining that.

10      Q.    Is there a statement by Mr. Cook

11  that you allege where he said "Give me

12  something, or else..."?

13            You can fill in --

14      A.    Again, I'm a layman.

15      Q.    -- you can fill in the "something"

16  or the "or else."  Let me repeat.

17            Is there a statement you're alleging

18  by Mr. Cook in which he told you that you had

19  to give him something, anything, or else

20  anything?

21      A.    The whole aspect of them stalking

22  me.  The whole aspect of them trying to get

23  money from me.  The whole aspect of them trying

24  to utilize and take advantage of my giving

25  heart is an aspect of intent to, "Then if you

1    don't give it, I'm going to post pictures of my

2    cock in your fiancée's mouth.  If you don't

3    give it, I'm going to post signs all over the

4    town where you live that state that you raped

5    my child.  If you don't give it I'm going to

6    post things about your fiancée's family being

7    terrorists, and you bought more property for it

8    to be a training ground for terrorists if you

9    don't give us these things," as we saw played

10   out in real life.

11        Q.    Okay.  So is there any statement --

12        A.    And the list can go on and on and on

13   and on.

14        Q.    Are you finished?

15             Is there any statement -- not an

16   aspect, but a statement that you can point to,

17   oral or written -- by Mr. Cook in which he said

18   that you have to give him something of

19   pecuniary value, or else he will do something,

20   whether it be post signs, post photos of your

21   fiancée, or anything else?

22             Is there any such statement?

23                  ATTORNEY SHOCHET:  Compound.

24   Objection to form.

25   BY ATTORNEY MATZKIN:

1       Q.    Do you understand the question?

2       A.    Absolutely.

3       Q.    Can you answer it?

4       A.    Everything stated.  All the evidence

5   that you have in your hands is all because they

6   did not get what they wanted from me.

7       Q.    Okay.  Again, a written or oral

8   statement that you can quote or point to in

9   which Mr. Cook said, "Give me something, or I

10  will do something"?

11      A.    Again, everything that you're

12  looking at from the aspect of he's got pictures

13  of his cock in my fiancée's mouth, and I can't

14  take that post down is because they did not get

15  what they wanted from me:  Money, fame, and

16  gifts in kind and donations.  And the list goes

17  on and on.

18      Q.    Okay.  Where does it say -- where

19  does the -- where do they say that, Mr. Cook or

20  Ms. Preston ever say that?

21            I understand you believe that, but

22  I'm asking, where do they say in written or

23  oral form?

24      A.    It's their intent from the very

25  beginning.  Intent.  Intent.  Malicious.

1    "Maliciously threatened to do injury to Hales'

2    reputation with intent."

3         Q.    So that was --

4         A.    That was the intention from the

5    entire time, to stalk and then to try and get

6    money, to try and get fame.  Publicly posting

7    she's going to launch her YouTube at my event

8    "Half Mill, Time to Grill."  They're wanting

9    begging for items that I have.  Money.

10   Donations.

11            Intent.  They didn't get it.  Then

12   what happened?  This is what happened.

13        Q.    So - so there's no statement you can

14   point to -- oral or written -- where they

15   actually say, "We're going to do things unless

16   you give us something"?

17        A.    Intent.  You mean, like, statements

18   that you have in writing, that you're going to

19   help people grow and fuse if they cover your

20   side of this story like that?  Like, things

21   you've done, put in writing claiming that

22   you're a famous lawyer?  What a joke.  What a

23   joke.  You're a famous lawyer.  Putting in

24   writing that you're going to guarantee views.

25   Things like you've done?

1          Would you like me to go on?  Things

2     like creating an ecosystem, an "Anti-Hales

3     ecosystem" that destroyed somebody's

4     reputation, to destroy their business in

5     writing like you have done.  You.

6               ATTORNEY SHOCHET:  Let the

7     record reflect Mr. Matzkin is actually smiling

8     at that answer.

9               THE WITNESS:  Oh, by the way,

10    there's also that piece of evidence "Give me

11    $65,000."

12    BY ATTORNEY MATZKIN:

13        Q.    Oh.

14        A.    Oh, wait.  That's in your evidence.

15    We're going to get to it, isn't it?

16        Q.    Why don't we go right to Exhibit 1.

17    Tell me when you're able to look at Exhibit 1.

18               ATTORNEY SHOCHET:  I've got to

19    get to it.  Hold on.  I've got to close this

20    one first.

21               THE WITNESS:  By the way, Lisa

22    Lee is waiting for your text messages.  Oh,

23    wait.  That's transcribed, and that's evidence

24    now, too.

25               (Deposition Exhibit No. 1 was marked

```
 1   for identification.)

 2   BY ATTORNEY MATZKIN:

 3        Q.    So Exhibit 1, are you able to open

 4   that?

 5                 ATTORNEY SHOCHET:  Hang on.

 6   It's so out of order.  I don't know why your

 7   exhibits are not numbered correctly.  But let

 8   me try that.

 9                 ATTORNEY MATZKIN:  They're in

10   order, Exhibit 1 through 78.

11                 ATTORNEY SHOCHET:  Mine is --

12   this -- your Google Drive, it's out of order.

13   But I can find it.  I just got to scroll.

14                 ATTORNEY MATZKIN:  They're in

15   numerical order.

16                 ATTORNEY SHOCHET:  Not on my

17   screen they're not.

18            Okay.  Do you see that?

19                 THE WITNESS:  Yeah, I can see

20   it.

21                 ATTORNEY SHOCHET:  Okay.  We

22   have it up, Counsel.

23   BY ATTORNEY MATZKIN:

24        Q.    Okay.  Is this a -- what appears to

25   be a maybe a Facebook post?
```

1      A.    It's not what appears.  It's what it

2   is.  Posted by your client.

3      Q.    A Facebook post that appears to be

4   posted by Lynette Michelle Preston.  It says --

5   well, there's a yellow highlight on the part

6   that reads, "Put your freaking money where your

7   mouth is and pay him the $65,000 so he can walk

8   away and leave me in peace."

9           Did I read that accurately?

10     A.    You read the "Otherwise shut your

11  damn pie hole and leave me and my little girl

12  alone," to finish the statement for you.

13     Q.    Okay.  And who is this -- do you

14  understand who this is directed towards?

15     A.    Absolutely.  It's directed towards

16  me.

17     Q.    So who -- who is "him" in "pay him

18  the $65,000 so he can walk away"?  Who is "him"

19  and "he" in that sentence?

20     A.    John Cook.

21     Q.    And she's saying to pay him $65,000

22  for what?

23     A.    So that she can be of -- rid of him.

24  She wants my money.

25           What?  You didn't know your client

1   wanted rid of your other client.

2        Q.    So she's suggesting that you give

3   Mr. Cook $65,000 so he -- so he can leave her?

4        A.    I'm suggesting exactly what it says.

5   She put and capitalized, "Put your freaking

6   money where your mouth is and pay him" --

7   meaning John Cook -- "$65,000 so he can walk

8   away and leave me in peace.  Otherwise shut

9   your damn pie hole and leave me and my little

10  girl alone."

11       Q.    Okay.  Now, was this sent to you?

12       A.    This was a public post.

13       Q.    Okay.  Was this sent to you

14  separately, privately in any other form?

15       A.    Again, this is a public post.

16       Q.    So is it your claim that this is an

17  extortionist threat?

18                  ATTORNEY SHOCHET:  Objection

19  to form.  Same reasons as before.

20  BY ATTORNEY MATZKIN:

21       Q.    Do you understand my question?

22             Do you understand my question?

23       A.    Ask your question appropriately.

24       Q.    Is it your claim that this Exhibit 1

25  contains an extortionist threat, "Give me money

1   or else..."?

2                    ATTORNEY SHOCHET:  Objection

3   to form.  Competence.  Calls for a legal

4   conclusion.

5             But if you want an answer in his lay

6   opinion, you can answer.

7                    THE WITNESS:  Again, as a

8   layman, I won't be making those decisions; a

9   judge and a jury will.

10  BY ATTORNEY MATZKIN:

11       Q.   Okay.  But you understand that we're

12  here to determine what evidence you have of

13  your claims; right?

14       A.   Yes.

15       Q.   Okay.  So I'm asking you, does this

16  constitute evidence of your claim of extortion?

17                    ATTORNEY SHOCHET:  Same --

18                    THE WITNESS:  Again, I'm not a

19  professional -- go ahead.

20                    ATTORNEY SHOCHET:  Same

21  objection.

22            You can answer.

23                    THE WITNESS:  He's going to

24  keep doing it regardless.

25  BY ATTORNEY MATZKIN:

```
 1        Q.    Let's move to Paragraph 30 of the

 2    Complaint.

 3              Tell me when you're ready.

 4                   ATTORNEY SHOCHET:  What was

 5    that?  70-something?

 6                   THE WITNESS:  77.

 7                   ATTORNEY SHOCHET:  77.  Which

 8    one?  Which paragraph?

 9                   ATTORNEY MATZKIN:  30.

10                   ATTORNEY SHOCHET:  30?

11                   ATTORNEY MATZKIN:  Correct.

12              You ready?

13                   ATTORNEY SHOCHET:  Yep.

14    BY ATTORNEY MATZKIN:

15        Q.    Can you read that out loud to me?

16        A.    "On or about May 28, 2023, Preston"

17    -- meaning Lynette Preston -- "posted on her

18    social media that, (1), 'I'm going to stand

19    tall and not let Jeremy Hales hurt me ever

20    again'; (2), she will 'put a cap in the ass of

21    anyone who messes with her.'  And, (3), 'I'm

22    done with it.  You met your match, Mr. Hales.'"

23        Q.    Is it your belief that any of those

24    three statements constitute defamation, i.e.,

25    false statements that harm your reputation?
```

1          ATTORNEY SHOCHET:  Objection

2     to form, as before.

3               THE WITNESS:  Same answer as

4     before.  A judge and a jury will be deciding

5     that, not myself.

6     BY ATTORNEY MATZKIN:

7          Q.    Is it your testimony that "I'm going

8     to stand tall and not let Jeremy Hales hurt me

9     ever again" is a false statement that harms

10    your reputation?

11         A.    Yet again, same answer:  A judge and

12    a jury is going to determine that, not myself.

13         Q.    Okay.  Do you have any information

14    as to how that statement harmed your

15    reputation?

16         A.    I have plenty of information.

17         Q.    Well, what is that?

18         A.    Again, a judge and a jury is going

19    to be determining that.

20         Q.    Well, no.  You said you had

21    information as to how that statement harmed

22    your reputation.  So I want to know what your

23    information is.

24         A.    You have it, as well.  You have all

25    the evidence.

1      Q.    Sir, I need you to tell me an answer

2    to my question.

3            What is your information that the

4    quote "I'm going to stand tall and not let

5    Jeremy Hales hurt me ever again" harmed your

6    reputation?

7      A.    First --

8                  ATTORNEY SHOCHET:  Hold on.

9    Objection to form.

10                 THE WITNESS:  Oh, my goodness.

11                 ATTORNEY SHOCHET:  That's a

12   different question.  So same objection as

13   before.

14   BY ATTORNEY MATZKIN:

15     Q.    Again, how did that statement harm

16   your reputation?

17                 ATTORNEY SHOCHET:  Form.

18   BY ATTORNEY MATZKIN:

19     Q.    Mr. Hales, I have a question

20   pending.  How did that statement harm your

21   reputation?

22                 ATTORNEY SHOCHET:  You can

23   answer.

24                 THE WITNESS:  First of all, I

25   never hurt her.  So in the aspect of claiming

1  that I hurt her, that harms my reputation.

2  That is a false statement.  I've never hurt her

3  once.  I never hurt her twice.

4             Now, what we can talk about is all

5  the things that she's actually put in legal

6  writing and in court about John Cook abusing

7  her, John Cook actually abusing the child and

8  him threatening her life -- her mom's life with

9  a firearm.

10             Not to mention three -- three

11  legally documented incidents with John Cook

12  pointing firearms at different individuals.  We

13  don't even know about the individuals that he

14  hasn't been documented with the Levy County

15  Sheriff, but there's three documented.

16             Living in fear every day of my life.

17  And individuals destroying my life with

18  defamation stating that I've done something to

19  them that I've never once did.

20             Oh, by the way, you're a part of

21  that, as well.  In writing.  Literally, in

22  writing, you have written it.  You have sent it

23  out, and they're all coming forward with what

24  you've said and you've done.

25  BY ATTORNEY MATZKIN:

1      Q.    Mr. Hales, I'm going to just sort of

2   warn that I'm going to ask that the Court

3   require you to pay for this transcript if it is

4   replete with tirades and asides that take up a

5   lot of the transcript and are not --

6                    ATTORNEY SHOCHET:  Move to

7   strike that last statement by Mr. Matzkin.

8                    ATTORNEY MATZKIN:  -- and not

9   responsive to my questions.

10  BY ATTORNEY MATZKIN:

11     Q.    So --

12                   ATTORNEY SHOCHET:  Also move

13  to strike that.

14  BY ATTORNEY MATZKIN:

15     Q.    Let's look at No. 2 in Paragraph 30,

16  "She will 'put a cap in the ass of anyone who

17  messes with her.'"

18                   Where did that statement -- where

19  did you see that statement or hear that

20  statement?

21     A.    She posted it on Facebook with a

22  picture of her and her firearm.

23     Q.    And is it your belief that that

24  somehow caused you damage?

25     A.    That would be why it's in a

1    Complaint and filed within the courts.  Yes.

2         Q.    And how did that cause you damage?

3         A.    That will be determined by a judge

4    and a jury.

5         Q.    So you're not prepared here to

6    explain how this statement on social media,

7    that Ms. Preston will put a cap in the ass of

8    anyone who messes with her, harmed you

9    personally?

10                   ATTORNEY SHOCHET:  Form.

11                   THE WITNESS:  That will be

12   determined by a judge and a jury.

13   BY ATTORNEY MATZKIN:

14        Q.    But you can't explain here how that

15   harmed you?

16        A.    That will be determined by a judge

17   and a jury.

18        Q.    But the judge and the jury -- the

19   jury has to base its decision on evidence, so

20   we're here to learn what evidence you have.

21                   ATTORNEY SHOCHET:  Is that a

22   question?

23   BY ATTORNEY MATZKIN:

24        Q.    So what evidence do you have that

25   that statement harmed your reputation or caused

1   you damage in any way?

2        A.    That will be determined by a judge

3   and a jury.

4        Q.    Okay.  Are you unwilling to answer

5   the question, or you just don't have any

6   evidence that you can articulate?

7        A.    That will be determined by a judge

8   and a jury what damage that done -- has done to

9   my reputation.

10       Q.    Do you know --

11                 ATTORNEY SHOCHET:  It's the

12  same question.

13                 I need -- I need a two, three, and a

14  bathroom break, guys.

15                 ATTORNEY MATZKIN:  Let's just

16  finish with this.

17                 ATTORNEY SHOCHET:  No question

18  pending, so let's take a two-minute break.

19  Okay?

20                 ATTORNEY MATZKIN:  Let's

21  finish Paragraph 30, and then we'll do that.

22                 ATTORNEY SHOCHET:  Oh, are

23  you -- are you refusing on the record to give a

24  bathroom break, Counsel?  You're adding another

25  question?

```
 1                    ATTORNEY MATZKIN:  Go ahead.
 2    Take a break.
 3                    ATTORNEY SHOCHET:  Two to
 4    three minutes.
 5                    ATTORNEY MATZKIN:  Sure.
 6                    (A recess was taken.)
 7    BY ATTORNEY MATZKIN:
 8        Q.    We were -- we were looking at
 9    Paragraph 30 of the Complaint, and I was asking
10    Mr. Hales if you allege that the third quoted
11    statement -- "I'm done with it.  You've met
12    your match, Mr. Hales" -- harmed your
13    reputation in some way?
14                    ATTORNEY SHOCHET:  Form.
15                    THE WITNESS:  Do I still
16    answer?
17                    ATTORNEY SHOCHET:  You can
18    answer.  When I say, "form," you can answer it.
19                    THE WITNESS:  I think you have
20    a drastic misunderstanding in regards to
21    defamation and extortion.  This is part of
22    extortion.  "Give me what I want:  money.  Give
23    me promotion.  Give me physical items.
24    Donations.  Or I'm going to pop a cap in your
25    ass.  I am done with you.  You've met your
```

1    match."

2            There are multiple facets of this

3    Complaint, and you somehow are taking

4    defamation and extortion and trying to ball

5    them up all into one which is extremely foolish

6    on your part.  This is extortion.  "Give me

7    what I want.  If you don't, this is what I'm

8    going to do to you."  And then a throwdown

9    threat, "I'm done with it.  You've met your

10   match, Mr. Hales."

11   BY ATTORNEY MATZKIN:

12        Q.    Okay.  So we're --

13        A.    And what flowed out of that --

14   please let me finish -- and what flows out of

15   that is defamation upon defamation upon

16   defamation upon defamation in an attempt to

17   destroy my life, my business, my personal

18   relationships and I'm quoting you now, quoting

19   you, Bruce -- an "Anti What the Hales

20   ecosystem."

21            ATTORNEY SHOCHET:  I'm going

22   to ask you about that on the record.

23            ATTORNEY MATZKIN:  Counsel,

24   Mr. Hales should address me as "counsel" or

25   Attorney Matzkin" or "Mr. Matzkin," not by my

```
 1   first name.  I'd ask you --
 2                   THE WITNESS:  How about
 3   "Deuce"?  How about I exercise my first
 4   amendment right?  I'll address you any way I
 5   legally want to address you.
 6                   ATTORNEY MATZKIN:  So,
 7   Counsel, I'll ask you to politely ask your
 8   client to address me as "Counsel," "Attorney
 9   Matzkin," or "Mr. Matzkin," one of those three,
10   but not by my first name or any nicknames.
11   Would you kindly make that request of your
12   client?
13                   ATTORNEY SHOCHET:  Sir, you're
14   taking a deposition.  I'm not under oath.
15   Continue with your deposition.
16                   ATTORNEY MATZKIN:  So you
17   won't ask him to refrain from calling me --
18                   ATTORNEY SHOCHET:  Continue
19   with your deposition, Counsel.  When I talk to
20   my counsel [sic], you do not get to tell me
21   what I tell my counsel -- what I tell my
22   client.
23                   ATTORNEY MATZKIN:  Well, I've
24   made a professional --
25                   ATTORNEY SHOCHET:  Please move
```

1   on.  I'm not going to -- just you're dragging

2   this out.  Is there a question?  Please ask

3   your next question.

4                    ATTORNEY MATZKIN:  As a

5   professional courtesy, I would like you to ask

6   your client to refrain from addressing me by my

7   first name or a nickname.

8                    ATTORNEY SHOCHET:  I've

9   answered.  Do you have a question for my

10  client?  Otherwise, it's my turn to ask

11  questions.

12  BY ATTORNEY MATZKIN:

13      Q.    Okay.  Mr. Hales, where is there any

14  statement, as you just described it -- "Give me

15  what I want, or else this is what I'm going to

16  do" -- in one statement?

17      A.    $65,000 requested.  $65,000.  We

18  already looked it.  We looked at that piece of

19  evidence.

20      Q.    And that says, "Give 65,000, or else

21  I'm going to do what"?

22      A.    "Put your freaking money where your

23  mouth is, or shut your pie hole."  The intent

24  is there to destroy my reputation, to destroy

25  my businesses, to destroy my personal

1  relationships.

2      Q.    Paragraph 31, can you read that out

3  loud, please.

4              ATTORNEY SHOCHET:  Hang on.

5              THE WITNESS:  "Despite knowing

6  the falsity of their statements, Preston and

7  Cook used their defamatory statements to

8  persuade Hales' customers to stop supporting

9  Hales."

10  BY ATTORNEY MATZKIN:

11      Q.    So my question is:  How did they

12  persuade your customers to stop supporting you?

13              ATTORNEY SHOCHET:  Objection

14  to form.

15              When I say, "form," you can still

16  answer.

17              THE WITNESS:  All right.

18  Well, we can go in and already see that the

19  customers, for example, in fake "What the

20  Hales" pages -- that you're pretty active in

21  calling people idiots, calling them morons, and

22  yet you want professional courtesy.  That's

23  funny, by the way.

24              So we have all of these individuals

25  stating publicly on other hate channels such as

1    Two Lee's in a Pod, we've got Miltowns Best,

2    "I'm not watching What the Hales anymore.  I'm

3    not supporting them anymore."  And you at the

4    forefront of it, the "Anti What the Hales

5    ecosystem" in writing.  In writing.

6              How can a lawyer be so foolish to

7    put something like that in writing?

8                   ATTORNEY SHOCHET:  Let the

9    record reflect Mr. Matzkin just smiled again

10   and is smiling at those comments.  And he

11   admits he does.  Let the record reflect since

12   there's no video here.  The jury will be

13   advised of the record.

14   BY ATTORNEY MATZKIN:

15        Q.    Paragraph 32, you -- you allege that

16   "Hales reported all of the above events while

17   in Ohio in September 2023, and Ohio court

18   issued a two-year renewable restraining

19   ordering injunction against Preston and Cook

20   for stalking Hales and his fiance."

21              Did I read that accurately?

22        A.    Yes.

23        Q.    And then in Paragraph 33, "To date

24   this has not stopped Preston and Cook from

25   continue their illegal acts against Hales.

1  Rather than cease, Preston has demanded that

2  Hales provide her with a list of names and

3  contact information of all of his donors."

4          Did I read that correctly?

5      A.   Yes.

6      Q.   All right.  Well, where is this

7  demand or in what form does it take of

8  providing her with a list of your contact

9  information of donors?

10     A.    I find it ironic that you're asking

11  when you're complaining to the judge that we

12  have released public information in regards to

13  her deposition, and in the deposition, she's

14  the one that demands a list of all of my

15  donors.

16     Q.    In which deposition?  In the

17  deposition you're referring to from January in

18  the State Court action that she filed?

19     A.    Yes.

20     Q.    So this 30 -- Paragraph 33, this

21  statement refers to a statement she made during

22  her deposition in January?

23     A.    Yes.

24     Q.    Do you recall the exact statement?

25     A.    Unless you can bring it up as

1    evidence, I can't recall the exact statements.

2    Unless you have it prepared.  We can view it

3    together.

4         Q.    That's okay.

5         A.    To my recollection -- to my

6    recollection, it is "I want a list of all of

7    his donors" screaming in the deposition.

8         Q.    Do you remember the context?  What

9    was that in response to?

10        A.    Again, if you have it -- if you have

11   it and you pull it up, we can watch it

12   together, but I don't have it in front of me

13   right now.

14        Q.    Okay.  Other than what you just

15   quoted her from your memory, do you remember

16   what came right before that?

17        A.    No, I do not.

18        Q.    And when you say in Paragraph 33,

19   "Continuing their illegal acts against Hales,"

20   are you referring to that demand of you

21   providing customer or donor information?

22                  ATTORNEY SHOCHET:  Objection

23   to form.

24              You can answer.

25                  THE WITNESS:  They continue to

 1  break the civil protection orders.  Your

 2  clients have been found guilty, and they

 3  continue to break the civil protection orders.

 4  BY ATTORNEY MATZKIN:

 5      Q.   What customers have you lost as a

 6  result of the conduct of my clients?

 7              ATTORNEY SHOCHET:  Hold on.

 8  Now, this is different.  So client lists are

 9  confidential.  So I'm going to --

10              ATTORNEY MATZKIN:

11  Mr. Shochet, I have a question, and I'm --

12              ATTORNEY SHOCHET:  I am going

13  to instruct him not to answer because the names

14  of -- are you asking for the names?

15          We lost you.  You froze for a

16  second.  Are you there?

17              THE REPORTER:  Mr. Matzkin,

18  can you hear us?

19              ATTORNEY SHOCHET:  Are you

20  asking -- are you asking for individuals'

21  names?

22              ATTORNEY MATZKIN:  I asked a

23  question.

24              ATTORNEY SHOCHET:  Okay.

25  I'll --

1           ATTORNEY MATZKIN:  He can

2    either answer it or say he doesn't understand

3    the question, and I can rephrase it.  You

4    can --

5           ATTORNEY SHOCHET:  Well, I'm

6    going to object and instruct him not to answer

7    if you're -- I don't know what you're -- if

8    you're asking for names, you do not give out

9    names or anything confidential from your

10   confidential customer list.

11          ATTORNEY MATZKIN:  That's an

12   improper instruction because it's

13   (indecipherable) --

14          ATTORNEY SHOCHET:  No, it's

15   not.  You can go ahead with the Court.  It's

16   confidential.  I'm objecting.  You're not going

17   to get his names because you're asking for

18   confidential information.

19   BY ATTORNEY MATZKIN:

20       Q.    Is it your allegation that you have

21   lost customers due to the conduct of my client?

22   Yes or no?

23       A.    Yes.

24       Q.    Are you capable, if your counsel

25   were to allow you to do so, to identify the

1    customers that you claim to have lost?

2        A.    Yes.

3        Q.    And are you capable of identifying

4    individuals by name?

5        A.    Yes.

6        Q.    So to be clear, when you're talking

7    about customers you've lost, you're talking

8    about individuals?

9        A.    To be clear, "customers" is plural,

10   meaning more than one, made up of individual

11   persons.

12       Q.    Again, my question is:  Are you able

13   to identify individual persons that were

14   customers that you lost?

15             Yes or no?

16       A.    Again, as you've already asked this

17   question, yes.

18       Q.    How many?

19       A.    I do not know the number currently.

20       Q.    Can you give me a range?

21       A.    We are hiring a professional to do

22   an analysis on money lost, customers lost, and

23   that will be presented in the Federal Court.

24       Q.    When you say, "an analysis on

25   customers lost," for example, are you talking

```
1   about a viewer of your YouTube videos?

2         A.    That is one aspect.  A consumer.

3         Q.    So you would claim damages as a

4   result of a viewer of your YouTube videos that

5   shows to no longer view your YouTube videos

6   because of something my clients did?

7         A.    Yes.

8         Q.    So you're going to attempt to

9   identify all people who were your YouTube video

10  viewers and then weren't anymore and try to

11  correlate that with conduct of my clients?

12               ATTORNEY SHOCHET:  Objection

13  to form.

14               You can answer.

15               THE WITNESS:  The conduct of

16  your client that calls me a child rapist; the

17  conduct of your client that states that I raped

18  their child; the conduct of your client that

19  states that we're opening a terrorist training

20  ground in the old schoolhouse; the conduct of

21  your client that -- I can go on and on and on.

22               Yes, I've lost consumers due to the

23  actions and the statements of your clients, and

24  yes, we will identify as many as we possibly

25  can.
```

1           But then the reality is we can't

2    identify all of them, but an expert will do an

3    analysis and share how much I've lost because

4    of them.

5           ATTORNEY SHOCHET:  Just,

6    Counsel, I will tell you this, based on the --

7           ATTORNEY MATZKIN:  There's no

8    question pending.

9           ATTORNEY SHOCHET:  No, no, I

10   know.  It's not a question, Counsel.  I'm

11   trying to help you.  If you and I --

12          ATTORNEY MATZKIN:  Counsel, I

13   don't --

14          ATTORNEY SHOCHET:  If you and

15   I can come -- -

16          ATTORNEY MATZKIN:  -- the last

17   thing I want is your help.  Okay?  Now, please

18   be quiet, and let me ask my questions.  Okay?

19          ATTORNEY SHOCHET:  If you and

20   I -- if you and I can enter into a

21   confidentiality agreement, you can get those

22   names.

23          ATTORNEY MATZKIN:  I am

24   absolutely willing to keep any information

25   procured in this deposition to myself.

```
 1                    ATTORNEY SHOCHET:  In writing,
 2    sir.
 3                    ATTORNEY MATZKIN:  That
 4    doesn't --
 5                    ATTORNEY SHOCHET:  We'll have
 6    to a -- it's not just a deposition.  We'll do a
 7    blanket confidentiality agreement, so you don't
 8    have to keep coming back based on an objection.
 9    I'm willing to do it.  It's very common.  I can
10    send you a draft, if you want to look at it.
11                    ATTORNEY MATZKIN:  Let me
12    respond to that.
13           There's no need for such a document
14    for -- for Mr. Hales to be able to answer my
15    questions in this deposition.  You can rely on
16    my representation.
17           We will -- we will move on.
18    BY ATTORNEY MATZKIN:
19        Q.   My question is this:  Is it -- is it
20    your intent to have an analysis so you can
21    literally identify by name individuals who used
22    to watch your YouTube videos but no longer do,
23    blame it on my clients, and claim damages from
24    that?
25        A.   You're horrible at phrasing
```

1  questions.  But I will do my best to give you

2  an actual good answer.

3          We can provide names of individuals

4  who are not consumers anymore because of the

5  actions and the statements of your clients.

6      Q.    And how many such individuals are

7  you able to identify?

8      A.    I do not have a count.

9      Q.    Is it under a hundred?

10     A.    I do not have a count.

11     Q.    And for any given such individual,

12 how is it that it causes you damage if they no

13 longer watch YouTube -- you on YouTube?

14     A.    Again, a judge and answer a jury

15 will determine damages, not me.  I'm a

16 layperson.

17     Q.    All right.  In Paragraph 79 -- you

18 ready?

19              ATTORNEY SHOCHET:  Not yet.  I

20 told you we're getting there.  Mouse is a

21 little slow.  Okay.  Okay.

22 BY ATTORNEY MATZKIN:

23     Q.    It says, "Despite knowledge of the

24 customer," singular, "contractual, and business

25 relationship with Hales, Cook intentionally and

1    without valid justification interferes with

2    such relationship."

3             Is it your intent to have a single

4    customer referred to in this paragraph?

5        A.    The aspect that Cook defamed myself

6    and then openly, publicly posts that he is

7    posting things such as dildos for a dollar on

8    Levy County Facebook groups, destroying a

9    customer base, trying to make gross allegations

10   that I'm selling dildos, used dildos for a

11   dollar a piece.  That he's posting in the

12   democratic party.  That he's posting in the

13   LGQBT [sic] communities.  That he's posting.

14   That he's posting.  That he's posting.  All

15   potential customers.

16       Q.    Is there a contract that you lost,

17   that you attribute to Mr. Cook or Ms. Preston's

18   conduct or actions?

19       A.    Multiple contracts that are under

20   attack personally right now in the aspect of

21   Cook and Preston both stating that they're

22   trying to get our YouTube channel shut down.

23   Oh, by the way, you're a part of that, as well.

24   Huh.  Isn't that interesting.  Try to hide the

25   smile this time.

```
 1                  All right.  So we've got the whole
 2       aspect of a contract with YouTube.  We've got
 3       the whole aspect of a contract with Facebook.
 4       We have the whole aspect of a contract with
 5       Instagram, TikTok.  I can go on and on.  X,
 6       Twitter.
 7                  We can go with the aspect of -- oh,
 8       I don't know.  Olight.  Oh, wait.  That's
 9       right.  You're behind that, as well.
10                  So we've got Olight.  We've got
11       Whatnot being attacked now.  We've got anything
12       we can put our hands on being attacked by your
13       clients and personally by you.
14           Q.    The question is:  Have you lost a
15       contract that you had because of my client's
16       conduct or actions or statements?
17                     ATTORNEY SHOCHET:  Objection
18       to form.  Asked and answered.
19                  You can answer it.
20                     THE WITNESS:  I've already
21       answered it.
22       BY ATTORNEY MATZKIN:
23           Q.    No, you haven't.
24                  Did you have a contract that was
25       lost --
```

1            ATTORNEY SHOCHET:  Strike --

2    strike "No, you haven't."

3    BY ATTORNEY MATZKIN:

4        Q.    Did you have a contract that was

5    lost or canceled due to my clients'

6    interference?

7        A.    Your clients have attempted to

8    interfere with all of my contracts on a daily

9    basis.

10       Q.    Okay.  You've listed a number of

11   companies.  TikTok.  Do you have a contract

12   with TikTok?

13       A.    Everybody has a contract when they

14   get into the terms of service.  That's a

15   written contract.

16       Q.    Have you lost that contract due to

17   my client?

18       A.    No, I haven't.

19       Q.    And What- -- Whatnot, have you a

20   contract with Whatnot?

21       A.    Yes, I have a contract with Whatnot.

22       Q.    And have you lost that contract due

23   to my clients?

24       A.    Not currently.

25       Q.    Has it been affected in some way?

1        A.    Absolutely.

2        Q.    In what way?

3        A.    False bidders.

4        Q.    False bidders?

5        A.    Yep.

6        Q.    What does --

7        A.    Your client and you.  Your client

8   and you spurring on other people to do hateful,

9   malicious things such as come into my auctions

10  and then inflate prices and then not pay.

11  Therefore, that item is no longer -- for

12  example, if it's a Gatorade bottle and somebody

13  says, "I'm going to pay a thousand dollars for

14  that Gatorade bottle," now they don't pay.  Now

15  that item didn't get to the sold to the person

16  that would have paid ten dollars for it.

17            That affects my contracts and my

18  business.

19        Q.    And that's something that you're

20  claiming and alleging my clients do?

21        A.    I'm claiming you do it, as well.

22        Q.    But you don't have a lawsuit against

23  me.  You have a lawsuit against John Cook and

24  Michelle Preston; am I right?

25        A.    That's interesting I don't have a

1   lawsuit against you.  Yet.

2        Q.    So are you claiming that Michelle

3   Preston or John Cook do what you just described

4   to interfere with your bidding, falsely --

5        A.    I'm claiming what the Complaint

6   states that they are trying to interfere and

7   hurt my contracts and relationships.

8        Q.    Okay.  So you acknowledge that you

9   haven't lost the contract with Whatnot due to

10  my clients?

11       A.    I've acknowledged that my contracts

12  are under attack on a daily basis due to your

13  client and you.

14       Q.    What about YouTube?  Have you lost a

15  contract with YouTube due to my clients?

16       A.    My contract with YouTube is still in

17  place.

18       Q.    Well, you said TikTok, Whatnot,

19  YouTube.  You mentioned three or four others.

20  Would you be able to repeat them, or I can have

21  the reporter look back.

22       A.    You can have the court reporter do

23  it.

24             ATTORNEY MATZKIN:  Would you

25  mind, Alyssa?  Thanks.

```
 1                    (Reporter read back from the
 2    record.)
 3    BY ATTORNEY MATZKIN:
 4         Q.    Okay.  So, Mr. Hales, you have a
 5    contract with Facebook?
 6         A.    I did.
 7         Q.    You did.  But does that mean you no
 8    longer do?
 9         A.    Yeah.  It's gone.
10         Q.    What was the contract with Facebook?
11    What does that entail, the contract with
12    Facebook?
13         A.    That would be proprietary
14    information, and it's none of your business.
15         Q.    But you're saying that you had a
16    contract with Facebook, and you lost it?
17         A.    Let me answer that again.  That
18    contract, it's called "none ya," as in "none ya
19    business."
20         Q.    So you're alleging, though, tortious
21    interference against my clients in that their
22    conduct resulted in your loss of contract.
23              So is Facebook a contract that you
24    lost?
25         A.    I already answered that for you.
```

1    Q.    No, I don't think you did.  Did

2    you -- well, I'll ask you again.  Please

3    clarify for me, did you -- are you alleging you

4    lost the Facebook contract due to my clients?

5    A.    Yes, I've lost a Facebook contract,

6    and I continue to lose revenue on a daily basis

7    due to your clients and due to you.

8    Q.    Well, what's a Facebook contract?

9    A.    You want me to name it again?  It

10    was called "none ya."  "None ya business."

11    That's proprietary, and you're not going to

12    have information in my personal business.

13    Q.    Okay.  But you're alleging that you

14    had a contract -- a business contract with

15    Facebook and that you've lost it because of my

16    clients; is that accurate?

17    A.    I lose revenue on a daily basis due

18    to your clients, due to you.

19    Q.    But was there a contract that

20    Facebook said, "Well, we're going to cancel

21    this now because of something"?

22    A.    I lose revenue on a daily basis due

23    to your clients and due to you.

24    Q.    Okay.  Let's go to Olight.  Am I

25    correct that Olight is a product that endorsed

1   What the Hales YouTube?

2        A.    You are incorrect.  Olight did not

3   endorse YouTube.  YouTube had nothing to do

4   with Olight.  Olight had nothing do with the

5   What the Hales.  What the Hales endorsed or

6   promoted Olight.

7        Q.    I see.  Was that pursuant to a

8   contract with Olight?

9        A.    No.  I was not under any contract

10  with Olight.

11       Q.    You were not under a contract with

12  Olight?

13       A.    Did I stutter?

14       Q.    I'm asking to clarify.  Did you

15  have -- did you ever have some sort of a

16  contract between you and Olight?

17       A.    Did I not already answer that?

18       Q.    I'm asking you to answer it again.

19  Did you have a contract with Olight?

20       A.    No, I did not have a contract with

21  Olight.

22       Q.    Then what did you describe as you

23  were promoting Olight?

24       A.    I'll try to put this in the simplest

25  terms possible:  I was promoting Olight.

1      Q.    Were you receiving any remuneration,

2    compensation, consideration?

3      A.    Yes.  Revenue.

4      Q.    From Olight?

5      A.    Yes, from Olight.

6      Q.    Okay.  Can you explain how that

7    worked?

8      A.    No.  That's confidential.

9      Q.    This deposition requires you to

10    provide relevant information, and if it's

11    confidential, you can accept my representation

12    that it will not be shared.  And your counsel

13    can take any steps he believes is necessary to

14    protect it.

15            But what I need to understand is

16    what you're alleging what my clients did that

17    caused you damage, and you're alleging that

18    they interfered with your contract with Olight.

19            Am I wrong or right about that

20    statement?

21      A.    Can you ask a simple question?  And

22    by the way, as you said --

23      Q.    You had --

24      A.    Wait.  Pause.  I'm not done.

25            As you stated, I can take your

1    counsel that you won't -- you really think I'm

2    ever going to trust you?  You fool.  You

3    incompetent fool.  Literally, in writing

4    staging the "Anti What the Hales ecosystem."

5    You fool.  In writing.  Oh, my goodness.  And

6    you think I'm ever going to listen to anything

7    you have to say?

8                When it comes down to it, at the end

9    of the day, I have lost income, revenue due to

10   your clients and due to you.

11        Q.    So are you alleging that my clients

12   interfered with a contract that you had with

13   Olight?

14        A.    I'm alleging that I lose revenue on

15   a daily basis due to your clients and

16   relationships with potential contracts in the

17   future and relationships that are being

18   strained with current contracts.

19                You can ask the question again.

20   You're going get the same answer.  Or you can

21   just move on like you do after I put you in

22   your place every single time.

23        Q.    Okay.  So yes or no, are you

24   alleging that you lost the contract with Olight

25   due to my clients?

1          ATTORNEY SHOCHET:  Objection

2    to form.

3          THE WITNESS:  Are you that

4    foolish?  How many times do I have to tell you

5    I didn't have a contract, and you want to keep

6    saying, "Are you alleging that I lost a

7    contract with Olight?"  How many times do you

8    have to be told there was no contract?

9          Was I making revenue?  Yes.  I'm

10   losing revenue, and my relationships are being

11   damaged due to your clients and due to you.

12   BY ATTORNEY MATZKIN:

13   Q.    Okay.  So you're -- you're alleging

14   that you are losing revenue from Olight due to

15   my clients; correct?

16   A.    I'm alleging very clearly in the

17   Complaint that there's interference with my

18   contracts, there's interference with my revenue

19   due to your clients and due to you.

20   Q.    Well, right now I'm only asking

21   about Olight.  So you've made clear that you

22   don't have a contract with Olight or didn't

23   have a contract with Olight, but my question

24   is:  Are you claiming that you're losing

25   revenue from Olight due to my clients?

1       A.    How many times do you want me to

2   say?  Yes, I'm losing revenue due to your

3   clients with past, current, and even future

4   contracts.

5       Q.    But I'm only talking about --

6       A.    Do it again.  Ask me one more time.

7   One more time.  One more time.

8       Q.    Just Olight.  I just want to know

9   about Olight.

10      A.    What did I tell you already?

11      Q.    Well, you keep saying, "other past,

12  future, et cetera."  I just want to know very

13  clearly, are you claiming you're losing revenue

14  from Olight?  Just Olight.  Not anybody else?

15      A.     I've lost revenue in all aspects of

16  all of my businesses due to your clients and

17  due to you.

18      Q.    So that would include Olight?

19      A.    Let me state it again:  I've lost

20  revenue in all aspects of my businesses.

21      Q.    And Olight would be one of those

22  aspects?

23      A.    Let me state it again.

24             THE WITNESS:  This is like you

25  with Lynette.

```
 1              Again, I've lost revenue on all
 2   aspects of my businesses.
 3   BY ATTORNEY MATZKIN:
 4       Q.    So I'm going to try one more time.
 5              Are you claiming that you have lost
 6   revenue from Olight from -- due to my clients?
 7   Just Olight.
 8       A.    Again, I have lost revenue in all of
 9   my business endeavors.
10       Q.    Okay.  How would you earn revenue
11   from Olight?
12       A.    None of your business.
13       Q.    So you're claiming that you lost
14   revenue from Olight due to my clients; right?
15       A.    Do you want me to go over this
16   again?
17       Q.    So how does the revenue work with
18   Olight?
19       A.    None of your business.
20       Q.    Okay.  What about -- you mentioned
21   past, present, and future contracts.  So we
22   went over some social media contracts,
23   Facebook, TikTok, Whatnot, and now Olight.
24              What other contracts have been
25   harmed interfered with by my clients?
```

1      A.    I've lost revenue in all of my

2    business ventures due to your clients.

3      Q.    Okay.  But I'd like to have

4    individual name of the companies or other

5    identifying aspect of the contracts.

6      A.    Decreased income.

7      Q.    No, no.  I mean the other party to

8    the contracts that you're saying were harmed or

9    affected?

10            ATTORNEY SHOCHET:  Objection

11    to form.  You've asked and answered it, but

12    have at it.

13    BY ATTORNEY MATZKIN:

14      Q.    So imagine you have a pile of

15    contracts in paper form in front out of all

16    your business contracts.  I'd like you to pull

17    out, figuratively, the ones that you claim were

18    harmed or interfered with by my clients and

19    tell me the name on them.

20            ATTORNEY SHOCHET:  Objection

21    to form.

22            You can answer.

23            THE WITNESS:  Again, my income

24    has decreased due to your clients, what they

25    have said, what they have done, their actions

1  and yours in regards to destroying, you know,

2  the "Anti What the Hales ecosystem."

3  BY ATTORNEY MATZKIN:

4      Q.    Okay.  So you're not going to just

5  tell me whether Olight itself discretely -- how

6  you lost revenue from Olight; just Olight.

7  You're not going to answer that question?

8      A.    Are you even asking questions?  I

9  mean, you're literally all over the place

10  mumbling, and then you put all this stuff

11  together, and there's not even a clear question

12  at the end.

13          Can you ask a very clear question,

14  please.

15      Q.    Did Olight take some action with

16  respect to their business arrangement with you

17  following the publication of that video where

18  you and Guapo are almost in an altercation?

19      A.    Can you ask a clear question,

20  please.

21      Q.    Do you know which video I referred

22  to at the storage facility where each you and

23  Guapo had your cell phones out, and you're --

24      A.    Yes, I do.

25      Q.    Is it sometime after that that you

1   lost revenue from Olight?

2       A.   Yes, it is.

3       Q.   How long after that?

4       A.   Almost immediately.

5       Q.   And yet you're blaming that on Cook

6   and Preston?

7       A.   No.  I'm blaming that on you and

8   them as they encouraged everybody to contact

9   Olight and state that I was using a flashlight

10  as a weapon, which, by the way, Olight actually

11  markets as a weapon.  That's why it is there.

12          And so individuals such as yourself,

13  individuals such as Two Lee's, individuals such

14  as -- you know, your entire What -- you know,

15  "Anti What the Hales ecosystem," encouraging

16  people to go out there and contact Olight to

17  actually hurt my contracts.

18          You know, all that stuff that's

19  actually publicly already addressed.  It's all

20  there.  It's all evidence.  It's there in video

21  form.  Yeah.  Absolutely that hurt my revenue.

22          Claiming that -- I ain't done yet.

23  Keep your mouth shut -- claiming that I was

24  using a flashlight that's marketed as a weapon

25  as a weapon which never left my hand.  Never

 1 | left, and never did anything whatsoever.  Yeah.

 2 | You hurt my contract.  Your clients hurt my

 3 | contract.

 4 |          Wait.  That's right.  There is no

 5 | contract.  You're the one that once asked 25

 6 | times about a contract.  There was no contract.

 7 | It hurts revenue.  I didn't sign a contract

 8 | with Olight.  The revenue was still there.  The

 9 | revenue is gone.  Facebook revenue is gone.

10 | Olight revenue is gone.  YouTube revenue has

11 | been destroyed.

12 |          And my list can go on and on, but

13 | really, it's none of your business.

14 |     Q.    So what did Olight do or say?  Did

15 | they send you a letter?  An E-mail?  Did they

16 | call you on the phone?

17 |     A.    It's none of your business.

18 |               ATTORNEY SHOCHET:  Object to

19 | form.  Compound, as well.

20 | BY ATTORNEY MATZKIN:

21 |     Q.    So after the video that we were

22 | discussing, did Olight contact you?

23 |     A.    Again, none of your business.

24 | That's confidential information.  That's

25 | confidential business information.

1       Q.    Well, I'm just asking if they

2   contacted you.

3       A.    And I'm just telling you it's

4   confidential.  Did you not hear me the first

5   time?  Am I stuttering?

6                 ATTORNEY SHOCHET:  You can --

7   without giving the details, you can answer that

8   one yes or no.  That --

9                 ATTORNEY MATZKIN:  How is it

10  confidential -- how is it confidential just

11  to --

12                ATTORNEY SHOCHET:  Counsel, he

13  can answer.

14          It's a yes or no question.

15                THE WITNESS:  Yes, they

16  contacted me.

17  BY ATTORNEY MATZKIN:

18      Q.    In what form?

19      A.    E-mail.

20      Q.    And in that E-mail, did they inform

21  you that they were changing whatever business

22  arrangement had been in place?

23      A.    Confidential information.

24      Q.    Was this E-mail sent the day after

25  that video played?

1          A.     No.

2          Q.     Related to when the video played,

3     how long after did you receive this E-mail?

4          A.     I don't recall.

5          Q.     Was it within a week?

6          A.     I don't recall.

7          Q.     Do you know if the action Olight

8     took, which you're refusing to disclose, was

9     taken in reliance on a particular source?

10         A.     Again, confidential information in

11    regards to the context of the communication.

12         Q.     Well, you testified that you were --

13    strike that.

14               Do you know whether Olight watched

15    the video?

16               ATTORNEY SHOCHET:  Objection

17    to form.  Calls for speculation.

18               You can answer.

19               THE WITNESS:  Olight contacted

20    me.

21    BY ATTORNEY MATZKIN:

22         Q.     Did they indicate whether they had

23    watched the video in question?

24         A.     Olight contacted me.  Any contacts

25    of their communication with me is confidential.

1    Q.    But you can just tell me whether

2  they indicated they had watched the video or

3  not.

4    A.    Or I can tell you -- or I can just

5  tell you that it's confidential.

6    Q.    Well, what I'm trying to ascertain

7  is whether you're able to say whether whatever

8  decision they made to take action that changed

9  their business with you was made in reliance on

10  actually having seen the video or some other

11  source?

12    A.    What I'm trying to say is it's

13  confidential.

14    Q.    Okay.  Do you know whether -- you

15  don't have to tell me the answer, but do you

16  know whether they saw the video or not?

17    A.    Any communication with Olight and

18  myself is confidential.

19    Q.    Did it include either way whether

20  they viewed the video?  Without telling me

21  whether they did or didn't view the video, can

22  you just --

23    A.    Any communication with any of my

24  contracts are confidential.

25    Q.    But in this case --

```
 1        A.    Any of my business is confidential.

 2        Q.    Okay.  But to be clear, in this

 3   case, although not named in the Complaint,

 4   Olight is one of the advantageous relationships

 5   you claim my clients interfered with?

 6        A.    Well, you're very clear with that as

 7   you've been on the livestreams when individuals

 8   are so happy that they actually interfered with

 9   it.  I mean, why would you even ask when you

10   already had all the answers?  Oh, you've been a

11   part of it.  You literally have been a part of

12   it sitting right there, and everybody rejoicing

13   that it's gone, that it's over.

14              Where's the grin?  Where's the

15   smile?

16                   ATTORNEY MATZKIN:  Okay.  Why

17   don't we take a 12-minute break until 11:45?

18                   ATTORNEY SHOCHET:  Okay.  Go

19   off the record.

20              (A recess was taken.)

21   BY ATTORNEY MATZKIN:

22        Q.    Mr. Hales, I want to direct your

23   attention to Exhibit 72.

24              (Deposition Exhibit No. 72 was

25   marked for identification.)
```

1          ATTORNEY SHOCHET:  Okay.  Now

2    this one is a big -- I've got to shrink it a

3    little bit, maybe.

4          It's nine pages; right?

5          ATTORNEY MATZKIN:  Correct.

6          ATTORNEY SHOCHET:  Just -- I

7    can only get one -- even a half page on the

8    screen.  You've got it so big.

9          Just when you refer to it, just tell

10   me where you want me to be.  I have it up.

11   Just --

12          ATTORNEY MATZKIN:  Yeah.  I'm

13   finding it.  On the top of the fifth page,

14   Page 5 of the PDF.

15          ATTORNEY SHOCHET:  Where it

16   says, "The second incident"?

17          ATTORNEY MATZKIN:  Correct.

18          ATTORNEY SHOCHET:  Okay.

19   We're here.  We got it.

20          ATTORNEY MATZKIN:  Yep.  If

21   Mr. Hales can read that one paragraph to

22   himself or out loud, as he chooses.

23          THE WITNESS:  Okay.  I'm done

24   reading.

25   BY ATTORNEY MATZKIN:

JEREMY B. HALES                                        JOB NO. 1278527
DECEMBER 02, 2024

1      Q.    Is there anything in there that you
2   disagree with factually?
3      A.    Yes.
4      Q.    And what would that be?
5      A.    It says, "No evidence of a violation
6   was discovered."
7      Q.    Where is that?
8      A.    Line 2 and 3 in that paragraph, "No
9   evidence of a violation was discovered."  Ohio
10  found them guilty.
11     Q.    Got you.  What about the rest of the
12  factual information?
13               ATTORNEY SHOCHET:  Objection
14  to form.
15               You can answer.
16  BY ATTORNEY MATZKIN:
17     Q.    So do you disagree with any of the
18  other factual information in that paragraph?
19     A.    I agree with the allegation as
20  "unfounded."  Ohio found them guilty.
21     Q.    Okay.  Nothing else?
22     A.    Nothing that sticks out to me
23  currently.
24     Q.    When you drove by Mr. Cook on the
25  road, did he see you coming?

1        A.    Yes.

2        Q.    So was he facing where your truck

3    was coming from the other direction?

4        A.    He heard me, saw me -- both Cook and

5    Preston both heard and saw.  We even slowed

6    down to give the opportunity for them to get on

7    their own property because John Cook was in the

8    middle of the road, which he could not be on

9    the road within 500 feet of myself or George

10    based on the Ohio civil protection orders.

11        Q.    Are you -- so let me understand.

12    Are you saying that before your truck reached

13    the point in the road where Mr. Cook was on the

14    side, you had slowed down, and he knew you were

15    coming?

16        A.    Yes.

17        Q.    So can you describe that?  Because

18    we've seen videos of this, but they begin at a

19    certain point in time.

20            So why don't you tell us what

21    occurred prior to the beginning of the videos

22    that we're familiar with?

23        A.    I literally just did.  They can hear

24    the truck.  They can see the truck.  We slowed

25    down to give an opportunity for John to get

1    onto his own property because if he's on his

2    own property, he only has to be within 10 feet

3    of me and George.  But he refused to actually

4    go onto his own property.

5          Q.    And how long did this, you know,

6    interaction last?

7          A.    I did not time it.

8          Q.    Would you say it was 30 seconds or

9    more?

10          A.    I did not time it.

11          Q.    I understand that.  Going by memory,

12    was it 30 seconds or more?

13          A.    I understand that.  Again, I did not

14    time it.

15          Q.    Now, why did you just not proceed at

16    a normal rate of speed past Mr. Cook and

17    continue on your way?

18          A.    Because I'm polite, and I gave him

19    an opportunity to actually comply with the

20    civil protection order.

21          Q.    And him, according to you, having

22    refused to do so, why did you then not just

23    drive past and continue on your way?

24          A.    Let's back up.

25                Not according to me.  According to a

1   court he refused to -- he was found guilty of

2   breaking the civil protection order.  Can we

3   agree on that?

4           So unless he breaks --

5       Q.    I don't --

6       A.    I'm not done yet.  Let's use the

7   phrasing appropriately because he was found

8   guilty -- guilty by the courts.

9           So my life doesn't change based on

10  the CPOs.  Their lives change based on the

11  CPOs.  They're the ones that broke the law.

12  They're the ones that have the consequences of

13  breaking the laws.

14          Even as such my life doesn't change.

15  I've still been polite enough to give them an

16  opportunity to actually adhere to the CPO.  Yet

17  they did not have.  And I have to film every

18  single time I drive by that property for my own

19  protection.

20          An individual who posted -- and you

21  are well aware of -- he's going to shoot me in

22  the face and feed me to the gators.

23      Q.    So prior to -- so initially, you had

24  slowed down.  You're telling us here that they

25  knew you were coming and chose not to remove

1    themselves from the road; correct?

2          A.    Lynette was not in the road.

3    Lynette was screaming at the side at John.  And

4    John was in the road and refused to remove

5    himself from the road.

6          Q.    And at that point, you determined

7    that you would need to proceed with him

8    remaining in the road; correct?

9          A.    Yes.  That's the direction to where

10   I was going.

11         Q.    And am I correct that you could have

12   chosen to proceed at a normal rate of speed

13   without slowing down and filming out the window

14   yelling "10 feet," or --

15         A.    No.  You are --

16         Q.    -- and you chose to --

17         A.    -- you are completely incorrect.  I

18   film every single time -- I'm not done.

19               I film every single time.  Your

20   clients have both threatened to shoot me.  Your

21   clients have said the most horrific, horrendous

22   things about me.  I film every time I even

23   think there's going to be an opportunity that

24   they're around for accountability.

25               They have continually broke the law.

1    You know they continually have broke the law.

2    They have put my life in jeopardy.  They've put

3    George's life in jeopardy.  They put other

4    individuals' lives in jeopardy.  They've put

5    fans in jeopardy.  They put viewerships in

6    jeopardy.  They put individuals in Otter Creek

7    in jeopardy.

8            Every single time I have to film for

9    my protection, for my loved ones' protection,

10   for the people that I care about, protection

11   because they are unhealthy, unhinged, insane

12   individuals who are threatening our lives on a

13   daily basis.

14           Don't you even try and start this

15   stuff that I don't have to film when you would

16   film every single time you drove by somebody

17   who threatened your life, to end your life, to

18   shoot you in the face, to feed you to gators.

19   Don't you even try this stuff with me.  You

20   incompetent fool.

21           ATTORNEY MATZKIN:

22   Mr. Shochet, if you can't control your client,

23   I'll have to end the deposition, make a motion,

24   and ask that he be assessed the cost of the

25   deposition up to this point, and who knows --

 1   going forward.

 2            Can you exercise --

 3                 ATTORNEY SHOCHET:  As you set

 4   the grounds on --

 5                 ATTORNEY MATZKIN:  -- some

 6   steps to control --

 7                 ATTORNEY SHOCHET:  --

 8   (indecipherable crosstalk) grounds.  I move to

 9   strike what Mr. Matzkin just said.

10   BY ATTORNEY MATZKIN:

11        Q.   So, Mr. Hales, you just said that

12   your life is threatened every day -- strike

13   that.

14            Give me an example of Mr. Cook

15   threatening your life.

16                 THE WITNESS:  Have we provided

17   him the evidence of Cook pointing the gun at

18   me?  Oh, okay.

19            We have already looked at Lynette

20   saying she's going to pop a cap in my ass.  Oh,

21   wait.  That's right.  He also has the

22   screenshot to Shara and others in the group,

23   probably including him because he's the grand

24   master --

25   BY ATTORNEY MATZKIN:

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

1    Q.    Okay.  So --

2    A.    -- claiming to not control

3  everybody, but he's the one literally telling

4  them what to do.

5          Hey, put your hand down.  I'm not

6  done answering the question.

7                ATTORNEY MATZKIN:  But I'm

8  about to --

9                THE WITNESS:  Put your hand

10  down.  I'm not done answering the question.

11                ATTORNEY MATZKIN:  -- end the

12  deposition, Mr. Shochet.

13                THE WITNESS:  So you already

14  know that your clients have both -- both

15  threatened to shoot me.  My life is in jeopardy

16  every day to the point where I have to sell a

17  piece of property that I love to get away from

18  their insanity; that I love, that I crave to be

19  on to enjoy my life and peace and harmony where

20  I just wanted to hide from people, and yet I

21  was stalked by your clients.  I was extorted by

22  your clients.  I've been defamed by your

23  clients.

24          My life has been threatened by your

25  clients.  Every single day I have to live in

1   the back of my mind, "Are they going to try to

2   shoot me today?  Is today the day."

3   BY ATTORNEY MATZKIN:

4       Q.    Where did Ms. Preston threaten to

5   put a cap in your ass?

6       A.    Oh, my goodness.  You already

7   brought it up as evidence.  You forgot already?

8       Q.    Well, it doesn't refer to you

9   specifically, though.  "Anyone," it says;

10  right?

11      A.    Nuh-uh.  You asked me who she was

12  addressing, and my answer was "Me."

13      Q.    And the threats against your life by

14  Mr. Cook consist of what you've described in

15  the Complaint, driving on your property with a

16  gun; right?

17      A.    We've already addressed this, and

18  there will be more complaints in with regard to

19  it as well as more evidence is coming.

20      Q.    Okay.  And then -- and then there's

21  the more recent one you're referring to; am I

22  correct?  A social media post or comment about

23  shooting you in the face and feeding you to the

24  alligators; correct?

25      A.    I have referred to that.

1        Q.    Now, when did you first become aware

2    of that?

3        A.    I don't recall the day.

4        Q.    But it was recently?  Within the

5    last couple of weeks; am I right?

6        A.    I don't recall the day.

7        Q.    It was no longer than a month ago;

8    right?

9        A.    I don't recall the day.

10       Q.    It certainly wasn't -- I'm not

11   asking for the day, Mr. Hales.  I'm just trying

12   to find out if this is sort of a recent

13   development, the "shooting in the face, feeding

14   to the alligators" threat?

15       A.    Is that a question?  Because that

16   sounded like a statement to me.

17       Q.    Yes.  Well, let me ask you this:

18   Did you only learn about that because of Shara

19   Michelle posting it?

20       A.    No, I did not.

21       Q.    So you learned about it in another

22   way?

23       A.    Yes, I did.

24       Q.    And what was that?  How was that?

25       A.    That's attorney/client privilege.

1    Q.    So did Shara Michelle share it with

2    you prior to her posting it?

3    A.    No, she did not.

4    Q.    So you were aware of this comment

5    before it appeared on Shara Michelle's Facebook

6    page?

7    A.    Yes, I was.

8    Q.    And you had not disclosed it before,

9    had you?

10    A.    There's a lot I haven't disclosed

11    yet.

12    Q.    So the specific comment on Facebook,

13    that Mr. Cook threatened to shoot you in the

14    face and feed you to the alligators, you had

15    not mentioned publicly before; am I right?

16    A.    Let's be very clear and very precise

17    because this is a matter of law, which is clear

18    and precise.  You keep saying "Facebook post."

19    This not a Facebook post.  These are messages

20    sent to --

21    Q.    Yes --

22    A.    -- individuals.  Oh, you were

23    probably one of them at some point.  Oh.  But

24    at any rate, they were Facebook messages.

25    Yes --

1      Q.    Right.

2      A.    -- I was aware of them before Shara

3   actually posted them.

4      Q.    And am I correct that that

5   particular message originated in May of 2023?

6      A.    I don't recall as I'm not looking at

7   it currently.

8      Q.    Would you doubt it if I made that

9   representation so we can ask a question about

10  it?

11     A.    I doubt anything you represent.

12     Q.    So is there a reason why you had

13  sort of kept that to yourself until it showed

14  up on Shara Michelle's Facebook?

15     A.    Again, client/attorney [sic]

16  privilege.

17     Q.    So I haven't asked you to talk about

18  a communication with your counsel.  I'm trying

19  to find out when you learned about the

20  particular Facebook message by Mr. Cook that

21  says, "shoot you in the face and feed you to

22  the alligators"?

23     A.    And I'm trying to share with you

24  that I don't recall the exact date.  And we're

25  going to be precise in regards to the

1    information and the evidence for the law.  I

2    don't know the --

3         Q.    Well, I don't need you to be

4    precise.  I need you to just be as best you can

5    answer sitting here now.

6         A.    And the best I can answer is I don't

7    recall the exact date.

8         Q.    But I don't want the exact date.  Do

9    you recall the exact year?

10        A.    I don't recall.

11        Q.    So you don't know whether it was in

12   2023 or 2024?

13        A.    I don't recall.

14        Q.    So if you only learned about it in

15   the last month, you wouldn't be able to be

16   confused about which year you learned it in

17   because we're so late in 2024; right?

18        A.    Is that a question?

19        Q.    Strike that.

20              So from whom did you first learn

21   about the existence of this message?

22        A.    I won't be sharing that.

23        Q.    Who was the message sent to by

24   Mr. Cook?

25        A.    I won't be sharing that either.

1       Q.    But this is a deposition.  It's your

2   lawsuit.  This is evidence, and I'm entitled to

3   the information.

4       A.    Inappropriate timing to receive the

5   information.

6       Q.    This is -- this is exactly the time

7   for me to receive the information.

8       A.    Let me share again:  I won't be

9   sharing that.

10      Q.    Okay.  So just to move on from this,

11  I'm going to one more time very clearly ask,

12  when and from whom you learned the message that

13  Mr. Cook had sent, that says "shooting you in

14  the face and feeding you to the alligators"?

15      A.    Just so we're very clear, this is

16  attorney/client privileged things that we have

17  discussed, and I will not be discussing that.

18              ATTORNEY SHOCHET:  Don't waive

19  attorney/client privilege.  And if you have to

20  rely on anything that I've told you or DeRamus

21  told you to answer the question, don't answer

22  the question.

23              But if you can answer the question

24  without relying on it, then you should answer

25  it.

```
 1                   THE WITNESS:  Okay.
 2   BY ATTORNEY MATZKIN:
 3       Q.   So is it -- is it the case that you
 4   were apprised of this message by your counsel?
 5                   ATTORNEY SHOCHET:  Are you --
 6   that -- that one you are not going to answer.
 7                   THE WITNESS:  That was pretty
 8   dumb.
 9                   ATTORNEY SHOCHET:  That's --
10                   THE WITNESS:  That was
11   pretty --
12                   ATTORNEY SHOCHET:  --
13   objectionable, if it's asked again.
14                   THE WITNESS:  Wow.
15                   ATTORNEY SHOCHET:  Do not
16   answer that question.
17                   THE WITNESS:  Wow.
18                   ATTORNEY SHOCHET:  That was a
19   direct inquiry into the attorney/client
20   privilege.
21                   THE WITNESS:  Wow.
22   BY ATTORNEY MATZKIN:
23       Q.   The existence -- and I'm not asking
24   you to disclose a communication, advice, or
25   anything else.  I am asking you whether
```

 1  there -- that you learned of the existence of

 2  that message from your counsel?

 3                  ATTORNEY SHOCHET:  Do you

 4  understand you're asking him to reveal a

 5  conversation of what he allegedly learned from

 6  his counsel?

 7                  ATTORNEY MATZKIN:  That's the

 8  only -- that's the only way --

 9                  ATTORNEY SHOCHET:  Don't

10  answer the question.  Don't answer the

11  question.  Next.

12                  ATTORNEY MATZKIN:  Okay.  In

13  that case, then --

14                  ATTORNEY SHOCHET:  I will move

15  for sanctions.  If I hear anything else, I will

16  move to terminate this deposition.

17          If you ask one more question

18  invading the attorney/client privilege, we're

19  going to -- we're going to move under Rule 30,

20  as I E-mailed you this morning to give you fair

21  warning before the deposition started.  I'll

22  refer to that E-mail here on the record -- that

23  if you ask him again one more time about an

24  attorney/client privileged conversation about

25  what he learned from that conversation, we're

1  going to move to terminate this deposition and

2  take it right to the magistrate.

3          As a matter of fact, we'll call the

4  magistrate if you ask that again.

5          ATTORNEY MATZKIN:  Okay.

6  BY ATTORNEY MATZKIN:

7      Q.    When you wrote the Complaint -- when

8  you filed the Complaint, which was in March of

9  2024 -- and you referred to statements by

10  Mr. Cook and Ms. Preston, some of which you

11  quote -- were you at that point in time aware

12  of the existence of this message about shooting

13  you in the face and feeding you to the

14  alligators?

15     A.    I don't recall.

16     Q.    When you were in court in Ohio for a

17  Motion for Contempt regarding this incident

18  that we've been discussing driving past

19  Mr. Cook on the road, am I correct that you

20  presented a Motion for Contempt in Ohio court

21  based on that incident?

22     A.    From my recollection, I presented a

23  Motion of Contempt based on multiple, not

24  just --

25     Q.    My question -- my question only

1    pertains to this particular incident.

2              So did you present a Motion for

3    Contempt on the incident that we've been

4    describing on the top of Page 5 of this PDF

5    police report?

6        A.    The one that they were found guilty

7    on?  Yes.

8        Q.    Yes.  And in that proceeding, did

9    your video get played?

10       A.    To my recollection, I believe so.

11       Q.    Did you offer it into evidence?

12       A.    Again, I'm not going over all that

13   information, and there is so much and years and

14   thousands of upon thousands of video clips and

15   screenshots.

16             But to my recollection, we did play

17   it because he was found guilty for telling me

18   to suck his cock for initiating communication.

19   So we played it, yes.

20             And I believe it was entered into

21   evidence, and then Lynette wanted her side

22   entered into evidence as well, which we

23   obviously didn't have any problem with because

24   it just further shows the guilt.  And they were

25   found guilty.

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

1    Q.    Okay.  So your testimony is that

2    during that proceeding in Ohio -- in which you

3    were represented by counsel; am I right?

4    A.    Correct.

5    Q.    Can you tell me the name of that

6    counsel?

7    A.    Eli.

8    Q.    Last name?

9    A.    Heller.

10    Q.    K or H?

11    A.    H.  Heller.

12    Q.    Eli Heller.  Out of where in Ohio,

13    if you know?

14    A.    I don't know the address.

15    Q.    Do you know the town?

16    A.    I believe they're out of Cuyahoga

17    Falls, but I'm not 100 percent for sure.  I

18    think they have a lot of offices in a lot of

19    different towns or a lot different cities.

20    Q.    Okay.  And what's the name of the

21    firm?

22    A.    That I can't remember off the top of

23    my head either without looking at all of my

24    legal E-mails.  I don't have it.  I don't have

25    my cell phone.  I don't have access to it.

1    Q.    Okay.  And so your testimony is that

2  during the proceeding on this contempt, that

3  the video that you took with your cell phone

4  was played into evidence?

5    A.    To my best recollection.  Again, I

6  want to be very clear that I do not remember

7  100 percent.  There has been so much in all of

8  this.

9    Q.    Okay.  Let's talk about the signs --

10  what we can refer to as "the defamatory road

11  signs."  Okay?

12        Do you know what I'm referring to?

13    A.    Yes.

14            ATTORNEY SHOCHET:  Are you off

15  this exhibit?

16            ATTORNEY MATZKIN:  Yes, off

17  this exhibit.

18  BY ATTORNEY MATZKIN:

19    Q.    Okay.  So my first question about

20  the signs, Mr. Hales.  Other than Zim Padgett,

21  Teresa [sic] Granger, and Stephen Granger, are

22  you aware of any individual or individuals that

23  saw the signs where they were posted?

24    A.    I am unaware of how many people or

25  how long the signs were posted, even that.

1    Q.    Okay.  Has anybody ever reported to

2  you having seen the signs as they were posted

3  before they were removed other than those three

4  individuals?

5    A.    Zim Padgett.  I don't know who

6  Teresa is who you're referring to, but Therese

7  and Brett Granger all shared with me that they

8  found signs.

9    Q.    So other than those three, though,

10  you're not aware or have been informed that any

11  other person saw them while they were posted?

12    A.    I've not been made aware.

13    Q.    Has anyone ever said anything, to

14  your knowledge, to suggest that they believe

15  the information posted on those signs about

16  you?

17    A.    Yes.  It's posted all over the

18  internet right now.  Oh, look at that.  You've

19  actually sat on livestreams with them talking

20  about it on Two Lee's in a Pod.  Oh.  You.

21  You, of all people.  Look at that.

22          Now, so your clients --

23          ATTORNEY SHOCHET:  And let the

24  record reflect he just smiled again.

25          THE WITNESS:  All right.  Your

JEREMY B. HALES                                          JOB NO. 1278527
DECEMBER 02, 2024

1    clients have posted defamatory signs.  Don't

2    you still speak over me.

3              Your sign -- your clients have

4    posted defamatory signs which then have spun

5    out of control from other hate, other hate,

6    other hate.  Posted all over Facebook.  Posted

7    all over YouTube.  Posted everywhere in regards

8    stating that they believe this.

9              So the answer is 100 percent.  Yes.

10   BY ATTORNEY MATZKIN:

11       Q.    So since the signs themselves came

12   to light, is it your testimony that my clients

13   have subsequently, separately from the signs,

14   accused you of the things that the signs

15   accused you of?

16       A.    Can you ask a clear question?

17       Q.    Well, the signs accuse you of

18   certain things; right?

19       A.    All right.  Stop right there.

20   You're making a statement.  Ask a clear,

21   concise question.

22       Q.    The signs accuse you of certain

23   things; correct?

24       A.    The signs call me a child rapist.

25   The sign states that I raped their daughter.

1    Q.    So my question is:  Other than the

2  sign, are there any other instances of Mr. Cook

3  or Ms. Preston making same or similar such

4  accusations against you?

5    A.    There are so many defamatory things

6  said.  Thousands upon thousands of texts.

7  Thousands upon thousands of screenshots.

8  Thousands upon thousands of video screen

9  recorded.

10          I would have to spend weeks going

11  through everything to say, "Well, did they do

12  it again?"  There's too much.  There's too

13  much.  Your clients have done so much

14  horrendous, horrific things that I would have

15  to spend weeks.  You'd have to give me this

16  question and let me take weeks and weeks and

17  weeks to pull everything out and go, "Here's

18  what they did.  Here's what they did.  Here's

19  what they did."

20    Q.    Yeah, but that's called written

21  discovery, which we've propounded and has been

22  responded to.

23          But my question, to be very clear,

24  is not the thousands and thousands of things

25  you're referring to, but is there any specific

1    instance of Mr. Cook or Ms. Preston accusing

2    you of the same or similar things that those

3    signs accused you of other than the signs

4    themselves?

5                    ATTORNEY SHOCHET:  I've got a

6    FedEx coming here.  It's okay.  You can answer,

7    and we'll take -- he's going to walk in in a

8    second.

9                    THE WITNESS:  To my current

10   recollection, I don't know.  I would have to go

11   through all of the evidence yet again.

12                   ATTORNEY SHOCHET:  Okay.

13   Pause.

14          (Indecipherable discussion off

15   camera.)

16                   THE WITNESS:  Randy, I'm not

17   done with that answer.  So if, when we unpause,

18   I can finish that answer.

19                   ATTORNEY SHOCHET:  Okay.  Go

20   ahead.  Sure.

21                   THE WITNESS:  Are we unpaused?

22                   ATTORNEY SHOCHET:  Yeah.

23                   THE WITNESS:  There is plenty

24   of evidence out there of your clients stating

25   the exact same allegations, if not even other

1    allegation along those lines to many, many

2    other individuals who have been on that

3    property with them.

4    BY ATTORNEY MATZKIN:

5        Q.    So what -- you'll so have to

6    specify, please.  So whom do -- can you clarify

7    what you just -- you just said?  Because you

8    said you weren't aware before Mr. Shochet took

9    a break, and now you came back and said that

10   there are many -- I'm not even sure what you

11   said.

12            Can you clarify?

13       A.    You asked if I'm aware if they've

14   said anything else about me with the signs.  I

15   told you, there's so much information that I

16   would have to take weeks to actually go through

17   it all and go, "Well, here you go.  Here you

18   go.  Here you go."

19            Then I shared with you that your

20   clients have a pattern in their lives that

21   anyone that's in their lives, they don't get

22   what they want, and all of a sudden, they say

23   the exact same gross, horrific things about

24   those individuals.

25            For example, let's talk about Lloyd

```
1   Campbell.  All of a sudden, Lloyd is the
2   greatest person in the world, but she doesn't
3   get his camper.  Now she states that Lloyd is
4   grooming the child -- grooming the child for
5   these things.
6            Let's see.  We had Jessica Mumford
7   on the property with her boyfriend which they
8   were great to have living in a shed illegally
9   in Florida.  And yet when they didn't get what
10  they wanted from them they went and publicly
11  posted that they do these horrendous, horrific
12  things.
13           I can go on and on and on.  What
14  about Jamster, Jamie Starr Johnson?  Now, they
15  didn't get what they wanted from Jamie.  They
16  post and say these horrific, horrible things.
17           Your clients have a pattern of
18  trying to destroy people's lives.
19      Q.   Finished?
20               ATTORNEY MATZKIN:  Okay.
21  Mr. Shochet --
22               THE WITNESS:  No, I'm not.
23  You have a pattern of jumping on board for fame
24  and a potential of money and trying to destroy
25  people's lives, as well.  And it's sick.  It is
```

1    sick.

2                    ATTORNEY MATZKIN:  Finished?

3            Mr. Shochet, I'm --

4                    ATTORNEY SHOCHET:  I'm not on

5    deposition, Counsel.  Please next question.

6                    ATTORNEY MATZKIN:  I'm

7    going -- I'm going to be seeking at least a

8    portion of this transcript to be paid for by

9    Mr. Hales when ready, and I'd --

10                   ATTORNEY SHOCHET:  Move to

11   strike.

12                   ATTORNEY MATZKIN:  -- like you

13   to -- I'd like you to ask your client to -- I'd

14   like you to control your client and ask him to

15   answer the questions and not go on tirades.

16                   ATTORNEY SHOCHET:  Are you at

17   the end of your question?

18                   ATTORNEY MATZKIN:  So you're

19   not willing to instruct your client to answer

20   questions without going on tirades?

21                   ATTORNEY SHOCHET:  You're --

22   you're not deposing anyone but my client.  Do

23   you have another question?  Otherwise, I will

24   start answering -- I'll start the cross.

25   BY ATTORNEY MATZKIN:

1    Q.    So my question is -- let's be more

2    specific, then, referring to, quote, what's

3    stated on the signs.

4            You've already testified the signs

5    accuse you of being a child rapist and of

6    raping their child, their daughter; correct?

7    A.    Yes.

8    Q.    So are you aware of Mr. Cook or

9    Ms. Preston subsequently to the discovery of

10   those signs making any such statements similar

11   or the same as that you're a child rapist or

12   raped their daughter?

13   A.    Are you referring to me, or are you

14   referring things such as Lynette stating about

15   her own grandson Landon assaulting their

16   daughter?

17           So are you asking, like, me,

18   personally?  Are you asking -- and by the way,

19   just so -- as you're calling these tirades, I'm

20   speaking as loud as possible because Alyssa

21   asked me to speak as loud as possible.

22           And you have done some very horrific

23   things.  Your clients have done some very

24   horrific things and have destroyed portions of

25   my life.  And so the volume level is for

1   Alyssa, not for you.

2             So clarify, are you asking in

3   regards to her stating such as Landon, her own

4   grandson, assaulted this child, or are you

5   stating that they say more after the signs

6   about me raping their daughter?

7        Q.    After the signs were discovered, do

8   you have any information that Mr. Cook or

9   Ms. Preston accused you of being a child rapist

10  or raping their daughter?

11       A.    As I've stated multiple times

12  already, I would have to spend weeks going

13  through all of the evidence, all of the

14  screenshots, all of the recordings, all of the

15  videos because there's been so much stretched

16  out over so long of a time.

17       Q.    Okay.  But sitting here right now,

18  you're unable or unwilling to identify a

19  particular instance of a statement accusing you

20  of being a rapist or raping their daughter

21  besides this sign?

22                 ATTORNEY SHOCHET:  Objection

23  to form.  Compound question.

24  BY ATTORNEY MATZKIN:

25       Q.    So, again, sitting here right now,

1 | can you identify even one statement by Mr. Cook

2 | and Ms. Preston accusing you of being a child

3 | rapist or raping their daughter other than on

4 | the signs?

5 |     A.    I would have work my way through.

6 | It'd take weeks to go through all of the

7 | evidence to answer that question appropriately.

8 |     Q.    Is it because you -- you've come

9 | across some such statements, and you need to go

10 | back and dig to find them, or is it because you

11 | just expect to find them, but you don't really

12 | know of one sitting here?

13 |     A.    Can you ask a real question?

14 |     Q.    If you're going to go back and dig

15 | through the thousands and thousands of

16 | whatevers, is it because you've already come

17 | across statements that you hope to locate

18 | accusing you of being a rapist?

19 |     A.    No.  It's because there's so much

20 | information I would have to, as I've already

21 | stated multiple times, go through everything

22 | again, and it would take weeks.

23 |     Q.    But you don't recall having already

24 | come across something like that?

25 |     A.    Again, I can't answer that question

1   without going through everything that I already

2   have, and it would take weeks for me to do

3   that.

4        Q.    Well, you know, if, for example,

5   other than on the signs a month later -- or any

6   time later -- Mr. Cook or Ms. Preston had

7   written a post or a comment or a private

8   message that you came into possession of that

9   accused you of being a rapist, you'd remember

10  it; right?

11       A.    Well, let's -- for example, I just

12  remember one right now because you brought it

13  up.

14            In the actual Complaint where

15  Lynette says, "I'm not going to let Mr. Hales

16  hurt me and my daughter anymore."  I believe it

17  was -- oh, "I'm not going to let" -- "I'm going

18  to stand tall and not let Jeremy Hales hurt

19  me."  Ms. Preston posted on her own social

20  media that "John posted the signs, not me," to

21  directly quote Preston.

22            John Cook, in Ohio court under oath,

23  stated, "If Michelle put the signs up, what

24  does that have to do with me?"

25            I can keep going and going, but

1    there's so much.  It would take time for me to

2    remember everything.

3            Q.    Okay.  So sitting here today, you

4    know, without, obviously, the ability to go

5    back right now through thousands of whatever,

6    do you recall ever seeing or hearing any

7    statement by Mr. Cook or Ms. Preston accusing

8    you of being a rapist or raping their daughter

9    apart from on the signs?

10           A.    July 2023, Lynette Preston posted on

11   her social media that 'John posted the signs,

12   not me.'"

13               Now, that would be a direct -- don't

14   interrupt me.  I'm not done answering the

15   question.

16               Now, that would be a direct

17   statement towards the aspect of "Jeremy Hales

18   is a child rapist.  Jeremy Hales raped my

19   daughter."

20               Do you understand?  Can you

21   comprehend that?  Lynette is referring to it

22   yet again, and you're asking "Has there been

23   anything else?"

24               In the Complaint itself, it states,

25   "In July 2023, Preston posted on her social

1    media, 'John posted the signs, not me.'"

2            That is a direct towards the sign

3    posting yet again.

4        Q.    Are you aware of any private message

5    sent by Mr. Cook or Ms. Preston to anyone in

6    which they claimed you were a rapist or raped

7    their daughter?

8        A.    Again, I would have to go through

9    all the evidence and look at everything.

10   Current recollection, I'm not remembering

11   anything off the top of my head.

12       Q.    Appreciate that.

13           Now, is it correct that the -- you

14   know, your understanding is that the signs were

15   discovered by Zim and Therese and Stephen

16   Granger; right?

17       A.    I wouldn't use the word

18   "discovered."  Anybody who saw them could have

19   easily discovered them.

20           I was made aware of them by Zim

21   Padgett, Therese Granger, and Brett Granger.

22       Q.    Okay.  And when they saw them, they

23   stopped and removed them; right?

24       A.    Not initially.  They made me aware

25   of them, and then I asked them to remove them.

1    Q.    When you say they -- "not initially,

2    but they first made you aware of them," can you

3    elaborate?  Did they call you from the scene of

4    the discovery -- their discovery of the signs?

5    A.    I don't recall if it was phone

6    call -- well, it was text.  Brett texted me.  I

7    don't recall if Zim texted me or called me.

8    But -- but I do recall the text from Brett.

9    Q.    And was that at -- was that at,

10   like, 7:00 a.m., give or take a few minutes?

11   A.    That, again, I don't recall.

12   Q.    Well, do you recall whether the text

13   was that, "Hey, we found these signs.  They're

14   still in the ground," or was it after they had

15   already removed them?

16   A.    Here's what I recall:  I recall

17   thinking "how horrific, who horrendous for

18   somebody to say something about another

19   person."  I recall thinking, "Oh, my goodness.

20   How many people drove past this?  How many

21   people saw this?"

22        And laughing in the aspect that you

23   would even put in a court order, "Oh, if" --

24   maybe people -- "it was out there for 40

25   minutes, 50 minutes," whatever you put, what a

1   joke.  It takes one person.  One person.  One

2   person to see something so horrific, so

3   horrible to destroy somebody's life.

4            Even if no person saw it, it is so

5   horrific to destroy somebody's life.  I don't

6   care how long it was out there.  It could have

7   been out there all day Saturday, and nobody

8   told me, and nobody saw it.  It could have been

9   out there all day Friday, and nobody told me,

10  and nobody let me know.  It could have been

11  there all Thursday, all Wednesday.  The time

12  means nothing.

13           This is a busy highway.  We've got

14  Route No. 24.  All tourism going to Cedar Key

15  and back and forth.  We've got Route 98, 19,

16  the busiest -- one of the busiest highways in

17  all of Florida with the most accidents, as

18  well; causing more accidents posting signs out

19  there, no doubt.

20           So I don't care how long they were

21  out there.  All I care is it was out there, and

22  it was a horrific, horrendous thing to do

23  somebody.  Horrible.  Horrible.

24     Q.    So do you -- do you have any

25  evidence or information that the signs were

1    posted before midnight --

2          A.    As if it matters.

3          Q.    -- the morning they were discovered?

4          A.    As if it matters.  They were posted.

5    They were put in the ground.  People saw them.

6    End of story.

7          Q.    Do you have any information that

8    they were posted the day before?

9          A.    You already have the answer to the

10   question.  You've already asked.  Please move

11   on.

12         Q.    So is that a "no"?  You don't have

13   information they were posted a day before they

14   were found; right?

15         A.    I've already shared with you what my

16   knowledge of them is.

17         Q.    Okay.  So you just testified this

18   was a busy -- sort of a busy location for cars

19   to be driving by where the signs were found;

20   right?

21         A.    Yes.

22         Q.    Now, and it's busy why?  Where are

23   people typically on their way -- you know, is

24   it Cedar Key?

25         A.    It's busy because people drive on

1    it.  It's a road.

2        Q.    No, I understand.  But where might

3    somebody who doesn't really live around there

4    but has to go down that road -- where might

5    they be, you know, typically going to if you

6    had to guess?  Cedar Key?  A tourist

7    destination?

8        A.    So Cedar Key would be a major

9    tourist destination.  You've got Route 19,

10    which is also Route 98, which is a major

11    north-to-south route on the -- on the West

12    Coast of Florida on the nature coast.  Major,

13    major highway.

14        Q.    Okay.  Now, so you know that the

15    signs, according to your affiants, which are

16    the Grangers and Zim, were found by them, I

17    believe, around 7:14 a.m. Sunday morning;

18    right?

19        A.    I don't recall the time.

20        Q.    So if we assume that there's some

21    cars that drove by where the signs were

22    posted --

23        A.    Let's not assume because we know

24    what assuming does.  It makes you look like a

25    complete and total ass and me, as well.  So

1  let's not assume.  Let's get down to actual

2  facts.

3       Q.    Okay.  But we don't -- we don't have

4  any, like, video showing cars driving by there;

5  right?  There's no, like, traffic cam near

6  there; right?

7       A.    Do we need video?  I mean, this is

8  such a horrible thing to say about somebody and

9  to post.  We don't need a video.  We know

10  people are on the road.  We know people saw it.

11  We don't need a video.  We don't need a picture

12  of it.

13            It doesn't even matter if nobody

14  drove by.  It's so horrible that your clients

15  did this.

16       Q.    Wait.  So now you're assuming that

17  cars drove because you just said, you know, "We

18  don't need video.  We know."  That's an

19  assumption; right?

20            Because you can know, or you can

21  know know.  You know what I mean?

22       A.    The way that you know that your

23  clients wrote those signs?  Yeah, I know what

24  you mean.

25       Q.    So for example, I mean, you know,

1  you know cars drove by.  I mean, it makes

2  sense.  It's a busy road.

3          But to know know that would be like

4  having a video of the cars driving by; right?

5      A.    Well, I'm pretty confident cars

6  drove by when Zim drove by, the Grangers drove

7  by.  Zim and the Grangers saw cars driving by.

8      Q.    But --

9      A.    Pretty confident to know know, both

10  know and know know.

11     Q.    Okay.  So did Zim and the Grangers

12  tell you that they saw cars driving by that saw

13  the signs while they were there?

14     A.    Again, I don't recall.

15     Q.    So let's give you the benefit of the

16  doubt that a good number of cars drove by there

17  while those signs were stuck in the ground.

18  Okay?

19          Can we work on that assumption in

20  your favor?  Okay?

21     A.    Let's state that even if one car

22  drove by, whether it was Zim, whether it was

23  Therese, whether it was Brett, whether it was

24  anybody, is too many cars to --

25     Q.    Right.

1      A.    -- read something so horrific.

2      Q.    Right.  So -- well, you already

3  admitted, I believe, in response to written

4  discovery -- and you can confirm or we can look

5  it up -- that you're not claiming that

6  Mr. Padgett -- Zim Padgett or the Grangers

7  believed the statements on the signs; correct?

8          You're not claiming they believed

9  any of it; right?

10     A.    I can't claim what another person

11 believes.

12     Q.    Has Zim Padgett or either of the

13 Grangers ever said anything to you to suggest

14 that they have any doubt about the falsity of

15 those signs?

16     A.    That communication hasn't happened

17 with me.  But when you want to talk about what

18 people believe, I believe 100 percent you know

19 that your clients did this.  And yet at the

20 same time, you're going to play this game in

21 court.

22          I believe 100 percent you know they

23 did this.  And you're playing a game in PR and

24 all of this and the "Anti What the Hales

25 ecosystem."  You believe because you know they

1    did it.

2              I 100 percent believe that you know

3    that 100 percent they did it.  You know 100

4    percent they're guilty.  I believe you 100

5    percent know they're guilty.

6              You want to keep talking about what

7    I believe?

8        Q.    Okay.  So I'm going to give you all

9    of that.  I'm going to give you all of that.

10   And I'm just trying to get to the issue of

11   publication.  So I'm giving you all of what you

12   just said.  Good for you.

13             Now, can we move on, and answer my

14   question, about publication of the signs, of

15   the defamatory information?

16             I'm going to move on and I'm going

17   to ask you the next question and it's about the

18   issue of the publication of the defamatory

19   signs.

20             So -- so how would you be able to

21   determine if any given car that drove by --

22   let's say you had a road -- a checkpoint 200

23   yards past the intersection where the signs

24   were so that somebody can waive down every car

25   and say, "Hey, did you see those signs and what

JEREMY B. HALES                                    JOB NO. 1278527
DECEMBER 02, 2024

```
 1   they said"?  Now, how would you be able to

 2   determine if any car, any driver, any passenger

 3   in a car driving by read those signs?

 4            Is there any way for you to

 5   determine that or prove that?  Yes or no?

 6       A.   First of all --

 7       Q.   And if it's yes, you tell me how.

 8       A.   First of all, you're horrible at

 9   asking questions.  You really need to work on

10   this if you're going to be a professional

11   lawyer.

12            No. 2, I'm going to use the Socratic

13   method, which I assume you're aware of.  So it

14   comes from Socrates.  You answer a question

15   with a question.

16            Now, in all reality, you're in

17   charge of this deposition.  This is your

18   deposition.  But I'm going to ask you the same

19   question:  How in the world can you confirm

20   that nobody saw it?  Oh, wait.  That's right.

21   You can't.

22       Q.   I guess --

23       A.   You can't.  That's the reality.  You

24   cannot confirm.  I'm answering your question,

25   and I'm using the Socrates method -- the
```

1    Socratic method to answer your question.

2              How can you confirm that nobody saw

3    it?  How you can confirm that no damage was

4    done to my reputation?  How can you confirm who

5    did, how many people?

6              How can you -- how can you -- how

7    can you -- you can't, and you know you can't.

8                   THE REPORTER:  Can you please

9    slow down.

10                  THE WITNESS:  You know people

11   drove by.  You know people saw it.  You have

12   evidence that at bare minimum, three people saw

13   it.  And then I was made aware of it.

14             And at the end of the day, the jury

15   is going to make the conclusions, not you and

16   not me.

17        Q.    Finished?

18             All right.  Do you understand that

19   in your lawsuit that you have the burden to

20   provide evidence to prove your claims,

21   including damages?

22        A.    Absolutely.  Yes.

23        Q.    Okay.  And do you understand that in

24   this lawsuit where you claim defamation in the

25   form of these road signs, that one element of

1    your claim is to prove that they were published

2    causing damage to you?

3           Do you understand that that's an

4    element?

5        A.    Yes.  I also understand that the

6    magistrate has also said that damages don't

7    even need to be proved because of the

8    statements that were made are so defamatory,

9    they're so destructive to a person and their

10   reputation.

11       Q.    Okay.  But we're talking about

12   publications, so not --

13       A.    Well, I'm answering your question

14   based on what the magistrate has already said,

15   who is ultimately going to be a part of the

16   actual decisions of who is guilty, who is not

17   guilty, and the jury, who is guilty, who is not

18   guilty.

19           So you ask a question, whether you

20   like my answer or not, you're going to get my

21   answer.  And the answer is the magistrate has

22   already stated these things are so horrible

23   damages don't even need to be proved in the

24   Complaint.  That's how horrific it is.

25       Q.    Well, you may be right, but if I

1   may, I'm going to hypothetically assume that

2   the -- for the sake of my argument -- for the

3   sake of my question that the magistrate hadn't

4   examined the issue of publication, and that's

5   the question that I have.

6            So my question is:  Is there any way

7   for you to demonstrate that any single or

8   multiple individuals driving by saw those

9   signs?

10       A.    Yes.  Three individuals --

11       Q.    Other than --

12       A.    -- saw the signs up.

13       Q.    Other than those three.  Other than

14   those three individuals?

15       A.    Three is too many.  Two is too many.

16   One is too many.  It's so horrific.

17       Q.    So you have no evidence that you can

18   provide in this case, that any other person

19   drove by and saw those signs?

20            ATTORNEY SHOCHET:  Objection

21   to form.  That calls for a legal conclusion.

22   We're back on that track again.  Competence.

23            ATTORNEY MATZKIN:  That was a

24   fact question.

25            Can you read the question, Alyssa?

```
1                    (Reporter read back from the

2    record.)

3    BY ATTORNEY MATZKIN:

4         Q.    Correct?

5                    ATTORNEY SHOCHET:  Same

6    objection.

7    BY ATTORNEY MATZKIN:

8         Q.    You can answer the question.

9                    ATTORNEY SHOCHET:  Answer the

10   question subject to my objection.

11                   THE WITNESS:  What's the

12   question, again?

13   BY ATTORNEY MATZKIN:

14        Q.    Do you have any evidence you can

15   produce in this case that anybody other than

16   those three individuals drove by and saw the

17   signs?

18        A.    Common sense.

19        Q.    Okay.  Thank you.

20        A.    Which I believe the jury will

21   hold -- have and hold onto.

22                   ATTORNEY MATZKIN:  By the way,

23   we'll go to 1:00, if that's okay, and then take

24   45 minutes.

25                   Alyssa, is that above standard?
```

```
 1                    THE REPORTER:  I can have a
 2    shorter lunch, too.  That's fine.
 3                    ATTORNEY MATZKIN:  Gentlemen,
 4    would that work for both of you?
 5                    ATTORNEY SHOCHET:  So, you
 6    know, this is a Federal Court deposition.  You
 7    have a time cutoff.
 8            You do know that; right?
 9                    THE WITNESS:  No, he doesn't
10    know.
11                    ATTORNEY MATZKIN:  Well, I
12    understand.  I mean, do you want to have lunch
13    or not?
14                    ATTORNEY SHOCHET:  You want to
15    have lunch?
16                    THE WITNESS:  Let's get it
17    done.
18                    ATTORNEY SHOCHET:  Okay.  Oh.
19    You don't want to have lunch?
20                    THE WITNESS:  We'll have
21    lunch.  We'll have lunch.
22            But I do want to add that we will
23    have traffic information coming for the
24    court -- for the Federal Court.
25            So we will -- we will get that from
```

```
 1   the State and have traffic information on those

 2   roads.

 3                   ATTORNEY MATZKIN:  I

 4   appreciate that.

 5   BY ATTORNEY MATZKIN:

 6       Q.   Let me ask you about that.

 7            So have you already taken steps to

 8   begin procuring such information?

 9                   ATTORNEY SHOCHET:  Hold on.

10                   THE WITNESS:  Wow.

11                   ATTORNEY SHOCHET:  Again --

12                   THE WITNESS:  Wow.

13                   ATTORNEY SHOCHET:  -- once

14   again --

15                   THE WITNESS:  Wow.

16                   ATTORNEY SHOCHET:  -- once

17   again, do not reveal anything that you've

18   learned from me about that.

19                   THE WITNESS:  Wow.

20                   ATTORNEY SHOCHET:  But if you

21   can answer without -- that's work product and

22   attorney/client privilege.

23                   THE WITNESS:  Attorney/client

24   privilege.  Move on.

25                   ATTORNEY SHOCHET:  Well, do
```

1  you know anything outside of it -- outside of

2  our conversations?

3              THE WITNESS:  Not outside of

4  our conversations.

5              ATTORNEY SHOCHET:  Okay.  Then

6  don't answer that question.

7              THE WITNESS:  Okay.

8  BY ATTORNEY MATZKIN:

9      Q.    Are you aware of a source of traffic

10  information that would tell how many cars drove

11  by on whatever that date -- May 14th, 2023 --

12  during the period of time when those signs were

13  posted?

14              ATTORNEY SHOCHET:  Same

15  objection.  If you can answer that question

16  without relying on things that you and I

17  discussed, you can answer.  But otherwise, do

18  not answer that question.

19  BY ATTORNEY MATZKIN:

20      Q.    So you expect to have some sort of a

21  factual report that constitutes evidence of

22  people reading those signs?

23              ATTORNEY SHOCHET:  That's a

24  direct work product violation question.  I'll

25  assert work product privilege as well as

1    attorney/client privilege.

2            If you can answer the question

3    outside of what you discussed, you can answer

4    it.  Otherwise, do not.

5    BY ATTORNEY MATZKIN:

6        Q.    Well, Mr. Hales, you testified in

7    response to my question about whether you can

8    produce evidence of anybody seeing the signs

9    that, in fact, you intend to produce some sort

10   of data.

11           And I'm trying to understand what

12   this data is, and you know, is there some sort

13   of a bureau of information that has such

14   information that you're availing yourself of?

15                   ATTORNEY SHOCHET:  Same

16   objections.

17                   ATTORNEY MATZKIN:  So you're

18   instructing him not to answer whether he's

19   aware of whether there's a -- some sort of a

20   source of public information about traffic?

21                   ATTORNEY SHOCHET:  You just

22   rephrased your question three times.

23                   ATTORNEY MATZKIN:  All right.

24   I'll rephrase it one more time to avoid your

25   problem with it.

1              ATTORNEY SHOCHET:  He's not

2   going to reveal any conversations that I've had

3   with experts and data because I haven't decided

4   yet how, what, where, who we're going to use

5   it.

6              When it is decided, you will be

7   given expert disclosure.

8              Did you want to go lunch?  You want

9   to --

10              ATTORNEY MATZKIN:  No.  1:00.

11   1:00.

12              ATTORNEY SHOCHET:  Oh.  We're

13   going to 1:00.

14   BY ATTORNEY MATZKIN:

15       Q.    You procured and have disclosed in

16   opposition to a summary judgment motion the

17   expert report of a handwriting expert Dianne

18   Peterson; right?

19       A.    Yes.

20       Q.    Excuse me.

21              And had you already determined that

22   Mr. Cook and Ms. Preston and/or Ms. Preston

23   wrote those signs before Ms. Peterson was hired

24   and conducted her analysis?

25       A.    We suspected.  We did not know.

1      Q.    And what was the suspicion based on?

2      A.    Based on the character of your

3   clients and what they've done to our lives.

4      Q.    And was there any effort to

5   actually, you know, factually determine it, not

6   just assume it because of their character?

7            Did you take any steps to factually

8   determine that my clients wrote the signs?

9      A.    Yes.  I contacted Deputy Weaver of

10  Levy County Sheriff who then told me that there

11  was nothing that they were going to be able to

12  do, whether it be fingerprinting or anything

13  else.

14           And that I had a very strong

15  defamation case, which then I went to multiple

16  stores -- Ace Hardware and Walmart -- and asked

17  to get all video footage and all receipts from

18  individuals buying those particular products

19  that were used for those signs.

20     Q.    And were they provided to you?  Were

21  those videos and receipts provided to you?

22     A.    No, they were not.

23     Q.    Why weren't they?  Did somebody

24  explain why they weren't being provided?

25                 ATTORNEY SHOCHET:  Objection

```
 1   to form.  Calls for hearsay.
 2              You can answer, if you know outside
 3   of that.
 4                   THE WITNESS:  At that time
 5   frame, they were not able to provide.
 6   BY ATTORNEY MATZKIN:
 7        Q.    So let me understand.  You went to
 8   the local hardware store local to Otter Creek?
 9        A.    Yes.
10        Q.    What store?
11        A.    Ace Hardware.
12        Q.    And how -- if you know, how far is
13   that Ace Hardware?  Is it in Otter Creek?
14        A.    No.  There's nothing in Otter Creek.
15        Q.    And where is it in?  What town is it
16   located?
17        A.    Chiefland.
18        Q.    And how far would that be from your
19   property?
20        A.    Ten minutes.
21        Q.    Ten minutes by car?
22        A.    Well, if your client is going to
23   walk it, 18 hours both ways, which she has
24   attempted to, putting a child's life in danger
25   and her own.
```

1          You can roll your eyes as much as

2    you want.  The reality still exists.

3          Q.    Yeah.  But I'm trying to stay on

4    point here.

5          Okay.  You went to Ace Hardware

6    after -- how long after May 14, 2023, when the

7    signs were found did you go to Ace Hardware?

8          A.    I don't recall the exact dates.

9          Q.    Do you -- did you do it -- within a

10   week, did you visit a Ace Hardware from that

11   date?

12         A.    No matter how you rephrase this

13   question, I don't recall the exact dates.

14         Q.    Okay.  What do you recall about this

15   trip to Ace Hardware?

16         A.    I remember going to Ace Hardware and

17   asking, "Can I get your video footage?  Can I

18   get copy of receipts for these particular

19   products that were purchased?"

20         Q.    Did you identify -- did you give

21   them the specific date you wanted those

22   receipts from, like, May 14th, May 13th, May

23   12th?

24         A.    Yes.

25         Q.    And whom did you speak with?

1          A.      That I don't recall.

2          Q.      Did you ask for a manager?

3          A.      I don't recall if I was talking to a

4     manager or not.

5          Q.      And was it just one conversation

6     that you asked, and they said, "Sorry.  We

7     can't give it to you"?

8          A.       It wasn't, "Sorry.  They can't give

9     it to me."  They would have given it to me if

10    it was within a time frame that they can

11    actually go back and get it, but unfortunately,

12    that time frame had already lapsed in their

13    system.

14         Q.      I see.  So you're saying they have a

15    CCTV, you know, loop, and it kind of erases

16    after a period of time?

17         A.      You sure are putting a lot of words

18    in their mouths.

19         Q.      Well, I mean, I'm familiar with that

20    process.  So you're saying that they have

21    footage that would have captured somebody

22    coming in and buying, you know, these products,

23    but that that footage was no longer available

24    by the time you asked them for it?

25         A.      That is correct.

1      Q.    But what about the receipts?  The

2   receipts wouldn't have been, you know, disposed

3   of, would they?

4      A.    I just shared with you exactly what

5   was shared with me.

6      Q.    In other words, separately from the

7   video footage, they're saying that they also

8   couldn't provide you the receipts?

9      A.    They could not go back in that time

10   frame and provide video footage or receipts.

11      Q.    And, I mean, I can understand video,

12   but why would they not be able to provide

13   receipts?  I mean, you can go back and provide

14   receipts, you know, from years ago?

15      A.    Why don't you call them and ask

16   them?

17      Q.    Okay.  So you didn't do anything

18   else to follow up on this?

19      A.    I went to Walmart and did the exact

20   same thing.

21      Q.    And how did that go?  Was that the

22   same day?

23      A.    No, it was not.

24      Q.    Which one was first?  Ace or

25   Walmart?

JEREMY B. HALES                                          JOB NO. 1278527
DECEMBER 02, 2024

1         A.    Ace Hardware was first.

2         Q.    Okay.  And then do you remember how

3    long later you went to Walmart?

4         A.    No, I do not.

5         Q.    Did you go with anybody?

6         A.    I don't recall that either.

7         Q.    So when you went to Walmart, do you

8    remember who you spoke to there?

9         A.    No, I do not.

10        Q.    Do you remember whether it was a

11   manager or a cashier?

12        A.    Why would you ask a follow-up

13   question if I literally just told you I don't

14   recall who I spoke to?

15        Q.    Well, because maybe the "who" was

16   the -- you thinking the person by name.  So now

17   I'm trying to get more general in whether you

18   remember, you know, anything about the person

19   you spoke to.

20              Was it a manager?

21        A.    I don't remember the person that I

22   spoke to.

23        Q.    Was it a man or a woman?

24        A.    That I don't recall either.

25        Q.    Okay.  And what was their response

1   to your request for video footage and --

2        A.    It was another dead end.

3        Q.    I'm not done with my question.

4        A.    They couldn't provide it.

5        Q.    I'm not done with my question.

6              THE REPORTER:  Mr. Hales,

7   please wait.

8   BY ATTORNEY MATZKIN:

9        Q.    What was their -- what was their

10  response to your request at Walmart for video

11  footage or receipts of the products that, you

12  know, made the signs?

13       A.    That they couldn't provide it.

14       Q.    And did they explain why they

15  couldn't provide it?

16       A.    Foggy in the back of my mind.  I

17  think Walmart was of the point that they needed

18  a court order to provide such information,

19  which we did not have at that point in time.

20             But -- and Ace -- Ace Hardware just

21  time elapsed, and it was no longer in their

22  system.

23       Q.    Okay.  Now, right now there's

24  nothing preventing you from subpoenaing Ace or

25  Walmart whether for video or receipts; right?

1      A.    Correct.

2      Q.    And have you taken steps to do that?

3      A.    That would be attorney/client

4  privilege.

5      Q.    But you're convinced that the

6  products were bought by my clients, or at least

7  somebody on their behalf; correct?

8      A.    I'm convinced that your client,

9  Lynette Preston, wrote half the signs stating

10  that I'm a child rapist.

11      Q.    And you're convinced that they were

12  purchased either at Ace or Walmart?

13      A.    I just shared with you what I'm

14  convinced.  Your client, Lynette Preston, wrote

15  half of the signs stating that I'm a child

16  rapist.

17      Q.    Other than going to Ace and Walmart,

18  did you do anything to identify the handwriting

19  besides -- and before hiring the expert?

20      A.    Yes.  Individual research.

21      Q.    Go ahead.  What did you do?

22      A.    I looked at her handwriting that she

23  posts publicly on the property.  I looked at

24  other individuals' handwriting that was

25  publicly available through public records from

1  everybody in the town, including individuals

2  that actually found them.

3          I analyzed everybody's handwriting

4  to see if there was a match.

5      Q.   So -- so you embarked on your own

6  investigation to -- to identify the writer of

7  the signs; correct?

8      A.    Correct.

9      Q.   And you did so already sort of

10  believing it was Mr. Cook and Ms. Preston or

11  with an open mind?

12      A.   I did so with an open mind, and to

13  be frank, I don't believe John Cook wrote those

14  sings.  I believe Lynette Preston did and

15  somebody else.

16      Q.   So what individuals -- strike that.

17          Whose handwrite samples were you

18  able to procure in your investigation?

19      A.   Again, it's been a long time.  Lots

20  of information and lots of time has passed, and

21  so I don't recall everybody.

22          But the strongest one is right out

23  in front of the property at Turd Purgatory

24  [sic], her own handwriting.  Otter Creek

25  Avenue, Amazon, UPS, FedEx, Box.  And drive

1    North Otter Creek 151.

2        Q.    All right.

3        A.    Glaring right there in everybody's

4    face.

5        Q.    Did you maintain any files or

6    records of, for example, the samples belonging

7    to certain individuals that you examined?

8                    ATTORNEY SHOCHET:  Objection

9    to form.

10   BY ATTORNEY MATZKIN:

11       Q.    Do you understand my question?

12       A.    Yep.

13       Q.    So did you -- did you maintain any

14   files of the --

15       A.    Don't know (indecipherable).

16                    THE REPORTER:  I'm sorry.

17   What?

18                    ATTORNEY MATZKIN:  Excuse me?

19                    THE REPORTER:  I couldn't hear

20   you, Mr. Hales.

21                    THE WITNESS:  I don't --

22   louder?

23                    THE REPORTER:  Just clearer.

24                    THE WITNESS:  I'm sorry.  I'll

25   go louder.

1              I don't recall whether I've kept any

2    of those sample files.

3    BY ATTORNEY MATZKIN:

4         Q.    So you're going to testify here that

5    you investigated this handwriting, including by

6    procuring samples of other people to compare,

7    but that you don't recall whether you have

8    files of that work?

9         A.    That is not what I said.  You asked

10   if I had and held onto any of those files, and

11   I stated that I don't recall if I held onto any

12   of those files or samples.

13        Q.    So your testimony is you definitely

14   did have files containing handwriting samples

15   of people, yes?

16        A.    My testimony is I looked at any

17   available handwriting samples for anybody

18   within the community of Otter Creek.  If I

19   could find it -- if it was a public record, I

20   looked to try to match to find out who did it.

21             I also publicly stated if anybody

22   had any cameras, Bing Blink, anything that if

23   they would share that with us.  We did not have

24   anybody come forward with any camera.

25        Q.    Okay.  So now, for example, if you

1  were comparing someone's handwriting that you

2  located within the community to see or to rule

3  it out, what would you do to make that

4  analysis?  Would you just look at it and then

5  say "Nope" and move on, or would you take a

6  photograph of it?

7              ATTORNEY SHOCHET:  Objection.

8  Compound question.

9  BY ATTORNEY MATZKIN:

10     Q.    Do you understand my question?

11     A.    Yep.

12              ATTORNEY SHOCHET:  Same

13  objection, for the record.

14          You can answer, but it's subject to

15  my objection with the magistrate.

16              THE WITNESS:  I would make a

17  visual comparison and then see if it was

18  actually matching or not.  But I'm not a

19  hand- -- please, let me finish.

20          I'm not a handwriting expert.  So

21  once we found a comparison that matched, we

22  hired a handwriting expert who can actually get

23  into the forensic science of the handwriting.

24  BY ATTORNEY MATZKIN:

25     Q.    So you say you would do a visual

1   comparison.  So you're looking at, you know,

2   some person's handwriting sample, and you're

3   looking at the sign to compare it, right, the

4   signs?

5        A.    Well, the same way I can do a visual

6   right now.  I can look at you, and I can look

7   at Randy.  Randy doesn't have glasses.  You

8   have glasses on.  I just did a visual.  Randy

9   has a small nose.  You have a huge nose.  I

10  just did a visual.  You're both wearing ties.

11  Oh, look, you're both wearing ties and a

12  collared shirt.  I can see there's a match

13  there.  But he has a jacket.  You don't.  I'm

14  doing a visual.

15       Q.    So if you found a particular

16  individual's handwritten sample and you wanted

17  to then do this visual comparison, would you do

18  anything to preserve the sample other than your

19  memory?  So did --

20              ATTORNEY SHOCHET:  That's my

21  doorbell.

22              ATTORNEY MATZKIN:  -- you take

23  a photograph of the sample?

24              ATTORNEY SHOCHET:  Hold on.

25  Did you hear that ring?  That's my doorbell.

1    Hold on.

2                    (Attorney Shochet stepped away

3    from the Zoom videoconference.)

4                    ATTORNEY MATZKIN:  They could

5    be having all kinds of conversation over there.

6                    ATTORNEY SHOCHET:  Sorry about

7    that, Counsel.  I had another delivery.  Go

8    ahead.

9                    ATTORNEY MATZKIN:  Could you

10   read back my last question, Alyssa?

11                   (Reporter read back from the

12   record.)

13                   THE WITNESS:  Is it okay to

14   answer, Alyssa?

15                   THE REPORTER:  If it's okay

16   with your counsel.

17                   ATTORNEY SHOCHET:  Sure.

18   Answer.

19                   THE WITNESS:  Yes.

20   BY ATTORNEY MATZKIN:

21       Q.    And would you then download the

22   photo into an electronic file of any sample

23   that you photographed?

24       A.    Can you be clear on your questions,

25   please?

1    Q.    You just said "yes" when I asked you

2    if you would take a photograph of samples of

3    people's handwriting that you were comparing to

4    see if they matched the signs; is that

5    accurate?

6    A.    So for example, you have it in

7    evidence.  You have a picture of her

8    handwriting out front of Turd Purgatory [sic].

9         So, yes, there is a picture.  It's

10   uploaded then to the sky into a Dropbox as

11   evidence.

12   Q.    Okay.  And you're referring to that

13   one particular photograph with the address of

14   her address.  I'm aware of that.

15        I'm asking about other individuals'

16   handwriting samples.  So did you take any

17   photographs of any other individual's

18   handwriting samples?

19   A.    I'm sure I did, but at the same

20   time, the aspect of if it doesn't match why

21   would I hold onto it, then I don't know if I

22   did hold onto it.  This has been going on for

23   years now that they've been terrorizing us.

24        So the aspect of if I was to look at

25   one and go, "Oh, does this match?  Nope," I'm

1    going to delete it.

2              The same way that I look at

3    messages.  For example, if you were to send me

4    a message, I would look at it, and I would have

5    would laugh and I would delete it, and I would

6    go, "This is irrelevant.  This is ridiculous.

7    It's gone.  I don't need that in my life."

8    What I need is the matching.

9              So whether I have anything else or

10   any other samples is irrelevant.  What I have

11   is samples -- public records of Lynette Preston

12   handwriting.  We've got photos of her

13   handwriting on the property.  We've got photos

14   of the handwriting of the signs.  Anything else

15   is irrelevant if it doesn't match.

16        Q.    But at this point in time, you

17   hadn't retained the expert; right?

18        A.    I literally have no idea what you're

19   asking right now in regards to a timeline.  You

20   are very, very not --

21        Q.    At the point --

22        A.    -- clear, concise.

23        Q.    At the point in time you were

24   conducting your own investigation by locating

25   individuals' handwriting samples to compare to

1   the signs, had you -- you had not yet retained

2   your expert; am I correct?

3        A.    Again, a very unclear question.  You

4   said -- so if I'm understanding you correct,

5   oh, if a year ago you're looking at -- you're

6   looking at samples and comparing but a year

7   later you're still looking at samples and

8   comparing and you find the sample, obviously, I

9   was comparing samples when Lynette was running

10  to the courthouse in Levy County and writing my

11  over name over and over and over and over and

12  over again in every affidavit, in every special

13  supplemental affidavit writing "Jeremy Hales,"

14  Jeremy Hales."  And then when there's a match,

15  I hired the handwriting expert.

16             So I hired the handwriting expert as

17  I was finding the matches and analyzing it.

18        Q.    Okay.  So I don't want to talk at

19  all about the match.  I don't want to talk

20  about Ms. Preston's handwriting sample or the

21  sign that she wrote for her address on her

22  property or of anything she filed in court

23  which contains her handwriting.

24             What I want to ask is about anybody

25  else 's handwriting samples that you analyzed

1    or compared the signs to.

2                 Are there other handwriting samples

3    that you looked at and ruled out as matches?

4         A.    I've already answered that question

5    multiple times.

6         Q.    And the answer was "yes"; right?

7         A.    So you did understand.

8         Q.    So with respect to those handwriting

9    samples -- not Ms. Preston's, but anybody

10   else's that you compared to the signs to see if

11   they match or didn't match -- did you take any

12   photographs and preserve them, or did you

13   testify that you deleted any such photographs?

14        A.    I testified that I don't know.  I

15   don't recall.

16        Q.    Okay.  Now, before you hired the

17   expert and before you became certain that the

18   handwriting of my client matched the signs, it

19   was possible that there were other individuals

20   responsible for the signs; correct?

21        A.    There are two people responsible for

22   the writing on the signs, one of them being

23   Lynette Preston, the other one not being

24   identified as of yet.

25                 No, it is not possible for other

1   people to be responsible because the only

2   people responsible for the consequences of

3   what's written on the signs are the people who

4   actually wrote the signs.  That would be common

5   sense.

6       Q.    All right.  We're almost ready to

7   take a break.  But I'm just trying to

8   understand if you -- how many different

9   individuals' handwriting did you procure or

10  locate so you can compare it to the signs?

11      A.    I don't remember.

12      Q.    Did you find individuals'

13  handwriting samples in a particular form like

14  land records, for example?

15      A.    I don't recall where I found it all.

16      Q.    Did you -- did you ask anybody,

17  "Hey, may I see a sample of your handwriting"?

18      A.    No.

19      Q.    No, but you didn't say, "May I just

20  voluntarily have your handwriting so I can rule

21  you out"?

22      A.    No.

23      Q.    Are you aware of anybody who even

24  knows of the signs that existed other than Zim

25  Padgett, the Grangers, Deanna West, yourself,

1   Martha George Rizk that -- strike that.

2           Other than those people, does

3   anybody, to your knowledge, know of the signs

4   by any other way other than you having

5   broadcast them on YouTube?

6       A.    Yeah.  You've been a part of

7   livestreams of them being broadcasted on

8   YouTube on Two Lee's in a Pod.  You literally

9   have been a part of it broadcasting the

10  production of the signs, showing the signs, and

11  then making a mockery out of it with a fake

12  handwriting expert making fake analysis

13  accusing me of actually writing them.  What a

14  joke.

15      Q.    Okay.  Now, but it's not your

16  testimony that the Two Lee's were showing the

17  signs so that they can propagate that the

18  statements in them were true about you; right?

19          That's not what you're testifying;

20  right?

21      A.    You trying to put words in my mouth

22  now?  Can you ask a clear question?  How are

23  you a lawyer and not able to ask a clear

24  question?

25      Q.    Are you testifying that Two Lee's

1   was showing the signs so that they were saying

2   to their audience, "These are true.  These

3   statements are true"?

4                ATTORNEY SHOCHET:  Objection

5   to form.  Calls for speculation.

6                And you can answer subject to my

7   objection with the magistrate.

8   BY ATTORNEY SHOCHET:

9        Q.    So you don't --

10       A.    As to what Two Lee's -- Two Lee's

11  and this moron were out to defame me and run

12  their "Anti What the Hales ecosystem"

13  defamation campaign.

14       Q.    Is it your testimony that the Two

15  Lee's told their audiences that you're a child

16  rapist or raped their daughter -- Michelle

17  Preston's daughter?

18       A.    My testimony that they have

19  continued to defame me, as well as you.

20       Q.    And is it your testimony that --

21  well, are you aware of anybody who became aware

22  of those signs and the statements on them other

23  than Zim, the Grangers, Deanna West, yourself,

24  and Martha George Rizk?

25                ATTORNEY SHOCHET:  Objection.

1    Asked and answered.

2                        ATTORNEY MATZKIN:  I haven't

3    finished the question.

4                        ATTORNEY SHOCHET:  Okay.

5    BY ATTORNEY MATZKIN:

6        Q.    Are you aware of anyone who became

7    aware of those signs from any other source than

8    your YouTube videos?

9        A.    Yes.  I've already shared.

10       Q.    Who?

11       A.    Other YouTube videos.

12       Q.    Two Lee's?

13       A.    There's one.

14       Q.    Any others?

15       A.    Miltowns Best.

16       Q.    Any others?

17       A.    I'm sure there are others out there.

18   There are plenty right now with your "Anti What

19   the Hales ecosystem."

20       Q.    And what about Megan Fox?  Did she

21   ever show the signs on her YouTube channel?

22       A.    I do not know.

23       Q.    What about ThatUmbrellaGuy?  Did he

24   ever show it on his YouTube channel?

25       A.    I do not know.

1      Q.    Okay.  So who -- of all the channels

2  on which those signs were shown, to your

3  knowledge, which one was first?  Which was the

4  earliest?

5      A.    Again, I do not know.

6      Q.    Well, we made a list of three

7  channels that you claim to know for sure showed

8  those signs, yours, Two Lee's, and Miltowns

9  Best; right?

10     A.    I think you made a much larger list

11  than that and asked me questions on it.

12     Q.    But you confirmed that -- those

13  three, yourself, Miltowns, and Two Lee's?

14     A.    What's your question, again?

15     Q.    Are you confirming that those are

16  the three channels that you know showed those

17  signs -- those road signs?

18     A.    No, I'm not confirming that.

19     Q.    You're -- a minute ago you were

20  saying Two Lee's --

21     A.    I openly -- I openly shared that

22  there are many other channels out there that

23  have shown it as well that I don't even know

24  how far it's gone.

25          But it all stems to the core in

1    Otter creek With your client, Lynette Preston,

2    and whoever else wrote the other half of the

3    signs.  And then other channel --

4         Q.    Why --

5         A.    -- and then other channels latching

6    on under direction and control of individuals

7    such as yourself creating an "Anti What the

8    Hales ecosystem" with a negative PR against --

9    damaging me, my business, my life, my

10   relationships.

11        Q.    Okay.  So my question is --

12        A.    So no.  No, I don't know how many.

13   As a matter of fact, it's spun out of control.

14   And what people believe, I can't answer that

15   question either because I can't tell you what

16   you believe, even though I know you believe

17   that she wrote them.

18        Q.    So are you aware of any YouTube

19   channel that broadcasted any information,

20   including images of the signs before you did on

21   your channel?

22        A.    I am unaware.

23        Q.    Are you aware of any YouTube channel

24   that, in connection with showing the signs or

25   discussing the signs, indicated that they

1    believe the accusations contained on them?

2         A.    I'm unaware, but I am aware that

3    you've been on with Two Lee's in a Pod

4    indicating that I actually wrote those things

5    about myself trying to tell people that I wrote

6    them about myself.

7              So I don't know what's more hideous,

8    the aspect that somebody else wrote them or

9    somebody coming in and saying, "Well, Jeremy

10   wrote this about himself" and then post it.

11             Both of them are gross.  Both of

12   them are sick.  And the consequences for those

13   individuals, including yourself, will be fought

14   out in the court of law.

15             ATTORNEY SHOCHET:  Counsel,

16   are you aware that you stated on the record

17   that we'd be breaking for lunch at 1:00 --

18             ATTORNEY MATZKIN:  Yeah.  I

19   notice.  And we're going to break.

20             ATTORNEY SHOCHET:  -- and now

21   it's 1:05.  Are you aware of that?

22             ATTORNEY MATZKIN:  Yeah.  So

23   we'll take a break now, and why don't we resume

24   at 1:50?

25             Would that be okay with everybody?

```
 1                    ATTORNEY SHOCHET:  1:50.  Yep.
 2    5-0; right?
 3                    ATTORNEY MATZKIN:  That's 45
 4    minutes.
 5                    ATTORNEY SHOCHET:  Bye.
 6                    (A recess was taken.)
 7    BY ATTORNEY MATZKIN:
 8         Q.    Mr. Hales, you're a Cleveland sports
 9    fan; am I correct?
10         A.    Not really.
11         Q.    You're not a Cleveland baseball fan?
12         A.    I'm not a die-hard fan of anything.
13         Q.    Okay.  Is there a reason why you
14    wear the old Cleveland Indians hoodie on your
15    YouTube streams and not a current Cleveland
16    Guardians hoodie?
17         A.    No, there's no reason.
18         Q.    Do you have a position on, like, the
19    sports team changing their names out of
20    political correctness?
21         A.    No.  There's no position.
22         Q.    Do you feel like maybe some people
23    might find it offensive to see people wearing
24    old Cleveland Indians jerseys which were, you
25    know, eliminated due to political correctness?
```

1        ATTORNEY SHOCHET:  At this

2   point, this is way afield.  I'm going to object

3   as to relevance.  I'll let you do maybe one

4   more question.

5            Subject to my objection, you can

6   answer.  If he tries to bring this up, you can

7   answer.

8             THE WITNESS:  What was the

9   question?

10  BY ATTORNEY MATZKIN:

11       Q.   Well, how would you feel if somebody

12  said they found it offensive, that they're a

13  fan of yours, but they don't like the Cleveland

14  Indians garb?

15       A.    I wouldn't care.  I would

16  probably -- probably the same way they would

17  feel if I told them I was offended by them not

18  liking what I wear.  It doesn't matter in the

19  long run, in the big scheme of life.  It does

20  not matter.

21       Q.   What's your current relationship --

22  your personal relationship with Martha George

23  Rizk?  Are you engaged?

24            ATTORNEY SHOCHET:  Objection.

25  Not relevant at all to these proceedings.  And

```
 1   that one is -- you can answer that one, but I'm
 2   going to tell you right now -- this was the
 3   purpose of the E-mail, Counsel -- their
 4   personal relationship has nothing to do with
 5   this lawsuit, so --
 6                   ATTORNEY MATZKIN:  That's not
 7   for you to determine, Mr. Shochet.
 8                   ATTORNEY SHOCHET:  Let's call
 9   the judge.  We'll call the magistrate in about
10   five minutes if you're going to have a line of
11   questioning about their relationship.
12                   ATTORNEY MATZKIN:  That would
13   be interesting.
14   BY ATTORNEY MATZKIN:
15       Q.   So are you engaged, you and Martha
16   George Rizk?
17       A.   My relationship with Martha George
18   Rizk is of no concern of this lawsuit.
19       Q.   Do you have a business relationship
20   with Martha George Rizk?
21       A.   Martha George Rizk is an independent
22   contractor.
23       Q.   So she's self-employed?
24       A.   Correct.
25       Q.   And does she have a contract with
```

```
 1   What the Hales or with you?
 2        A.   Yes.
 3        Q.   And what is the status -- what is
 4   her status in that contract?  Is it as a
 5   service provider?
 6        A.   Frankly, it's none of your business.
 7   That's proprietary information for the
 8   business.
 9        Q.   Is she a service provider paid on a
10   1099?
11                  ATTORNEY SHOCHET:  Objection.
12   Compound question.
13   BY ATTORNEY MATZKIN:
14        Q.   Is Ms. Rizk paid on a 1099?
15        A.   It's none of your business.
16        Q.   Is there a set -- a set amount of
17   payment to her pursuant to a contract over
18   periods of -- you know, a pay period?
19        A.   Yeah.  None of your business.  This
20   isn't relevant to the actual lawsuit.
21        Q.   Okay.  Well, that's not for you to
22   determine, so I'm going to ask you again.
23             Is there a contract with Ms. Rizk
24   that involves a regular amount of payment to
25   her over regular periods of time like pay
```

1    periods?

2        A.    Again, I am determining it.  It's

3    not relevant to the lawsuit.

4        Q.    I will -- I will say this to your

5    Counsel --

6                    ATTORNEY MATZKIN:  I do intend

7    to file a motion based on --

8                    ATTORNEY SHOCHET:  Counsel,

9    you don't need to announce your intentions.

10   I've told you several times, do whatever you

11   have to do.

12                   ATTORNEY MATZKIN:  Well, this

13   is me endeavoring to -- to make the remainder

14   of the deposition productive.  And so if --

15                   ATTORNEY SHOCHET:  You want to

16   go off the record and discuss this?

17                   ATTORNEY MATZKIN:  No, no.

18   This is particularly for the record, and that

19   is this:  You have not controlled your client.

20   Your client has gone on many tirades, and

21   you're --

22                   (Indecipherable crosstalk.)

23                   Hey, Mr. Shochet, may I speak?

24   May I speak?

25                   ATTORNEY SHOCHET:  No, I'm

1    getting the magistrate on the phone right now

2    on the record.   Hang on.

3                    ATTORNEY MATZKIN:   Now,

4    Mr. Shochet, may I speak?

5              You're -- you're not going call the

6    magistrate now, are you, before I've even --

7                    ATTORNEY SHOCHET:   Absolutely.

8    Absolutely are.

9                    ATTORNEY MATZKIN:   -- before

10   -- okay.

11                   ATTORNEY SHOCHET:   Excuse me?

12                   ATTORNEY MATZKIN:   Before I've

13   even spoken and finished what I have to say?

14                   ATTORNEY SHOCHET:   Your -- do

15   you have a question for -- do you have a -- do

16   you have a motion to make on the record or a

17   question for my client other than a speech to

18   me?

19                   ATTORNEY MATZKIN:   My question

20   is --

21             Can you read the last question,

22   Alyssa?

23                   THE REPORTER:   One moment.

24                   ATTORNEY SHOCHET:   While she's

25   looking, do you have any exhibits?   Wait.   I'm

1  sorry.  This is important.

2           Do you have any -- a different --

3  are you going to be using these same exhibits

4  on Wednesday for Ms. Martha Rizk's deposition,

5  or do you have another set?

6           ATTORNEY MATZKIN:  I'm not

7  going to start talking about that.  I just need

8  the last question read back, please.

9           (Reporter read back from the

10  record.)

11  BY ATTORNEY MATZKIN:

12      Q.    Do you understand the question?

13      A.    Yes, I do.

14      Q.    Can I have your answer, please.

15      A.    You already got my answer.  That's

16  confidential business information that you're

17  not entitled to and has no relevancy to this

18  lawsuit whatsoever.

19      Q.    Relevancy is not a proper objection

20  in a deposition.

21           ATTORNEY SHOCHET:  Motion to

22  strike what Mr. Matzkin just said.

23           Do you have another question?

24           ATTORNEY MATZKIN:  I'm asking

25  you to instruct your client to answer the

1  question, unless you're instructing him not to

2  answer on the grounds of privilege.

3              ATTORNEY SHOCHET:  I didn't

4  hear a question.

5              ATTORNEY MATZKIN:  I'm asking

6  you, Attorney Shochet, to instruct your client

7  to answer the last question unless you're

8  instructing him not to answer on the ground of

9  privilege.

10              ATTORNEY SHOCHET:  Did you

11  hear me instruct him not to answer?

12              ATTORNEY MATZKIN:  So,

13  therefore, I'm asking you to ask him to answer

14  the question.

15              ATTORNEY SHOCHET:  I'm not

16  here to do that, Counsel.  He's answered the

17  question.

18              ATTORNEY MATZKIN:  So you're

19  not here to tell -- you're not here to tell

20  your client to answer a question that's been

21  asked in a deposition?  You're his counsel in a

22  deposition, but you're not going to tell him to

23  answer a question that you're not instructing

24  him not to answer?

25              ATTORNEY SHOCHET:  If you're

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

1   not happy with his answer, you can do things

2   with it.  Please move on.

3                     ATTORNEY MATZKIN:  I will.

4   BY ATTORNEY MATZKIN:

5        Q.   How come the -- the E-mail from

6   Ms. Preston to Mayor Dan in Ohio was not

7   alleged in your Complaint?

8                     ATTORNEY SHOCHET:  Objection.

9   That's attorney/client privilege and work

10  product.  And that I will instruct him not to

11  answer unless you can answer that question

12  outside of conversations that you and I had.

13                     THE WITNESS:  I can't.

14                     ATTORNEY SHOCHET:  You can't?

15  Well, then don't answer the question.

16  BY ATTORNEY MATZKIN:

17       Q.   Am I correct that there was an

18  E-mail sent by Ms. Preston to a person that we

19  refer to as Mayor Dan, who is the mayor of your

20  hometown in Ohio; correct?

21       A.   Yes.

22       Q.   And to the best of your

23  recollection, what did that E-mail say?

24       A.   To summarize, to the best of my

25  recollection, basically, she was trying to warn

1    Mayor Dan to try and remove me from the town

2    that I live in.

3         Q.    When you say, "remove you," what

4    does that mean?

5         A.    She doesn't want me living anywhere.

6    She wants to cause problems wherever I'm at,

7    including whether I'm in Ohio or Florida or

8    anywhere else.

9         Q.    Okay.  But when you say that she

10   wrote an E-mail to try to have you removed from

11   the town in Ohio, is that what you testified?

12        A.    I'm testifying first she contacted

13   the Town Hall multiple times on the phone and

14   then threatened to call the local news station

15   if she didn't get in contact with the actual

16   mayor.

17             Then she sent an E-mail to the mayor

18   and, in an essence, summarizing that she

19   doesn't -- she wants the mayor to know what a

20   problem I am.

21        Q.    And -- but you said to have you

22   removed.  So was there something in this E-mail

23   that suggested that you should be kicked out of

24   the town?

25        A.    Would you like to bring the E-mail

1    up so we can actually read it?

2        Q.    I don't have it.

3        A.    Why not?  You're asking questions

4    about it.

5        Q.    So what town is it, by the way, in

6    Ohio?

7        A.    It really doesn't have any relevancy

8    to the issue here.

9        Q.    The town that Mayor Dan is the mayor

10   of?

11       A.    Well, in all reality, it's not a

12   town.  So your question is wrong.

13       Q.    Well, what is he the mayor of, even

14   if it's not a town?

15       A.    He's the mayor of a village.

16       Q.    And what's the name of the village?

17       A.    I don't really think it matters.

18             ATTORNEY SHOCHET:  It's public

19   record.  It's public record.

20             THE WITNESS:  Peninsula.

21   BY ATTORNEY MATZKIN:

22       Q.    Peninsula, Ohio, is that the address

23   somebody would write on an envelope?

24       A.    Yes.

25       Q.    And what's the Zip code?

1      A.    44264.

2      Q.    I do -- I do want to have you open

3   Exhibit 73, please.

4           (Deposition Exhibit No. 73 was

5   marked for identification.)

6   BY ATTORNEY MATZKIN:

7      Q.    Yes.   73, which is a JPEG.

8               ATTORNEY SHOCHET:  A what?

9   Hang on.

10              ATTORNEY MATZKIN:  It's not a

11  PDF, but you know, it's a screenshot.

12              ATTORNEY SHOCHET:  Okay.

13  Sorry.  It's a one-page police report.  Okay.

14  We have it.

15  BY ATTORNEY MATZKIN:

16     Q.    And is that a police report dated --

17              ATTORNEY SHOCHET:  It's really

18  touchy.

19  BY ATTORNEY MATZKIN:

20     Q.    It doesn't seem to have the exact

21  date on it, does it?  Or am I missing that, the

22  date of the report?

23          Well, in any event, does the report

24  say that you -- that the writer spoke on

25  1/17/2024 to someone who is blacked out, "who

1    advised that he believes Lynette Preston

2    violated their no contact order"?

3            So we're looking at the same thing?

4        A.    That is the first line, yes.

5        Q.    All right.  And would you agree with

6    me there's no doubt that the name that's been

7    redacted is yours?

8        A.    I honestly do not know.  It's

9    redacted.

10       Q.    I understand that.

11       A.    And I have not -- I have not read

12   the rest of the police report.  I've only

13   looked at the first line.

14       Q.    Okay.  I'll tell you what:  You take

15   a minute or two or three, even, and please read

16   it.  And then my question will be whether

17   you're willing to acknowledge that the -- it's

18   yours.

19               THE WITNESS:  Can you increase

20   that?

21               ATTORNEY SHOCHET:  Yeah.  It's

22   very touchy.

23               THE WITNESS:  Yeah, it's very

24   touchy.

25               ATTORNEY SHOCHET:  I just

1  touch it, and it just moves.  Is that better?

2              THE WITNESS:  Yeah, that's a

3  little better.

4          Yes, that redacted would be Jeremy

5  Hales.

6  BY ATTORNEY MATZKIN:

7      Q.    I appreciate that.

8              And can you read the last line and

9  use your name in place of the blacked out part

10  out loud, please.

11      A.    Is that the last line?

12              ATTORNEY SHOCHET:  The "no

13  contact order," that's the last line?

14              ATTORNEY MATZKIN:  The very

15  bottom of the E-mail.

16              ATTORNEY SHOCHET:  Where it

17  says, "The no contact order?"  "The no contact

18  order"?

19              ATTORNEY MATZKIN:  Two

20  paragraphs below that would be the last --

21              ATTORNEY SHOCHET:  Okay.  It's

22  just we got to get this thing -- this document

23  is -- okay.  There.  We can pull it up.  Now

24  you can see that.

25              THE WITNESS:  "It should be

1   noted" -- "It should be noted that during my

2   encounter with Jeremy I asked him if Lynette's

3   phone number was blocked from his phone.

4   Jeremy replied he had the number blocked before

5   but unblocked it in order to try and get her to

6   break the injunction."

7   BY ATTORNEY MATZKIN:

8        Q.    Do you agree or dispute that

9   statement?

10       A.    Absolutely disagree.  I can't force

11  anybody to break an injunction.  I can't force

12  your client, Lynette, to break an injunction.

13  But what I can do is hold her accountable when

14  she does.

15            So for example, I blocked her

16  because of all of her crazy rants.  And then I

17  unblocked her because she was told by a

18  court -- found guilty for stalking that she was

19  not allowed to be contacting me.  And the only

20  way I would know if she was contacting me is if

21  she was unblocked.

22            And, no, you can't force another

23  person to actually break a civil protection

24  order.  Only Lynette can break that civil

25  protection order.

1      Q.    Okay.  So my question, then, is:

2   Did you make this statement --

3      A.    No.

4      Q.    -- that the report says you make?

5      A.    No.  The officer -- the officer

6   said, "Do you have her number blocked?"  I

7   said, "Obviously not.  Here's the text message.

8   I did have her blocked.  I have her unblocked

9   to know if she breaks the civil protection

10  order."

11     Q.    How would unblocking it enable you

12  to know if she breaks the civil protection

13  order apart from --

14     A.    Are you literally that dumb?  If

15  she's blocked and she contacts me via phone I

16  won't know.  If she's unblocked and she

17  contacts me, I will know, therefore breaking

18  the civil protection order which you literally

19  are having me look at a police report where she

20  broke the civil protection order because she's

21  unblocked.  That's how I know.

22     Q.    I understand.  Okay.  So I just want

23  to see -- see if I understand.

24          So you had her blocked, and that

25  prevented her from -- even if she were trying

1    to reach you, you wouldn't know because it was

2    blocked; right?

3        A.    Correct.

4        Q.    All right.  And so I guess,

5    theoretically, a third-party witness might be

6    there seeing her attempting to call you, maybe

7    not realizing she's been blocked, and they can

8    report that and say, "Hey I saw her try to call

9    Jeremy.  He doesn't know because it was

10   blocked"; right?

11       A.    I don't live in a world of

12   theoreticalities.  I live in a world of facts.

13   She texted me.

14       Q.    All right.  So while blocked,

15   although possible for her to attempt to contact

16   you, maybe she knew she was blocked; maybe she

17   didn't.  But certainly, she can attempt to call

18   you while blocked; correct?

19       A.    Yes, she could.

20       Q.    And in that case, you would never

21   know, at least not just from the call itself,

22   correct?

23       A.    Correct.

24       Q.    All right.  So you then at some

25   point in time chose to unblock her number;

1   correct?

2       A.    It's a statement.  You got any

3   questions?

4       Q.    Correct?

5       A.    Oh, my goodness.

6                ATTORNEY SHOCHET:  Objection

7   to form.  Ask a question.

8                THE WITNESS:  Ask a question.

9   BY ATTORNEY MATZKIN:

10      Q.    At some point in time, you chose to

11  unblock her number; correct?

12      A.    I already answered that question.

13      Q.    That was "yes"; right?

14      A.    I already answered that question.

15  The no -- broke the civil protection order,

16  she's unblocked because she was court ordered

17  not to break the civil protection order.  How

18  am I supposed to know if she breaks it if she's

19  blocked?

20      Q.    Okay.  What -- you know, what

21  precipitated your decision to take the overt

22  act of unblocking the number?

23      A.    Did you not hear my last statement

24  which matched exactly what I said multiple

25  times before?

1      Q.    I guess I didn't understand it.

2      A.    There is a legal civil protection

3  order against your client, Lynette Preston,

4  which states she may not contact me whatsoever.

5  The only way to keep that accountable to know

6  if she's contacting me is to unblock her.

7      Q.    But if she's blocked, it's

8  impossible for her to contact you?  It's only

9  possible for her to futilely attempt to contact

10  you; right?

11      A.    Again, another great statement.  You

12  got any questions?  Do you not know how to ask

13  a question?

14      Q.    Well, your testimony was that you

15  unblocked her, so you would know if she is

16  breaking the protection order; right?

17      A.    My testimony was there's a civil

18  protection order against her, and to know

19  whether she is actually breaking that civil

20  protection order of actually contacting me she

21  is unblocked.

22      Q.    But it's impossible for her to

23  contact you while blocked; right?

24            ATTORNEY SHOCHET:  Form.

25  Objection to form.

1           THE WITNESS:  How would it be

2    impossible?  She's broken the civil protection

3    order in person time and time and time again.

4           There are many facets to this civil

5    protection order.  You can roll your eyes as

6    much as you want.  You already know what she's

7    done over and over again.  She's been found

8    guilty over and over again.

9           She continues to block our way.  He

10   continues to block our way into places where

11   they are to leave immediately.  They're not

12   allowed to be anywhere near us within 500 feet.

13   Any public price, any private place, any public

14   road, any private road.  They are not allowed

15   to have any contact with us whatsoever.

16           Just because I block her on the

17   phone doesn't mean she can't get on something

18   else to try to contact us with her many --

19   multiple fake accounts.

20           You want me to keep going on?  You

21   obviously know she can contact me.  She's done

22   it.  She's been found guilty of it.

23   BY ATTORNEY MATZKIN:

24       Q.   Okay.  Now, let me clarify:  So it

25   would be impossible for her to break the order

1    using the blocked phone number while blocked;

2    correct?

3         A.    No.   Incorrect.   There's a million

4    different ways she can do it.  Oh, let's think

5    of some.  That's right.  Her grandson was at

6    the property.  Oh, that's right.  The Levy

7    County Sheriff took her phone as evidence.  She

8    has another phone.

9              She can contact me a million

10   different ways under different names, different

11   profiles.  No, it's not impossible by any

12   stretch of the imagination.  And she's known

13   and has a pattern of creating multiple profiles

14   and doing such things with multiple devices and

15   multiple electronics such as multiple phones,

16   just like when the Levy County Sheriff took her

17   phone as evidence when Cook got arrested for

18   brandishing a firearm at yet another person.

19              ATTORNEY MATZKIN:  Can you

20   read back the question, Alyssa?

21              (Reporter read back from the

22   record.)

23   BY ATTORNEY MATZKIN:

24        Q.    Using the blocked number; correct?

25        A.    No, not correct.  You can download

1    apps, change your number, get through blocks;

2    not correct in any stretch of the imagination.

3         Q.    Okay.  Is it your testimony she

4    violated the protective order using the phone

5    number that we're talking about while it was

6    blocked?

7         A.    Oh, my goodness.  The stupidity.

8         Q.    But you just said that there's other

9    ways to get through a block.  So while you had

10   her number blocked, is it your testimony she

11   committed a violation using that number?

12        A.    The absolute asinine stupidity.

13   You're literally looking at the police report.

14        Q.    Can you speak up?

15        A.    My testimony is -- my testimony is

16   that your client contacted me breaking the

17   civil protection order that is placed on her.

18        Q.    Okay.  So my question is -- there

19   was a time when you had her number blocked.

20   We're talking about a particular phone number,

21   right, like, the number that you blocked that

22   you refer to --

23        A.    Looks like it's right there.

24   (941) 249-2195.

25        Q.    Okay.  So you had blocked that at

```
 1   some point in time; right?

 2        A.    Yes.

 3        Q.    Okay.  Do you remember about when?

 4        A.    No.

 5        Q.    And then you unblocked it at some

 6   point in time; right?

 7        A.    Yes.

 8        Q.    Do you remember about when?

 9        A.    No.

10        Q.    And while it was unblocked after you

11   unblocked it, am I right that you received a

12   text message from her -- Ms. Preston from that

13   number?

14        A.    Yes.

15        Q.    And do you remember when you

16   received that text message?

17        A.    Is there a date on the police

18   report?

19              ATTORNEY SHOCHET:  Do you

20   remember without looking at the report?

21              THE WITNESS:  Without looking

22   at the report?  No.

23   BY ATTORNEY MATZKIN:

24        Q.    Okay.  Was it around the time of the

25   deposition -- her deposition in January?
```

```
 1        A.    Without looking at the report, I
 2   don't know.
 3        Q.    Do you remember what the text said?
 4        A.    Without looking at the report, I
 5   don't know.
 6        Q.    Do you know if the violation is
 7   depicted in the Zoom video deposition?
 8        A.    I don't understand this question
 9   either.
10        Q.    Is it your -- is the act of her
11   contacting you with that phone number in
12   violation of the order depicted in the video
13   during the deposition?  Did she do it during
14   that deposition?
15        A.    That I don't recall either.
16        Q.    Do you recall mentioning that you
17   had recently reported four new violations of
18   the protective order?
19        A.    Yes.
20        Q.    And did you mention that on a
21   livestream or on a rerecorded YouTube video
22   within the last couple of weeks or so?
23        A.    I don't recall.
24        Q.    Well, what would you estimate when
25   that was, how long ago that you mentioned the
```

1   four new violations?

2       A.    I don't recall, and I don't recall

3   whether it was prerecorded or a livestream.

4       Q.    All right.  So did you report four

5   violations of the protective order that aren't

6   already a subject of these reports that we've

7   been looking at?

8       A.    Can you ask a clear question,

9   please.

10      Q.    Did you recently report four new

11  violations of the Ohio protective order?

12      A.    Yes.

13      Q.    And how did you report them?  Did

14  you visit the Levy County Sheriff's Office?

15      A.    Levy County Sheriff Office came out

16  and got the information and the report from me

17  and the videos.

18      Q.    And what precipitated their visit?

19  Did you make a phone call?

20      A.    Yes.

21      Q.    And do you remember when this was?

22      A.    I don't know the exact date.

23      Q.    Was it during your current period of

24  time being in Florida, or had there been, you

25  know, a time in Ohio in between when you made

1    that report and your current time?

2        A.    During my time in Florida.

3        Q.    And when did you arrive in Florida

4    last?

5        A.    I don't remember the exact date.

6        Q.    Was it less than a month ago?

7        A.    No.

8        Q.    Probably six weeks roughly?

9        A.    I don't remember the exact date.

10       Q.    Okay.  And so after you arrived in

11   Florida, do you know how long after you arrived

12   you went to the -- you made that call, and then

13   the sheriff county -- Levy County Sheriff

14   visited your property?

15       A.    Is there a question in there

16   somewhere?

17       Q.    How long after you arrived in

18   Florida did the Sheriff's office visit you to

19   take this report of four violations?

20       A.    I don't recall the exact date.

21       Q.    Approximately?

22       A.    I don't recall the exact date.

23       Q.    So how did this begin?  Did you pick

24   up the phone and call, "I want to report four

25   violations.  Please send somebody over"?

```
 1        A.    I called Levy County Sheriff to
 2   report a violation.
 3        Q.    And did they say, "Okay.  We'll send
 4   somebody over"?
 5        A.    Yes.
 6        Q.    And did they send somebody right
 7   over then, or was it later in the day?  The
 8   next day?
 9        A.    They sent two officers over
10   immediately.
11        Q.    And do you remember the names of the
12   officers?
13        A.    No.
14        Q.    Had you met either one of them
15   before?
16        A.    I don't recall.
17        Q.    Were they male or female?
18        A.    Two males.
19        Q.    Since then, have you come to learn
20   their names?
21        A.    I don't recall.
22        Q.    Okay.  Is it on -- is it reflected
23   on the report?
24        A.    I don't have a report yet.  I still
25   have to FO -- I have to get the request for the
```

1   report, and then it will be reflected on the

2   report.

3        Q.    Okay.  So how long did they -- how

4   long did they stay when they arrived?

5        A.    I don't recall.

6        Q.    Was it an hour or less?

7        A.    It was less than an hour.

8        Q.    And where did you speak with them?

9   Was it indoors or outdoors?

10       A.    Outdoors.

11       Q.    Can you describe the location?

12       A.    One of my properties in Otter Creek.

13       Q.    Yeah.  Can you be more specific?

14       A.    351 Florida State 24, Otter Creek.

15       Q.    Is that what's known as "The

16  schoolhouse?"

17       A.    Some people call it the schoolhouse.

18       Q.    So did you meet them at the gate of

19  that property where a visitor would have to

20  enter?

21       A.    No.

22       Q.    They were let in, or they entered

23  through the gate and then met you somewhere

24  else on the property?

25       A.    Correct.

1      Q.    Okay.  And then did you have this

2   conversation standing outside standing up?

3      A.    Yes.

4      Q.    And were the two officers recording?

5   Do you know?  Or just writing?

6      A.    I do not recall.

7      Q.    Okay.  And you reported to them four

8   separate violations?

9      A.    I gave them four separate videos to

10   report violations.

11      Q.    And can you tell us about those four

12   videos, you know, the first of the four videos?

13      A.    I don't know which order they were

14   in.  No. 1 would be John Cook laughing, running

15   towards sheets, laughing about George having

16   cancer.

17           Another would be John Cook talking

18   to me at the edge of his property as he's

19   filming and then going, "Your Honor, Your

20   Honor, see this is what I got to go through

21   every day," which is communication with me.

22           Another is John Cook violating the

23   protection order at the post office.

24           Another is John Cook and Lynette

25   violating the protection order driving straight

1  towards me as they see me on the road on North

2  Otter Creek Avenue.  They see me.  They stop.

3  Instead of turning around, they drive straight

4  towards me.

5              ATTORNEY MATZKIN:  And are

6  those videos -- can you produce those videos to

7  me by my request now, or do I need to go

8  through a formal procedure to request them?

9              ATTORNEY SHOCHET:  You're

10  going to need to go through a formal procedure.

11  BY ATTORNEY MATZKIN:

12      Q.    Okay.  So the video you described of

13  the -- well --

14              ATTORNEY MATZKIN:  Well,

15  Mr. Shochet, I would say that they're

16  responsive to the already-propounded requests,

17  but we can discuss that.

18  BY ATTORNEY MATZKIN:

19      Q.    So the video about the -- you

20  mentioned the post office.  Was one of them

21  about the post office?

22              ATTORNEY MATZKIN:  I'm sorry.

23  Alyssa, can you repeat the description of the

24  four videos?  Let's have her repeat the

25  description of the four videos, please.

1    Mr. Hales' description of the four videos.

2                    (Reporter read back from the

3    record.)

4    BY ATTORNEY MATZKIN:

5        Q.    Got you.  Okay.

6              So the laughing about cancer,

7    running towards the sheets.  Can you describe

8    that in a little more detail?  What do you mean

9    by "running towards the sheets"?

10       A.    Which part don't you understand?

11   "Running?"  "Towards?"  Or "sheets"?

12       Q.    Which sheets?

13       A.    You're going to play dumb like you

14   don't know they've got sheets hung up right

15   now?

16       Q.    So when did this violation --

17   alleged violation occur?

18       A.    I don't have the exact date.  I'd

19   have to get the report.

20       Q.    And when you say, "He was laughing

21   about George having cancer, running towards the

22   sheets," how did you witness this?

23       A.    Well, I film every time I have to

24   drive by there for my own protection and

25   accountability, and I have ears, and I can hear

1    it.

2          Q.    Oh.  So you were driving by filming.

3    And were you filming with your arm out the

4    window holding a cell phone?

5          A.    I film the only way I know how to

6    film with something in my hand.  With a cell

7    phone.

8          Q.    Okay.  So on this particular day,

9    you were driving on the road between the

10   property -- between your property and their

11   property; right?

12         A.    Correct.

13         Q.    And were you driving in the

14   direction such that the driver side was closer

15   to their side or your side?

16         A.    Their side.

17         Q.    Okay.  So you're driving by, and

18   you're holding the cell phone out the window,

19   filming for protection and accountability;

20   correct?

21         A.    Correct.

22         Q.    And tell me what happened then that

23   constitutes the violation.

24         A.    We already covered this.

25         Q.    Well, I'm asking you to now describe

1  it now that I've set the scenario.

2       A.    We literally have already covered

3  this multiple times.  Running towards the

4  sheets, laughing, going, "Ha, ha, ha, ha,

5  George cancer."  Communication.

6       Q.    Running in what direction?

7       A.    Breach of civil protection order.

8  Communication.  Intentional.  Willingly.

9  Knowingly communication.  Literally running

10 towards so I would hear him.  Literally running

11 towards so I will see him.  Literally

12 willingly, knowingly violating the civil

13 protection order.  Not turning around like he's

14 supposed to.  Not minding his own business like

15 he's supposed to.  Taunting, making contact

16 with me.  Intentionally making contact with me.

17      Q.    Are you finished?

18            Where was he running from?  What

19 direction, or what building?

20      A.    Behind the sheets.

21      Q.    So you were driving by, and he

22 emerged from behind the sheets, so you could

23 see him?

24      A.    Yes.

25      Q.    And then he moved in what direction?

1    Toward the road?  To the left?  To the right?

2        A.    Towards me, towards the road.

3        Q.    I see.  So you're driving by.  Your

4    cell phone is out the window, and he shows up

5    from behind the sheets and starts walking

6    towards the road.

7              And was he filming?  Was he holding

8    a cell phone?

9        A.    I do not know.

10       Q.    Okay.  But he was walking towards

11   the road and saying what?

12       A.    Oh, my goodness.  We already covered

13   this.  Move on.  Ask a relevant question.

14       Q.    So he emerged from behind the sheet

15   and began walking towards the road saying what?

16       A.    I already answered this.  Ask

17   another question.

18       Q.    I need you to answer it now.

19       A.    I already answered it multiple

20   times.  As a matter of fact, you could probably

21   answer it.  You know what I said.

22              ATTORNEY MATZKIN:

23   Mr. Shochet, it's a really simple question.

24   Would you mind asking him to just give me a

25   simple answer?

1          ATTORNEY SHOCHET:  He answered

2     it two times.  Even I can memorize what he

3     said.

4     BY ATTORNEY MATZKIN:

5          Q.    Mr. Hales, what did Mr. Cook say as

6     he walked from behind the sheets towards as you

7     were driving by filming?

8          ATTORNEY SHOCHET:  All right.

9     One more time, then that's it.

10          THE WITNESS:  He was laughing

11     out loud to make sure I could hear him, which

12     is covered on the cell phone video footage,

13     mocking George having cancer.

14     BY ATTORNEY MATZKIN:

15          Q.    But I want words spoken, not your

16     characterization.

17          A.    Well, you can have the video when

18     you go through the proper channels to get the

19     video, and you'll hear them.

20          Q.    But do you remember what he said,

21     not just a --

22          A.    I do not have the video right now.

23          Q.    Do you remember what he said?  Do

24     you remember what he said?

25          A.    I just told you what he said for the

1    third time, and I'm not going to answer it

2    again.

3         Q.    All right.  And the second violation

4    that you reported.  You said that Mr. Cook was

5    on the edge of his property yelling, "Your

6    Honor, this is what we have to go through"?

7              Is that correct?

8         A.    Oh, my goodness.  We finally got a

9    question out of this statement.  Wow.

10             Yes.

11        Q.    And, again, let's set up this

12   scenario.  Where were you at this time?

13        A.    Driving.

14        Q.    Was this a different day than the

15   first one?

16        A.    Yes.

17        Q.    Okay.  So was it the same thing,

18   where you were driving on the road filming for

19   accountability and protection?

20        A.    Yes.

21        Q.    And also with your side -- the

22   driver side closer to their property?

23        A.    Yes.

24        Q.    And as you were driving by, you saw

25   Mr. Cook on his property?

1        A.    Yes.

2        Q.    And did you stop or slow down?

3        A.    I always slow down when there's an

4    individual near the road.  Not to mention they

5    have publicly posted stating that I go 65, 70

6    miles per hour, that they even posted signs,

7    "Slow down."  They posted signs.  You don't

8    want me to slow down?  So, yes, I slowed down.

9        Q.    Okay.  And so tell me, then, what

10   happened that constitutes a violation?

11       A.    Communication.  Contact.

12       Q.    Well, again, you're characterizing,

13   so I'd like you to give me the facts.

14            What exactly did he do or say?

15       A.    And, again, I already told you, and

16   this is the last time I'm going to answer the

17   question.  He is filming me as I'm filming him

18   and going, "Your Honor, this is what I have to

19   go through every day."  There is no "Your

20   Honor."  The communication is with me.  I'm the

21   only person there.

22       Q.    And then you talked about a

23   violation occurring at the post office?

24       A.    Nice statement.  You got a question?

25       Q.    Yes.  Please tell me about that

1    violation.

2         A.    He violated.  He was within the 500

3    feet at the post office.

4         Q.    Do you recall when?

5         A.    No.

6         Q.    Was this on a different day than the

7    first two we've just discussed?

8         A.    Yes.

9         Q.    And did you arrive at the post

10   office after he was there or the other way

11   around?

12        A.    I arrived at the post office after

13   he was there.

14        Q.    So you parked your vehicle, did you?

15        A.    No.  I was in the road.  He was in

16   the road on Route 24.  He was driving.  I was

17   driving.  And he already knows we're at the

18   post office every day roughly at 2:30 dropping

19   off packages, and he went there at 2:30.  He

20   pulled in.  I stayed on the road and told him

21   to "leave.  Leave now."  He got back in his

22   vehicle.  Spit rocks at my vehicle.  And then

23   did not leave within 500 feet.  He went to the

24   next parking lot, which is less than a hundred

25   feet away.

1    Q.    So you and he were both in your

2    vehicle.  Like you were behind him driving, and

3    he knew you were behind him, driving, going to

4    the post office?

5        A.    Yes.

6        Q.    And so it's your testimony that he

7    then pulled into the post office knowing that

8    that would create this issue of a violation?

9        A.    And he made verbal contact, as well.

10       Q.    And what was the verbal contact?

11       A.    I'd have to look at the video again.

12   I don't recall.

13       Q.    Okay.  And then you say you didn't

14   pull into the parking lot, but you said

15   something to them verbally to leave?

16       A.    I told them to "Leave.  Leave now."

17       Q.    And then you said that he left but,

18   like, spit rocks, meaning, like, he peeled out?

19       A.    Yes, to kick rocks at my vehicle.

20       Q.    Did it cause any damage?

21       A.    Not to my knowledge.

22       Q.    And then you say he drove only a

23   hundred feet away to another parking lot?

24       A.    Yes.

25       Q.    Okay.  And then what did you do?

1        A.    I continued to film until he left.

2        Q.    So you mean he left from that spot

3    that he originally driven to hundred feet away?

4        A.    Eventually, because I was continuing

5    to film him.

6        Q.    And how long did you --

7        A.    The whole accountability thing.

8    When he's breaking the law.  When he's breaking

9    civil protection orders which he should have

10   immediately got in his vehicle and left within

11   500 feet, but he chose not to -- willingly,

12   knowingly chose not to.  He chose to park less

13   than hundred feet away to still be breaking the

14   civil protection order until two people --

15   myself and Deanna West -- continued to film him

16   until he eventually left.

17       Q.    Was Deanna West in the vehicle in

18   with you?

19       A.    No.

20       Q.    Where was she?  How did she come

21   upon the scene?

22       A.    She was in her own vehicle.

23       Q.    But was she making the trip to the

24   post office in conjunction with you?

25       A.    Yes.

1    Q.    So you were, like, both delivering

2    packages?

3    A.    Yes.

4    Q.    And so how long did Mr. Cook remain

5    a hundred feet away and then finally leave?

6    A.    I don't recall.  I'd have to review

7    the video.

8    Q.    But you do recall being --

9    A.    And let's be very clear:  Even if

10   he's not -- even if he's there for a second,

11   two seconds -- I don't care if it's five

12   minutes, ten minutes.  It's a break and a

13   breach and a violation of the civil protection

14   order.

15        One second, half a second is a break

16   and a breach and a violation of the protection

17   order.  I can care less about the time.  And

18   frankly, you should care less about the time.

19   You should be telling your clients to stay as

20   far away from as possible so they don't end up

21   breaking the law.

22   Q.    When you got the civil protection

23   order in Ohio, that was after you had filed but

24   been denied one in Florida; am I right?

25   A.    I never filed for one in Florida.  I

1   was not denied one in Florida.

2       Q.   So it's your testimony that you did

3   not apply for a protection order in Florida?

4       A.   I eventually applied for a

5   protection order in Florida once I had my civil

6   protection orders in Ohio.  But the way that

7   you phrased the question was the understanding

8   that I applied for one in Florida, got denied,

9   therefore, went to Ohio.

10          That was completely and totally

11  incorrect.

12      Q.   Okay.  So to be clear, your

13  testimony is there's no record of any filing by

14  you in Florida prior to when you went to Ohio

15  to get a protective order?

16      A.   Correct.

17      Q.   And then you said you did file after

18  you got the Ohio protective order.  You said

19  you tried to file for a Florida protective

20  order?

21      A.   Correct.

22      Q.   Okay.  And where did that get filed?

23      A.   Levy County.

24      Q.   And what happened with that

25  application?

1      A.    Judge Craig DeThomasis sealed it and

2  denied it.

3      Q.    So there is a -- albeit a sealed

4  record, of a filing by you seeking a protective

5  order in Florida that was ruled on and denied

6  by Judge DeThomasis?

7      A.    Correct.  Illegally.  Both state

8  law --

9      Q.    Did you --

10     A.    -- state -- I'm not finished -- both

11 state law was broken by Judge Craig DeThomasis

12 and both federal law was broken by Judge Craig

13 DeThomasis.  And then he sealed it so nobody

14 would have any access to it.  But then I paid

15 to have it unsealed to find out exactly what he

16 did.

17     Q.    Has it been unsealed?

18     A.    To me; not to you.

19     Q.    So you have -- well, even if it were

20 sealed and not unsealed, you still, of course,

21 have a record or file of what you filed, right?

22 An electronic copy; right?

23     A.    Yes.

24     Q.    So will you produce that in

25 discovery?

1              ATTORNEY SHOCHET:  I need to

2    see your request, Counsel.

3              ATTORNEY MATZKIN:  Okay.  I'm

4    pretty sure it was responsive to other

5    requests, but if we need to, we will.

6    BY ATTORNEY MATZKIN:

7         Q.    So Ms. Preston was pro se,

8    unrepresented by counsel, during the

9    proceedings in the Ohio court, the evidentiary

10   proceeding; correct?

11        A.    I do not know Ms. Preston's legal

12   background or who is helping or representing

13   her except for you.

14        Q.    Well, in the Ohio proceeding that

15   you filed and were granted a protective order,

16   to your knowledge, did she have a counsel of

17   record at the time of that proceeding?

18        A.    Within the courts, she did not have

19   a counsel of record.

20        Q.    And the fourth new -- fourth

21   violation that you testified to recently

22   reported involved them driving towards you on

23   the road; correct?

24        A.    Yes.

25        Q.    Okay.  Can you give us more details

1    about that, please.  What road?

2         A.    North Otter Creek Avenue.

3         Q.    And when you say, "driving towards

4    you," were you in a vehicle, or were you on

5    foot?

6         A.    Vehicle.

7         Q.    And were you driving away from your

8    property or towards it going back home?

9         A.    Both.  I have multiple properties.

10   I was leaving one property going to another

11   property.

12        Q.    Okay.  And so tell us what the

13   violation consisted of.

14        A.    The violation consisted of not being

15   more than 500 feet away from me on any public

16   or private road.  They stopped knowing that

17   they were going to break the violation.

18   Instead of backing up and removing themselves,

19   they broke it intentionally, willingly,

20   knowingly.  They stopped.  They knew they were

21   going to break it.  And then they moved

22   forward.

23        Q.    Okay.  I've got to understand this a

24   little better.  So were you saying that you

25   were driving, and then they were coming in the

1    other direction?

2         A.    Correct.

3         Q.    Okay.  Were they -- did you, you

4    know, surmise they were coming in the other

5    direction to, you know, go back to their

6    property?

7         A.    Doesn't matter.  Where in the civil

8    protection order do you read it matters where

9    they break and violate?  It matters based on

10   where they're going, where they've been.  It

11   matters based on how much time.  It matters

12   based -- none of that matters, so stop asking

13   stupid questions.  You're sounding like an

14   ignorant fool.

15              The only thing that matters is they

16   broke and violated the civil protection order.

17   The only thing in the civil protection order is

18   they must stay 500 feet away from myself and

19   George at all times.  No matter where they're

20   headed, no matter where they're going, no

21   matter where they've been, 500 feet away on

22   every public and private road.  End of story.

23        Q.    So when you saw them, they were

24   coming in in the other direction, and let's say

25   you stopped right there, and they were on their

1    way home.  They would have had to pass you; am

2    I right?

3          A.    Are you that incompetent?  No, they

4    don't pass me.  They turn around, and they go

5    the other way to make sure that they are 500

6    feet away from me, per the civil protection

7    order.

8               They are not legally allowed to be

9    within 500 feet of me on any public or private

10   road --

11         Q.    That -- I'm not --

12         A.    -- public or private building, any

13   public or private place.  They cannot be within

14   500 feet of me.

15              I don't care if they're driving

16   home.  I don't care if they're driving to my

17   place.  I don't care where they're driving,

18   where they came from, where they're going.

19   They cannot be within 500 feet of me.  End of

20   story.

21         Q.    Okay.  You finished?

22         A.    Did it sink into your head yet?

23         Q.    So what I'm really trying -- you

24   know, my question doesn't really go to anything

25   of what you were, you know, just going on

1    about.

2            My question is -- what I'm really

3    trying to do is envision the situation

4    physically the location of the vehicles.  Okay?

5            So they're coming in the other

6    direction, and if they were from the point you

7    saw them, assuming they're just -- and they

8    didn't turn around and let's say you weren't

9    there or they didn't care that you were there

10   and they just wanted to go home and they didn't

11   change directions, they would have to pass you

12   to reach that destination, the point where you

13   were located; is that correct?

14       A.   It makes no difference; any type of

15   destination.  They are legally bound to stay

16   within 500 feet away from me.

17       Q.   So I'm asking if you can just tell

18   me -- what I want to understand is if they were

19   just going home and continued on their routes

20   without regard to the protection order, they

21   would have had to go right past where you were

22   at that moment of time when you spotted them?

23   Yes or no?

24       A.   What I want you to understand is

25   where I was.  They were breaking and violating

 1   the civil protection order.  They may not

 2   legally be within 500 feet of me.  Nothing else

 3   matters.

 4              ATTORNEY SHOCHET:  Let the

 5   record reflect Counsel was laughing and smiling

 6   during Mr. Hales' response.

 7              ATTORNEY MATZKIN:  So,

 8   Mr. Shochet, I wonder if you can ask Mr. Hales

 9   to give me a direct answer to the question I'm

10   actually asking, which is, if you take

11   Mr. Hales' location at the moment in time he

12   spotted them coming in the other direction and

13   they were just going to continue on to go home,

14   would they have to pass him?  Would they have

15   to go right by him?

16              That's the question.  Can he answer

17   that?

18              THE WITNESS:  And the answer

19   is legally, they must remove themselves.

20   That's the answer.

21   BY ATTORNEY MATZKIN:

22      Q.    Did they pass you?

23      A.    That's the law.  That's the law.

24      Q.    Did they drive by you?

25      A.    I'm not done.  The answer is they

1  legally must remove themselves from the

2  situation.  That's what their consequences of

3  their actions have done as they have not only

4  stalked me.  They have harassed me.  They have

5  extorted me.  They have constantly put my life

6  in fear, my loved ones in danger.  The

7  consequences of their action under the law,

8  civil protection, means they remove themselves.

9  That's what they needed to do.

10      Q.    All right.  So what did they do?

11      A.    Violated and broke the civil

12  protection order.

13      Q.    But that's your characterization.

14  So I want to know factually.  So you spotted

15  them.  How far away were you -- how far apart

16  was your vehicle from their vehicle when you

17  spotted them coming the other direction?

18      A.    I don't know.  I don't go out in the

19  middle of North Otter Creek Avenue dragging a

20  tape measurer with my leg wrapped up to my

21  crotch.

22      Q.    And so when you spotted them, did

23  their vehicle continue to come closer to you?

24  Did they continue to drive towards you?  I

25  believe they did, you said; is that correct?

1          A.     I've already answered this multiple

2     times.  Can you ask an actual question?

3                 Let's see.  Let's go -- let's have

4     the civil protection order actually answer this

5     question.  "Respondent shall not initiate or

6     have any contact with the protected persons

7     named in this order and the residences,

8     businesses, places, employment, schools, day

9     care centers, child care providers.  Contact

10    includes, not limited to landline, cordless,

11    cellular, digital tech telephone, text instant

12    messaging, fax, E-mail, voicemail, delivery

13    services, social media, blogging, writings,

14    electronic communication, a personal message,

15    communication by any other means directly or

16    through another person.

17                "Respondent may not violate this

18    order even with the permission of the protected

19    person."

20                ATTORNEY MATZKIN:  Alyssa, I'm

21    going to give you 30 seconds.

22                THE REPORTER:  I'm good,

23    Counsel.  Thank you.

24                THE WITNESS:  You're doing a

25    great job, Alyssa.

```
 1   BY ATTORNEY MATZKIN:
 2        Q.    During this alleged violation of the
 3   Ohio order, did they pass you in their vehicle?
 4        A.    Yes.
 5        Q.    Thank you.  And you continued on
 6   after they passed you, and thereby, your cars
 7   -- your vehicles then became further apart at
 8   that point in time; right?
 9                   ATTORNEY SHOCHET:  Objection
10   to form.
11                   You can answer, if you understand
12   the question.
13   BY ATTORNEY MATZKIN:
14        Q.    When they passed you, were you
15   moving, or were you stationary?
16        A.    Moving.
17        Q.    Okay.  And were you on the right
18   side, and they were on the right side of the
19   road, your right side, and they were on their
20   right side?
21        A.    Yes.
22        Q.    Okay.  And did you have your cell
23   phone out the window for accountability and
24   protection?
25        A.    Yes.
```

1      Q.    And did you see who was in the

2  vehicle?

3      A.    Yes.

4      Q.    And who was in the vehicle?

5      A.    John Cook, Lynette Preston.

6      Q.    And anybody else?

7      A.    Not that I saw.

8      Q.    Who was driving?

9      A.    I'd have to go back and look at the

10  video again to remember.

11      Q.    And was there anyone in your vehicle

12  with you?

13      A.    No.

14      Q.    And did anybody say anything, either

15  you or Michelle Preston or John Cook?

16      A.    No.

17      Q.    Were the windows -- was there a

18  window down?

19      A.    No.

20      Q.    Do you know that they were aware it

21  was you driving towards them?

22            ATTORNEY SHOCHET:  Objection

23  to form.  Calls for speculation.

24            But you can answer, if you knew what

25  they were aware of.

1             THE WITNESS:  Pretty easy to

2    know --

3    BY ATTORNEY MATZKIN:

4         Q.    The question is:  Do you know if

5    they were aware that it was you driving towards

6    them?

7         A.    Pretty easy to know what they're

8    aware of as they have outlined and documented

9    the make and model and color of my vehicle, not

10   only stating that I pass by them filming

11   hundreds of times a day, which is not true

12   whatsoever.  I pass by when is needed to pass

13   by.

14             That they have literally documented

15   in court evidence, court documents my vehicle.

16   They know my vehicle.  They stopped when they

17   saw my vehicle.  And instead of going in the

18   side street and turning around, which they had

19   every opportunity to do, they decided to

20   willingly and willingly violate the civil

21   protection order.

22        Q.    All right.  SO there was a side

23   street.  Now, was the side street between you

24   and their vehicle at the moment you spotted

25   them, or had they already passed it?

1       A.    They did not pass it.

2       Q.    So in the space between the front of

3   your vehicle and the front of their vehicle at

4   the moment in time when you spotted them -- and

5   presumably, they spotted you -- you're saying

6   that there was a side street that they could

7   have turned into?

8       A.    Yes.

9       Q.    And where was that side street

10  relative, you know, to your car?  Was it closer

11  to yours or to theirs?

12      A.    They were right at it.

13      Q.    Would that have been a right turn or

14  a left turn for them?

15      A.    That would have been a right turn.

16      Q.    Meaning, if you were going to turn

17  into that side, it would have been a left turn?

18      A.    Yes.

19      Q.    All right.  And what is that side

20  street exactly?

21      A.    I don't know the name.

22      Q.    How far from the entrance to Turtle

23  Purgatory was this side street?

24      A.    I don't go out and measure.

25      Q.    Well, was it, let's say, you know,

```
 1   less than a tenth of a mile?

 2        A.    Again, I don't go out and measure.

 3        Q.    Well, it was right -- you had just

 4   left your property; am I right?  And they were

 5   on their way home; right?

 6        A.    You sure do make a lot of

 7   assumptions about where they were going, what

 8   they were doing, what I was doing.

 9              But, yes, I was leaving my property.

10   I have no idea where they were going.  And it

11   doesn't matter because they violated knowingly,

12   willingly the civil protection order.  They

13   cannot be within 500 feet of me.  They know my

14   vehicle.  They know everything about my

15   vehicle.  And they willingly, knowingly

16   violated.

17              It doesn't matter where they were

18   going, so you can stop saying they were going

19   home.  I don't care where they were going.  I

20   don't care where they were coming from.  None

21   of it matters.  The Court isn't going to care

22   about it either when it's in Ohio court for yet

23   another violation.  What they're going to care

24   is did they violate, and the answer is, yes,

25   they violated it again.
```

1    Q.    So if they had turned down the side

2    street, you're saying that that would have

3    avoided the violation?

4    A.    If they would have turned down the

5    side street -- that side street feeds right out

6    into Route 19, Route 98 -- they would have

7    avoided it.

8    Q.    Had you ever gone somewhere because

9    you learned or were aware that they were there

10    just for the purpose of using the Ohio

11    protection order to force them to leave?

12    A.    No.

13    Q.    Well, have you ever said on any of

14    your YouTube videos that you would go to one

15    location or another and there -- enforce the

16    Ohio protection order by making them leave?

17    A.    I've clearly stated that I will live

18    my life without consequences because I'm not

19    the one that's been found guilty.  I'm a

20    reseller.  I go to flea markets.  I buy from

21    sellers and then resell.  That is part of a

22    major part of my business.

23        And so if they are at a flea market

24    and I show up at the flea market, they must

25    remove themselves from the flea market.

1           Now, as such, I've not yet gone to

2    that flea market as I've been busy and out of

3    town with other resale opportunities.  But

4    there will be a day where I will be at that

5    flea market because I attend that flea market.

6    I buy from other sellers, and then I resell,

7    which means they will be in violation, and

8    therefore, they must leave.

9        Q.    Okay.  So to be clear, you have not

10   but you do fully intend to attend the -- what's

11   it called?  The flea market?  Is it Chiefland?

12       A.    I fully intend to live my life

13   normally as I always have without

14   repercussions, without consequences, because I

15   haven't broken the law.  They have.

16       Q.    What's the name of the flea market

17   we're talking about?

18       A.    You tell me.

19       Q.    I don't know.  The one where

20   Ms. Preston --

21       A.    I don't know the name either.

22       Q.    All right.  But it's your intention

23   at some point, you fully intend to go to that

24   flea market where Ms. Preston has a booth

25   because you have business there, and when you

1  do, your intention is to make sure that the

2  Ohio order is enforced and that she's made to

3  leave; am I correct?

4      A.    My intention when I have business

5  there is to make sure that I'm protected and

6  the law isn't broken.

7      Q.    And that would, in this case, mean

8  requiring her to leave on threat of contempt of

9  the Ohio order; correct?

10      A.    Those are the consequences of her

11  being found guilty, her breaking the law.

12      Q.    But I'm saying prospectively now, in

13  the future, if and when you go to this flea

14  market, it's your intention to require her to

15  leave on threat of contempt of the Ohio order;

16  am I right?

17      A.    Whether I go to a town hall meeting,

18  whether I go to Walmart, whether I go to

19  McDonald's, whether I go to the Chiefland Flea

20  Market, whether I go home on my own road, if

21  they violate, they're going to be reported.

22      Q.    Okay.  But I want to know

23  specifically about the flea market.  So it is

24  your present intention to, at some time in the

25  future, go there for business, and when you do,

1    you're going to enforce the Ohio order?

2        A.    I've answered the question multiple

3    times.  Move on, or ask a new question.

4        Q.    And do you know -- do you have a

5    time frame of when you expect to invoke your

6    right to go to the flea market and enforce the

7    Ohio order, question mark?

8        A.    It has nothing to do with enforcing

9    an Ohio order.  It has everything to do with

10   protecting myself from these monsters.

11       Q.    So do you have a time frame when you

12   plan -- do you have a plan of when you might go

13   do business at the flea market and then this

14   issue may arise?

15       A.    I have no time frame.  Whenever

16   business is to the point where I need to go and

17   buy and purchase from sellers at the flea

18   market, that's when I'll be there.

19             Same as I don't have a time frame of

20   when I'm going to Walmart, and nor am I going

21   to confer with your clients to say, "I'm going

22   to Walmart right now."  And yet they have

23   broken at Walmart, as well.

24             Your client, Lynette Preston, double

25   birded me, flicked me off with both hands in

1    the parking lot of Walmart.  You think I'm

2    going to go to her and say, "Hey, I'm going to

3    Walmart now.  Please don't be there"?  No.  She

4    is the one that has to immediately leave.

5            So I will live a life normally as my

6    life should be normal except they have

7    terrorized our lives to where it's no longer

8    normal, to the point where we have to put our

9    own piece of property up for sale just to get

10   away from their insanity, just to get away from

11   the harassment, just to get away from their

12   threats, just to get away from they're going to

13   pop a cap in my ass.  They're going to shoot me

14   in the face, and they're going to feed me to

15   the gators.

16           I will live a life normally, as I do

17   every single day, and protect myself from your

18   clients.

19       Q.    The -- so she flipped you the double

20   bird at Walmart?

21           Mr. Hales, she flipped you the

22   double -- Ms. Preston flipped you the double

23   bird at Walmart?

24       A.    You already have that answer.  I've

25   already stated it.

1      Q.    Was that the subject of a violation
2    that you reported?
3      A.    We did in Ohio.
4      Q.    When did the flip the bird at
5    Walmart incident occur?
6      A.    I don't have the dates in front of
7    me.
8      Q.    Was that -- was that brought to the
9    Court in Ohio already filed as a contempt?
10      A.    It's already in the Ohio court.  The
11    magistrate is ruling on it.  We're waiting for
12    the ruling.
13      Q.    Oh, that's one of the two contempts
14    that are still out there; am I right?
15      A.    As I just stated, the magistrate is
16    wait -- we're waiting on the magistrate to make
17    the final ruling.
18      Q.    Okay.  Specifically about whether
19    there was a violation from her at Walmart
20    flipping the double bird; correct?
21      A.    As I just stated, we're waiting on
22    the magistrate's ruling.
23      Q.    And also on another incident, a town
24    hall incident; correct?
25      A.    As I just stated, we're waiting for

1    the magistrate's ruling.

2         Q.    I understand there's a ruling

3    waiting, and I'm wondering -- my question is --

4    you're awaiting the ruling on whether there was

5    a violation from the Walmart double bird

6    flipping incident, No. 1, and also a violation

7    of the order by virtue of being present at town

8    hall, No. 2.

9              Are those the two rulings you're

10   awaiting A magistrate ruling on?

11        A.    There are so many violations of the

12   civil protection order by your clients, I don't

13   even -- can't even keep straight which one is

14   which ruling at what time.

15             But I will tell you, there will be

16   another filing for contempt on the four that we

17   just discussed.

18        Q.    I got you.  All right.  So let's

19   see.

20             You have shown a lot of private

21   messages and chats that you've obtained from

22   people who were party to those private messages

23   and chats with Michelle Preston; am I right?

24        A.    Who's Michelle Preston?

25        Q.    Lynette Preston.  Am I right?

1      A.     There we go.  That's better.  Yeah.

2  Use her real name.  Lynette Preston.  Michelle

3  Preston is the daughter of Lynette Preston, and

4  Lynette Preston is using her daughter's name to

5  scam.

6      Q.     Can you pronounce her name "Lynette"

7  like it's supposed to be?

8      A.     No.  I have a northern accent.  I

9  apologize.  You should probably understand

10  that.  You're from up north, as well.

11      Q.     So am I right, though, that you have

12  shown on YouTube videos on your own cell phone

13  screenshots or actual forwarded messages and

14  chats between people and Michelle -- and

15  Lynette Preston?  Yes or no?

16      A.     Can you show me what you're

17  referring to?

18      Q.     No.  This is just a general

19  question.  Have you on occasion on YouTube

20  shown private chats and messages of which

21  Lynette Preston was a party?

22      A.     No, I haven't shown anything

23  private.  It's been made public.  It's evidence

24  in court.  It's -- it's evidence for anybody to

25  make a public record request.

1       Q.    Well --

2       A.    None of it is private.  If it's

3   made -- if it's made known to me, how can it be

4   private?  So let's actually call it what it is.

5   It's a publication by Lynette Preston.

6       Q.    Well, no.  No.  I'm specifically

7   asking about your publication of private chats

8   and messages between Lynette Preston and other

9   parties who provided them to you?

10      A.    There is no privacy, so drop the

11  word "private."  There is no privacy.  It's the

12  internet.  Anything can be subpoenaed.  Even

13  text messages can be subpoenaed.  There is no

14  privacy whatsoever.  So stop saying "privacy."

15      Q.    Fair enough.

16      A.    There's nothing private at all.

17      Q.    Fair enough.  So let me retract

18  that.

19            Have you shown on your YouTube

20  channel messages and chats of which Michelle --

21  Lynette Preston was a party with any other

22  individual that were originally just between

23  her and the other individual?

24      A.    How am I supposed to answer whether

25  it's between her and another individual?  Ask a

1  better question.

2      Q.   Have you received -- have you

3  received --

4      A.   You can laugh.  You're the one that

5  looks like the fool here.  You can can't even

6  formulate a full question.  So you can giggle

7  and laugh all you want.  You're a party.

8  You're complacent within this.  And you're

9  going to be held accountable for it, as well,

10  with your "Anti What the Hales ecosystem."

11          So get ready for that, buddy.

12      Q.   So -- gee wiz.  I can't remember

13  what my question was.

14                  ATTORNEY MATZKIN:  Alyssa, I'm

15  sorry --

16                  THE WITNESS:  I

17  honestly --

18          (Indecipherable crosstalk.)

19                  THE WITNESS:  -- that you can

20  even think, to be honest.

21                  ATTORNEY MATZKIN:  -- would

22  you mind?

23                  THE REPORTER:  I'm sorry.  I

24  couldn't hear you.

25                  ATTORNEY MATZKIN:  I can't

1  even remember what my question was.  Would you

2  mind?

3                    (Reporter read back from the

4  record.)

5  BY ATTORNEY MATZKIN:

6      Q.    So do you understand the question?

7      A.    And I already followed up, and I

8  said, "can you show me what you're referring

9  to?"

10     Q.    Well, have you ever talked about

11  having moles on your YouTube videos?  Have you

12  ever said that you have moles providing you

13  information?

14     A.    Good question.  How many moles do

15  you think there potentially is?  Do you

16  think -- do you think there's moles in your

17  private conversations right now?

18     Q.    Mr. Hales, I'm asking the questions.

19            So do you acknowledge saying on your

20  YouTube videos on more than one you occasion

21  that you have moles providing you with

22  information that you're then disseminating

23  publicly on your YouTube videos?

24     A.    Well, let me answer this question

25  since you stated that you're the one asking the

1    questions.

2        Q.    It's a yes-or-no question.

3        A.    Because what you're doing is making

4    statements, and then I have to prompt you to

5    actually ask a question.

6            I don't need moles because your

7    clients post everything out there with fools

8    such as you putting everything out there on the

9    internet.  Nobody needs a mole.  Nobody needs

10   anything sent to them when people such as you

11   continue to incriminate yourself within this

12   conspiracy of defamation with your clients who

13   needs a to mole anything?

14           Yeah.  I've got moles.  They're all

15   over my body.  I have freckles, too.

16       Q.    So have there been people who have

17   contacted you and said -- and shared with you

18   their messages and chats with Lynette Preston?

19       A.    Rephrase the question, please.

20       Q.    Have there been people who have

21   contacted you and shared with you their chats

22   and messages with Lynette Preston?

23       A.    There have been people who have

24   shared communication from Lynette Preston for

25   evidence in court.

1    Q.    Okay.  And does that include some of

2   which you've shown holding your cell phone up

3   to the camera on YouTube videos?

4    A.    I have no idea.

5    Q.    Okay.  I'd like to know the names of

6   the individuals that have provided you this

7   evidence for use in court of communications

8   with Lynette Preston.

9              ATTORNEY SHOCHET:  Well, I'm

10   going to say that some of those names are

11   confidential work product.

12              So if you know of anyone that

13   hasn't -- that I --

14              ATTORNEY MATZKIN:  Listen --

15              ATTORNEY SHOCHET:  -- that's

16   attorney/client privilege.  Hold on.  You keep

17   wanting to invading attorney/client privilege,

18   which you're opening yourself up for that.  So

19   same instruction as before.

20              THE WITNESS:  Yeah.  There's

21   no one that is outside the bounds of the

22   attorney/client privilege.

23              ATTORNEY SHOCHET:  Then don't

24   answer it.

25              ATTORNEY MATZKIN:  I'm going

1  to have to follow up here.

2  BY ATTORNEY MATZKIN:

3      Q.   So is it your testimony that --

4  strike that.

5           Has there been a nonlawyer who has

6  contacted you and said, "I would like to share

7  -- I have information to share in the form of

8  my messages and chats and conversations with

9  Lynette Preston"?

10           ATTORNEY SHOCHET:  You can

11  answer that.  Contacted you, not me.

12           THE WITNESS:  Ask the question

13  again.  Rephrase it.

14  BY ATTORNEY MATZKIN:

15      Q.   So the question is:  Have there been

16  individuals who have contacted you to share

17  with you those individuals' conversations,

18  messages, chats that they had with Lynette

19  Preston?

20           ATTORNEY SHOCHET:  That they

21  had with Lynette Preston.

22           THE WITNESS:  Contacted me

23  personally?

24  BY ATTORNEY MATZKIN:

25      Q.   Yes.

1    A.    Individuals don't contact me

2    personally.  They may send a message and say,

3    "Hey, look at this."  "Hey" -- you know, and

4    it's all to fans of What the Hales and it all

5    goes into an inbox.

6    Q.    Okay.

7    A.    But nobody -- nobody has

8    particularly contacted me personally.

9    Q.    So who sent messages that went into

10    the What the Hales inbox that you then used and

11    showed on YouTube?

12    A.    Again, I don't have a list.  If you

13    were going to ask this question, you should

14    have prepped beforehand so I can be ready to --

15    actually with a list to answer this question.

16        So I have no recollection right now.

17    I'm not looking at anything.  I have nothing in

18    my hands.  I don't have my cell phone.  I don't

19    have my E-mails.  I don't have anything.  You

20    should have better prepped.

21    Q.    So you don't remember the names of

22    any people that have shared with you their

23    conversations that they had had with

24    Michelle -- Lynette Preston?

25    A.    You should have better prepped.

1    Q.    Okay.  So is it your testimony,

2  though, that -- and without getting into

3  attorney/client privilege, though -- that you

4  learned there are individuals you have learned

5  of information from or you have obtained

6  information from, but that you're refusing to

7  identify because they provided it to your

8  counsel and not to you directly?

9    A.    Ask the question better.

10    Q.    Are there individuals you're aware

11  of who have shared information with your

12  counsel but not with you that will be used as

13  evidence in court?

14              ATTORNEY SHOCHET:  Again --

15              THE WITNESS:  Unbelievable.

16              ATTORNEY SHOCHET:  -- invading

17  the attorney/client privilege.

18              THE WITNESS:  Attorney/client

19  privilege.  Oh, my --

20              ATTORNEY MATZKIN:  It's just a

21  yes or no question.

22              ATTORNEY SHOCHET:  Honestly,

23  you can't --

24              THE WITNESS:  That's --

25              THE REPORTER:  One at a time.

JEREMY B. HALES                                          JOB NO. 1278527
DECEMBER 02, 2024

1              ATTORNEY SHOCHET:  -- you're
2    saying what I said, which is the same thing.
3    You're doing it --
4    BY ATTORNEY MATZKIN:
5         Q.   Here's the question.  Here's the
6    question.
7              Are you aware -- I'm not telling you
8    to name them or tell me the nature of the
9    information.  I'm just asking a yes-or-no
10   question.  Are there individuals that you're
11   aware of, that shared information with your
12   counsel that you intend to use at evidence in
13   court?  Yes or no?
14             ATTORNEY SHOCHET:  That's work
15   product.  So don't answer that either.
16             THE WITNESS:  Oh, my goodness.
17             ATTORNEY SHOCHET:  I get to
18   decide what's -- what we use --
19             THE WITNESS:  I can't believe
20   it.  I literally cannot believe him.
21   BY ATTORNEY MATZKIN:
22        Q.   So you're not going to tell me the
23   names of any of these moles that you've
24   referred to on YouTube as providing texts that
25   you've been shown?

1           ATTORNEY SHOCHET:  Now we're

2    talking about moles?  Now it's moles?

3           THE WITNESS:  Would you like

4    the name of some freckles?  I call this one

5    Charlie.  This is Eileen.

6           ATTORNEY SHOCHET:  He doesn't

7    mean moles -- define mole for him.

8           THE WITNESS:  I know what he

9    means.

10           ATTORNEY SHOCHET:  Okay.

11           THE WITNESS:  It's just

12    ridiculous.

13    BY ATTORNEY MATZKIN:

14       Q.    So -- so on your YouTube videos, you

15    have on more than one occasion shown using your

16    own cell phone held up to the camera messages

17    and chats involving Lynette Preston and the

18    person who provided that to you.

19           And I'm asking you to give me the

20    names of the individuals who provided you

21    that -- those texts and chats that you showed

22    on YouTube?

23           ATTORNEY SHOCHET:  Objection.

24    Asked and answered.

25           If you want to answer it again.

 1                    THE WITNESS:  Attorney/client

 2     privilege.

 3                    ATTORNEY SHOCHET:  No, but the

 4     E-mails that you mentioned.  If you want to

 5     answer it again, go ahead.  It's up to you.

 6                    THE WITNESS:  I don't have any

 7     information in front of me to be able to

 8     answer.

 9                    ATTORNEY SHOCHET:  Okay.  Same

10     answer.

11     BY ATTORNEY MATZKIN:

12          Q.    Have you ever publicly stated that

13     the goal of suing someone is not to win, but to

14     bankrupt them?

15          A.    Not to my recollection.

16          Q.    Did you ever sue Marilyn Raby?

17          A.    No, I did not.

18          Q.    If you prevail in this lawsuit, what

19     do you believe you'll be able to collect from

20     my clients?

21                    ATTORNEY SHOCHET:  Objection

22     to form.

23             You can answer.

24     BY ATTORNEY MATZKIN:

25          Q.    To satisfy the judgement.  If you

1 | prevail and win a judgment against my clients

2 | for a lot of money, how will you seek to

3 | satisfy that?  What do you believe they have to

4 | satisfy such a judgement?

5 |                    ATTORNEY SHOCHET:  Again,

6 | okay, if you have to rely on anything I've told

7 | you about --

8 |                    THE WITNESS:  It's

9 | attorney/client privilege.

10 |                    ATTORNEY SHOCHET:  But do you

11 | have knowledge outside of our conversation?

12 |                    THE WITNESS:  I have no

13 | knowledge outside of our conversations.

14 | BY ATTORNEY MATZKIN:

15 |     Q.    So do you believe that they have,

16 | you know, cash that you can recover from them?

17 |                    ATTORNEY SHOCHET:  You can

18 | answer.

19 |                    THE WITNESS:  Yes.

20 | BY ATTORNEY MATZKIN:

21 |     Q.    And what is -- what is the basis of

22 | your belief that they have cash in sufficient

23 | an amount to pay off a judgement you expect to

24 | recover in this case?

25 |     A.    You just asked me if I believe.  You

```
 1   didn't ask me --
 2       Q.    No --
 3       A.    It's a belief --
 4       Q.    No, that's not what you're --
 5       A.    I belive -- I believe it --
 6                   ATTORNEY SHOCHET:  Hold on.
 7   Hold on.  Whoa.  Whoa.  Whoa.  Whoa.
 8                   THE WITNESS:  -- I believe in
 9   wind and air, too.
10                   ATTORNEY SHOCHET:  Objection
11   to form as to foundation.
12                   You can answer.  Go ahead.
13   BY ATTORNEY MATZKIN:
14       Q.    So what is the basis of your belief
15   as to their source of financial assets that you
16   can seek to satisfy a judgment?
17       A.    I have no basis for a belief.
18   That's why it's just a belief and not a fact.
19       Q.    Do you recall in more than one
20   YouTube video listing names of witnesses that
21   you would be requiring to travel to Florida to
22   testify in this proceeding?
23                   ATTORNEY SHOCHET:  Same thing.
24   Work product.  Objection.
25                   THE WITNESS:  Attorney/client
```

```
 1   privilege.
 2                   ATTORNEY SHOCHET:  You can
 3   answer.
 4   BY ATTORNEY MATZKIN:
 5        Q.    No, it's not.  I'm asking you
 6   whether you recall --
 7        A.    Yes, it is.  It's actually the
 8   attorney/client privilege.  It's a conversation
 9   that I've had with my attorney, and therefore,
10   it's attorney/client privilege.  I haven't had
11   conversations outside of it with my attorney.
12        Q.    Do you recall publicly on YouTube
13   naming individuals that you would be forcing to
14   travel to Florida to give testimony in this
15   case?
16                   ATTORNEY SHOCHET:  You can
17   answer that.
18                   THE WITNESS:  I recall stating
19   that that is the goal for those testimonies and
20   depositions.  But ultimately, I don't make that
21   decision.  The judge is making the decision in
22   regards to the amount of depositions and the
23   time frame of those.
24   BY ATTORNEY MATZKIN:
25        Q.    My question pertained to
```

1  specifically whether you acknowledge naming

2  some individuals and saying on YouTube that

3  they would be forced to travel to Florida to

4  give testimony in this case?

5              ATTORNEY SHOCHET:  That's work

6  product, and again, it's my decision.

7              ATTORNEY MATZKIN:  It's what

8  he said on YouTube.

9              ATTORNEY SHOCHET:  It doesn't

10  matter.  You're -- listen -- you can have the

11  question read back.  That's not what you asked.

12              ATTORNEY MATZKIN:  I'll move

13  on.

14  BY ATTORNEY MATZKIN:

15     Q.   What was the purpose for you to

16  broadcast Attorney Shochet's deposition --

17  video deposition of my client, Ms. Preston,

18  beginning on September 5th and over the course

19  of eight days?

20              ATTORNEY SHOCHET:  I didn't

21  hear that question.  You broke up.  What was

22  the what?

23  BY ATTORNEY MATZKIN:

24     Q.   What was the purpose, Mr. Hales, of

25  broadcasting the video deposition of my client

1  taken by your counsel in January?  What was the

2  purpose of broadcasting that over eight

3  segments on your YouTube channel from

4  September 5th to the 13?

5       A.    So the first purpose would be

6  accountability and protection.  The second

7  purpose would be this is my life.  This is the

8  story of my life that people want to know

9  what's going on.

10           But the main emphasis of all of it

11 is protection and accountability from these

12 monsters.

13      Q.    Thank you for that straight answer.

14           And so how was playing this video

15 going to serve the purpose of protection and

16 accountability given that that loss -- that

17 legal action was dismissed at the time?

18      A.    That's pretty funny considering you

19 at the beginning of this are begging and

20 pleading like a child that none of these

21 depositions are played.  And you had to file a

22 motion at the beginning.

23           You are the one that doesn't want

24 the accountability out there.  You are the one

25 that doesn't want the safeguarding of this

```
 1   information.  You're the one that doesn't want

 2   me protected.

 3              The accountability of the camera is

 4   more powerful than anything else.  Information

 5   out to the people is more powerful than

 6   anything else.  Seeing the corruption.  Seeing

 7   the disgust.  People are disgusted with you.

 8              You are vile.  You are bottom of the

 9   barrel.  You are trying to literally break the

10   law to try and get your name in the law.

11              This is disgusting.  You are the one

12   at the very beginning going, "I don't want this

13   played.  I don't want people to know who I am

14   really on camera.  I don't want people to see

15   who I am and what I'm really about."  Showing

16   them who you really are.  Showing them what

17   you're really about.  Showing them the reality

18   and the truth.  That's protection.  That's

19   accountability.  That's safeguarding my life.

20              Remember, it's your clients, both of

21   them, who said they were going to shoot me in

22   the face.  Both of them said they were going to

23   pop a cap in my ass.  Both of them who are part

24   of some of these vile, heinous, in -- just

25   gross, sick things.  Accountability.
```

1    Protection.  Safeguarding.  Information out

2    there is my protection.

3         Q.    Are you finished?

4         A.    Are you finished?

5         Q.    Nope.  So my question is:  How did

6    the broadcasting of the January deposition from

7    September 5th to 13th serve those purposes that

8    you just articulated?

9              ATTORNEY SHOCHET:  Objection

10   to form.  Hold on.  Objection to form.

11             You can answer, if you know how it

12   served those purposes.

13             THE WITNESS:  I already

14   answered it.  I just answered it in the

15   question before.

16             Protection.  Accountability.

17   Safeguard.  Truth.

18   BY ATTORNEY MATZKIN:

19        Q.    How did it protect you?

20        A.    Shut up, and listen.  You asked me a

21   question.

22             Exposing the truth.  Exposing who

23   they really are.  Exposing what they're really

24   about.  Sharing so nobody else has to go

25   through this hell that we've had to go through,

1   this torment that we've had to go through.

2   Being stalked, being extorted, being harassed,

3   being tormented.  We don't want this on

4   anybody.

5           You're an evil individual.  You're a

6   horrible person, and yet I still wouldn't want

7   you to be stalked and harassed and extorted by

8   these people.  We have been threatened by them

9   constantly.

10          And you making a mockery of it

11  online on YouTube.  Oh, boy, your PR campaign.

12  Oh, boy.  Your "What the Hales anti ecosystem."

13  I wouldn't give -- as horrible as you are as an

14  individual, I don't even know how you sleep at

15  night, to be honest.  I don't know how a woman

16  sleeps next to you, to be honest, and yet I

17  still wouldn't want your clients to do what

18  they've done to me to you.  They are horrific

19  people.

20          It's safeguarding.  It's protecting.

21  It's accountability, and it's making sure this

22  doesn't happen in our lives again.

23      Q.    Are you performing for YouTube now,

24  Mr. Hales?

25      A.    Are you on YouTube right now?

```
 1                   ATTORNEY MATZKIN:
 2     Mr. Shochet, are you able to control your
 3     client and have him answers questions directly?
 4                   ATTORNEY SHOCHET:
 5     Mr. Matzkin, again, do you have a question for
 6     my client?  He answered your question.  Do you
 7     have another question, or I'll start my cross?
 8     BY ATTORNEY MATZKIN:
 9        Q.    So you -- so you say that you played
10     the video of the deposition so that it wouldn't
11     happen to anybody else.  I think that was in
12     there somewhere; am I right?
13                   ATTORNEY SHOCHET:  You can
14     answer.
15                   THE WITNESS:  I -- why answer?
16     He's already asked.  I mean, come on.  You've
17     got so much time.  Federal court only allows
18     you so much time.  Get to something real.
19     BY ATTORNEY MATZKIN:
20        Q.    Well, so my question is:  Is how
21     would playing that deposition the way you did
22     from September 5th to 13th somehow protect
23     others from going through what you went
24     through?
25        A.    Really?  So they see the Court
```

```
 1   system.  They see the corruption of a judge.
 2   They see the corruption of Levy County.  They
 3   see what being stalked on YouTube is like, the
 4   hell that we've had to go through.  And you
 5   don't think they're going to learn from that
 6   process?  You don't think they're going to
 7   learn, "Oh, this is how to justice system
 8   works?  Oh, this is how it doesn't work?  Oh,
 9   this is how -- this is what's going on?"
10             This is how I protect myself.  This
11   is the most important thing for anybody online,
12   an online personality, is security, security,
13   security, security, or this is going to happen
14   to you, as well.
15             Oh, that's right.  They said that I
16   am a child rapist, that I raped their daughter.
17   How would you respond if they said that about
18   you because you're probably next on their list?
19   How are you going to respond when they put up
20   in your community?  How are you going to
21   respond when they start saying that on your
22   reviews online?  How are you going to respond
23   when these individuals say they're going to
24   shoot you in the face and feed you to gators?
25             This is a learning process and an
```

1    educational process for anybody and everybody

2    out there.  And you would think that you would

3    be smart enough -- I don't know how in the

4    world you passed the Bar -- but you would be

5    smart enough to know that that's the process in

6    the first place and to know that you just threw

7    in your hat with some people that are extremely

8    dangerous.

9            And here you are.  And now you're

10   trying to protect yourself, but it ain't going

11   to work.  And yet I'm protecting myself by

12   information out on the web.

13       Q.   Do you recall that Judge Davis said

14   he didn't want to see this on YouTube on

15   September 4th when Ms. Preston dismissed the

16   State Court temporary restraining order against

17   you?

18            Do you recall Judge Davis saying

19   that?

20       A.   Judge Davis never said that.

21       Q.   And do you acknowledge that that

22   night you specially made a YouTube broadcast --

23   a YouTube video bragging about winning -- "I

24   Won in Court" being the headline?

25       A.   Again, Judge Davis never said that,

1    nor do I remember what videos I broadcast on

2    any given day.  There's so many.

3                    ATTORNEY MATZKIN:  Would you

4    like to take a break, Alyssa?

5                    THE REPORTER:  No.  Thank you.

6                    ATTORNEY MATZKIN:  I think

7    we'll go until 5:00, and so I think we should

8    probably take a break at, like, 3:40 for ten

9    minutes.

10                    ATTORNEY SHOCHET:  So you're

11   announcing a break 22 minutes before it?  Okay.

12   BY ATTORNEY MATZKIN:

13        Q.    So do you know who Olga Nelson is,

14   Mr. Hales?

15        A.    Yes.

16        Q.    And who is Olga Nelson?

17        A.    Biological aunt of Harley Grace.

18        Q.    And how do you know Olga Nelson?

19        A.    I have never met her in person.

20   I've only met her through communication.

21        Q.    And did you contact her, or did she

22   contact you originally?

23        A.    I've never contacted anybody in

24   regards to any of this.  Everybody contacts me.

25   Olga -- I don't even know if it was Olga who

1    contacted me.  It might have been Jessica.

2        Q.    Jessica who?

3              ATTORNEY SHOCHET:  You can

4    say.

5              THE WITNESS:  I don't have my

6    phone to look at contacts.

7              ATTORNEY SHOCHET:  Then you

8    don't have to answer.

9              THE WITNESS:  I don't know.

10   BY ATTORNEY MATZKIN:

11       Q.    Is Jessica another aunt --

12   biological aunt?

13       A.    Biological aunt of Harley Grace.

14       Q.    And did you have a remote live

15   video, you know, guest appearance by Ms. Nelson

16   and Jessica on one of your livestreams?

17       A.    Yes.

18       Q.    And did you discuss during that

19   livestream a -- initiating the Court proceeding

20   to have the Preston child removed and given

21   custody to them?

22       A.    Can you rephrase it in a simple,

23   easy-to-understand question instead of these

24   comments?

25       Q.    During the livestream on which

1  Jessica and Olga Nelson appeared as your

2  guests, did you discuss with them initiating --

3  them initiating a court proceeding directed at

4  having Harley Grace Preston taken from the

5  custody of Lynette Preston and given to them?

6       A.    We discussed an emergency court

7  proceeding based on the living conditions, the

8  extremely poor and, frankly, in my opinion,

9  abusive living conditions of Harley Grace based

10  on the actions of Lynette Preston and John Cook

11  against Harley Grace.

12            And let's see.  We've got --

13  let's -- well, let's just dig into that a

14  little bit.

15            We've got Lynette claiming that John

16  Cook is an abuser, that she wants him out of

17  her life.  That -- if that's happening to

18  Lynette, what do you think is happening to a

19  little child?

20            We've got Lynette stating all over

21  and in videos that John -- she doesn't trust

22  John with the child.  We've got Lynette stating

23  in videos that the child is so sick --

24  life-threatening disease that she can't be

25  around anyone, and yet we've got a livestream

1  sitting on fat Lisa Lee's lap.  Isn't that

2  interesting?  With no face mask.

3            Oh, we also have she's going to get

4  spanked in the mouth.  We also have all the

5  witnesses of actual people seeing Lynette

6  hitting her in the head.  We have -- I mean,

7  the list goes on and on.  Nails.  Glass.

8  "She's going to die from this.  She's going to

9  die from that."

10            The extreme conditions are un- --

11  unfavorable for a child, especially one that

12  somehow, someway has a life-threatening

13  disease.

14       Q.    So why would, to your understanding,

15  the biological aunts contact you about the

16  child's living conditions and dangers that

17  she's in?

18       A.    I don't know.  What about Lynette

19  posting that she moved out of the trailer to

20  get away from John Cook, to get Harley Grace

21  away from John Cook?

22            You know, this is your client's own

23  posting saying about the person that she's

24  living with with this child.  That's your

25  client.

1          Oh, and there's so much more.  So

2     much more.  The endangerment of this child.

3     So, so much more.

4          So who do you think -- who do you

5     think when they reach out to Levy County

6     Children Services, and Levy County Children

7     Services absolutely ignore all of this?  Oh, we

8     even have on video Levy County Children

9     Services coming and not even doing an

10    investigation on the property because it's too

11    hot, it's too humid, and we've got mosquitos,

12    and we show up with a sheriff, and then we

13    leave.

14          You know, at some point, people go,

15    "Where do I turn?"  And them knowing that

16    Lynette has done this to so many people, that

17    Lynette continues to ruin people's lives like

18    this, but she has finally found somebody who is

19    willing to stand up to her and hold her

20    accountable.

21          Oh, I would say they probably went,

22    "You know what?  We should contact him.  He's

23    actually going to hold her accountable.  Maybe

24    we can save this child."

25    Q.    Got you.  So they saw that you --

1   you were the one that they saw willing to stand

2   up to Lynette Preston, and so they contacted

3   you for help about the child; correct?

4       A.    Well, they definitely didn't go to

5   fat Lisa Lee and her "Save Harley Grace"

6   website.  Oh.  You know, the one where they

7   state that they're PR for Lynette, they're the

8   mouth piece for your client?  That one.  Yeah.

9   You know about that.

10            So they contacted me because they

11  care.  Would you be quiet and listen to my

12  answers?

13            They contacted me because they love

14  that child.  They contacted me because they

15  care about that child.  They contacted me

16  because they're in fear for that child's life

17  every single day around your clients.

18            They contacted me because of the --

19  because of the verbal abuse.  They contacted me

20  because of the physical abuse.  They contacted

21  me -- now, these are my beliefs.  I can't

22  answer the question for them why they contacted

23  me.  But I bet you're going to have an

24  opportunity to be in court to ask them.

25       Q.    Okay.  Now --

1        A.    Hold up a second.  I'm not done.

2    How about we got an almost 5-year-old on Route

3    98, one of the most dangerous highways in

4    Florida, at night.  And she's illegally walking

5    on the road with a child in a stroller who

6    isn't potty trained who's almost 5 years old.

7            Boy, you know what?  If you're not

8    contacting Levy County Children Services,

9    there's seriously something wrong with you,

10    seriously something wrong with you, because you

11    know this situation, and yet you are quoted as

12    saying, "I don't give a fuck about the child.

13    I'm just their lawyer."

14            How dare you not care about a child?

15        Q.    So the -- you had called CPS on --

16        A.    You're a mandatory reporter of child

17    abuse.  Did you report it?

18        Q.    So you had called CPS before; right?

19        A.    You're a mandatory reporter of child

20    abuse.  How many times have you called CPS and

21    reported this?  Because you know what's going

22    on.

23        Q.    You had called CPS before you had

24    the aunts on your livestream; am I right?

25        A.    How many times have you called CPS?

1  You're a mandatory child abuse reporter.  Oh,

2  that's right.  You don't care.  You don't care.

3  You want fame for macaroni and cheese.  Oh, my

4  goodness.  What a joke.

5           All right.  So I called CPS one

6  time.  I don't know what date.  I don't recall.

7  I don't remember.  One time I called CPS based

8  off of my concerns.

9       Q.   Now, when they -- when Ms. Nelson --

10  Ms. Nelson and Jessica contacted you and you

11  had them on your stream and you were talking

12  about the dangerous conditions, et cetera, and

13  an emergency proceeding, did you -- excuse

14  me -- did you offer to help them with that

15  financially to pay for lawyers or a lawyer?

16       A.   No.  I've never given them any money

17  for lawyers.

18       Q.   Did you donate a hoodie that was

19  auctioned off for something like $15,000, and

20  that money was for them to use for this court

21  proceeding?

22       A.   So we auctioned off a hoodie.  It

23  never got paid for.  I've never given them any

24  money for their lawyers.

25       Q.   Did you ever hear of an attorney

1   Jenny Consuegra from Miami?

2       A.    Not to my knowledge.

3       Q.    Were you aware of the filing by

4   Attorney Consuegra with Olga Nelson as her

5   client?

6       A.    Again, not to any knowledge.

7       Q.    Well --

8       A.    You're asking me about a filing with

9   an attorney where I already told you "not to my

10  knowledge."  How do you expect me to answer a

11  question when I've already told you I don't

12  know the attorney?

13      Q.    Okay.  But you, on your YouTube

14  broadcast, were regularly referring to an

15  ongoing emergency court removal proceeding to

16  save Harley Grace; right?

17          Do you acknowledge that you made

18  those statements?

19              ATTORNEY SHOCHET:  Objection

20  to form.  Compound question.

21              THE WITNESS:  I have no

22  authority to remove anyone from anyplace.  What

23  I do desire is for a child to be in a happy,

24  healthy living situation.  And that is not with

25  your clients.  It is evident to anyone,

1   including you, that that is not the safe

2   environment that she deserves as a child.

3           I can't remove any child.  I have no

4   authority, no power to remove any child.  What

5   I can do is report when I see something is

6   inappropriate.  I can report when I see

7   something is wrong.  When I see something, I

8   can do the responsible adult thing -- which you

9   have yet neglected to do -- and actually report

10  it -- even though you're a mandatory reporter.

11  BY ATTORNEY MATZKIN:

12      Q.    So were you at all in the loop, so

13  to speak, with respect to the filing by Olga

14  Nelson using Attorney Consuegra seeking to

15  access the adoption file pertaining to Harley

16  Grace Preston?

17      A.    I am not involved in any of that.

18      Q.    Were you involved in helping arrange

19  a crew of people to retrieve Lloyd Campbell's

20  RV and other items from Ms. Preston's property?

21      A.    No.  I'm involved in helping a

22  veteran who is afraid for his life, who reached

23  out to me and asked for help.

24      Q.    And did the -- did you actively

25  arrange for any of the following individuals to

1  participate in this help?

2          Martha George Rizk?  No.  Strike

3  that.  Not Martha George Rizk.

4      A.    Yeah.  I would say you got to

5  strike.  You obviously don't even know your

6  clients or your case.  That's for sure.

7      Q.    Did you specifically ask Deanna West

8  to participate in that effort?

9      A.    Not to my recollection.  And let's

10  be very, very, clear:  It is Lloyd Campbell who

11  had all full access and legal rights to the

12  property as a tenant, who asked for us to help

13  remove his personal property as he had every

14  legal right to remove that personal property.

15      Q.    So did you -- did you ask Deanna

16  West, "Hey, can you help out get Lloyd's

17  property off of Ms. Preston's property"?

18      A.    I don't recall.  I seriously doubt

19  it.  She probably volunteered to say "I want to

20  help him" because that's the type of person she

21  is.

22      Q.    Well, then how would she have known

23  that there was this need?

24          ATTORNEY SHOCHET:  Objection

25  to form.  Calls for speculation.

1           Answer, if you know.

2    BY ATTORNEY MATZKIN:

3         Q.    So it's your testimony that you're

4    not the one who told Deanna West about this,

5    and that's what led to her helping?

6         A.    No recollection of how Deanna West

7    knows about helping, and nor would I ever have

8    forced her or told her to do such a thing.

9         Q.    And did you have any -- did you

10   contact Rex Woods and ask him if he would help

11   remove Lloyd Campbell's property?

12        A.    No, I did not.

13        Q.    And did you contact Therese Granger

14   and ask if she would help?

15        A.    No, I did not.

16        Q.    And did ask you contact Stephen

17   Granger and asked if he would help?

18        A.    No.  Stephen Granger contacted me

19   and asked if I could help, and I said, "No, I

20   can't help.  I'm in Ohio."

21        Q.    So Stephen Granger called you on the

22   phone, did he?

23        A.    Again, I don't recall.

24        Q.    But is it your testimony, though,

25   that the first time you became aware of Lloyd

1   Campbell needing to get his stuff off the

2   property was Stephen Granger calling you?

3          A.    I don't recall if it was a phone

4   call or what it was.  But Stephen Granger is

5   the one that made me aware that Lloyd Campbell

6   was in fear for his life and that he needed

7   help somehow, someway to remove all of his

8   property from the property he had all legal

9   access to as a tenant.

10         Q.    So was that call from Stephen

11  Granger before or after you broadcasted a phone

12  call with Lloyd Campbell?

13         A.    Before.

14         Q.    And were you -- and were you -- did

15  you ask Travis Willis if he would be involved

16  in helping remove the property?

17         A.    I don't recall if I contacted him or

18  not.

19         Q.    Okay.  So you don't recall

20  contacting any of the five individuals, Deanna

21  West, Therese Granger, Stephen Granger, Rex

22  Woods, Travis Willis?  Your testimony is you

23  don't recall contacting any of them to ask them

24  if they would participate in helping remove

25  Lloyd Campbell's stuff?

```
 1        A.    I don't recall.

 2        Q.    And you don't know how any of them

 3   would have known about this mission other than

 4   you telling them?

 5        A.    Yeah, the same way I did.  Lloyd

 6   contacted me.

 7        Q.    So Lloyd contacted you out of the

 8   blue?

 9        A.    Oh, my goodness.  You literally just

10   talked about a video of a phone call with

11   Lloyd, and now you're asking me?

12              Obviously, he contacted me.

13        Q.    But it was the first time you had

14   ever had communi- -- it was just a phone call,

15   "Hi, I'm Lloyd Campbell, Mr. Hales.  I need

16   your help"?

17        A.    The first time I've ever had any

18   type of contact with Lloyd Campbell.

19        Q.    And how did he get your number?  Do

20   you know?

21              ATTORNEY SHOCHET:  Objection

22   to form.

23              Answer, if you know.

24              THE WITNESS:  Yes, I know.

25   Stephen Granger gave it to him.
```

 1   BY ATTORNEY MATZKIN:

 2        Q.    Now, you were aware, were you not,

 3   that the filing for the emergency removal of

 4   Harley Grace Preston was denied by the Court?

 5             You learned that maybe through some

 6   -- maybe Two Lee's or otherwise, but you

 7   learned that; right?

 8        A.    No.

 9                  ATTORNEY SHOCHET:   Objection

10   to form.   Hold on.

11             Objection to form.

12                  THE WITNESS:   I don't know

13   about it any way.

14   BY ATTORNEY MATZKIN:

15        Q.    So you're not aware -- you're not

16   aware that the Court -- the family law court

17   denied what was filed by Olga Nelson through

18   her lawyer seeking --

19        A.    I literally just said I'm not aware.

20   This is the first -- now, regardless of me

21   screen recording everything that Two Lee's

22   posts, it goes straight to a lawyer team, and

23   then it's going to court.

24             So regardless of whether I have

25   every screenshot of every little thing that

1  they've said and they've done, I don't actually

2  watch, and I don't listen.  It goes to a legal

3  team, and it will be handled in court.

4          So this is the first I'm hearing

5  anything about this.

6      Q.    Okay.  To be clear, right now me

7  telling you is the first time you're learning

8  that that proceeding seeking to -- to take

9  Harley Grace and put her with the biological

10 aunts -- you're just now learning that that was

11 denied by the Court?

12     A.    To my complete and total

13 recollection, this is the first time I've heard

14 anything about it.

15     Q.    But you were regularly referring to

16 it on your YouTube broadcasts, and then when it

17 was denied, you haven't referred to it since.

18          So you're saying that's just a

19 coincidence?

20              ATTORNEY SHOCHET:  Objection

21 to form.  Compound question.  Lack of

22 competence.  Calls for speculation.

23          But outside of that, subject to my

24 objection, if he tries to raise it with the

25 magistrate, you can answer.

```
 1                    ATTORNEY MATZKIN:  These are

 2   all improper speaking objections.

 3   BY ATTORNEY MATZKIN:

 4        Q.    But in any event, is it a

 5   coincidence that --

 6                    ATTORNEY SHOCHET:  No, it's

 7   not.

 8   BY ATTORNEY MATZKIN:

 9        Q.    Is it a --

10                    ATTORNEY SHOCHET:  He can

11   answer, subject to my objection.

12   BY ATTORNEY MATZKIN:

13        Q.    Is it a coincidence that the same

14   time the Court denied that proceeding and that

15   that fact was publicly broadcast -- and you

16   then suddenly stopped talking about this

17   emergency removal proceeding -- that's not

18   because you knew that the Court had denied the

19   filing?

20        A.    Absolutely not.  So why don't you

21   give me -- since you're talking about time

22   frame, why don't you give me the time frame

23   when this actually happened?

24        Q.    Well, I'm not going to take ten

25   minutes to go looking through records.
```

1      A.    No?  You'll take ten minutes to ask

2   this stupid question over and over and over

3   again in the form of a statement because you

4   don't literally know how to actually

5   communicate and ask a question.  You'll waste

6   more than ten minutes.

7      Q.    You posted a photograph last week

8   that appears to be taken from the top of a

9   vehicle so that it could be high enough to

10  capture an image above the six-foot-high

11  privacy fence; is that correct?

12     A.    No, it's not correct.  There's no

13  footage -- or no photo from any top of a

14  vehicle.

15     Q.    Oh.  Is there a photo, though, that

16  you brought -- that you showed on your YouTube

17  page -- on your YouTube channel that does show

18  over the fence into the property of

19  Ms. Preston?

20     A.    You mean literally that I can see

21  everything as I drive by?  Is that what you're

22  referring to?

23     Q.    I'm referring to a photograph where

24  the fence is shown, and you can see over the

25  fence because of the height of the camera.

1      A.    You going to show it so I can say
2  whether I recognize it or not?
3      Q.    I'm not going to show it.  I don't
4  have it.  I'm asking --
5      A.    Well, why didn't you come prepared?
6      Q.    So you don't know which photo I'm
7  referring to?
8      A.    There are photos upon photos upon
9  photos upon photos upon photos.  So which one
10  are you referring to?  Why didn't you come
11  prepared to show it?
12      Q.    Have you taken any photos -- have
13  you posted any photos over the fence showing
14  inside the property -- Ms. Preston's property?
15      A.    What's the difference what I can see
16  over the fence, or there was no fence, and I
17  can see all the same stuff?  There is no
18  difference.
19          So let's get down to your
20  terminology.  "Over the fence" means absolutely
21  nothing.  When I drive by, I can see
22  everything.  That fence means nothing.
23          Now, it does give me a little bit
24  more of security knowing that John Cook is
25  drunk most of the day, and there's a little

1    something more for a bullet to go through

2    instead of me or George or Deanna or some other

3    loved one.

4            But the reality is that fence does

5    absolutely nothing.  I can see all the same

6    things I saw before when I drive by.

7        Q.    Is it your -- is it your position

8    that -- that Ms. Preston is a public figure?

9        A.    It's not my position.  It's a fact.

10   Anybody who runs to the newspapers, anybody who

11   runs to the actually news channels, anybody who

12   has put hundreds and hundreds of GoFundMes to

13   exploit a child for money instead of getting a

14   job and actually being willing to take care of

15   that child, any individual who runs for public

16   office and literally fails is a public

17   individual.

18           Anybody who runs -- I don't know.

19   Last count I had 13 Facebook groups promoting

20   herself as a public individual.  Promoting the

21   turtle rescue.  Promoting.  Promoting.

22   Promoting.  Wanting to launch her YouTube

23   channel which, by the way -- and she wants to

24   complain about people posting pictures of the

25   child -- her main profile picture is the child

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

1    on YouTube.

2            Your client is a public person.

3    Channel 20 reporter?  Oh.  Let me run as fast

4    as I can out to Channel 20 and lie to Channel

5    20."

6            So your client who runs to the news

7    station.  Your client who contacts newspapers.

8    Your client who runs for office.  Your client

9    who literally asked a judge in Levy County,

10   "Can I run again for Town Hall?"  Who has

11   already ran for Town Hall.

12           I'm going to keep going on because

13   your client is a -- your client is a public

14   figure.  Soliciting public funds.  Solicit- --

15   oh, wait.  Wait.  Hold on a second.  That's

16   your client on Two Lee's In a Pod.  That's your

17   clients, both John Cook --

18       Q.    Okay.

19       A.    -- and the pickles and the fam --

20   hey, I'm not done.  Shut up, and listen.

21           That's your client who out there on

22   Miltowns Best.  That's your client all over

23   YouTube.  That's your client all over Facebook.

24   That's your client all over the newspaper

25   stating "What the Hales."  That's your client

1    on Channel 20.  That's your client at town

2    hall.  That's your client in all these public

3    records.  That's your client in court who says

4    she doesn't want anything to do with this.

5    That's your client that says she doesn't want

6    to be on YouTube, and yet she's on a livestream

7    in the lap of fat Lisa Lee.

8                That's your client who wants to have

9    my channel removed under your direction in your

10   "Anti What the Hales ecosystem."  Your client

11   is a public figure.

12        Q.    Okay.  Now, is it because of her

13   status as a public figure that you feel it's

14   okay to do so many videos focused on her and

15   her property condition and the safety of her

16   child and calling for the child to be removed?

17                Is it because of her status as a

18   public figure that you feel that it's okay for

19   you to do that?

20        A.    Excuse me.  What?  The channel name

21   is "What the Hales."  It's not "What the

22   Lynette."  It's not "What the Crook."  It's

23   "What the Hales."

24                This is the story of my life and how

25   they invaded my life, how they came, and they

1    actually stalked me which they've been found

2    guilty of.

3            They have broken the violations.

4    They have been found guilty of -- they will be

5    found guilty again.  We will actually file

6    again on more than we talked about today.

7            It is your clients that have stalked

8    me, defamed me, tormented me, harassed me.  I

9    am exercising my First Amendment rights.  I'm

10   exercising -- shut up, and listen.

11           I'm exercising --

12       Q.    You know what?  I'm going to --

13       A.    -- my right to actually safeguard

14   myself, protect myself and when Levy County

15   Sheriff and the Court system fails to make sure

16   there's some type of accountability in my life.

17           It's "What the Hales."  It's not

18   "What the Lynette."  It's not "What the Crook."

19   It's not "What the HG."

20           Now, there's also a child that is

21   living in despicable conditions.  Pooping in a

22   bucket.  Peeing in a bucket.  Almost 5 -- no.

23   Now 5 years old.  Can't even go to the

24   bathroom.  Not even potty trained yet.

25           Should be in school, but we both

1   know your client won't allow that to happen

2   because if they found out she's got lice and

3   she's living in lice and she can't even

4   formulate full sentences and she's so far

5   behind developmentally, that she'll be reported

6   to children services yet again.

7              There's a serious issue.  A child's

8   safety is at stake.  And you don't seem to

9   care.  And that makes you a pathetic

10  individual.  Especially, as I continue to tell

11  you, you are a mandatory reporter, and you've

12  reported nothing.

13      Q.    So why are you doing --

14      A.    It's my life.  This is my channel

15  documenting what they've done to destroy my

16  life.  You've tried to recruit others to come

17  in and destroy my life, which is all in

18  writing.

19              How stupid can a lawyer be?

20  Seriously?  How stupid?  You think you're going

21  to get away with this?  Uh-huh.  Never going to

22  happen.  Never going to happen.

23              Your clients who have come in,

24  invaded my life wanting money, wanting fame,

25  wanting donations, and then you jumping on

1  board because you want the exact same thing.

2  You recruiting others guaranteeing them,

3  telling them you're going to increase their

4  views, you're going to increase their income.

5      Q.    Done?

6              ATTORNEY SHOCHET:  Counsel,

7  when there's silence, it means he's finished.

8  BY ATTORNEY MATZKIN:

9      Q.    So why -- why do you believe it's

10 your responsibility to become involved in the

11 child situation?

12     A.    Are you that dumb?  I just told you.

13 You're a mandatory reporter.  It's your

14 responsibility, as well.

15          What have you done about it?

16     Q.    My question was:  Why do you feel

17 it's your responsibility to become involved?

18     A.    When you saw the video of her on 911

19 calling Levy County Sheriff that she threatens

20 to spank the child in the mouth, did you

21 call -- did you call CPS?

22          You're a mandatory reporter.  I know

23 you saw it.  You know she said it.  I know she

24 said it.  It's all public information.  Because

25 I'm --

1        Q.    Then why --

2        A.    -- shut up, and listen -- because I

3    am an actual responsible individual who cares

4    about children who can't defend themselves.

5    We've got a court reporter in here that just

6    told us her children were going to day care.

7    Do you think if something would happen to her

8    kids, that she wouldn't want somebody calling

9    and protecting her kids?

10            And yet here you are smirking.  Yet

11    here you are smirking with that giant nose that

12    somebody already broke.  Here you are smirking

13    at a camera because you've done nothing to

14    protect this child.  It's your responsibility.

15    It's my responsibility, it's Randy's

16    responsibility, it's Alyssa's responsibility to

17    protect those who can't protect themselves:

18    Children, the elderly such as Lloyd Campbell

19    who feared his life from your clients.  That's

20    why I feel responsibility, because there is a

21    human responsibility.

22            You know, there are some humans out

23    there that have hearts.  They actually care

24    about other people.  They don't try to take

25    advantage of other people.  They try and better

```
 1   their lives.
 2             And when I see things such as
 3   despicable living conditions, when I see
 4   backwards -- literally backwards developmental
 5   in a child, when I see individuals coming
 6   forward who originally, initially, actually
 7   believed Lynette but now who are coming forward
 8   to protect a child, it's their responsibility,
 9   as well.
10             When the truth is actually shared,
11   which is what I do on What the Hales, actual
12   truth, not Two Lee's in a Pod that smell like
13   cod, not two lies that you love to hang out
14   with.
15             And yet you know what?  You're
16   talking about the timeline.  All of the sudden,
17   you know that you're incriminating yourself
18   within these lawsuits, and now you're absent.
19   Oh, but you're still posting, calling people,
20   you know -- let's see -- morons, idiots.
21             You're the most unprofessional
22   lawyer I've ever witnessed in my life, and
23   frankly, you're the best lawyer I've never had
24   to pay in my life because you literally
25   incriminate your clients and yourself over and
```

1    over and over again.

2                It's your responsibility to protect

3    that child.  It's my responsibility to protect

4    that child.  And where others fail, we need to

5    step up.

6                There is -- there is all kinds of

7    harassment on Facebook from you.  There's all

8    kinds of the harassments on Facebook from

9    others incited by you.  There's all kinds of

10   harassment on YouTube and Facebook by your

11   clients.

12               This child should not have to live

13   this way:  Isolated.  You have a deputy, a

14   corporal who you're so foolish to name in a

15   lawsuit, who is literally telling Lynette, "Do

16   not lock that child in that camper."

17               That child is isolated from people.

18   That child is isolated from growth.  That child

19   is isolated and being abused.  It's my

20   responsibility to report it.  It's your

21   responsibility to report it.

22        Q.    Okay.  But why did -- why was it

23   necessary for you to make numerous videos

24   focused on the child being removed --

25        A.    Oh, my goodness.

1      Q.    -- and this proceeding?

2      A.    Oh, my goodness.  What's the name of

3   the channel, Bruce?  Oh, wait.  I'm sorry.

4   Deuce.  What's the name of the channel, deuce?

5   What is it?  Is it "What the child"?  What's

6   the name of the channel?

7      Q.    But it's not your child.

8      A.    Say it.

9      Q.    Why was it --

10      A.    Say it.

11      Q.    -- your responsibility?

12      A.    Say the name of the channel.

13      Q.    It wasn't a relative of yours.  Why

14   would you take it on your responsibility --

15      A.    Say the name of the channel.

16              THE REPORTER:  Please wait for

17   him to finish his question, Mr. Hales.  Please.

18              THE WITNESS:  Yes, ma'am.

19   Alyssa, I apologize that you're a part of this.

20   BY ATTORNEY MATZKIN:

21      Q.    So why was -- why did you take it on

22   as your responsibility to devote your YouTube

23   content to a campaign of saving the child by

24   having her removed?

25      A.    My YouTube content is my life.  Your

1  clients invaded my life.  They stalked me,

2  attempted to use me, and have abused my name,

3  and they have attempted to destroy my income

4  and my businesses mostly under the direction of

5  you.

6      Q.    Okay.  Do you --

7      A.    It's "What the Hales."

8      Q.    Do you think --

9      A.    "What the Hales."

10     Q.    Do you --

11     A.    "What the Hales."

12     Q.    Do you --

13     A.    The channel is about my life; your

14  clients invaded my life.  They stalked me.

15  They harassed me.

16          This is what's going on in my life.

17  You want it to end?  Tell your clients to get

18  healthy and stop doing what they do.  Why would

19  you actually represent them instead of further

20  incriminating them and yourself?

21     Q.    Is this being videotaped, to your

22  knowledge?  Is this deposition being

23  videotaped, to your knowledge, Mr. Hales?

24     A.    Does it matter?

25     Q.    I have a question.  I need an

1    answer.  Is it being videotaped, to your

2    knowledge?

3         A.    Here's the answer:  This is my life.

4         Q.    Just --

5         A.    There is no YouTube personality.

6    There is no YouTube content.  This is my life.

7    No matter if I'm in a storage unit, no matter

8    if I'm cutting down trees on my property, no

9    matter if I'm being stalked by your clients, my

10   life gets videoed and shared.  My life.  Not

11   yours that you have now invaded my life, as

12   well, and now you're worried that it's being

13   videoed?  You're worried that -- you're worried

14   it's going to be videoed?

15             You're the one that literally has

16   posted publicly that you can't wait to depose

17   me.  You fool.  You are an ignorant fool.  Shut

18   up, and listen when I'm answering your

19   questions.

20             ATTORNEY SHOCHET:  Hold on a

21   second.  Just -- I'm getting a -- in my upper

22   right corner, it says "recording."  And I'm not

23   recording it, and I hope you're not, sir.

24   Well, I see a red light.  It says "recording."

25   I'm going to take a screenshot of it.

1          THE REPORTER:  Counsel, I can

2    explain.  Counsel, I can explain.  That's for

3    Steno's backup purposes if I were to lose the

4    feed.  That's all it's for.  It gets destroyed

5    after 14 days of the deposition being taken.

6          ATTORNEY SHOCHET:  Okay.  I'm

7    going to ask your company to preserve it.

8          THE REPORTER:  You can make a

9    request to them.

10          ATTORNEY SHOCHET:  I will do

11    that.  Okay.

12    BY ATTORNEY MATZKIN:

13    Q.    Okay.  So now that we know that

14    Steno has a backup recording, my question to

15    Mr. Hales is:  To your knowledge, is this being

16    video recorded by your arrangement?

17    A.    Does it matter?

18    Q.    Yes.

19    A.    Why?  You're the one that is online.

20    You're the one that's gloating, saying you

21    can't wait to depose me.  You're the one that's

22    gloating, and you're the one that's telling Two

23    Lee's that you're going to put that all out

24    there on their channel.  You're the one

25    literally stating this.  What do you care --

1      Q.    Are you --

2      A.    -- if it's being recorded?

3            Shut up, and listen.  Keep your

4      mouth shut.  Gosh, for as big of a nose that

5      you have, your mouth is even bigger.

6            Listen.  You're the one that's out

7      there telling everybody you can't wait to

8      depose me, and yet here you are cowering like a

9      little child.  You're whining at the beginning,

10     "I don't want to record it."  Now you're -- now

11     you're whining more about recordings.

12           What's wrong?  Are you feeling

13     guilty?  You feeling like you haven't taken up

14     your responsibilities and done the right thing

15     for your clients and for yourself?  All of a

16     sudden, you got a moral compass?

17           The recording makes no difference

18     whatsoever.  There is no gag order.  There is

19     no court order.  And there's you publicly

20     stating you can't wait to depose me.  There's

21     young publicly stating that the deposition is

22     going to be online on Two Lee's.  There's you

23     stating all these things.

24     Q.    So the question, again, is:  Other

25     than the backup recording by Steno, are you

1   having this deposition videotaped?

2         A.    Attorney/client privilege.

3         Q.    No, it's not.

4         A.    Yeah, it is.  It's a conversation

5   with my attorney, and I'm not talking about it

6   outside of my conversation with my attorney.

7         Q.    I don't want anything about your

8   conversation with your attorney.  It's just a

9   yes-or-no question.

10        A.    That's why I just told you,

11  attorney/client privilege.

12        Q.    Is this video -- is this deposition

13  being videotaped by you through your request or

14  order or arrangement?

15              ATTORNEY SHOCHET:  Counsel,

16  let me save you time.  The answer is no.  Okay.

17  And I am preserving the video, so it is being

18  recorded, as you now are made aware.

19  BY ATTORNEY MATZKIN:

20        Q.    So, Mr. Hales, why wouldn't you just

21  tell me "no"?

22        A.    Well, you being the individual that

23  publicly stated that you were so -- you

24  couldn't wait to depose me, and that you're

25  going to put the depositions online, why would

1    it matter?

2        Q.    So the answer is no --

3              ATTORNEY SHOCHET:  Counsel --

4    BY ATTORNEY MATZKIN:

5        Q.    -- it's not being videotaped?

6              ATTORNEY SHOCHET:  -- for the

7    record, that I'm not recording it.  The court

8    reporter is.  Are you recording this right now?

9    This is a question that involve -- involves

10   Florida law.

11             So are you recording this right now?

12             ATTORNEY MATZKIN:  There is a

13   question.

14             ATTORNEY SHOCHET:  Oh, you're

15   not going to answer that?  Okay.

16   BY ATTORNEY MATZKIN:

17       Q.    Mr. Hales, is this deposition being

18   videotaped by you -- at your request by anybody

19   that you asked to videotape it or hired to

20   videotape it?  Yes or no?

21       A.    Not to my knowledge.

22       Q.    All right.  Do you have any videos

23   of Michelle -- of Lynette Preston or John Cook

24   stalking you?  Videos.

25       A.    Oh, my goodness.  Oh, my goodness.

1    Q.    Other than -- okay.  I guess you're

2  going to tell me about the ones you've turned

3  into the police, et cetera.

4            Other than the ones we might have

5  already discussed today, do you have any videos

6  of them that you claim show them stalking you?

7    A.    Let's back up.  Let's back up with

8  your ignorant question.

9            First of all, they've already been

10  found guilty as such.  So the argument is --

11    Q.    My question was about videos.

12  Videos.

13    A.    Shut up, and listen.  Shut your

14  mouth.

15    Q.    Okay.  Okay.  So we're going to end

16  right now.

17            ATTORNEY SHOCHET:  You guys

18  are both interrupting each other.

19            ATTORNEY MATZKIN:  The

20  deposition -- the deposition will be terminated

21  at this point.

22            Not yet, Alyssa.  I've got a few

23  things to say.  Thank you.  Okay.

24            ATTORNEY SHOCHET:  Just do a

25  quick question.

```
 1                    ATTORNEY MATZKIN:  There will
 2    be no more questions today.  Okay?  Listen to
 3    me, Mr. Shochet.  There will be no more
 4    questions today.
 5                    ATTORNEY SHOCHET:  Yes, there
 6    will.
 7                    ATTORNEY MATZKIN:  There is
 8    not -- I --
 9                    ATTORNEY SHOCHET:  Go ahead.
10                    ATTORNEY MATZKIN:  I'm
11    going -- I'm going to speak, and when I'm done
12    you can speak, okay, on the record.  But I'd
13    like you to put it on mute while I speak so
14    that Mr. Hales and you don't interrupt.  Okay?
15    Thank you.
16              So I'm going to end the questioning
17    for today.  And what I plan to do is to procure
18    a copy of the backup video from Steno as well
19    as the transcript and the audio file, so three
20    separate formats, and I intend to file an
21    appropriate motion with the Court.
22              And I intend to ask the Court to
23    review the deposition video that will be
24    presented to him, and I will ask the Court to
25    do a number of things in the alternative.
```

1            I'll ask them to dismiss the case.

2    I will ask them to impose sanctions, including

3    the cost to pay Steno for today's deposition,

4    and for my time.

5            And I will -- and I will ask them if

6    neither dismissed -- and/or whether they award

7    costs to enter appropriate orders addressing

8    the situation that has presented itself here

9    today.

10           And so I have endeavored to move on

11   through my questioning and progress down my

12   list of questions, which still has quite a long

13   way to go, and would have never been completed

14   in just today or one seven-hour deposition

15   given all the time wasted by Mr. Hales on his

16   tirades.

17           So I will, of course, be asking the

18   Court, if it's not dismissed, that I will be

19   entitled to continuing Mr. Hales' deposition as

20   necessary to get through my lines of

21   questioning in an efficient way and to my

22   satisfaction and, thereby would need an order,

23   according to the rules, to go beyond the single

24   day.  So I intend to file that request.

25           I do not intend to proceed on

1   Wednesday with the deposition of Martha George

2   Rizk.  I am notifying you here and now on this

3   record that I am postponing that deposition

4   indefinitely.

5                   ATTORNEY SHOCHET:  We need a

6   notice of cancellation, sir.

7                   ATTORNEY MATZKIN:  I am

8   postponing that definition -- that deposition

9   indefinitely.  You will not receive a separate

10  notices.  I'll send you an E-mail to confirm.

11          That is what you will get.  There's

12  no formal notice of cancellation.

13                  ATTORNEY SHOCHET:  Tell me

14  through written communication.  We're going to

15  be here.

16                  ATTORNEY MATZKIN:  I will

17  E-mail you confirming what I'm telling you now,

18  and if you want to come any way, then you'll do

19  it knowing that there won't be any court

20  reporter or opposing counsel.  Okay?

21                  ATTORNEY SHOCHET:  I'll do so

22  unless you do a notice of cancellation somehow.

23                  ATTORNEY MATZKIN:  What else?

24  Mr. Shochet --

25                  ATTORNEY SHOCHET:  You say

```
 1  you're terminating, but yet you keep talking.
 2  So I'm going to --
 3              ATTORNEY MATZKIN:  Yes.
 4              ATTORNEY SHOCHET:  --
 5  terminate it myself.
 6              ATTORNEY MATZKIN:  I don't
 7  take -- I don't lightly -- I don't lightly -- I
 8  don't lightly go to court about an opposing
 9  counsel, but I am -- I find it --
10              ATTORNEY SHOCHET:  All right.
11              ATTORNEY MATZKIN:  --
12  necessary in this case.
13              ATTORNEY SHOCHET:  Madam Court
14  Reporter, we are now going to leave since he's
15  terminated the deposition.  And I guess we
16  won't see you Wednesday.
17              (A discussion was held off the
18  record.)
19              ATTORNEY SHOCHET:  Mr. Matzkin
20  off the record briefly said that he's not
21  available on Wednesday for a deposition that
22  was scheduled on Friday.  He did notice
23  Ms. Rizk's deposition for Wednesday.
24          So I'm going to ask you,
25  Mr. Matzkin, you're not -- you were available
```

1    as of five seconds ago, but now you're not

2    going to be available on Wednesday.

3            You've also previously told me in an

4    E-mail that I could schedule a deposition at

5    any time.  So I'd ask you to state, since

6    you're going to send this video to the Court,

7    what is your conflict for Wednesday?

8            ATTORNEY MATZKIN:  You have a

9    noticed deposition for Friday, and I intend to

10   attend.  And that is all I will say.  Thank

11   you.

12           ATTORNEY SHOCHET:  I'm going

13   to renotice it for Wednesday, and we expect you

14   to appear unless you say what your conflict is.

15   You've already told me in an E-mail I can

16   schedule a deposition at any time.

17           Now that you've given up Wednesday,

18   I'll reschedule the deposition for Friday on

19   Wednesday.  Okay?

20           ATTORNEY MATZKIN:  I won't be

21   appearing on Wednesday.

22           ATTORNEY SHOCHET:  All right.

23   Let's go -- let's finish, go back off the

24   record.  Thank you, everybody.

25           THE REPORTER:  Mr. Shochet,

```
 1   before we go off, do you need a copy of the

 2   transcript?

 3                   ATTORNEY SHOCHET:  Well, we'll

 4   read, so send me a copy.  Sure.

 5                       -  -  -

 6           (Thereupon, the deposition was

 7   concluded at 4:01 p.m.  Signature was not

 8   waived.)

 9                       -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2                    -  -  -

 3    I, JEREMY B. HALES, do hereby certify that I

 4   have read the foregoing transcript and it is a

 5   true and correct copy of my deposition, except

 6   for the changes, if any, made by me on the

 7   attached Deposition Correction Sheet.

 8

 9

10

11          _____

12          Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

```
 1    ERRATA SHEET            REASON FOR
      PAGE       LINE         CHANGE/CORRECTION
 2    _____    _____      _____

 3    _____    _____      _____

 4    _____    _____      _____

 5    _____    _____      _____

 6    _____    _____      _____

 7    _____    _____      _____

 8    _____    _____      _____

 9    _____    _____      _____

10    _____    _____      _____

11    _____    _____      _____

12    _____    _____      _____

13    _____    _____      _____

14    _____    _____      _____

15    _____    _____      _____

16    _____    _____      _____

17    _____    _____      _____

18    _____    _____      _____

19    _____    _____      _____

20    _____    _____      _____

21    _____    _____      _____

22    _____    _____      _____

23    _____    _____      _____

24

25
```

```
1   COMMONWEALTH OF PENNSYLVANIA    )
                                    ) SS
2   COUNTY OF BERKS                 )

3                   CERTIFICATE

4     I, Alyssa A. Repsik, a notary public in and
    for the Commonwealth of Pennsylvania, do hereby
5   certify that the witness, JEREMY B. HALES, was
    by me first duly sworn to testify the truth,
6   the whole truth, and nothing but the truth;
    that the foregoing deposition was taken at the
7   time and place stated herein; and that the said
    deposition was recorded stenographically by me
8   and then reduced to typewriting under my
    direction and constitutes a true record of the
9   testimony given by said witness.

10    I further certify that I am not a relative,
    employee, or attorney of any of the parties or
11  a relative or employee of either counsel and
    that I am in no way interested directly or
12  indirectly in this action.

13    IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office this 5th day
14  of December 2024.

15

16                  _____

17                  Alyssa A.  Repsik, Notary Public
                    Court Reporter
18                  Notary Public
                    Berks County
19                  My Commission Expires March 12, 2028
                    Commission Number 1296614
20

21

22

23

24

25
```

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

---

## Exhibits

**Exhibit 1**  3:8 34:16,
17,25 35:3,10 37:24

**Exhibit 72**  3:9 81:23,
24

**Exhibit 73**  3:10
170:3,4

**Exhibit 77**  3:7 6:21,
22 7:13,21

---

## $

**$15,000**  252:19

**$65,000**  34:11 36:7,
18,21 37:3,7 49:17

---

## (

**(1)**  39:18

**(2)**  39:20

**(3)**  39:21

---

## 1

**1**  16:21 20:20 22:21,24
23:9 34:16,17,25 35:3,
10 37:24 187:14 221:6

**1/17/2024**  170:25

**10**  85:2 87:14

**100**  101:17 102:7
104:9 122:18,22 123:2,
3,4

**1099**  162:10,14

**11:45**  81:17

**12-minute**  81:17

**12th**  136:23

**13**  238:4 264:19

**13th**  136:22 240:7
242:22

**14**  136:6 276:5

**14th**  131:11 136:22

**151**  143:1

**18**  135:23

**19**  117:15 119:9 215:6

**1:00**  128:23 133:10,11,
13 158:17

**1:05**  158:21

**1:50**  158:24 159:1

---

## 2

**2**  16:21 22:25 23:6 29:7
43:15 83:8 124:12
221:8

**20**  265:3,4,5 266:1

**200**  123:22

**2023**  9:9 20:9 21:2
39:16 51:17 94:5 95:12
114:10,25 131:11 136:6

**2024**  95:12,17 99:9

**22**  245:11

**24**  117:14 186:14
196:16

**25**  9:3 10:8,15 11:17
12:7 13:6 14:16 77:5

**27**  19:21 23:19 24:2,15
25:7 26:12

**28**  39:16

**2:30**  196:18,19

---

## 3

**3**  23:18 24:2,11,15
26:11 29:6 83:8

**30**  9:3 39:1,9,10 43:15
45:21 46:9 52:20 85:8,
12 98:19 209:21

**31**  50:2

**32**  51:15

**33**  51:23 52:20 53:18

**351**  186:14

**3:40**  245:8

---

## 4

**40**  116:24

**44264**  170:1

**45**  128:24 159:3

**4:01**  286:7

**4th**  244:15

---

## 5

**5**  82:14 100:4 251:6
267:22,23

**5-0**  159:2

**5-year-old**  251:2

**50**  116:25

**500**  84:9 178:12 196:2,
23 198:11 203:15
204:18,21 205:5,9,14,
19 206:16 207:2 214:13

**5:00**  245:7

**5th**  237:18 238:4 240:7
242:22

---

## 6

**65**  195:5

**65,000**  49:20

---

## 7

**70**  195:5

**70-something**  39:5

**72**  81:23,24

**73**  170:3,4,7

**77**  6:21,22 7:13,21
39:6,7

**78**  7:7 35:10

**79**  60:17

**7:00**  116:10

**7:14**  119:17

---

## 9

**911**  269:18

**941 249-2195**
180:24

**98**  117:15 119:10 215:6
251:3

---

## A

**a.m.**  116:10 119:17

**ability**  114:4

**absent**  271:18

**absolute**  180:12

**absolutely**  32:2
36:15 58:24 64:1 76:21
125:22 164:7,8 173:10
249:7 261:20 263:20
264:5

**abuse**  250:19,20
251:17,20 252:1

**abused**  272:19 274:2

**abuser**  247:16

**abusing**  42:6,7

**abusive**  247:9

**accent**  222:8

**accept**  69:11

**access**  101:25
201:14 254:15 255:11
257:9

**accidents**  117:17,18

**accountability**
87:24 189:25 190:19
194:19 198:7 210:23
238:6,11,16,24 239:3,
19,25 240:16 241:21
267:16

**accountable**
173:13 177:5 224:9
249:20,23

**accounts**  8:18
178:19

---

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**accurate** 16:4 67:16 148:5

**accurately** 9:14 21:5 25:7 36:9 51:21

**accusations** 105:4 158:1

**accuse** 104:17,22 110:5

**accused** 104:14,15 106:3 111:9 113:9

**accusing** 106:1 111:19 112:2,18 114:7 153:13

**Ace** 134:16 135:11,13 136:5,7,10,15,16 138:24 139:1 140:20,24 141:12,17

**acknowledge** 4:3,7 65:8 171:17 225:19 237:1 244:21 253:17

**acknowledged** 65:11

**act** 176:22 182:10

**action** 52:18 75:15 79:7 80:8 208:7 238:17

**actions** 57:23 60:5 61:18 62:16 74:25 208:3 247:10

**active** 50:20

**actively** 254:24

**acts** 51:25 53:19

**actual** 60:2 113:14 120:1 126:16 162:20 168:15 209:2 222:13 248:5 270:3 271:11

**add** 7:5 129:22

**adding** 45:24

**address** 47:24 48:4, 5,8 101:14 148:13,14 150:21 169:22

**addressed** 76:19 91:17

**addressing** 49:6 91:12 282:7

**adhere** 86:16

**administered** 4:8

**admits** 51:11

**admitted** 122:3

**adoption** 254:15

**adult** 254:8

**advantage** 23:23 24:18 26:15 27:11,21, 23 29:8,11,17,22 30:3, 24 270:25

**advantageous** 81:4

**advice** 97:24

**advised** 51:13 171:1

**affected** 63:25 74:9

**affects** 64:17

**affiants** 119:15

**affidavit** 150:12,13

**afield** 160:2

**afraid** 254:22

**again'** 39:20

**agree** 83:19 86:3 171:5 173:8

**agreement** 4:14,15 58:21 59:7

**ahead** 7:11 15:10 38:19 46:1 55:15 106:20 141:21 147:8 233:5 235:12 281:9

**air** 235:9

**albeit** 201:3

**allegation** 11:25 26:24 29:10,16 55:20 83:19 107:1

**allegations** 61:9 106:25

**allege** 8:21 17:19,24 18:16,17,24 27:20 30:11 46:10 51:15

**alleged** 8:18 10:20,23 167:7 189:17 210:2

**allegedly** 98:5

**alleging** 8:5 16:25 17:5,7 18:2 30:17 64:20 66:20 67:3,13 69:16,17 70:11,14,24 71:6,13,16

**alligators** 91:24 92:14 93:14 94:22 96:14 99:14

**allowed** 173:19 178:12,14 205:8

**already-propounded** 188:16

**altercation** 75:18

**alternative** 281:25

**Alyssa** 26:9 65:25 110:20 111:1 127:25 128:25 147:10,14 164:22 179:20 188:23 209:20,25 224:14 245:4 273:19 280:22

**Alyssa's** 270:16

**Amazon** 142:25

**amendment** 48:4 267:9

**amount** 162:16,24 234:23 236:22

**amplify** 11:13

**analysis** 56:22,24 58:3 59:20 133:24 145:4 153:12

**analyzed** 142:3 150:25

**analyzing** 150:17

**and/or** 133:22 282:6

**announce** 163:9

**announcing** 245:11

**answering** 90:6,10 109:24 114:14 124:24 126:13 275:18

**answers** 81:10 242:3 250:12

**anti** 47:19 51:4 70:4 75:2 76:15 122:24 154:12 155:18 157:7 224:10 241:12 266:10

**Anti-hales** 34:2

**anymore** 51:2,3 57:10 60:4 113:16

**anyplace** 253:22

**apologize** 222:9 273:19

**appearance** 246:15

**appeared** 93:5 247:1

**appearing** 285:21

**appears** 35:24 36:1,3 262:8

**application** 200:25

**applied** 200:4,8

**apply** 200:3

**apprised** 97:4

**approach** 21:16

**appropriately** 37:23 86:7 112:7

**Approximately** 184:21

**apps** 180:1

**argument** 127:2 280:10

**arise** 218:14

**arm** 190:3

**arrange** 254:18,25

**arrangement** 4:12 75:16 78:22 276:16 278:14

**arrested** 179:17

**arrive** 184:3 196:9

**arrived** 184:10,11,17 186:4 196:12

**articulate** 45:6

**articulated** 240:8

**ascertain** 80:6

**asides** 43:4

**asinine** 180:12

**aspect** 19:12 30:21, 22,23,25 31:16 32:12 41:25 57:2 61:5,20

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

62:2,3,4,7 74:5 114:17
116:2 148:20,24 158:8

**aspects** 72:15,20,22
73:2

**ass** 39:20 43:16 44:7
46:25 89:20 91:5
119:25 219:13 239:23

**assaulted** 111:4

**assaulting** 110:15

**assert** 131:25

**assessed** 88:24

**assets** 235:15

**association** 15:20

**assume** 5:17 119:20,
23 120:1 124:13 127:1
134:6

**assuming** 119:24
120:18 206:7

**assumption** 120:19
121:19

**assumptions** 214:7

**attack** 61:20 65:12

**attacked** 62:11,12

**attempt** 47:16 57:8
175:15,17 177:9

**attempted** 63:7
135:24 274:2,3

**attempting** 175:6

**attend** 216:5,10
285:10

**attention** 81:23

**attorney** 4:17,20 5:2,
24 6:19,24 7:2,4,7,9,12,
15,18 8:8,11,13,23 9:1,
19,20,23 10:2,22,24
11:6,11,14 12:2,4,21
13:2,7,10,12,25 14:4,8,
10,12,14,23 15:7,9,12
18:3,6,14,15,20,22
19:24 20:3,6,8,16,19,
21,24,25 22:18,20,23
23:4,8,13,15,17 24:3,7,
10 25:18,22 26:10 27:2,
9,13,15,24 28:7,10,16,
18,23 29:1,4,12,14
30:4,5 31:23,25 34:6,

12,18 35:2,5,9,11,14,
16,21,23 37:18,20 38:2,
10,17,20,25 39:4,7,9,
10,11,13,14 40:1,6
41:8,11,14,17,18,22
42:25 43:6,8,10,12,14
44:10,13,21,23 45:11,
15,17,20,22 46:1,3,5,7,
14,17 47:11,21,23,25
48:6,8,13,16,18,23,25
49:4,8,12 50:4,10,13
51:8,14 53:22 54:4,7,
10,12,19,22,24 55:1,5,
11,14,19 57:12 58:5,7,
9,12,14,16,19,23 59:1,
3,5,11,18 60:19,22
62:17,22 63:1,3 65:24
66:3 71:1,12 73:3
74:10,13,20 75:3 77:18,
20 78:6,9,12,17 79:16,
21 81:16,18,21 82:1,5,
6,12,15,17,18,20,25
83:13,16 88:21 89:3,5,
7,10,25 90:7,11 91:3
96:18 97:2,5,9,12,15,
18,22 98:3,7,9,12,14
99:5,6 102:14,16,18
103:23 104:10 106:5,
12,19,22 107:4 108:20
109:2,4,6,10,12,16,18,
21,25 111:22,24
127:20,23 128:3,5,7,9,
13,22 129:3,5,11,14,18
130:3,5,9,11,13,16,20,
25 131:5,8,14,19,23
132:5,15,17,21,23
133:1,10,12,14 134:25
135:6 140:8 143:8,10,
18 144:3 145:7,9,12,24
146:20,22,24 147:2,4,6,
9,17,20 154:4,8,25
155:2,4,5 158:15,18,20,
22 159:1,3,5,7 160:1,
10,24 161:6,8,12,14
162:11,13 163:6,8,12,
15,17,25 164:3,7,9,11,
12,14,19,24 165:6,11,
21,24 166:3,5,6,10,12,
15,18,25 167:3,4,8,14,
16 169:18,21 170:6,8,
10,12,15,17,19 171:21,
25 172:6,12,14,16,19,
21 173:7 176:6,9
177:24 178:23 179:19,
23 181:19,23 188:5,9,
11,14,18,22 189:4

192:22 193:1,4,8,14
202:1,3,6 207:4,7,21
209:20 210:1,9,13
211:22 212:3 224:14,
21,25 225:5 227:9,14,
15,23,25 228:2,10,14,
20,24 230:14,16,20,22
231:1,4,14,17,21 232:1,
6,10,13,23 233:3,9,11,
21,24 234:5,10,14,17,
20 235:6,10,13,23
236:2,4,9,11,16,24
237:5,7,9,12,14,16,20,
23 240:9,18 242:1,4,8,
13,19 245:3,6,10,12
246:3,7,10 252:25
253:4,9,12,19 254:11,
14 255:24 256:2 258:21
259:1,9,14 260:20
261:1,3,6,8,10,12
269:6,8 273:20 275:20
276:6,10,12 278:5,6,8,
15,19 279:3,4,6,12,14,
16 280:17,19,24 281:1,
5,7,9,10 283:5,7,13,16,
21,23,25 284:3,4,6,10,
11,13,19 285:8,12,20,
22 286:3

**attorney/client**
92:25 96:16,19 97:19
98:18,24 130:22,23
132:1 141:3 167:9
227:16,17,22 230:3,17,
18 233:1 234:9 235:25
236:8,10 278:2,11

**attorneys** 4:2

**attribute** 61:17

**auctioned** 252:19,22

**auctions** 64:9

**audience** 154:2

**audiences** 154:15

**audio** 281:19

**aunt** 245:17 246:11,
12,13

**aunts** 248:15 251:24
260:10

**authority** 253:22
254:4

**availing** 132:14

**Avenue** 142:25 188:2
203:2 208:19

**avoid** 132:24

**avoided** 215:3,7

**awaiting** 221:4,10

**award** 282:6

**aware** 86:21 92:1 93:4
94:2 99:11 102:22
103:10,12 107:8,13
110:8 115:4,20,24
116:2 124:13 125:13
131:9 132:19 148:14
152:23 154:21 155:6,7
157:18,23 158:2,16,21
211:20,25 212:5,8
215:9 230:10 231:7,11
253:3 256:25 257:5
259:2,15,16,19 278:18

**B**

**back** 7:10 59:8 65:21
66:1 85:24 91:1 107:9
112:10,14 114:5 117:15
127:22 128:1 137:11
138:9,13 140:16
147:10,11 165:8,9
179:20,21 189:2 196:21
203:8 204:5 211:9
225:3 237:11 280:7
285:23

**background** 202:12

**backing** 203:18

**backside** 22:15

**backup** 276:3,14
277:25 281:18

**backwards** 271:4

**ball** 47:4

**bang** 21:21,25 23:5

**bankrupt** 233:14

**Bar** 244:4

**bare** 125:12

**barrel** 239:9

**base** 44:19 61:9

**baseball** 159:11

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**based** 58:6 59:8 84:10 86:9,10 99:21,23 126:14 134:1,2 163:7 204:9,11,12 247:7,9 252:7

**basically** 167:25

**basis** 63:9 65:12 67:6, 17,22 70:15 88:13 234:21 235:14,17

**bathroom** 45:14,24 267:24

**began** 9:7 11:18 192:15

**begging** 33:9 238:19

**begin** 6:20 84:18 130:8 184:23

**beginning** 32:25 84:21 237:18 238:19,22 239:12 277:9

**behalf** 8:4 141:7

**belief** 39:23 43:23 234:22 235:3,14,17,18

**beliefs** 250:21

**believed** 122:7,8 271:7

**believes** 69:13 122:11 171:1

**believing** 142:10

**belive** 235:5

**belonging** 143:6

**benefit** 121:15

**bet** 250:23

**bidders** 64:3,4

**bidding** 65:4

**big** 82:2,8 160:19 277:4

**bigger** 277:5

**Bing** 144:22

**biological** 245:17 246:12,13 248:15 260:9

**bird** 219:20,23 220:4, 20 221:5

**birded** 218:25

**bit** 82:3 247:14 263:23

**blacked** 170:25 172:9

**blame** 59:23

**blaming** 76:5,7

**blanket** 59:7

**Blink** 144:22

**block** 178:9,10,16 180:9

**blocked** 173:3,4,15 174:6,8,15,24 175:2,7, 10,14,16,18 176:19 177:7,23 179:1,24 180:6,10,19,21,25

**blocks** 180:1

**blogging** 209:13

**blue** 258:8

**board** 108:23 269:1

**body** 226:15

**booth** 216:24

**bottle** 64:12,14

**bottom** 172:15 239:8

**bought** 31:7 141:6

**bound** 206:15

**bounds** 227:21

**Box** 142:25

**boy** 241:11,12 251:7

**boyfriend** 108:7

**bragging** 244:23

**brandishing** 179:18

**breach** 191:7 199:13, 16

**break** 5:18 45:14,18, 24 46:2 54:1,3 81:17 107:9 152:7 158:19,23 173:6,11,12,23,24 176:17 178:25 199:12, 15 203:17,21 204:9 239:9 245:4,8,11

**breaking** 86:2,13 158:17 174:17 177:16,

19 180:16 198:8,13 199:21 206:25 217:11

**breaks** 86:4 174:9,12 176:18

**Brett** 103:7 115:21 116:6,8 121:23

**briefly** 284:20

**bring** 25:5 52:25 160:6 168:25

**broadcast** 153:5 237:16 244:22 245:1 253:14 261:15

**broadcasted** 153:7 157:19 257:11

**broadcasting** 153:9 237:25 238:2 240:6

**broadcasts** 260:16

**broke** 86:11 87:25 88:1 174:20 176:15 203:19 204:16 208:11 237:21 270:12

**broken** 178:2 201:11, 12 216:15 217:6 218:23 267:3

**brought** 91:7 113:12 220:8 262:16

**Bruce** 4:20 47:19 273:3

**bucket** 267:22

**buddy** 224:11

**building** 191:19 205:12

**bullet** 264:1

**burden** 125:19

**bureau** 132:13

**busiest** 117:16

**business** 8:7,19 19:8 34:4 47:17 60:24 64:18 66:14,19 67:10, 12,14 73:9,12,19 74:2, 16 75:16 77:13,17,23, 25 78:21 80:9 81:1 157:9 161:19 162:6,8, 15,19 165:16 191:14 215:22 216:25 217:4,25

218:13,16

**businesses** 49:25 72:16,20 73:2 209:8 274:4

**busy** 117:13 118:18, 22,25 121:2 216:2

**buy** 215:20 216:6 218:17

**buying** 134:18 137:22

**Bye** 159:5

---

## C

**call** 22:5 77:16 99:3 104:24 116:3,6 138:15 161:8,9 164:5 168:14 175:6,8,17,21 183:19 184:12,24 186:17 223:4 232:4 257:4,10,12 258:10,14 269:21

**called** 22:8 66:18 67:10 105:20 116:7 185:1 216:11 251:15, 18,20,23,25 252:5,7 256:21

**calling** 22:10 48:17 50:21 110:19 257:2 266:16 269:19 270:8 271:19

**calls** 9:24 12:22 38:3 57:16 79:17 127:21 135:1 154:5 211:23 255:25 260:22

**cam** 120:5

**camera** 106:15 144:24 227:3 232:16 239:3,14 262:25 270:13

**cameras** 144:22

**campaign** 154:13 241:11 273:23

**Campbell** 108:1 255:10 257:1,5,12 258:15,18 270:18

**Campbell's** 254:19 256:11 257:25

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**camper** 108:3 272:16

**cancel** 67:20

**canceled** 63:5

**cancellation** 283:6, 12,22

**cancer** 187:16 189:6, 21 191:5 193:13

**cap** 39:20 43:16 44:7 46:24 89:20 91:5 219:13 239:23

**capable** 55:24 56:3

**capitalized** 37:5

**capture** 262:10

**captured** 137:21

**car** 121:21 123:21,24 124:2,3 135:21 213:10

**care** 88:10 117:6,20, 21 160:15 199:11,17,18 205:15,16,17 206:9 209:9 214:19,20,21,23 250:11,15 251:14 252:2 264:14 268:9 270:6,23 276:25

**cares** 270:3

**cars** 118:18 119:21 120:4,17 121:1,4,5,7, 12,16,24 131:10 210:6

**case** 8:2,4 80:25 81:3 97:3 98:13 127:18 128:15 134:15 175:20 217:7 234:24 236:15 237:4 255:6 282:1 284:12

**cash** 234:16,22

**cashier** 139:11

**caused** 43:24 44:25 69:17

**causing** 117:18 126:2

**CCTV** 137:15

**cease** 52:1

**Cedar** 117:14 118:24 119:6,8

**cell** 21:17 75:23

101:25 102:3 190:4,6, 18 192:4,8 193:12 210:22 222:12 227:2 229:18 232:16

**cellular** 209:11

**centers** 209:9

**cetera** 72:12 252:12 280:3

**change** 86:9,10,14 180:1 206:11

**changed** 80:8

**changing** 78:21 159:19

**channel** 61:22 155:21,24 157:3,19,21, 23 223:20 238:3 262:17 264:23 265:3,4 266:1,9, 20 268:14 273:3,4,6,12, 15 274:13 276:24

**channels** 50:25 156:1,7,16,22 157:5 193:18 264:11

**character** 15:19 134:2,6

**characterization** 193:16 208:13

**characterizing** 195:12

**charge** 124:17

**Charlie** 232:5

**chats** 221:21,23 222:14,20 223:7,20 226:18,21 228:8,18 232:17,21

**checkpoint** 123:22

**cheese** 252:3

**Chiefland** 135:17 216:11 217:19

**child** 15:25 31:5 42:7 57:16,18 104:24 108:4 110:5,6,11 111:4,9 112:2 114:18 141:10,15 154:15 209:9 238:20 243:16 246:20 247:19, 22,23 248:11,24 249:2, 24 250:3,14,15 251:5, 12,14,16,19 252:1

253:23 254:2,3,4 264:13,15,25 266:16 267:20 269:11,20 270:14 271:5,8 272:3,4, 12,16,17,18,24 273:5,7, 23 277:9

**child's** 135:24 248:16 250:16 268:7

**children** 249:6,8 251:8 268:6 270:4,6,18

**choose** 24:9

**chooses** 82:22

**chose** 86:25 87:16 175:25 176:10 198:11, 12

**chosen** 87:12

**cities** 101:19

**civil** 54:1,3 84:10 85:20 86:2 173:23,24 174:9,12,18,20 176:15, 17 177:2,17,19 178:2,4 180:17 191:7,12 198:9, 14 199:13,22 200:5 204:7,16,17 205:6 207:1 208:8,11 209:4 212:20 214:12 221:12

**claim** 14:21 30:2 37:16,24 38:16 56:1 57:3 59:23 74:17 81:5 122:10 125:24 126:1 156:7 280:6

**claimed** 115:6

**claiming** 9:16 10:5,8, 11,25 11:4 13:13 33:21 41:25 64:20,21 65:2,5 71:24 72:13 73:5,13 76:22,23 90:2 122:5,8 247:15

**claims** 8:14 38:13 125:20

**clarify** 67:3 68:14 107:6,12 111:2 178:24

**clear** 56:6,9 71:21 75:11,13,19 81:2,6 93:16,17 96:15 102:6 104:16,20 105:23 147:24 149:22 153:22, 23 183:8 199:9 200:12 216:9 255:10 260:6

**clearer** 143:23

**Cleveland** 159:8,11, 14,15,24 160:13

**client** 5:8 13:17,24 19:13 36:2,25 37:1 48:8,12,22 49:6,10 54:8 55:21 57:16,17,18,21 63:17 64:7 65:13 88:22 109:13,14,19,22 135:22 141:8,14 151:18 157:1 163:19,20 164:17 165:25 166:6,20 173:12 177:3 180:16 218:24 237:17,25 242:3,6 248:25 250:8 253:5 265:2,6,7,8,13,16,21, 22,23,24,25 266:1,2,3, 5,8,10 268:1

**client's** 8:15 62:15 248:22

**client/attorney** 94:15

**clients** 8:6,18 17:7 19:4 54:2,6 57:6,11,23 59:23 60:5 62:13 63:7, 23 64:20 65:10,15 66:21 67:4,7,16,18,23 69:16 70:10,11,15,25 71:11,15,19,25 72:3,16 73:6,14,25 74:2,18,24 77:2 81:5 87:20,21 90:14,21,22,23,25 103:22 104:1,3,12 105:13 106:24 107:20 108:17 110:23 120:14, 23 122:19 134:3,8 141:6 199:19 218:21 219:18 221:12 226:7,12 233:20 234:1 239:20 241:17 250:17 253:25 255:6 265:17 267:7 268:23 270:19 271:25 272:11 274:1,14,17 275:9 277:15

**clients'** 63:5

**clips** 100:14

**close** 34:19

**closer** 190:14 194:22 208:23 213:10

**coast** 119:12

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**cock** 26:22 31:2 32:13
100:18

**cod** 271:13

**code** 169:25

**coincidence**
260:19 261:5,13

**collared** 146:12

**collect** 233:19

**color** 212:9

**comment** 91:22
93:4,12 113:7

**comments** 51:10
246:24

**committed** 8:21
12:8 180:11

**common** 59:9
128:18 152:4

**communi-** 258:14

**communicate**
262:5

**communication**
79:11,25 80:17,23
94:18 97:24 100:18
122:16 187:21 191:5,8,
9 195:11,20 209:14,15
226:24 245:20 283:14

**communications**
227:7

**communities** 61:13

**community** 144:18
145:2 243:20

**companies** 63:11
74:4

**company** 276:7

**compare** 144:6
146:3 149:25 152:10

**compared** 151:1,10

**comparing** 145:1
148:3 150:6,8,9

**comparison**
145:17,21 146:1,17

**compass** 277:16

**compensation**

69:2

**competence** 38:3
127:22 260:22

**competency** 9:25
13:1,8 18:5

**competent** 15:5

**complacent** 224:8

**complain** 264:24

**complaining** 52:11

**complaint** 7:22 8:1,3
9:4 10:9,16 11:16,17,20
12:8,14 19:3 39:2 44:1
46:9 47:3 65:5 71:17
81:3 91:15 99:7,8
113:14 114:24 126:24
167:7

**complaints** 91:18

**complete** 119:25
260:12

**completed** 282:13

**completely** 87:17
200:10

**comply** 85:19

**compound** 8:9 18:5,
21 20:17 28:22 29:13
31:23 77:19 111:23
145:8 162:12 253:20
260:21

**comprehend**
114:21

**concern** 161:18

**concerns** 252:8

**concise** 104:21
149:22

**concluded** 286:7

**conclusion** 9:24
12:22 38:4 127:21

**conclusions**
125:15

**condition** 266:15

**conditions** 247:7,9
248:10,16 252:12
267:21 271:3

**conduct** 54:6 55:21
57:11,15,17,18,20
61:18 62:16 66:22

**conducted** 133:24

**conducting** 149:24

**confer** 218:21

**confident** 121:5,9

**confidential** 54:9
55:9,10,16,18 69:8,11
77:24,25 78:4,10,23
79:10,25 80:5,13,18,24
81:1 165:16 227:11

**confidentiality**
58:21 59:7

**confirm** 122:4
124:19,24 125:2,3,4
283:10

**confirmed** 156:12

**confirming** 156:15,
18 283:17

**conflating** 22:24

**conflict** 285:7,14

**confused** 95:16

**conjunction** 198:24

**connection** 157:24

**consent** 4:12

**consequences**
86:12 152:2 158:12
208:2,7 215:18 216:14
217:10

**consideration** 69:2

**consist** 91:14

**consisted** 203:13,14

**conspiracy** 226:12

**constantly** 208:5
241:9

**constitute** 38:16
39:24

**constitutes** 9:17
29:7 131:21 190:23
195:10

**Consuegra** 253:1,4
254:14

**consumer** 57:2

**consumers** 57:22
60:4

**contact** 52:3,8 76:8,
16 77:22 168:15 171:2
172:13,17 175:15
177:4,8,9,23 178:15,18,
21 179:9 191:15,16
195:11 197:9,10 209:6,
9 229:1 245:21,22
248:15 249:22 256:10,
13,16 258:18

**contacted** 78:2,16
79:19,24 134:9 168:12
180:16 226:17,21
228:6,11,16,22 229:8
245:23 246:1 250:2,10,
13,14,15,18,19,20,22
252:10 256:18 257:17
258:6,7,12

**contacting** 173:19,
20 177:6,20 182:11
251:8 257:20,23

**contacts** 79:24
174:15,17 245:24 246:6
265:7

**contained** 158:1

**contempt** 99:17,20,
23 100:3 102:2 217:8,
15 220:9 221:16

**contempts** 220:13

**content** 273:23,25
275:6

**context** 53:8 79:11

**continually** 87:25
88:1

**continue** 25:2,3
26:1,2 48:15,18 51:25
53:25 54:3 67:6 85:17,
23 207:13 208:23,24
226:11 268:10

**continued** 154:19
198:1,15 206:19 210:5

**continues** 178:9,10
249:17

**continuing** 53:19
198:4 282:19

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**contract** 61:16 62:2, 3,4,15,24 63:4,11,13, 15,16,20,21,22 65:9,15, 16 66:5,10,11,16,18,22, 23 67:4,5,8,14,19 68:8, 9,11,16,19,20 69:18 70:12,24 71:5,7,8,22,23 77:2,3,5,6,7 161:25 162:4,17,23

**contractor** 161:22

**contracts** 61:19 63:8 64:17 65:7,11 70:16,18 71:18 72:4 73:21,22,24 74:5,8,15,16 76:17 80:24

**contractual** 60:24

**control** 88:22 89:6 90:2 104:5 109:14 157:6,13 242:2

**controlled** 163:19

**conversation** 98:5, 24,25 137:5 147:5 187:2 234:11 236:8 278:4,6,8

**conversations** 131:2,4 133:2 167:12 225:17 228:8,17 229:23 234:13 236:11

**convinced** 141:5,8, 11,14

**Cook** 4:22 9:6 11:18 20:10 21:2,7 26:20 29:21 30:2,10,18 31:17 32:9,19 36:20 37:3,7 42:6,7,11 50:7 51:19,24 60:25 61:5,17,21 64:23 65:3 76:5 83:24 84:4,7, 13 85:16 89:14,17 91:14 93:13 94:20 95:24 96:13 99:10,19 105:2 106:1 110:8 111:8 112:1 113:6,22 114:7 115:5 133:22 142:10,13 179:17 187:14,17,22,24 193:5 194:4,25 199:4 211:5, 15 247:10,16 248:20,21 263:24 265:17 279:23

**copy** 136:18 201:22 281:18 286:1,4

**cordless** 209:10

**core** 156:25

**corner** 275:22

**corporal** 272:14

**correct** 8:7,15,19,22 16:11 19:2 39:11 67:25 71:15 82:5,17 87:1,8,11 91:22,24 94:4 99:19 101:4 104:23 110:6 115:13 122:7 128:4 137:25 141:1,7 142:7,8 150:2,4 151:20 159:9 161:24 167:17,20 175:3,18,22,23 176:1,4, 11 179:2,24,25 180:2 186:25 190:12,20,21 194:7 200:16,21 201:7 202:10,23 204:2 206:13 208:25 217:3,9 220:20, 24 250:3 262:11,12

**correctly** 24:12,14, 23 25:13 35:7 52:4

**correctness** 159:20,25

**correlate** 57:11

**corruption** 239:6 243:1,2

**cost** 88:24 282:3

**costs** 282:7

**counsel** 4:11 5:9,12 15:4 23:10 24:4 35:22 45:24 47:23,24 48:7,8, 19,20,21 55:24 58:6,10, 12 69:12 70:1 78:12 94:18 97:4 98:2,6 101:3,6 109:5 147:7,16 158:15 161:3 163:5,8 166:16,21 202:2,8,16, 19 207:5 209:23 230:8, 12 231:12 238:1 269:6 276:1,2 278:15 279:3 283:20 284:9

**count** 60:8,10 264:19

**county** 42:14 61:8 134:10 150:10 179:7,16 183:14,15 184:13 185:1 200:23 243:2 249:5,6,8 251:8 265:9 267:14 269:19

**couple** 5:4 92:5 182:22

**court** 6:6 7:24 8:1,3 10:10,17 12:8,15 25:5 42:6 43:2 51:17 52:18 55:15 56:23 65:22 86:1 99:16,20 113:22 116:23 122:21 129:6,24 140:18 150:22 158:14 173:18 176:16 202:9 212:15 214:21,22 220:9,10 222:24 226:25 227:7 230:13 231:13 242:17, 25 244:16,24 246:19 247:3,6 250:24 252:20 253:15 259:4,16,23 260:3,11 261:14,18 266:3 267:15 270:5 277:19 279:7 281:21, 22,24 282:18 283:19 284:8,13 285:6

**courtesy** 49:5 50:22

**courthouse** 150:10

**courts** 44:1 86:8 202:18

**cover** 33:19

**covered** 190:24 191:2 192:12 193:12

**cowering** 277:8

**CPO** 86:16

**CPOS** 86:10,11

**CPS** 251:15,18,20,23, 25 252:5,7 269:21

**Craig** 201:1,11,12

**crave** 90:18

**crazy** 173:16

**create** 197:8

**creating** 34:2 157:7 179:13

**creek** 88:6 135:8,13, 14 142:24 143:1 144:18 157:1 186:12,14 188:2 203:2 208:19

**crew** 254:19

**Crook** 266:22 267:18

**cross** 109:24 242:7

**crosstalk** 89:8 163:22 224:18

**crotch** 208:21

**current** 70:18 72:3 106:9 115:10 159:15 160:21 183:23 184:1

**custody** 246:21 247:5

**customer** 53:21 55:10 60:24 61:4,9

**customers** 50:8,12, 19 54:5 55:21 56:1,7,9, 14,22,25 61:15

**cutoff** 129:7

**cutting** 275:8

**Cuyahoga** 101:16

## D

**daily** 63:8 65:12 67:6, 17,22 70:15 88:13

**damage** 15:19 43:24 44:2 45:1,8 60:12 69:17 125:3 126:2 197:20

**damaged** 19:8,9,10, 11 71:11

**damages** 57:3 59:23 60:15 125:21 126:6,23

**damaging** 157:9

**damn** 36:11 37:9

**Dan** 167:6,19 168:1 169:9

**danger** 135:24 208:6

**dangerous** 244:8 251:3 252:12

**dangers** 248:16

**dare** 251:14

**data** 132:10,12 133:3

**date** 51:23 94:24 95:7, 8 131:11 136:11,21 170:21,22 181:17 183:22 184:5,9,20,22 189:18 252:6

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**dated** 170:16

**dates** 136:8,13 220:6

**daughter** 104:25
110:6,12,16 111:6,10,
20 112:3 113:16 114:8,
19 115:7 154:16,17
222:3 243:16

**daughter's** 222:4

**Davis** 244:13,18,20,
25

**day** 42:16 70:9 78:24
89:12 90:16,25 91:2
92:3,6,9,11 117:7,9
118:8,13 125:14 138:22
185:7,8 187:21 190:8
194:14 195:19 196:6,18
209:8 212:11 216:4
219:17 245:2 250:17
263:25 270:6 282:24

**days** 237:19 276:5

**dead** 140:2

**Deanna** 152:25
154:23 198:15,17
255:7,15 256:4,6
257:20 264:2

**decide** 16:22 17:3
29:18 231:18

**decided** 133:3,6
212:19

**deciding** 16:23 40:4

**decipher** 26:7

**decision** 44:19 80:8
176:21 236:21 237:6

**decisions** 38:8
126:16

**declare** 4:9

**decreased** 74:6,24

**defam-** 26:25

**defamation** 9:18
13:14 15:14,18,25 16:5,
15,22 17:4 20:14 27:8
39:24 42:18 46:21 47:4,
15,16 125:24 134:15
154:13 226:12

**defamatory** 9:7
10:7 11:18,24 12:17,20

13:5 14:17,22 18:8 50:7
102:10 104:1,4 105:5
123:15,18 126:8

**defame** 154:11,19

**defamed** 8:6,15 61:5
90:22 267:8

**defend** 270:4

**Defendants'** 4:21

**define** 232:7

**definition** 283:8

**delete** 149:1,5

**deleted** 151:13

**delivering** 199:1

**delivery** 147:7
209:12

**demand** 52:7 53:20

**demanded** 29:21
52:1

**demands** 52:14

**democratic** 61:12

**demonstrate** 127:7

**denied** 199:24 200:1,
8 201:2,5 259:4,17
260:11,17 261:14,18

**depicted** 182:7,12

**depose** 275:16
276:21 277:8,20 278:24

**deposing** 109:22

**deposition** 4:3,5,6
6:3,22 25:2,4 26:1
28:19 34:25 48:14,15,
19 52:13,16,17,22 53:7
58:25 59:6,15 69:9
81:24 88:23,25 90:12
96:1 98:16,21 99:1
109:5 124:17,18 129:6
163:14 165:4,20
166:21,22 170:4 181:25
182:7,13,14 237:16,17,
25 240:6 242:10,21
274:22 276:5 277:21
278:1,12 279:17 280:20
281:23 282:3,14,19
283:1,3,8 284:15,21,23
285:4,9,16,18 286:6

**depositions**
236:20,22 238:21
278:25

**deputy** 134:9 272:13

**Deramus** 96:20

**describe** 68:22
84:17 186:11 189:7
190:25

**describing** 100:4

**description** 188:23,
25 189:1

**deserves** 254:2

**desire** 253:23

**despicable** 267:21
271:3

**destination** 119:7,9
206:12,15

**destroy** 34:4 47:17
49:24,25 108:18,24
117:3,5 268:15,17
274:3

**destroyed** 34:3
77:11 110:24 276:4

**destroying** 42:17
61:8 75:1

**destructive** 126:9

**detail** 189:8

**details** 78:7 202:25

**determine** 17:24
27:8,17 29:23 38:12
40:12 60:15 123:21
124:2,5 134:5,8 161:7
162:22

**determined** 17:17,
21 44:3,12,16 45:2,7
87:6 133:21

**determining** 30:8,9
40:19 163:2

**Dethomasis** 201:1,
6,11,13

**deuce** 48:3 273:4

**development** 92:13

**developmental**
271:4

**developmentally**
268:5

**devices** 179:14

**devote** 273:22

**Dianne** 133:17

**die** 248:8,9

**die-hard** 159:12

**difference** 206:14
263:15,18 277:17

**dig** 112:10,14 247:13

**digital** 209:11

**dildos** 61:7,10

**direct** 81:22 97:19
114:13,16 115:2 131:24
207:9

**directed** 8:22 36:14,
15 247:3

**direction** 84:3 87:9
157:6 190:14 191:6,19,
25 204:1,5,24 206:6
207:12 208:17 266:9
274:4

**directions** 206:11

**directly** 113:21
209:15 230:8 242:3

**disagree** 83:2,17
173:10

**disclose** 79:8 97:24

**disclosed** 93:8,10
133:15

**disclosure** 133:7

**discovered** 83:6,9
111:7 115:15,18,19
118:3

**discovery** 105:21
110:9 116:4 122:4
201:25

**discretely** 75:5

**discuss** 163:16
188:17 246:18 247:2

**discussed** 96:17
131:17 132:3 196:7
221:17 247:6 280:5

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**discussing** 77:22
96:17 99:18 157:25

**discussion** 106:14
284:17

**discussions** 6:13

**disease** 247:24
248:13

**disgust** 239:7

**disgusted** 239:7

**disgusting** 239:11

**dismiss** 282:1

**dismissed** 238:17
244:15 282:6,18

**disposed** 138:2

**dispute** 173:8

**disseminating**
225:22

**District** 7:24,25

**document** 59:13
172:22

**documented** 42:11,
14,15 212:8,14

**documenting**
268:15

**documents** 212:15

**dollar** 61:7,11

**dollars** 64:13,16

**donate** 252:18

**donations** 32:16
33:10 46:24 268:25

**donor** 53:21

**donors** 52:3,9,15
53:7

**doorbell** 146:21,25

**double** 218:24
219:19,22 220:20 221:5

**doubt** 94:8,11 117:19
121:16 122:14 171:6
255:18

**down.'** 26:23

**download** 147:21
179:25

**draft** 59:10

**dragging** 49:1
208:19

**drastic** 46:20

**drive** 7:5,10 35:12
85:23 86:18 118:25
142:25 188:3 189:24
207:24 208:24 262:21
263:21 264:6

**driven** 198:3

**driver** 124:2 190:14
194:22

**driving** 20:11 21:3,8,
9 91:15 99:18 118:19
120:4 121:4,7,12 124:3
127:8 187:25 190:2,9,
13,17 191:21 192:3
193:7 194:13,18,24
196:16,17 197:2,3
202:22 203:3,7,25
205:15,16,17 211:8,21
212:5

**drop** 223:10

**Dropbox** 148:10

**dropping** 196:18

**drove** 83:24 88:16
116:20 119:21 120:14,
17 121:1,6,16,22
123:21 125:11 127:19
128:16 131:10 197:22

**drunk** 263:25

**due** 5:12 55:21 57:22
63:5,16,22 65:9,12,15
67:4,7,17,18,22,23
70:9,10,15,25 71:11,14,
19,25 72:2,16,17 73:6,
14 74:2,24 159:25

**duly** 4:24

**dumb** 97:8 174:14
189:13 269:12

---

**E**

**E-MAIL** 77:15 78:19,
20,24 79:3 98:22 161:3
167:5,18,23 168:10,17,
22,25 172:15 209:12

283:10,17 285:4,15

**E-MAILED** 98:20

**E-MAILS** 101:24
229:19 233:4

**earliest** 156:4

**earn** 73:10

**ears** 189:25

**easily** 115:19

**easy** 212:1,7

**easy-to-
understand** 246:23

**ecosystem** 34:2,3
47:20 51:5 70:4 75:2
76:15 122:25 154:12
155:19 157:8 224:10
241:12 266:10

**edge** 187:18 194:5

**educational** 244:1

**efficient** 282:21

**effing** 22:5

**effort** 134:4 255:8

**Eileen** 232:5

**elaborate** 116:3

**elapsed** 140:21

**elderly** 270:18

**electronic** 147:22
201:22 209:14

**electronics** 179:15

**element** 13:14
125:25 126:4

**Eli** 101:7,12

**eliminated** 159:25

**else's** 151:10

**embarked** 142:5

**emerged** 191:22
192:14

**emergency** 247:6
252:13 253:15 259:3
261:17

**emphasis** 238:10

**employment** 209:8

**enable** 174:11

**encounter** 173:2

**encouraged** 76:8

**encouraging** 76:15

**end** 25:4 70:8 75:12
88:17,23 90:11 109:17
118:6 125:14 140:2
199:20 204:22 205:19
274:17 280:15 281:16

**endangerment**
249:2

**endeavored** 282:10

**endeavoring**
163:13

**endeavors** 73:9

**endorse** 68:3

**endorsed** 67:25 68:5

**enforce** 215:15
218:1,6

**enforced** 217:2

**enforcing** 218:8

**engaged** 160:23
161:15

**enjoy** 90:19

**entail** 66:11

**enter** 20:11 21:4
58:20 186:20 282:7

**entered** 100:20,22
186:22

**entering** 21:9

**entire** 14:3 20:17 24:5
27:25 33:5 76:14

**entirety** 10:9,16 12:7,
13

**entitled** 96:2 165:17
282:19

**entrance** 213:22

**envelope** 169:23

**environment** 254:2

**envision** 206:3

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**epithets** 21:18

**erases** 137:15

**essence** 168:18

**estimate** 182:24

**event** 33:7 170:23
261:4

**events** 51:16

**eventually** 198:4,16
200:4

**everybody's** 142:3
143:3

**evidence** 21:14 23:2
32:4 34:10,14,23 38:12,
16 40:25 44:19,20,24
45:6 49:19 53:1 76:20
83:5,9 89:17 91:7,19
95:1 96:2 100:11,21,22
102:4 106:11,24 111:13
112:7 115:9 117:25
125:12,20 127:17
128:14 131:21 132:8
148:7,11 179:7,17
212:15 222:23,24
226:25 227:7 230:13
231:12

**evident** 253:25

**evidentiary** 202:9

**evil** 241:5

**exact** 52:24 53:1
94:24 95:7,8,9 106:25
107:23 136:8,13 138:19
170:20 183:22 184:5,9,
20,22 189:18 269:1

**EXAMINATION** 5:1

**examined** 4:24
127:4 143:7

**excuse** 133:20
143:18 164:11 252:13
266:20

**exercise** 48:3 89:2

**exercising** 267:9,
10,11

**exhibit** 6:21,22 7:13,
21 19:22 34:16,17,25
35:3,10 37:24 81:23,24
102:15,17 170:3,4

**exhibits** 7:8 35:7
164:25 165:3

**existed** 152:24

**existence** 95:21
97:23 98:1 99:12

**exists** 136:2

**expect** 112:11 131:20
218:5 234:23 253:10
285:13

**expert** 58:2 133:7,17
141:19 145:20,22
149:17 150:2,15,16
151:17 153:12

**experts** 133:3

**explain** 11:13 44:6,14
69:6 134:24 140:14
276:2

**exploit** 264:13

**Exposing** 240:22,23

**extort** 23:23 24:17
26:15 27:11,20,23 29:7,
10,17 30:3

**extorted** 90:21 208:5
241:2,7

**extortion** 8:22 38:16
46:21,22 47:4,6

**extortionist** 37:17,
25

**extortive** 30:2

**extreme** 248:10

**extremely** 47:5
244:7 247:8

**eyes** 136:1 178:5

---

### F

**face** 19:14 86:22 88:18
91:23 92:13 93:14
94:21 96:14 99:13
143:4 219:14 239:22
243:24 248:2

**Facebook** 23:25
24:19 26:16 35:25 36:3
43:21 61:8 62:3 66:5,
10,12,16,23 67:4,5,8,

15,20 73:23 77:9 93:5,
12,18,19,24 94:14,20
104:6 264:19 265:23
272:7,8,10

**facets** 47:2 178:4

**facility** 75:22

**facing** 84:2

**fact** 25:22 99:3 127:24
132:9 157:13 192:20
235:18 261:15 264:9

**facts** 120:2 175:12
195:13

**factual** 83:12,18
131:21

**factually** 83:2 134:5,
7 208:14

**faggot** 22:5

**fail** 272:4

**fails** 264:16 267:15

**fair** 98:20 223:15,17

**fake** 50:19 153:11,12
178:19

**Falls** 101:17

**false** 10:20,23 11:3,4
12:1,6 13:13,16,17,23
16:8,9,10,15,20,21
17:12,14 18:9 20:14
26:25 27:7 39:25 40:9
42:2 64:3,4

**falsely** 23:24 24:19
26:16 65:4

**falsity** 50:6 122:14

**fam** 265:19

**fame** 32:15 33:6
108:23 252:3 268:24

**familiar** 21:16 84:22
137:19

**family** 31:6 259:16

**famous** 33:22,23

**fan** 159:9,11,12 160:13

**fans** 88:5 229:4

**fast** 265:3

**fat** 248:1 250:5 266:7

**favor** 121:20

**fax** 209:12

**fear** 42:16 208:6
250:16 257:6

**feared** 270:19

**federal** 56:23 129:6,
24 201:12 242:17

**Fedex** 106:6 142:25

**feed** 19:14 86:22
88:18 93:14 94:21
219:14 243:24 276:4

**feeding** 91:23 92:13
96:14 99:13

**feeds** 215:5

**feel** 159:22 160:11,17
266:13,18 269:16
270:20

**feeling** 277:12,13

**feet** 84:9 85:2 87:14
178:12 196:3,23,25
197:23 198:3,11,13
199:5 203:15 204:18,21
205:6,9,14,19 206:16
207:2 214:13

**female** 185:17

**fence** 262:11,18,24,25
263:13,16,20,22 264:4

**fiance** 23:25 26:17
51:20

**fiancée** 24:20 31:21

**fiancée's** 31:2,6
32:13

**figuratively** 74:17

**figure** 264:8 265:14
266:11,13,18

**file** 147:22 163:7
200:17,19 201:21
238:21 254:15 267:5
281:19,20 282:24

**filed** 8:2,4 44:1 52:18
99:8 150:22 199:23,25
200:22 201:21 202:15
220:9 259:17

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**files** 143:5,14 144:2,8, 10,12,14

**filing** 200:13 201:4 221:16 253:3,8 254:13 259:3 261:19

**fill** 30:13,15

**film** 86:17 87:18,19,22 88:8,15,16 189:23 190:5,6 198:1,5,15

**filming** 87:13 187:19 190:2,3,19 192:7 193:7 194:18 195:17 212:10

**final** 220:17

**finally** 194:8 199:5 249:18

**financial** 235:15

**financially** 252:15

**find** 35:13 52:10 92:12 94:19 112:10,11 144:19,20 150:8 152:12 159:23 201:15 284:9

**finding** 82:13 150:17

**fine** 13:9 14:6,25 15:10 129:2

**fingerprinting** 134:12

**finish** 36:12 45:16,21 47:14 106:18 145:19 273:17 285:23

**finished** 31:14 108:19 109:2 125:17 155:3 164:13 191:17 201:10 205:21 240:3,4 269:7

**firearm** 42:9 43:22 179:18

**firearms** 42:12

**firm** 101:21

**flashlight** 76:9,24

**flea** 215:20,23,24,25 216:2,5,11,16,24 217:13,19,23 218:6,13, 17

**flicked** 218:25

**flip** 220:4

**flipped** 219:19,21,22

**flipping** 220:20 221:6

**Florida** 4:18 7:25 108:9 117:17 119:12 168:7 183:24 184:2,3, 11,18 186:14 199:24,25 200:1,3,5,8,14,19 201:5 235:21 236:14 237:3 251:4 279:10

**flowed** 47:13

**flows** 47:14

**FO** 185:25

**focused** 266:14 272:24

**Foggy** 140:16

**follow** 138:18 228:1

**follow-up** 139:12

**fool** 70:2,3,5 88:20 204:14 224:5 275:17

**foolish** 47:5 51:6 71:4 272:14

**fools** 226:7

**foot** 203:5

**footage** 134:17 136:17 137:21,23 138:7,10 140:1,11 193:12 262:13

**footnote** 24:4,13,22, 24,25 25:8,9,15,16 26:18 29:7

**footnotes** 24:6

**force** 173:10,11,22 215:11

**forced** 237:3 256:8

**forcing** 236:13

**forefront** 51:4

**forensic** 145:23

**forgot** 25:16 91:7

**form** 5:7 8:9,23 9:24 11:7 12:2,22 15:3 18:5, 14,21 27:2,14,25 28:24 29:13,22 30:4 31:24

32:23 37:14,19 38:3 40:2 41:9,17 44:10 46:14,18 50:14,15 52:7 53:23 57:13 62:18 71:2 74:11,15,21 76:21 77:19 78:18 79:17 83:14 111:23 125:25 127:21 135:1 143:9 152:13 154:5 176:7 177:24,25 210:10 211:23 228:7 233:22 235:11 240:10 253:20 255:25 258:22 259:10, 11 260:21 262:3

**formal** 188:8,10 283:12

**formats** 281:20

**formulate** 224:6 268:4

**forward** 42:23 89:1 144:24 203:22 271:6,7

**forwarded** 222:13

**fought** 158:13

**found** 54:2 83:10,20 86:1,7 100:6,17,25 103:8 116:13 118:14,19 119:16 136:7 142:2 145:21 146:15 152:15 160:12 173:18 178:7,22 215:19 217:11 249:18 267:1,4,5 268:2 280:10

**foundation** 235:11

**fourth** 202:20

**Fox** 155:20

**frame** 135:5 137:10, 12 138:10 218:5,11,15, 19 236:23 261:22

**frank** 142:13

**frankly** 162:6 199:18 247:8 271:23

**freaking** 36:6 37:5 49:22

**freckles** 226:15 232:4

**Friday** 117:9 284:22 285:9,18

**front** 53:12 74:15 142:23 148:8 213:2,3 220:6 233:7

**froze** 54:15

**fuck** 251:12

**full** 224:6 255:11 268:4

**fully** 216:10,12,23

**funds** 265:14

**funny** 50:23 238:18

**fuse** 33:19

**futilely** 177:9

**future** 70:17 72:3,12 73:21 217:13,25

---

**G**

**gag** 277:18

**game** 122:20,23

**garb** 160:14

**gate** 186:18,23

**Gatorade** 64:12,14

**gators** 19:14 86:22 88:18 219:15 243:24

**gave** 12:18 85:18 187:9 258:25

**Gay** 22:5

**gee** 224:12

**general** 139:17 222:18

**Gentlemen** 129:3

**George** 84:9 85:3 153:1 154:24 160:22 161:16,17,20,21 187:15 189:21 191:5 193:13 204:19 255:2,3 264:2 283:1

**George's** 26:22 88:3

**get all** 134:17

**giant** 270:11

**gifts** 32:16

**giggle** 224:6

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**girl** 36:11 37:10

**give** 15:16 30:11,19 31:1,3,5,9,18 32:9 33:16 34:10 37:2,25 45:23 46:22,23 47:6 49:14,20 55:8 56:20 60:1 84:6,25 86:15 89:14 98:20 105:15 116:10 121:15 123:8,9 136:20 137:7,8 192:24 195:13 202:25 207:9 209:21 232:19 236:14 237:4 241:13 251:12 261:21,22 263:23

**giving** 30:24 78:7 123:11

**Glaring** 143:3

**Glass** 248:7

**glasses** 146:7,8

**gloating** 276:20,22

**goal** 233:13 236:19

**Gofundmes** 264:12

**good** 5:3 60:2 121:16 123:12 209:22 225:14

**goodness** 41:10 70:5 91:6 116:19 176:5 180:7 192:12 194:8 231:16 252:4 258:9 272:25 273:2 279:25

**Google** 35:12

**Gosh** 277:4

**Grace** 245:17 246:13 247:4,9,11 248:20 250:5 253:16 254:16 259:4 260:9

**grand** 89:23

**grandson** 110:15 111:4 179:5

**Granger** 102:21 103:7 115:16,21 256:13,17,18,21 257:2, 4,11,21 258:25

**Grangers** 119:16 121:6,7,11 122:6,13 152:25 154:23

**granted** 202:15

**great** 108:8 177:11 209:25

**greatest** 108:2

**Grill** 33:8

**grin** 81:14

**grooming** 108:4

**gross** 61:9 107:23 158:11 239:25

**ground** 5:4,22 31:8 57:20 116:14 118:5 121:17 166:8

**grounds** 89:4,8 166:2

**group** 4:18 89:22

**groups** 61:8 264:19

**grow** 33:19

**growth** 272:18

**Guapo** 75:18,23

**guarantee** 33:24

**guaranteeing** 269:2

**Guardians** 159:16

**guess** 119:6 124:22 175:4 177:1 280:1 284:15

**guest** 246:15

**guests** 247:2

**guilt** 100:24

**guilty** 54:2 83:10,20 86:1,8 100:6,17,25 123:4,5 126:16,17,18 173:18 178:8,22 215:19 217:11 267:2,4,5 277:13 280:10

**gun** 20:10 21:2,10,24 89:17 91:16

**guys** 22:23,24 45:14 280:17

**H**

**ha** 191:4

**Hales** 4:23 5:3 7:14 9:8,11,12,21 11:22 12:6 13:20 14:17,19 15:8,13, 24 16:12,14,18 17:10 18:10 20:22 21:1,3 25:1 26:11 39:19 40:8 41:5, 19 43:1 46:10,12 47:10, 19,24 49:13 50:9,20 51:2,4,16,20,25 52:2 53:19 59:14 60:25 66:4 68:1,5 70:4 75:2 76:15 81:22 82:21 89:11 92:11 102:20 109:9 113:15,18 114:17,18 122:24 132:6 140:6 143:20 150:13,14 154:12 155:19 157:8 159:8 162:1 172:5 193:5 207:8 219:21 224:10 225:18 229:4,10 237:24 241:12,24 245:14 258:15 265:25 266:10,21,23 267:17 271:11 273:17 274:7,9, 11,23 276:15 278:20 279:17 281:14 282:15

**Hales'** 10:6,19 11:2 12:10 13:4 21:4 23:22, 25 24:16,20 26:14,17 33:1 50:8 189:1 207:6, 11 282:19

**Hales.'** 39:22

**half** 33:8 82:7 141:9,15 157:2 199:15

**hall** 168:13 217:17 220:24 221:8 265:10,11 266:2

**hand** 76:25 90:5,9 190:6

**hand-** 145:19

**handled** 260:3

**hands** 32:5 62:12 218:25 229:18

**handwrite** 142:17

**handwriting** 133:17 141:18,22,24 142:3,24 144:5,14,17 145:1,20, 22,23 146:2 148:3,8,16, 18 149:12,13,14,25 150:15,16,20,23,25 151:2,8,18 152:9,13,17,

20 153:12

**handwritten** 146:16

**hang** 35:5 50:4 164:2 170:9 271:13

**happen** 241:22 242:11 243:13 268:1,22 270:7

**happened** 33:12 122:16 190:22 195:10 200:24 261:23

**happening** 247:17, 18

**happy** 81:8 167:1 253:23

**harassed** 208:4 241:2,7 267:8 274:15

**harassment** 219:11 272:7,10

**harassments** 272:8

**hard** 23:2

**hardware** 134:16 135:8,11,13 136:5,7,10, 15,16 139:1 140:20

**Harley** 245:17 246:13 247:4,9,11 248:20 250:5 253:16 254:15 259:4 260:9

**harm** 12:11 16:3,6,10, 16 17:15 18:13,17,24 39:25 41:15,20

**harmed** 17:1,6,8,20 19:3,4 40:14,21 41:5 44:8,15,25 46:12 73:25 74:8,18

**harmony** 90:19

**harms** 16:20 17:12 18:10,16 20:15 27:1 40:9 42:1

**hat** 244:7

**hate** 50:25 104:5,6

**hateful** 64:8

**head** 101:23 115:11 205:22 248:6

**headed** 204:20

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**headline** 244:24

**healthy** 253:24
274:18

**hear** 43:19 54:18 78:4
84:23 98:15 143:19
146:25 166:4,11 176:23
189:25 191:10 193:11,
19 224:24 237:21
252:25

**heard** 6:9 84:4,5
260:13

**hearing** 114:6 260:4

**hearsay** 135:1

**heart** 30:25

**hearts** 270:23

**height** 262:25

**heinous** 239:24

**held** 144:10,11 224:9
232:16 284:17

**hell** 240:25 243:4

**Heller** 101:9,11,12

**helping** 202:12
254:18,21 256:5,7
257:16,24

**her.'** 39:21 43:17

**hey** 90:5 116:13
123:25 152:17 163:23
175:8 219:2 229:3
255:16 265:20

**HG** 267:19

**hide** 61:24 90:20

**hideous** 158:7

**high** 262:9

**highlight** 36:5

**highway** 117:13
119:13

**highways** 117:16
251:3

**hired** 133:23 145:22
150:15,16 151:16
279:19

**hiring** 56:21 141:19

**hitting** 248:6

**hold** 6:25 10:22 34:19
41:8 54:7 128:21 130:9
146:24 147:1 148:21,22
173:13 227:16 235:6,7
240:10 249:19,23 251:1
259:10 265:15 275:20

**holding** 190:4,18
192:7 227:2

**hole** 36:11 37:9 49:23

**home** 203:8 205:1,16
206:10,19 207:13
214:5,19 217:20

**hometown** 167:20

**honest** 224:20
241:15,16

**honestly** 171:8
224:17 230:22

**Honor** 187:19,20
194:6 195:18,20

**hoodie** 159:14,16
252:18,22

**hope** 6:12 112:17
275:23

**horrendous** 87:21
105:14 108:11 116:17
117:22

**horrible** 59:25
108:16 117:3,23 120:8,
14 124:8 126:22 241:6,
13

**horrific** 17:8 87:21
105:14 107:23 108:11,
16 110:22,24 116:17
117:2,5,22 122:1
126:24 127:16 241:18

**hot** 249:11

**hour** 186:6,7 195:6

**hours** 135:23

**huge** 146:9

**human** 270:21

**humans** 270:22

**humid** 249:11

**hundred** 60:9 196:24
197:23 198:3,13 199:5

**hundreds** 212:11
264:12

**hung** 189:14

**hurt** 39:19 40:8 41:5,
25 42:1,2,3 65:7 76:17,
21 77:2 113:16,18

**hurts** 77:7

**hypothetically**
127:1

---

**I**

---

**i.e.** 39:24

**idea** 149:18 214:10
227:4

**identification** 6:23
35:1 81:25 170:5

**identified** 151:24

**identify** 29:25 55:25
56:13 57:9,24 58:2
59:21 60:7 111:18
112:1 136:20 141:18
142:6 230:7

**identifying** 56:3
74:5

**idiots** 50:21 271:20

**ignorant** 204:14
275:17 280:8

**ignore** 249:7

**illegal** 51:25 53:19

**illegally** 108:8 201:7
251:4

**image** 262:10

**images** 157:20

**imagination** 179:12
180:2

**imagine** 74:14

**immediately** 9:7
76:4 178:11 185:10
198:10 219:4

**important** 165:1
243:11

**impose** 282:2

**impossible** 177:8,
22 178:2,25 179:11

**improper** 6:14 28:8
55:12 261:2

**inappropriate** 96:4
254:6

**inbox** 229:5,10

**incident** 82:16 99:17,
21 100:1,3 220:5,23,24
221:6

**incidents** 23:10
42:11

**incited** 272:9

**include** 28:4 72:18
80:19 227:1

**includes** 209:10

**including** 24:6 89:23
125:21 142:1 144:5
157:20 158:13 168:7
254:1 282:2

**income** 19:11 70:9
74:6,23 269:4 274:3

**incompetent** 70:3
88:20 205:3

**incorrect** 68:2 87:17
179:3 200:11

**increase** 171:19
269:3,4

**incriminate** 226:11
271:25

**incriminating**
271:17 274:20

**indecipherable**
55:13 89:8 106:14
143:15 163:22 224:18

**indefinitely** 283:4,9

**independent**
161:21

**Indians** 159:14,24
160:14

**indicating** 158:4

**individual** 15:20,23
56:10,13 60:11 74:4
86:20 102:22 141:20
195:4 223:22,23,25

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

241:5,14 264:15,17,20 268:10 270:3 278:22

**individual's** 146:16 148:17

**individuals** 42:12, 13,17 50:24 56:4,8 59:21 60:3,6 76:12,13 81:7 88:6,12 93:22 102:22 103:4 107:2,24 127:8,10,14 128:16 134:18 142:1,16 143:7 151:19 157:6 158:13 227:6 228:16 229:1 230:4,10 231:10 232:20 236:13 237:2 243:23 254:25 257:20 271:5

**individuals'** 54:20 88:4 141:24 148:15 149:25 152:9,12 228:17

**indoors** 186:9

**inflate** 64:10

**inform** 78:20

**information** 40:13, 16,21,23 41:3 52:3,9,12 53:21 55:18 58:24 66:14 67:12 69:10 77:24,25 78:23 79:10 83:12,18 95:1 96:3,5,7 100:13 103:15 107:15 111:8 112:20 117:25 118:7,13 123:15 129:23 130:1,8 131:10 132:13, 14,20 140:18 142:20 157:19 162:7 165:16 183:16 225:13,22 228:7 230:5,6,11 231:9,11 233:7 239:1,4 240:1 244:12 269:24

**informed** 103:10

**initially** 86:23 115:24 116:1 271:6

**initiate** 209:5

**initiating** 100:18 246:19 247:2,3

**injunction** 51:19 173:6,11,12

**injure** 23:21

**injury** 23:22 24:16 26:13 33:1

**inquiry** 97:19

**insane** 88:11

**insanity** 90:18 219:10

**inside** 263:14

**Instagram** 62:5

**instance** 106:1 111:19

**instances** 105:2

**instant** 209:11

**instruct** 6:15 54:13 55:6 109:19 165:25 166:6,11 167:10

**instructed** 5:11

**instructing** 132:18 166:1,8,23

**instruction** 6:1 55:12 227:19

**instructions** 11:12

**intend** 132:9 163:6 216:10,12,23 231:12 281:20,22 282:24,25 285:9

**intent** 23:23 24:17 26:14 27:20 28:1 29:10, 17 30:25 32:24,25 33:2, 11,17 49:23 59:20 61:3

**intention** 33:4 216:22 217:1,4,14,24

**Intentional** 191:8

**intentionally** 60:25 191:16 203:19

**intentions** 163:9

**interaction** 85:6

**interesting** 61:24 64:25 161:13 248:2

**interfere** 63:8 65:4,6

**interfered** 8:6,19 69:18 70:12 73:25 74:18 81:5,8

**interference** 63:6 66:21 71:17,18

**interferes** 61:1

**internet** 13:21 103:18 223:12 226:9

**interrupt** 114:14 281:14

**interrupting** 280:18

**intersection** 123:23

**introduce** 6:7

**invaded** 266:25 268:24 274:1,14 275:11

**invading** 98:18 227:17 230:16

**investigated** 144:5

**investigation** 142:6,18 149:24 249:10

**invoke** 218:5

**involve** 6:12,13 279:9

**involved** 202:22 254:17,18,21 257:15 269:10,17

**involves** 162:24 279:9

**involving** 232:17

**ironic** 52:10

**irrelevant** 6:4,7 149:6,10,15

**isolated** 272:13,17, 18,19

**issue** 9:25 13:1 123:10,18 127:4 169:8 197:8 218:14 268:7

**issued** 51:18

**item** 64:11,15

**items** 20:20 33:9 46:23 254:20

---

**J**

**jacket** 146:13

**Jamie** 108:14,15

**Jamster** 108:14

**January** 52:17,22 181:25 238:1 240:6

**Jenny** 253:1

**jeopardy** 88:2,3,4,5, 6,7 90:15

**Jeremy** 4:23 6:2 9:11,12,21 10:6,19 11:2,21 12:10 13:4 14:19 15:24 16:18 17:10 18:10,25 26:20, 21 39:19 40:8 41:5 113:18 114:17,18 150:13,14 158:9 172:4 173:2,4 175:9

**jerseys** 159:24

**Jessica** 108:6 246:1, 2,11,16 247:1 252:10

**job** 209:25 264:14

**John** 4:22 36:20 37:7 42:6,7,11 64:23 65:3 84:7,25 87:3,4 113:20, 22 114:11 115:1 142:13 187:14,17,22,24 211:5, 15 247:10,15,21,22 248:20,21 263:24 265:17 279:23

**Johnson** 108:14

**joke** 33:22,23 117:1 153:14 252:4

**JPEG** 170:7

**judge** 16:21 17:2,17, 21,23 27:7,17 29:18,23 30:8 38:9 40:4,11,18 44:3,12,16,18 45:2,7 52:11 60:14 161:9 201:1,6,11,12 236:21 243:1 244:13,18,20,25 265:9

**judgement** 233:25 234:4,23

**judgment** 133:16 234:1 235:16

**July** 114:10,25

**jumping** 108:23 268:25

**junk** 14:20 16:19 17:11 18:11 19:1

**junk.'** 9:13

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**jury** 16:22 17:2,3,18,
22,23 27:7,17 29:18,23
30:8 38:9 40:4,12,18
44:4,12,17,18,19 45:3,8
51:12 60:14 125:14
126:17 128:20

**justice** 243:7

**justification** 61:1

---

### K

**Key** 117:14 118:24
119:6,8

**kick** 197:19

**kicked** 168:23

**kids** 270:8,9

**kind** 32:16 137:15

**kindly** 48:11

**kinds** 147:5 272:6,8,9

**knew** 84:14 86:25
175:16 197:3 203:20
211:24 261:18

**knowing** 50:5 197:7
203:16 249:15 263:24
283:19

**knowingly** 191:9,12
198:12 203:20 214:11,
15

**knowledge** 60:23
103:14 118:16 153:3
156:3 197:21 202:16
234:11,13 253:2,6,10
274:22,23 275:2 276:15
279:21

---

### L

**Lack** 260:21

**land** 152:14

**landline** 209:10

**Landon** 110:15 111:3

**lap** 248:1 266:7

**lapsed** 137:12

**larger** 156:10

**latching** 157:5

**late** 95:17

**laugh** 149:5 224:4,7

**laughing** 116:22
187:14,15 189:6,20
191:4 193:10 207:5

**launch** 33:7 264:22

**law** 4:18 86:11 87:25
88:1 93:17 95:1 158:14
198:8 199:21 201:8,11,
12 207:23 208:7 216:15
217:6,11 239:10 259:16
279:10

**laws** 86:13

**lawsuit** 64:22,23 65:1
96:2 125:19,24 161:5,
18 162:20 163:3 165:18
233:18 272:15

**lawsuits** 271:18

**lawyer** 8:4 13:8 15:5
33:22,23 51:6 124:11
153:23 251:13 252:15
259:18,22 268:19
271:22,23

**lawyers** 252:15,17,24

**lay** 13:9 14:24 15:9,16
38:5

**layman** 27:18 29:19,
24 30:7,14 38:8

**layperson** 60:16

**learn** 44:20 92:18
95:20 185:19 243:5,7

**learned** 92:21 94:19
95:14,16 96:12 98:1,5,
25 130:18 215:9 230:4
259:5,7

**learning** 243:25
260:7,10

**leave** 36:8,11 37:3,8,9
178:11 196:21,23
197:15,16 199:5
215:11,16 216:8 217:3,
8,15 219:4 249:13
284:14

**leaving** 28:1 203:10
214:9

**led** 256:5

**Lee** 34:22 250:5 266:7

**Lee's** 51:1 76:13
103:20 153:8,16,25
154:10,15 155:12
156:8,13,20 158:3
248:1 259:6,21 265:16
271:12 276:23 277:22

**left** 20:22 76:25 77:1
192:1 197:17 198:1,2,
10,16 213:14,17 214:4

**leg** 208:20

**legal** 9:24 12:22 15:2
38:3 42:5 101:24
127:21 177:2 202:11
238:17 255:11,14 257:8
260:2

**legally** 42:11 48:5
205:8 206:15 207:2,19
208:1

**letter** 77:15

**level** 110:25

**Levy** 42:14 61:8
134:10 150:10 179:6,16
183:14,15 184:13 185:1
200:23 243:2 249:5,6,8
251:8 265:9 267:14
269:19

**LGQBT** 61:13

**lice** 268:2,3

**lie** 265:4

**lies** 271:13

**lieu** 4:8

**life** 19:9,12 21:21
31:10 42:8,16,17 47:17
86:9,14 88:2,3,17
89:12,15 90:15,19,24
91:13 110:25 117:3,5
135:24 149:7 157:9
160:19 208:5 215:18
216:12 219:5,6,16
238:7,8 239:19 247:17
250:16 254:22 257:6
266:24,25 267:16
268:14,16,17,24 270:19
271:22,24 273:25

**leaving** 274:1,13,14,16 275:3,6,
10,11

**life-threatening**
247:24 248:12

**light** 104:12 275:24

**lightly** 284:7,8

**liking** 160:18

**limited** 209:10

**lines** 107:1 282:20

**Lisa** 34:21 248:1 250:5
266:7

**list** 19:15,19 31:12
32:16 52:2,8,14 53:6
55:10 77:12 156:6,10
229:12,15 243:18 248:7
282:12

**listed** 63:10

**listen** 70:6 227:14
237:10 240:20 250:11
260:2 265:20 267:10
270:2 275:18 277:3,6
280:13 281:2

**listing** 235:20

**lists** 54:8

**literally** 19:12,13
21:23,24 42:21 59:21
70:3 75:9 81:11 84:23
90:3 139:13 149:18
153:8 174:14,18 180:13
191:2,9,10,11 212:14
231:20 239:9 258:9
259:19 262:4,20 264:16
265:9 271:4,24 272:15
275:15 276:25

**live** 31:4 90:25 119:3
168:2 175:11,12 215:17
216:12 219:5,16 246:14
272:12

**lives** 15:23 86:10 88:4,
12 107:20,21 108:18,25
134:3 219:7 241:22
249:17 271:1

**livestream** 182:21
183:3 246:19,25 247:25
251:24 266:6

**livestreams** 81:7
103:19 153:7 246:16

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**living** 42:16 108:8 168:5 247:7,9 248:16, 24 253:24 267:21 268:3 271:3

**Lloyd** 107:25 108:1,3 254:19 255:10 256:11, 25 257:5,12,25 258:5,7, 11,15,18 270:18

**Lloyd's** 255:16

**local** 135:8 168:14

**locate** 112:17 152:10

**located** 135:16 145:2 206:13

**locating** 149:24

**location** 118:18 186:11 206:4 207:11 215:15

**lock** 272:16

**long** 76:3 79:3 85:5 102:25 111:16 117:6,20 136:6 139:3 142:19 160:19 182:25 184:11, 17 186:3,4 198:6 199:4 282:12

**longer** 57:5 59:22 60:13 64:11 66:8 92:7 137:23 140:21 219:7

**looked** 49:18 89:19 141:22,23 144:16,20 151:3 171:13

**loop** 137:15 254:12

**lose** 67:6,17,22 70:14 276:3

**losing** 71:10,14,24 72:2,13

**loss** 66:22 238:16

**lost** 54:5,15 55:21 56:1,7,14,22,25 57:22 58:3 61:16 62:14,25 63:5,16,22 65:9,14 66:16,24 67:4,5,15 70:9,24 71:6 72:15,19 73:1,5,8,13 74:1 75:6 76:1

**lot** 23:20 43:5 93:10 101:18,19 137:17 196:24 197:14,23 214:6

219:1 221:20 234:2

**lots** 21:12 142:19,20

**loud** 26:12 39:15 50:3 82:22 110:20,21 172:10 193:11

**louder** 143:22,25

**love** 90:17,18 250:13 271:13

**loved** 88:9 208:6 264:3

**lunch** 129:2,12,15,19, 21 133:8 158:17

**Lynette** 36:4 39:17 72:25 87:2,3 89:19 100:21 110:14 113:15 114:10,21 141:9,14 142:14 149:11 150:9 151:23 157:1 171:1 173:12,24 177:3 187:24 211:5 218:24 221:25 222:2,3,4,6,15,21 223:5,8,21 226:18,22, 24 227:8 228:9,18,21 229:24 232:17 247:5, 10,15,18,20,22 248:5, 18 249:16,17 250:2,7 266:22 267:18 271:7 272:15 279:23

**Lynette's** 173:2

---

## M

**macaroni** 252:3

**Madam** 284:13

**made** 29:16 48:24 52:21 56:10 71:21 80:8, 9 94:8 103:12 115:20, 24 116:2 125:13 126:8 140:12 156:6,10 183:25 184:12 197:9 217:2 222:23 223:3 244:22 253:17 257:5 278:18

**magistrate** 99:2,4 126:6,14,21 127:3 145:15 154:7 161:9 164:1,6 220:11,15,16 221:10 260:25

**magistrate's** 220:22 221:1

**main** 238:10 264:25

**maintain** 143:5,13

**major** 119:8,10,12,13 215:22

**make** 48:11 61:9 88:23 125:15 145:3,16 163:13 164:16 174:2,4 183:19 193:11 205:5 212:9 214:6 217:1,5 220:16 222:25 236:20 267:15 272:23 276:8

**makes** 119:24 121:1 206:14 268:9 277:17

**making** 38:8 71:9 104:20 105:3 110:10 153:11,12 191:15,16 198:23 215:16 226:3 236:21 241:10,21

**male** 185:17

**males** 185:18

**malicious** 32:25 64:9

**Maliciously** 23:19, 21 24:16 26:13 33:1

**man** 139:23

**manager** 137:2,4 139:11,20

**mandatory** 251:16, 19 252:1 254:10 268:11 269:13,22

**manner** 4:13

**March** 99:8

**Marilyn** 233:16

**mark** 218:7

**marked** 6:23 34:25 81:25 170:5

**market** 215:23,24,25 216:2,5,11,16,24 217:14,20,23 218:6,13, 18

**marketed** 76:24

**markets** 76:11 215:20

**Martha** 22:14 153:1 154:24 160:22 161:15,

17,20,21 165:4 255:2,3 283:1

**mask** 248:2

**master** 89:24

**match** 39:22 46:12 47:1,10 142:4 144:20 146:12 148:20,25 149:15 150:14,19 151:11

**matched** 145:21 148:4 151:18 176:24

**matches** 150:17 151:3

**matching** 145:18 149:8

**material** 6:8

**matter** 4:10 93:17 99:3 120:13 136:12 157:13 160:18,20 192:20 204:7,19,20,21 214:11,17 237:10 274:24 275:7,9 276:17 279:1

**matters** 27:3 118:2,4 169:17 204:8,9,11,12, 15 207:3 214:21

**Matzkin** 4:20,21 5:2 6:19 7:2,7,12,18 8:11, 13 9:1,20 10:2,24 11:14 12:4 13:2,10,12,25 14:8,10,14 15:7,12 18:6,15,22 20:3,8,19, 24,25 22:18 23:13,17 24:7,10 25:18,22 26:10 27:9,15 28:7,16,23 29:4,14 30:5 31:25 34:7,12 35:2,9,14,23 37:20 38:10,25 39:9,11, 14 40:6 41:14,18 42:25 43:7,8,10,14 44:13,23 45:15,20 46:1,5,7 47:11,23,25 48:6,9,16, 23 49:4,12 50:10 51:9, 14 54:4,10,17,22 55:1, 11,19 58:7,12,16,23 59:3,11,18 60:22 62:22 63:3 65:24 66:3 71:12 73:3 74:13 75:3 77:20 78:9,17 79:21 81:16,21 82:5,12,17,20,25 83:16 88:21 89:5,9,10,25

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

90:7,11 93:3 97:2,22
98:7,12 99:5,6 102:16,
18 104:10 107:4 108:20
109:2,6,12,18,25
111:24 127:23 128:3,7,
13,22 129:3,11 130:3,5
131:8,19 132:5,17,23
133:10,14 135:6 140:8
143:10,18 144:3 145:9,
24 146:22 147:4,9,20
155:2,5 158:18,22
159:3,7 160:10 161:6,
12,14 162:13 163:6,12,
17 164:3,9,12,19 165:6,
11,22,24 166:5,12,18
167:3,4,16 169:21
170:6,10,15,19 172:6,
14,19 173:7 176:9
178:23 179:19,23
181:23 188:5,11,14,18,
22 189:4 192:22 193:4,
14 202:3,6 207:7,21
209:20 210:1,13 212:3
224:14,21,25 225:5
227:14,25 228:2,14,24
230:20 231:4,21 232:13
233:11,24 234:14,20
235:13 236:4,24 237:7,
12,14,23 240:18 242:1,
5,8,19 245:3,6,12
246:10 254:11 256:2
259:1,14 261:1,3,8,12
269:8 273:20 276:12
278:19 279:4,12,16
280:19 281:1,7,10
283:7,16,23 284:3,6,11,
19,25 285:8,20

**mayor**  167:6,19
168:1,16,17,19 169:9,
13,15

**Mcdonald's**  217:19

**me.'**  114:12 115:1

**meaning**  37:7 39:17
56:10 197:18 213:16

**means**  5:8 117:12
208:8 209:15 216:7
232:9 263:20,22 269:7

**meant**  16:2

**measure**  213:24
214:2

**measurer**  208:20

**media**  9:8,10 11:19
12:18 14:18 39:18 44:6
73:22 91:22 113:20
114:11 115:1 209:13

**meet**  186:18

**meeting**  20:23 21:2
217:17

**Megan**  155:20

**memorize**  193:2

**memory**  53:15 85:11
146:19

**mention**  42:10
182:20 195:4

**mentioned**  65:19
73:20 93:15 182:25
188:20 233:4

**mentioning**  182:16

**message**  94:5,20
95:21,23 96:12 97:4
98:2 99:12 113:8 115:4
149:4 174:7 181:12,16
209:14 229:2

**messages**  34:22
93:19,24 149:3 221:21,
22 222:13,20 223:8,13,
20 226:18,22 228:8,18
229:9 232:16

**messaging**  209:12

**messes**  39:21 43:17
44:8

**met**  39:22 46:11,25
47:9 185:14 186:23
245:19,20

**method**  124:13,25
125:1

**Miami**  253:1

**Michelle**  4:21 36:4
64:24 65:2 92:19 93:1
113:23 154:16 211:15
221:23,24 222:2,14
223:20 229:24 279:23

**Michelle's**  93:5
94:14

**middle**  84:8 208:19

**midnight**  118:1

**mile**  214:1

**miles**  195:6

**Mill**  33:8

**million**  179:3,9

**Miltowns**  51:1
155:15 156:8,13 265:22

**mind**  65:25 91:1
140:16 142:11,12
192:24 224:22 225:2

**minding**  191:14

**Mine**  35:11

**minimum**  125:12

**minute**  7:5 156:19
171:15

**minutes**  46:4 116:10,
25 128:24 135:20,21
159:4 161:10 199:12
245:9,11 261:25 262:1,
6

**missed**  24:13

**missing**  170:21

**mission**  258:3

**misunderstandin
g**  46:20

**mockery**  153:11
241:10

**mocking**  193:13

**model**  212:9

**mole**  226:9,13 232:7

**moles**  225:11,12,14,
16,21 226:6,14 231:23
232:2,7

**mom's**  42:8

**moment**  164:23
206:22 207:11 212:24
213:4

**money**  30:23 32:15
33:6,9 36:6,24 37:6,25
46:22 49:22 56:22
108:24 234:2 252:16,
20,24 264:13 268:24

**monsters**  218:10
238:12

**month**  92:7 95:15
113:5 184:6

**moral**  277:16

**morning**  5:3 98:20
118:3 119:17

**moron**  154:11

**morons**  50:21 271:20

**mosquitos**  249:11

**motion**  7:20 25:5
88:23 99:17,20,23
100:2 133:16 163:7
164:16 165:21 238:22
281:21

**Mouse**  60:20

**mouth**  26:23 31:2
32:13 36:7 37:6 49:23
76:23 153:21 248:4
250:8 269:20 277:4,5
280:14

**mouths**  137:18

**move**  14:3,6,11,15
19:21 23:18 39:1 43:6,
12 48:25 59:17 70:21
89:8 96:10 98:14,16,19
99:1 109:10 118:10
123:13,16 130:24 145:5
167:2 192:13 218:3
237:12 282:10

**moved**  191:25 203:21
248:19

**moves**  172:1

**moving**  23:20
210:15,16

**multiple**  47:2 61:19
99:23 111:11 112:21
127:8 134:15 151:5
168:13 176:24 178:19
179:13,14,15 191:3
192:19 203:9 209:1
218:2

**mumbling**  75:10

**Mumford**  108:6

**mute**  281:13

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**N**

**Nails** 248:7

**named** 81:3 209:7

**names** 52:2 54:13,14, 21 55:8,9,17 58:22 60:3 159:19 179:10 185:11, 20 227:5,10 229:21 231:23 232:20 235:20

**naming** 236:13 237:1

**nature** 119:12 231:8

**needed** 140:17 208:9 212:12 257:6

**needing** 257:1

**negative** 157:8

**neglected** 254:9

**Nelson** 245:13,16,18 246:15 247:1 252:9,10 253:4 254:14 259:17

**news** 168:14 264:11 265:6

**newspaper** 265:24

**newspapers** 264:10 265:7

**Nice** 195:24

**nickname** 49:7

**nicknames** 48:10

**night** 241:15 244:22 251:4

**nonlawyer** 15:2 228:5

**normal** 85:16 87:12 219:6,8

**north** 143:1 188:1 203:2 208:19 222:10

**north-to-south** 119:11

**northern** 7:25 222:8

**nose** 146:9 270:11 277:4

**noted** 173:1

**notice** 158:19 283:6, 12,22 284:22

**noticed** 285:9

**notices** 283:10

**notifying** 283:2

**Nuh-uh** 91:11

**number** 56:19 63:10 121:16 173:3,4 174:6 175:25 176:11,22 179:1,24 180:1,5,10,11, 19,20,21 181:13 182:11 258:19 281:25

**numbered** 35:7

**numerical** 35:15

**numerous** 272:23

**O**

**oath** 4:8 13:18 48:14 113:22

**object** 5:9 28:20,24 29:2 55:6 77:18 160:2

**objecting** 28:12 55:16

**objection** 5:10 6:3,4, 8 8:8 9:19,23 11:6 12:21,24 13:1,7 14:24 15:3 18:4,21 20:16 27:4,13,14,24 29:12 31:24 37:18 38:2,21 40:1 41:9,12 50:13 53:22 57:12 59:8 62:17 71:1 74:10,20 79:16 83:13 111:22 127:20 128:6,10 131:15 134:25 143:8 145:7,13,15 154:4,7,25 160:5,24 162:11 165:19 167:8 176:6 177:25 210:9 211:22 232:23 233:21 235:10,24 240:9,10 253:19 255:24 258:21 259:9,11 260:20,24 261:11

**objectionable** 97:13

**objections** 4:13 5:6 132:16 261:2

**obtained** 221:21 230:5

**occasion** 222:19 225:20 232:15

**occur** 189:17 220:5

**occurred** 84:21

**occurring** 195:23

**offended** 160:17

**offensive** 159:23 160:12

**offer** 100:11 252:14

**offers** 14:16

**office** 183:14,15 184:18 187:23 188:20, 21 195:23 196:3,10,12, 18 197:4,7 198:24 264:16 265:8

**officer** 174:5

**officers** 185:9,12 187:4

**offices** 101:18

**Ohio** 15:24 20:22 21:1 51:17 83:9,20 84:10 99:16,20 101:2,12 113:22 167:6,20 168:7, 11 169:6,22 183:11,25 199:23 200:6,9,14,18 202:9,14 210:3 214:22 215:10,16 217:2,9,15 218:1,7,9 220:3,9,10 256:20

**Olga** 245:13,16,18,25 247:1 253:4 254:13 259:17

**Olight** 62:8,10 67:24, 25 68:2,4,6,8,10,12,16, 19,21,23,25 69:4,5,18 70:13,24 71:7,14,21,22, 23,25 72:8,9,14,18,21 73:6,7,11,14,18,23 75:5,6,15 76:1,9,10,16 77:8,10,14,22 79:7,14, 19,24 80:17 81:4

**one-page** 170:13

**ones'** 88:9

**ongoing** 253:15

**online** 241:11 243:11, 12,22 276:19 277:22 278:25

**open** 35:3 142:11,12 170:2

**opening** 57:19 227:18

**openly** 61:6 156:21

**opinion** 13:9 14:24 15:10 38:6 247:8

**opportunities** 216:3

**opportunity** 84:6,25 85:19 86:16 87:23 212:19 250:24

**opposing** 283:20 284:8

**opposition** 133:16

**oral** 23:25 24:20 26:17 30:1 31:17 32:7,23 33:14

**order** 35:6,10,12,15 85:20 86:2 116:23 140:18 171:2 172:13, 17,18 173:5,24,25 174:10,13,18,20 176:15,17 177:3,16,18, 20 178:3,5,25 180:4,17 182:12,18 183:5,11 187:13,23,25 191:7,13 198:14 199:14,17,23 200:3,5,15,18,20 201:5 202:15 204:8,16,17 205:7 206:20 207:1 208:12 209:4,7,18 210:3 212:21 214:12 215:11,16 217:2,9,15 218:1,7,9 221:7,12 244:16 277:18,19 278:14 282:22

**ordered** 176:16

**ordering** 51:19

**orders** 54:1,3 84:10 198:9 200:6 282:7

**originally** 198:3 223:22 245:22 271:6

**originated** 94:5

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**Otter** 88:6 135:8,13,14
142:24 143:1 144:18
157:1 186:12,14 188:2
203:2 208:19

**outdoors** 186:9,10

**outlined** 212:8

**overt** 176:21

---

**P**

**p.m.** 286:7

**packages** 196:19
199:2

**Padgett** 102:20 103:5
115:21 122:6,12 152:25

**pages** 50:20 82:4

**paid** 64:16 109:8
162:9,14 201:14 252:23

**paper** 74:15

**paragraph** 9:3 10:8,
15 11:17 12:7,13 13:5
14:16 19:21 23:19 24:2,
15 25:7 26:12 28:5
39:1,8 43:15 45:21 46:9
50:2 51:15,23 52:20
53:18 60:17 61:4 82:21
83:8,18

**paragraphs** 172:20

**park** 198:12

**parked** 21:23 196:14

**parking** 196:24
197:14,23 219:1

**part** 12:7 21:14 23:18
36:5 42:20 46:21 47:6
61:23 81:11 126:15
153:6,9 172:9 189:10
215:21,22 239:23
273:19

**participate** 255:1,8
257:24

**participating** 4:3

**parties** 4:11 223:9

**party** 61:12 74:7
221:22 222:21 223:21
224:7

**pass** 205:1,4 206:11
207:14,22 210:3
212:10,12 213:1

**passed** 142:20 210:6,
14 212:25 244:4

**passenger** 124:2

**past** 72:3,11 73:21
85:16,23 99:18 116:20
123:23 206:21

**pathetic** 268:9

**pattern** 107:20
108:17,23 179:13

**pause** 26:5 69:24
106:13

**pay** 36:7,17,21 37:6
43:3 64:10,13,14
162:18,25 234:23
252:15 271:24 282:3

**payment** 162:17,24

**PDF** 82:14 100:4
170:11

**peace** 36:8 37:8 90:19

**pecuniary** 23:23
24:18 26:15 27:11,21,
23 29:8,11,17,21 30:3
31:19

**Peeing** 267:22

**peeled** 197:18

**penalty** 4:10

**pending** 5:20 41:20
45:18 58:8

**Peninsula** 169:20,22

**people** 33:19 50:21
57:9 64:8 76:16 88:10
90:20 102:24 103:21
116:20,21,24 118:5,23,
25 120:10 122:18
125:5,10,11,12 131:22
144:6,15 151:21 152:1,
2,3 153:2 157:14 158:5
159:22,23 186:17
198:14 221:22 222:14
226:10,16,20,23 229:22
238:8 239:5,7,13,14
241:8,19 244:7 248:5
249:14,16 254:19
264:24 270:24,25

271:19 272:17

**people's** 108:18,25
148:3 249:17

**percent** 101:17 102:7
104:9 122:18,22 123:2,
3,4,5

**performing** 241:23

**period** 131:12 137:16
162:18 183:23

**periods** 162:18,25
163:1

**perjury** 4:10

**permission** 209:18

**person** 4:8 64:15
103:11 108:2 116:19
117:1,2,4 122:10 126:9
127:18 139:16,18,21
167:18 173:23 178:3
179:18 195:21 209:16,
19 232:18 241:6 245:19
248:23 255:20 265:2

**person's** 146:2

**personal** 19:9,10
47:17 49:25 67:12
160:22 161:4 209:14
255:13,14

**personality** 243:12
275:5

**personally** 44:9
61:20 62:13 110:18
228:23 229:2,8

**persons** 56:11,13
209:6

**persuade** 50:8,12

**pertained** 236:25

**pertaining** 254:15

**pertains** 100:1

**Peterson** 133:18,23

**phone** 21:17 77:16
101:25 102:3 116:5
164:1 168:13 173:3
174:15 178:17 179:1,7,
8,17 180:4,20 182:11
183:19 184:24 190:4,7,
18 192:4,8 193:12
210:23 222:12 227:2

229:18 232:16 246:6
256:22 257:3,11
258:10,14

**phones** 75:23 179:15

**photo** 147:22 262:13,
15 263:6

**photograph** 145:6
146:23 148:2,13 262:7,
23

**photographed**
147:23

**photographs** 24:1,
21 26:18 148:17
151:12,13

**photos** 31:20 149:12,
13 263:8,9,12,13

**phrased** 200:7

**phrasing** 59:25 86:7

**physical** 46:23
250:20

**physically** 4:4 206:4

**pick** 184:23

**pickles** 265:19

**picture** 26:22 43:22
120:11 148:7,9 264:25

**pictures** 31:1 32:12
264:24

**pie** 36:11 37:9 49:23

**piece** 34:10 49:18
61:11 90:17 219:9
250:8

**pile** 74:14

**place** 14:2 65:17
70:22 75:9 78:22 172:9
178:13 205:13,17 244:6

**places** 178:10 209:8

**placing** 15:22

**Plaintiff** 4:23

**plan** 218:12 281:17

**platforms** 9:9 11:19
14:18

**play** 100:16 122:20
189:13

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**played** 31:9 78:25 79:2 100:9,19 102:4 238:21 239:13 242:9

**playing** 122:23 238:14 242:21

**pleading** 238:20

**plenty** 40:16 106:23 155:18

**plural** 56:9

**Pod** 51:1 103:20 153:8 158:3 265:16 271:12

**point** 6:2 25:4 29:21 31:16 32:8 33:14 84:13, 19 87:6 88:25 90:16 93:23 99:11 136:4 140:17,19 149:16,21,23 160:2 175:25 176:10 181:1,6 206:6,12 210:8 216:23 218:16 219:8 249:14 280:21

**pointing** 42:12 89:17

**police** 100:5 170:13, 16 171:12 174:19 180:13 181:17 280:3

**polite** 85:18 86:15

**politely** 48:7

**political** 159:20,25

**Pooping** 267:21

**poor** 247:8

**pop** 46:24 89:20 219:13 239:23

**portion** 10:9,15 12:12,13 109:8

**portions** 110:24

**position** 159:18,21 264:7,9

**possession** 113:8

**possibly** 57:24

**post** 26:22 31:1,3,6,20 32:14 35:25 36:3 37:12, 15 91:22 93:18,19 108:16 113:7 120:9 158:10 187:23 188:20, 21 195:23 196:3,9,12, 18 197:4,7 198:24 226:7

**post'** 26:21

**posted** 26:20 36:2,4 39:17 43:21 86:20 94:3 102:23,25 103:2,11,15, 17 104:1,4,6,7 108:11 113:19,20 114:10,11,25 115:1 118:1,4,8,13 119:22 131:13 195:5,6, 7 262:7 263:13 275:16

**posting** 13:21 33:6 61:7,11,12,13,14 92:19 93:2 115:3 117:18 248:19,23 264:24 271:19

**postponing** 283:3,8

**posts** 61:6 141:23 259:22

**potential** 61:15 70:16 108:24

**potentially** 225:15

**potty** 251:6 267:24

**power** 14:5 254:4

**powerful** 239:4,5

**PR** 122:23 157:8 241:11 250:7

**precipitated** 176:21 183:18

**precise** 93:16,18 94:25 95:4

**prepared** 44:5 53:2 263:5,11

**prepped** 229:14,20, 25

**prerecorded** 183:3

**present** 4:4 73:21 100:2 217:24 221:7

**presented** 10:10,16 56:23 99:20,22 281:24 282:8

**preserve** 146:18 151:12 276:7

**preserved** 6:5

**preserving** 278:17

**Preston** 4:21 9:6,9 10:18 11:17 12:10

32:20 36:4 39:16,17 44:7 50:6 51:19,24 52:1 61:21 64:24 65:3 76:6 84:5 91:4 99:10 105:3 106:1 110:9 111:9 112:2 113:6,19,21 114:7,10,25 115:5 133:22 141:9,14 142:10,14 149:11 151:23 157:1 167:6,18 171:1 177:3 181:12 202:7 211:5,15 216:20, 24 218:24 219:22 221:23,24,25 222:2,3,4, 15,21 223:5,8,21 226:18,22,24 227:8 228:9,19,21 229:24 232:17 237:17 244:15 246:20 247:4,5,10 250:2 254:16 259:4 262:19 264:8 279:23

**Preston's** 11:1 61:17 150:20 151:9 154:17 202:11 254:20 255:17 263:14

**pretty** 50:20 97:7,11 121:5,9 202:4 212:1,7 238:18

**prevail** 233:18 234:1

**prevented** 174:25

**preventing** 140:24

**previously** 27:4 285:3

**price** 178:13

**prices** 64:10

**prior** 84:21 86:23 93:2 200:14

**privacy** 223:10,11,14 262:11

**private** 6:14 113:7 115:4 178:13,14 203:16 204:22 205:9,12,13 221:20,22 222:20,23 223:2,4,7,11,16 225:17

**privately** 37:14

**privilege** 5:12 92:25 94:16 96:19 97:20 98:18 130:22,24 131:25 132:1 141:4 166:2,9

167:9 227:16,17,22 230:3,17,19 233:2 234:9 236:1,8,10 278:2, 11

**privileged** 96:16 98:24

**pro** 202:7

**problem** 100:23 132:25 168:20

**problems** 168:6

**procedure** 188:8,10

**proceed** 85:15 87:7, 12 282:25

**proceeding** 100:8 101:2 102:2 202:10,14, 17 235:22 246:19 247:3,7 252:13,21 253:15 260:8 261:14,17 273:1

**proceedings** 160:25 202:9

**process** 137:20 243:6,25 244:1,5

**procure** 142:18 152:9 281:17

**procured** 58:25 133:15

**procuring** 130:8 144:6

**produce** 128:15 132:8,9 188:6 201:24

**product** 67:25 130:21 131:24,25 167:10 227:11 231:15 235:24 237:6

**production** 153:10

**productive** 163:14

**products** 134:18 136:19 137:22 140:11 141:6

**professional** 38:19 48:24 49:5 50:22 56:21 124:10

**profile** 264:25

**profiles** 179:11,13

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**progress** 282:11

**promoted** 68:6

**promoting** 68:23,25
264:19,20,21,22

**promotion** 46:23

**prompt** 226:4

**pronounce** 222:6

**propagate** 153:17

**proper** 165:19 193:18

**properties** 186:12
203:9

**property** 20:12 21:4,
9,20,24 31:7 84:7 85:1,
2,4 86:18 90:17 91:15
107:3 108:7 135:19
141:23 142:23 149:13
150:22 179:6 184:14
186:19,24 187:18
190:10,11 194:5,22,25
203:8,10,11 204:6
214:4,9 219:9 249:10
254:20 255:12,13,14,17
256:11 257:2,8,16
262:18 263:14 266:15
275:8

**propounded** 105:21

**proprietary** 66:13
67:11 162:7

**prospectively**
217:12

**protect** 69:14 219:17
240:19 242:22 243:10
244:10 267:14 270:14,
17 271:8 272:2,3

**protected** 209:6,18
217:5 239:2

**protecting** 218:10
241:20 244:11 270:9

**protection** 54:1,3
84:10 85:20 86:2,19
88:9,10 173:23,25
174:9,12,18,20 176:15,
17 177:2,16,18,20
178:2,5 180:17 187:23,
25 189:24 190:19
191:7,13 194:19 198:9,
14 199:13,16,22 200:3,

5,6 204:8,16,17 205:6
206:20 207:1 208:8,12
209:4 210:24 212:21
214:12 215:11,16
221:12 238:6,11,15
239:18 240:1,2,16

**protective** 180:4
182:18 183:5,11
200:15,18,19 201:4
202:15

**prove** 24:1,21 26:18
124:5 125:20 126:1

**proved** 126:7,23

**provide** 52:2 60:3
69:10 125:20 127:18
135:5 138:8,10,12,13
140:4,13,15,18

**provided** 89:16
134:20,21,24 223:9
227:6 230:7 232:18,20

**provider** 162:5,9

**providers** 209:9

**providing** 52:8
53:21 225:12,21 231:24

**pubically** 26:16

**public** 20:11 37:12,15
52:12 132:20 141:25
144:19 149:11 169:18,
19 178:13 203:15
204:22 205:9,12,13
222:23,25 264:8,15,16,
20 265:2,13,14 266:2,
11,13,18 269:24

**publically** 23:24
24:19

**publication** 11:24
75:17 123:11,14,18
127:4 223:5,7

**publications**
126:12

**publicly** 33:6 50:25
61:6 76:19 93:15
108:10 141:23,25
144:21 195:5 225:23
233:12 236:12 261:15
275:16 277:19,21
278:23

**published** 12:17
126:1

**publishing** 9:7
11:18

**pull** 7:1,3 53:11 74:16
105:17 172:23 197:14

**pulled** 20:10 21:2,9
196:20 197:7

**purchase** 218:17

**purchased** 136:19
141:12

**Purgatory** 142:23
148:8 213:23

**purpose** 161:3
215:10 237:15,24
238:2,5,7,15

**purposes** 240:7,12
276:3

**pursuant** 68:7
162:17

**put** 25:8 33:21 36:6
37:5 39:20 42:5 43:16
44:7 49:22 51:7 62:12
68:24 70:21 75:10 88:2,
3,4,5,6 90:5,9 91:5
113:23 116:23,25 118:5
153:21 208:5 219:8
243:19 260:9 264:12
276:23 278:25 281:13

**putting** 25:7 33:23
135:24 137:17 226:8

---

## Q

**question** 5:8,11,15,
16,19 6:9 8:9 10:3,4,13,
25 11:8,10,25 12:3,5,
19,25 15:11 16:13 18:5
20:4,17 26:5 27:16 29:5
30:6 32:1 37:21,22,23
41:2,12,19 44:22 45:5,
12,17,25 49:2,3,9 50:11
54:11,23 55:3 56:12,17
58:8,10 59:19 62:14
69:21 70:19 71:23 75:7,
11,13,19 78:14 79:23
90:6,10 92:15 94:9
95:18 96:21,22,23
97:16 98:10,11,17

99:25 102:19 104:16,21
105:1,16,23 109:5,17,
23 110:1 111:23 112:7,
13,25 114:15 118:10
123:14,17 124:14,15,
19,24 125:1 126:13,19
127:3,5,6,24,25 128:8,
10,12 131:6,15,18,24
132:2,7,22 136:13
139:13 140:3,5 143:11
145:8,10 147:10 150:3
151:4 153:22,24 155:3
156:14 157:11,15
160:4,9 162:12 164:15,
17,19,21 165:8,12,23
166:1,4,7,14,17,20,23
167:11,15 169:12
171:16 174:1 176:7,8,
12,14 177:13 179:20
180:18 182:8 183:8
184:15 192:13,17,23
194:9 195:17,24 200:7
205:24 206:2 207:9,16
209:2,5 210:12 212:4
218:2,3,7 221:3 222:19
224:1,6,13 225:1,6,14,
24 226:2,5,19 228:12,
15 229:13,15 230:9,21
231:5,6,10 236:25
237:11,21 240:5,15,21
242:5,6,7,20 246:23
250:22 253:11,20
260:21 262:2,5 269:16
273:17 274:25 276:14
277:24 278:9 279:9,13
280:8,11,25

**questioning** 161:11
281:16 282:11,21

**questions** 5:21 6:12
18:21 29:13 43:9 49:11
58:18 59:15 60:1 75:8
109:15,20 124:9 147:24
156:11 169:3 176:3
177:12 204:13 225:18
226:1 242:3 275:19
281:2,4 282:12

**quick** 280:25

**quiet** 58:18 250:11

**quote** 11:1 27:25 32:8
41:4 99:11 110:2
113:21

**quoted** 9:17 10:6
12:1 14:15 18:18 46:10

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

53:15 251:11

**quoting** 47:18

---

## R

**Raby** 233:16

**raise** 15:2 260:24

**raised** 12:23

**ran** 265:11

**Randy** 4:17 106:16
146:7,8

**Randy's** 270:15

**range** 56:20

**rants** 173:16

**raped** 15:25 31:4
57:17 104:25 110:12
114:18 115:6 154:16
243:16

**raping** 110:6 111:6,
10,20 112:3 114:8

**rapist** 15:25 57:16
104:24 110:5,11 111:9,
20 112:3,18 113:9
114:8,18 115:6 141:10,
16 154:16 243:16

**rate** 85:16 87:12 93:24

**reach** 25:4 175:1
206:12 249:5

**reached** 84:12
254:22

**read** 9:14 20:17 21:5
24:5,8,11,14,22,24,25
25:7,12,23 26:4,11
28:13 29:6 36:9,10
39:15 50:2 51:21 52:4
66:1 82:21 122:1 124:3
127:25 128:1 147:10,11
164:21 165:8,9 169:1
171:11,15 172:8
179:20,21 189:2 204:8
225:3 237:11 286:4

**reading** 24:15 27:25
82:24 131:22

**reads** 36:6

**ready** 19:23 20:6,7

39:3,12 60:18 109:9
152:6 224:11 229:14

**real** 31:10 112:13
222:2 242:18

**reality** 13:15 58:1
124:16,23 136:2 169:11
239:17 264:4

**realizing** 175:7

**reason** 5:13 29:3
94:12 159:13,17

**reasons** 27:4 37:19

**recall** 52:24 53:1 79:4,
6 92:3,6,9 94:6,24 95:7,
9,10,13 99:15 112:23
114:6 116:5,7,8,11,12,
16,19 119:19 121:14
136:8,13,14 137:1,3
139:6,14,24 142:21
144:1,7,11 151:15
152:15 182:15,16,23
183:2 184:20,22
185:16,21 186:5 187:6
196:4 197:12 199:6,8
235:19 236:6,12,18
244:13,18 252:6 255:18
256:23 257:3,17,19,23
258:1

**receipts** 134:17,21
136:18,22 138:1,2,8,10,
13,14 140:11,25

**receive** 79:3 96:4,7
283:9

**received** 181:11,16
224:2,3

**receiving** 69:1

**recent** 91:21 92:12

**recently** 9:22 10:7,20
11:3 12:11 13:22 92:4
182:17 183:10 202:21

**recently'** 13:4

**recently,'** 9:11

**recently.'** 11:22

**recess** 46:6 81:20
159:6

**recognize** 7:13
263:2

**recollection** 53:5,6
99:22 100:10,16 102:5
106:10 115:10 167:23,
25 229:16 233:15 255:9
256:6 260:13

**record** 4:16 14:2
26:3,6 28:12 34:7 45:23
47:22 51:9,11,13 66:2
81:19 98:22 103:24
128:2 144:19 145:13
147:12 158:16 163:16,
18 164:2,16 165:10
169:19 179:22 189:3
200:13 201:4,21
202:17,19 207:5 222:25
225:4 277:10 279:7
281:12 283:3 284:18,20
285:24

**recorded** 21:13
105:9 276:16 277:2
278:18

**recording** 187:4
259:21 275:22,23,24
276:14 277:17,25
279:7,8,11

**recordings** 111:14
277:11

**records** 141:25 143:6
149:11 152:14 261:25
266:3

**recover** 234:16,24

**recruit** 268:16

**recruiting** 269:2

**red** 275:24

**redacted** 171:7,9
172:4

**refer** 28:5 82:9 91:8
98:22 102:10 167:19
180:22

**referred** 61:4 75:21
91:25 99:9 231:24
260:17

**referring** 21:22
22:16 23:11 52:17
53:20 91:21 102:12
103:6 105:25 110:2,13,
14 114:21 148:12
222:17 225:8 253:14
260:15 262:22,23

263:7,10

**refers** 52:21

**reflect** 28:13 34:7
51:9,11 103:24 207:5

**reflected** 185:22
186:1

**refrain** 48:17 49:6

**refused** 85:3,22 86:1
87:4

**refusing** 45:23 79:8
230:6

**regard** 91:18 206:20

**regular** 162:24,25

**regularly** 253:14
260:15

**rejoicing** 81:12

**Related** 79:2

**relationship** 60:25
61:2 160:21,22 161:4,
11,17,19

**relationships**
19:10 47:18 50:1 65:7
70:16,17 71:10 81:4
157:10

**relative** 213:10
273:13

**released** 52:12

**relevance** 6:5 160:3

**relevancy** 165:17,19
169:7

**relevant** 6:5 20:13
69:10 160:25 162:20
163:3 192:13

**reliance** 79:9 80:9

**rely** 59:15 96:20 234:6

**relying** 96:24 131:16

**remain** 199:4

**remainder** 163:13

**remaining** 87:8

**remember** 53:8,15
101:22 102:6 113:9,12
114:2 136:16 139:2,8,
10,18,21 152:11 181:3,

8,15,20 182:3 183:21
184:5,9 185:11 193:20,
23,24 211:10 224:12
225:1 229:21 239:20
245:1 252:7

**remembering**
115:10

**remote** 246:14

**remotely** 4:6

**removal** 253:15
259:3 261:17

**remove** 86:25 87:4
115:25 168:1,3 207:19
208:1,8 215:25 253:22
254:3,4 255:13,14
256:11 257:7,16,24

**removed** 103:3
115:23 116:15 168:10,
22 246:20 266:9,16
272:24 273:24

**removing** 203:18

**remuneration** 69:1

**renewable** 51:18

**renotice** 285:13

**repeat** 16:13 30:16
65:20 188:23,24

**repeating** 22:7

**repercussions**
216:14

**rephrase** 5:16 11:15
18:4,23 55:3 132:24
136:12 226:19 228:13
246:22

**rephrased** 13:2
132:22

**replete** 43:4

**replied** 173:4

**report** 100:5 131:21
133:17 170:13,16,22,23
171:12 174:4,19 175:8
180:13 181:18,20,22
182:1,4 183:4,10,13,16
184:1,19,24 185:2,23,
24 186:1,2 187:10
189:19 251:17 254:5,6,
9 272:20,21

**reported** 51:16 103:1
182:17 187:7 194:4
202:22 217:21 220:2
251:21 268:5,12

**reporter** 4:2 25:17,
20,24 54:17 65:21,22
66:1 125:8 128:1 129:1
140:6 143:16,19,23
147:11,15 164:23 165:9
179:21 189:2 209:22
224:23 225:3 230:25
245:5 251:16,19 252:1
254:10 265:3 268:11
269:13,22 270:5 273:16
276:1,8 279:8 283:20
284:14 285:25

**reporting** 4:5,13

**reports** 183:6

**represent** 94:11
274:19

**representation**
59:16 69:11 94:9

**represented** 101:3

**representing**
202:12

**reputation** 16:3,7,
10,16,20 17:1,6,8,13,
16,20 18:10,13,17 19:4,
5 20:15 23:22 24:17
26:14 27:1 33:2 34:4
39:25 40:10,15,22 41:6,
16,21 42:1 44:25 45:9
46:13 49:24 125:4
126:10

**request** 48:11 140:1,
10 185:25 188:7,8
202:2 222:25 276:9
278:13 279:18 282:24

**requested** 49:17

**requests** 188:16
202:5

**require** 43:3 217:14

**requires** 69:9

**requiring** 217:8
235:21

**rerecorded** 182:21

**resale** 216:3

**reschedule** 285:18

**rescue** 264:21

**research** 141:20

**resell** 215:21 216:6

**reseller** 215:20

**reserved** 5:6

**residences** 209:7

**respect** 75:16 151:8
254:13

**respond** 59:12
243:17,19,21,22

**responded** 105:22

**Respondent** 209:5,
17

**response** 53:9 122:3
132:7 139:25 140:10
207:6

**responsibilities**
277:14

**responsibility**
269:10,14,17 270:14,
15,16,20,21 271:8
272:2,3,20,21 273:11,
14,22

**responsible**
151:20,21 152:1,2
254:8 270:3

**responsive** 43:9
188:16 202:4

**rest** 26:1 83:11 171:12

**restraining** 51:18
244:16

**result** 18:24 54:6 57:4

**resulted** 66:22

**resume** 158:23

**retained** 149:17
150:1

**retract** 223:17

**retrieve** 254:19

**returned** 20:22 21:1

**reveal** 98:4 130:17
133:2

**revenue** 67:6,17,22
69:3 70:9,14 71:9,10,
14,18,25 72:2,13,15,20
73:1,6,8,10,14,17 74:1
75:6 76:1,21 77:7,8,9,
10

**review** 199:6 281:23

**reviews** 243:22

**Rex** 256:10 257:21

**rid** 36:23 37:1

**ridiculous** 149:6
232:12

**rights** 255:11 267:9

**ring** 146:25

**Rizk** 153:1 154:24
160:23 161:16,18,20,21
162:14,23 255:2,3
283:2

**Rizk's** 165:4 284:23

**road** 83:25 84:8,9,13
87:1,2,4,5,8 99:19
102:10 119:1,4 120:10
121:2 123:22 125:25
156:17 178:14 188:1
190:9 192:1,2,6,11,15
194:18 195:4 196:15,
16,20 202:23 203:1,16
204:22 205:10 210:19
217:20 251:5

**roads** 130:2

**roadway** 20:11 21:3

**rocks** 196:22 197:18,
19

**roll** 136:1 178:5

**room** 4:5

**roughly** 184:8 196:18

**route** 117:14,15
119:9,10,11 196:16
215:6 251:2

**routes** 206:19

**ruin** 249:17

**rule** 98:19 145:2
152:20

**ruled** 151:3 201:5

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**rules** 5:4,22 29:2
282:23

**ruling** 220:11,12,17,
22 221:1,2,4,10,14

**rulings** 221:9

**run** 25:1 154:11
160:19 265:3,10

**running** 150:9
187:14 189:7,9,11,21
191:3,6,9,10,18

**runs** 264:10,11,15,18
265:6,8

**RV** 254:20

**S**

**safe** 254:1

**safeguard** 240:17
267:13

**safeguarding**
238:25 239:19 240:1
241:20

**safety** 266:15 268:8

**sake** 127:2,3

**sale** 219:9

**sample** 144:2 146:2,
16,18,23 147:22 150:8,
20 152:17

**samples** 142:17
143:6 144:6,12,14,17
148:2,16,18 149:10,11,
25 150:6,7,9,25 151:2,9
152:13

**sanctions** 98:15
282:2

**sat** 103:19

**satisfaction** 282:22

**satisfy** 233:25 234:3,
4 235:16

**Saturday** 117:7

**save** 15:1 249:24
250:5 253:16 278:16

**saving** 273:23

**scam** 222:5

**scenario** 191:1
194:12

**scene** 116:3 198:21

**schedule** 285:4,16

**scheduled** 284:22

**scheme** 160:19

**school** 267:25

**schoolhouse** 57:20
186:16,17

**schools** 209:8

**science** 145:23

**screaming** 53:7
87:3

**screen** 7:11 35:17
82:8 105:8 259:21

**screenshot** 89:22
170:11 259:25 275:25

**screenshots**
100:15 105:7 111:14
222:13

**scroll** 35:13

**scrolling** 7:16

**sealed** 201:1,3,13,20

**seconds** 85:8,12
199:11 209:21 285:1

**security** 243:12,13
263:24

**seek** 234:2 235:16

**seeking** 109:7 201:4
254:14 259:18 260:8

**segments** 238:3

**self-employed**
161:23

**sell** 90:16

**sellers** 215:21 216:6
218:17

**selling** 61:10

**send** 59:10 77:15
149:3 184:25 185:3,6
229:2 283:10 285:6
286:4

**sense** 121:2 128:18
152:5

**sentence** 20:18
28:13 36:19

**sentences** 24:5
268:4

**separate** 8:17 23:10
187:8,9 281:20 283:9

**separately** 8:17
37:14 104:13 138:6

**September** 51:17
237:18 238:4 240:7
242:22 244:15

**serve** 238:15 240:7

**served** 240:12

**service** 63:14 162:5,9

**services** 209:13
249:6,7,9 251:8 268:6

**set** 89:3 162:16 165:5
191:1 194:11

**seven-hour** 282:14

**sex** 23:25 24:20 26:17

**Shara** 89:22 92:18
93:1,5 94:2,14

**share** 58:3 93:1 94:23
96:8 144:23 228:6,7,16

**shared** 69:12 103:7
107:19 118:15 138:4,5
141:13 155:9 156:21
226:17,21,24 229:22
230:11 231:11 271:10
275:10

**sharing** 95:22,25
96:9 240:24

**she'll** 268:5

**shed** 108:8

**sheet** 192:14

**sheets** 187:15 189:7,
9,11,12,14,22 191:4,20,
22 192:5 193:6

**sheriff** 42:15 134:10
179:7,16 183:15 184:13
185:1 249:12 267:15
269:19

**Sheriff's** 183:14
184:18

**shirt** 146:12

**Shochet** 4:17,18
5:24 6:24 7:4,9,15 8:8,
23 9:19,23 10:22 11:6,
11 12:2,21 13:7 14:4,
12,23 15:9 18:3,14,20
19:24 20:6,16,21 22:19,
20,23 23:4,8,14,15
24:3,8 25:3 27:2,13,24
28:8,10,17,18,24 29:1,
12 30:4 31:23 34:6,18
35:5,11,16,21 37:18
38:2,17,20 39:4,7,10,13
40:1 41:8,11,17,22
43:6,12 44:10,21 45:11,
17,22 46:3,14,17 47:21
48:13,18,25 49:8 50:4,
13 51:8 53:22 54:7,11,
12,19,24 55:5,14 57:12
58:5,9,14,19 59:1,5
60:19 62:17 63:1 71:1
74:10,20 77:18 78:6,12
79:16 81:18 82:1,6,15,
18 83:13 88:22 89:3,7
90:12 96:18 97:5,9,12,
15,18 98:3,9,14 102:14
103:23 106:5,12,19,22
107:8 108:21 109:3,4,
10,16,21 111:22 127:20
128:5,9 129:5,14,18
130:9,11,13,16,20,25
131:5,14,23 132:15,21
133:1,12 134:25 143:8
145:7,12 146:20,24
147:2,6,17 154:4,8,25
155:4 158:15,20 159:1,
5 160:1,24 161:7,8
162:11 163:8,15,23,25
164:4,7,11,14,24
165:21 166:3,6,10,15,
25 167:8,14 169:18
170:8,12,17 171:21,25
172:12,16,21 176:6
177:24 181:19 188:9,15
192:23 193:1,8 202:1
207:4,8 210:9 211:22
227:9,15,23 228:10,20
230:14,16,22 231:1,14,
17 232:1,6,10,23 233:3,
9,21 234:5,10,17 235:6,
10,23 236:2,16 237:5,9,
20 240:9 242:2,4,13
245:10 246:3,7 253:19

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

255:24 258:21 259:9
260:20 261:6,10 269:6
275:20 276:6,10 278:15
279:3,6,14 280:17,24
281:3,5,9 283:5,13,21,
24,25 284:4,10,13,19
285:12,22,25 286:3

**Shochet's** 237:16

**shoot** 19:14 86:21
87:20 88:18 90:15 91:2
93:13 94:21 219:13
239:21 243:24

**shooting** 91:23
92:13 96:13 99:12

**short** 27:3

**shorter** 129:2

**shoving** 22:14

**show** 155:21,24
215:24 222:16 225:8
249:12 262:17 263:1,3,
11 280:6

**showed** 94:13 156:7,
16 229:11 232:21
262:16

**showing** 120:4
153:10,16 154:1 157:24
239:15,16,17 263:13

**shown** 156:2,23
221:20 222:12,20,22
223:19 227:2 231:25
232:15 262:24

**shows** 57:5 100:24
192:4

**shrink** 82:2

**shut** 36:10 37:8 49:23
61:22 76:23 240:20
265:20 267:10 270:2
275:17 277:3,4 280:13

**sic** 26:22 48:20 61:13
94:15 102:21 142:24
148:8

**sick** 108:25 109:1
158:12 239:25 247:23

**side** 33:20 84:14 87:3
100:21 190:14,15,16
194:21,22 210:18,19,20
212:18,22,23 213:6,9,
17,19,23 215:1,5

**sign** 77:7 104:3,25
105:2 111:21 115:2
146:3 150:21

**Signature** 286:7

**signs** 15:22 31:3,20
102:9,11,20,23,25
103:2,8,15 104:1,4,11,
13,14,17,22,24 106:3
107:14 110:3,4,10
111:5,7 112:4 113:5,20,
23 114:9,11 115:1,14
116:4,13 117:18,25
118:19 119:15,21
120:23 121:13,17
122:7,15 123:14,19,23,
25 124:3 125:25 127:9,
12,19 128:17 131:12,22
132:8 133:23 134:8,19
136:7 140:12 141:9,15
142:7 146:4 148:4
149:14 150:1 151:1,10,
18,20,22 152:3,4,10,24
153:3,10,17 154:1,22
155:7,21 156:2,8,17
157:3,20,24,25 195:6,7

**silence** 269:7

**similar** 105:3 106:2
110:10

**simple** 69:21 192:23,
25 246:22

**simplest** 68:24

**single** 22:8 61:3
70:22 86:18 87:18,19
88:8,16 90:25 127:7
219:17 250:17 282:23

**sings** 142:14

**singular** 60:24

**sink** 205:22

**sir** 7:6 28:18 29:1 41:1
48:13 59:2 275:23
283:6

**sitting** 21:17 81:12
95:5 111:17,25 112:12
114:3 248:1

**situation** 206:3
208:2 251:11 253:24
269:11 282:8

**six-foot-high**
262:10

**size** 9:12 14:20 16:19
17:11 18:11 19:1

**sky** 148:10

**sleep** 241:14

**sleeps** 241:16

**slow** 60:21 125:9
195:2,3,7,8

**slowed** 84:5,14,24
86:24 195:8

**slowing** 87:13

**small** 146:9

**smart** 244:3,5

**smell** 271:12

**smile** 61:25 81:15

**smiled** 51:9 103:24

**smiling** 34:7 51:10
207:5

**smirking** 270:10,11,
12

**social** 9:8,10 11:19
12:17 14:18 39:18 44:6
73:22 91:22 113:19
114:11,25 209:13

**Socrates** 124:14,25

**Socratic** 124:12
125:1

**sold** 64:15

**Solicit-** 265:14

**Soliciting** 265:14

**somebody's** 34:3
117:3,5

**someone's** 16:3,7,
10,16 18:10 145:1

**someway** 248:12
257:7

**sort** 43:1 68:15 92:12
94:13 118:18 131:20
132:9,12,19 142:9

**sounded** 92:16

**sounding** 204:13

**source** 79:9 80:11
131:9 132:20 155:7

235:15

**space** 213:2

**spank** 269:20

**spanked** 248:4

**speak** 104:2 110:21
136:25 163:23,24 164:4
180:14 186:8 254:13
281:11,12,13

**speaking** 110:20
261:2

**special** 150:12

**specially** 244:22

**specific** 93:12
105:25 110:2 136:21
186:13

**specifically** 91:9
217:23 220:18 223:6
237:1 255:7

**speculation** 79:17
154:5 211:23 255:25
260:22

**speech** 164:17

**speed** 85:16 87:12

**spend** 105:10,15
111:12

**spit** 196:22 197:18

**spoke** 139:8,14,19,22
170:24

**spoken** 164:13
193:15

**sports** 159:8,19

**spot** 198:2

**spotted** 206:22
207:12 208:14,17,22
212:24 213:4,5

**spun** 104:4 157:13

**spurring** 64:8

**staging** 70:4

**stake** 268:8

**stalk** 33:5

**stalked** 90:21 208:4
241:2,7 243:3 267:1,7
274:1,14 275:9

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**stalking** 30:21 51:20
173:18 279:24 280:6

**stand** 39:18 40:8 41:4
113:18 249:19 250:1

**standard** 128:25

**standing** 187:2

**Starr** 108:14

**start** 21:17 88:14
109:24 165:7 242:7
243:21

**started** 5:5 98:21

**starts** 192:5

**state** 29:3 31:4 52:18
72:19,23 76:9 121:21
130:1 186:14 201:7,10,
11 244:16 250:7 285:5

**stated** 9:10 11:21
13:5,18 23:24 24:19
26:16 27:3,4,7 32:4
69:25 110:3 111:11
112:21 113:23 126:22
144:11,21 158:16
215:17 219:25 220:15,
21,25 225:25 233:12
278:23

**statement** 9:17 10:6,
18,21,23 11:1,3,5,24
12:1,6,9,17,20 13:3,5,
14 14:16,22 16:19
17:10,12,14 18:8,9,18,
19,25 20:14 26:25
27:12,22 29:6,16,20
30:1,10,17 31:11,15,16,
22 32:8 33:13 36:12
40:9,14,21 41:15,20
42:2 43:7,18,19,20
44:6,25 46:11 49:14,16
52:21,24 69:20 92:16
104:20 111:19 112:1
114:7,17 173:9 174:2
176:2,23 177:11 194:9
195:24 262:3

**statements** 9:8
11:18 13:16 14:17 16:2,
6,9,15 33:17 39:24,25
50:6,7 53:1 57:23 60:5
62:16 99:9 110:10
112:9,17 122:7 126:8
153:18 154:3,22 226:4
253:18

**states** 7:24 11:17
15:24 19:3 57:17,19
65:6 104:25 108:3
114:24 177:4

**stating** 4:15 19:13
42:18 50:25 61:21
104:8 106:24 110:14
111:3,5 141:9,15 195:5
212:10 236:18 247:20,
22 265:25 276:25
277:20,21,23

**station** 168:14 265:7

**stationary** 210:15

**status** 162:3,4
266:13,17

**stay** 136:3 186:4
199:19 204:18 206:15

**stayed** 196:20

**stems** 156:25

**Steno** 276:14 277:25
281:18 282:3

**Steno's** 276:3

**step** 272:5

**Stephen** 102:21
115:15 256:16,18,21
257:2,4,10,21 258:25

**stepped** 147:2

**steps** 69:13 89:6
130:7 134:7 141:2

**sticks** 83:22

**stipulate** 4:19,22

**stop** 25:17,20,21,25
50:8,12 104:19 188:2
195:2 204:12 214:18
223:14 274:18

**stopped** 51:24
115:23 203:16,20
204:25 212:16 261:16

**storage** 75:22 275:7

**store** 135:8,10

**stores** 134:16

**story** 33:20 118:6
204:22 205:20 238:8
266:24

**straight** 187:25 188:3
221:13 238:13 259:22

**strained** 70:18

**stream** 252:11

**streams** 159:15

**street** 212:18,23
213:6,9,20,23 215:2,5

**stretch** 179:12 180:2

**stretched** 111:15

**stricken** 14:7,13

**strike** 8:11 9:3 14:1,3,
5,6,9 43:7,13 63:1,2
79:13 89:9,12 95:19
109:11 142:16 153:1
165:22 228:4 255:2,5

**stroller** 251:5

**strong** 134:14

**strongest** 142:22

**stuck** 121:17

**stuff** 75:10 76:18
88:15,19 257:1,25
263:17

**stupid** 204:13 262:2
268:19,20

**stupidity** 180:7,12

**stutter** 68:13

**stuttering** 78:5

**subject** 128:10
145:14 154:6 160:5
183:6 220:1 260:23
261:11

**submitted** 12:14

**Subpart** 24:2,11

**subpoenaed**
223:12,13

**subpoenaing**
140:24

**subsequently**
104:13 110:9

**suck** 100:18

**sudden** 107:22 108:1
271:16 277:16

**suddenly** 261:16

**sue** 233:16

**suffered** 18:18

**sufficient** 234:22

**suggest** 103:14
122:13

**suggested** 168:23

**suggesting** 37:2,4

**suing** 233:13

**summarize** 167:24

**summarizing**
168:18

**summary** 133:16

**Sunday** 119:17

**supplemental**
150:13

**supporting** 50:8,12
51:3

**supposed** 176:18
191:14,15 222:7 223:24

**surmise** 204:4

**suspected** 133:25

**suspicion** 134:1

**sworn** 4:24

**system** 137:13
140:22 243:1,7 267:15

**T**

**takes** 117:1

**taking** 15:22 47:3
48:14

**talk** 13:15 25:14 26:2
42:4 48:19 94:17 102:9
107:25 122:17 150:18,
19

**talked** 195:22 225:10
258:10 267:6

**talking** 22:11 23:5,9
56:6,7,25 72:5 103:19
123:6 126:11 137:3
165:7 180:5,20 187:17
216:17 232:2 252:11

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

261:16,21 271:16 278:5
284:1

**tall** 39:19 40:8 41:4
113:18

**tape** 208:20

**Taunting** 191:15

**team** 159:19 259:22
260:3

**tech** 209:11

**telephone** 209:11

**telling** 25:10 78:3
80:20 86:24 90:3
100:17 199:19 231:7
258:4 260:7 269:3
272:15 276:22 277:7
283:17

**temporary** 244:16

**ten** 64:16 135:20,21
199:12 245:8 261:24
262:1,6

**tenant** 255:12 257:9

**tenth** 214:1

**Teresa** 102:21 103:6

**terminate** 98:16 99:1
284:5

**terminated** 280:20
284:15

**terminating** 284:1

**terminology** 15:2
263:20

**terms** 63:14 68:25

**terrorist** 57:19

**terrorists** 31:7,8

**terrorized** 219:7

**terrorizing** 148:23

**testified** 4:25 79:12
110:4 118:17 132:6
151:14 168:11 202:21

**testify** 144:4 151:13
235:22

**testifying** 153:19,25
168:12

**testimonies** 236:19

**testimony** 4:9 40:7
101:1 102:1 104:12
144:13,16 153:16
154:14,18,20 177:14,17
180:3,10,15 197:6
200:2,13 228:3 230:1
236:14 237:4 256:3,24
257:22

**text** 34:22 116:6,8,12
174:7 181:12,16 182:3
209:11 223:13

**texted** 116:6,7 175:13

**texts** 105:6 231:24
232:21

**Thatumbrellaguy**
155:23

**theoreticalities**
175:12

**theoretically** 175:5

**Therese** 103:6
115:15,21 121:23
256:13 257:21

**thing** 58:17 117:22
120:8 138:20 171:3
172:22 194:17 198:7
204:15,17 231:2 235:23
243:11 254:8 256:8
259:25 269:1 277:14

**things** 15:18 16:2,24
21:12 22:10,14 28:14
31:6,9 33:15,20,25 34:1
42:5 61:7 64:9 87:22
96:16 104:14,18,23
105:5,14,24 106:2
107:23 108:5,12,16
110:14,23,24 126:22
131:16 158:4 167:1
179:14 239:25 264:6
271:2 277:23 280:23
281:25

**thinking** 22:3,4
116:17,19 139:16

**thinks** 9:12 14:19
16:19 17:10 18:11,25

**third-party** 175:5

**thousand** 64:13

**thousands** 100:14
105:6,7,8,24 112:15
114:5

**threat** 27:11,22 29:7
30:3 37:17,25 47:9
92:14 217:8,15

**threaten** 91:4

**threatened** 21:20,21
23:21 24:16 26:13 33:1
87:20 88:17 89:12
90:15,24 93:13 168:14
241:8

**threatening** 23:19
42:8 88:12 89:15

**threatens** 269:19

**threats** 91:13 219:12

**threw** 244:6

**throwdown** 47:8

**throwing** 21:18

**Thursday** 117:11

**ties** 146:10,11

**Tiktok** 62:5 63:11,12
65:18 73:23

**time** 5:7,18 12:23 15:1
22:8 28:20 29:3 33:5,8
61:25 70:22 72:6,7 73:4
78:5 84:19 85:7,10,14
86:18 87:18,19,22 88:8,
16 96:6,11 98:23 99:11
111:16 113:6 114:1
117:11 119:19 122:20
129:7 131:12 132:24
135:4 137:10,12,16,24
138:9 140:19,21
142:19,20 148:20
149:16,23 162:25
175:25 176:10 178:3
180:19 181:1,6,24
183:24,25 184:1,2
189:23 193:9 194:1,12
195:16 199:17,18
202:17 204:11 206:22
207:11 210:8 213:4
217:24 218:5,11,15,19
221:14 230:25 236:23
238:17 242:17,18
252:6,7 256:25 258:13,
17 260:7,13 261:14,21,
22 278:16 282:4,15

285:5,16

**timeline** 149:19
271:16

**times** 71:4,7 72:1 77:6
111:11 112:21 132:22
151:5 163:10 168:13
176:25 191:3 192:20
193:2 204:19 209:2
212:11 218:3 251:20,25

**timing** 96:4

**tirade** 14:3

**tirades** 43:4 109:15,
20 110:19 163:20
282:16

**today** 91:2 114:3
267:6 280:5 281:2,4,17
282:9,14

**today's** 282:3

**told** 30:18 60:20 71:8
96:20,21 107:15 117:8,
9 134:10 139:13 154:15
160:17 163:10 173:17
193:25 195:15 196:20
197:16 234:6 253:9,11
256:4,8 269:12 270:6
278:10 285:3,15

**top** 82:13 100:4 101:22
115:11 262:8,13

**torment** 241:1

**tormented** 241:3
267:8

**tortious** 66:20

**tortiously** 8:6,18

**total** 119:25 260:12

**totality** 12:14

**totally** 6:4 200:10

**touch** 172:1

**touchy** 170:18
171:22,24

**tourism** 117:14

**tourist** 119:6,9

**town** 15:23 20:23 21:2
31:4 101:15 135:15
142:1 168:1,11,13,24
169:5,9,12,14 216:3

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

217:17 220:23 221:7
265:10,11 266:1

**towns** 101:19

**track** 127:22

**traffic** 120:5 129:23
130:1 131:9 132:20

**trailer** 248:19

**trained** 251:6 267:24

**training** 31:8 57:19

**transcribed** 34:23

**transcript** 43:3,5
109:8 281:19 286:2

**travel** 235:21 236:14
237:3

**Travis** 257:15,22

**trees** 275:8

**Trenton** 4:18

**trespassed** 21:20,
23

**trial** 5:7

**trip** 136:15 198:23

**truck** 21:16 84:2,12,
24

**true** 13:17 17:25
153:18 154:2,3 212:11

**trust** 70:2 247:21

**truth** 13:23 239:18
240:17,22 271:10,12

**Turd** 142:23 148:8

**turn** 49:10 205:4 206:8
213:13,14,15,16,17
249:15

**turned** 213:7 215:1,4
280:2

**turning** 188:3 191:13
212:18

**turtle** 213:22 264:21

**Twitter** 62:6

**two-minute** 45:18

**two-year** 51:18

**type** 206:14 255:20

258:18 267:16

**typically** 118:23
119:5

---

## U

**Uh-huh** 268:21

**ultimately** 126:15
236:20

**un-** 248:10

**unable** 111:18

**unanswered** 5:19

**unaware** 102:24
157:22 158:2

**Unbelievable**
230:15

**unblock** 175:25
176:11 177:6

**unblocked** 173:5,
17,21 174:8,16,21
176:16 177:15,21
181:5,10,11

**unblocking** 174:11
176:22

**unclear** 150:3

**understand** 5:14
10:3 11:8,10,12 12:3
15:8,11,13 17:5 18:9
19:17,19 27:5,16 30:6
32:1,21 36:14 37:21,22
38:11 55:2 69:15 84:11
85:11,13 98:4 114:20
119:2 125:18,23 126:3,
5 129:12 132:11 135:7
138:11 143:11 145:10
151:7 152:8 165:12
171:10 174:22,23 177:1
182:8 189:10 203:23
206:18,24 210:11 221:2
222:9 225:6

**understanding**
15:17 16:5,14 115:14
150:4 200:7 248:14

**understood** 5:17

**unfavorable** 248:11

**unfounded** 83:20

**unhealthy** 88:11

**unhinged** 88:11

**unit** 275:7

**United** 7:24

**unpause** 106:17

**unpaused** 106:21

**unprofessional**
271:21

**unrepresented**
202:8

**unsealed** 201:15,17,
20

**untrue** 15:19 16:3,6,8

**unwilling** 45:4
111:18

**uploaded** 148:10

**upper** 275:21

**UPS** 142:25

**utilize** 30:24

---

## V

**valid** 5:12 61:1

**vehicle** 196:14,22
197:2,19 198:10,17,22
203:4,6 208:16,23
210:3 211:2,4,11 212:9,
15,16,17,24 213:3
214:14,15 262:9,14

**vehicles** 206:4 210:7

**ventures** 74:2

**verbal** 197:9,10
250:19

**verbally** 4:9 197:15

**veteran** 254:22

**video** 21:13,15,19,22,
25 22:6,9,12,15 23:11,
16 51:12 57:9 75:17,21
76:20 77:21 78:25 79:2,
15,23 80:2,10,16,20,21
100:9,14 102:3 105:8
120:4,7,9,11,18 121:4
134:17 136:17 138:7,
10,11 140:1,10,25

182:7,12,21 188:12,19
193:12,17,19,22 197:11
199:7 211:10 235:20
237:17,25 238:14
242:10 244:23 246:15
249:8 258:10 269:18
276:16 278:12,17
281:18,23 285:6

**videoconference**
147:3

**videoed** 275:10,13,
14

**videos** 9:11,21 10:6,
19 11:2,22 12:10 13:4,
20,22 57:1,4,5 59:22
84:18,21 111:15 134:21
155:8,11 183:17 187:9,
12 188:6,24,25 189:1
215:14 222:12 225:11,
20,23 227:3 232:14
245:1 247:21,23 266:14
272:23 279:22,24
280:5,11,12

**videotape** 279:19,20

**view** 20:14 53:2 57:5
80:21

**viewed** 80:20

**viewer** 57:1,4

**viewers** 57:10

**viewerships** 88:5

**views** 33:24 269:4

**vile** 239:8,24

**village** 169:15,16

**violate** 204:9 209:17
212:20 214:24 217:21

**violated** 171:2 180:4
196:2 204:16 208:11
214:11,16,25

**violating** 187:22,25
191:12 206:25

**violation** 83:5,9
131:24 180:11 182:6,12
185:2 189:16,17 190:23
194:3 195:10,23 196:1
197:8 199:13,16 202:21
203:13,14,17 210:2
214:23 215:3 216:7
220:1,19 221:5,6

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

**violations** 182:17
183:1,5,11 184:19,25
187:8,10 221:11 267:3

**virtue** 221:7

**visit** 136:10 183:14,18
184:18

**visited** 184:14

**visitor** 186:19

**visual** 145:17,25
146:5,8,10,14,17

**voicemail** 209:12

**volume** 110:25

**voluntarily** 152:20

**volunteered** 255:19

---

**W**

---

**wait** 7:4 34:14,23 62:8
69:24 77:4 89:21
120:16 124:20 140:7
164:25 220:16 265:15
273:3,16 275:16 276:21
277:7,20 278:24

**waiting** 34:22 220:11,
16,21,25 221:3

**waive** 4:12 96:18
123:24

**waived** 286:8

**walk** 22:4 36:7,18 37:7
106:7 135:23

**walked** 193:6

**walking** 192:5,10,15
251:4

**Walmart** 134:16
138:19,25 139:3,7
140:10,17,25 141:12,17
217:18 218:20,22,23
219:1,3,20,23 220:5,19
221:5

**wanted** 32:6,15 37:1
90:20 100:21 108:10,15
136:21 146:16 206:10

**wanting** 33:8 227:17
264:22 268:24,25

**warn** 43:2 167:25

**warning** 98:21

**waste** 262:5

**wasted** 282:15

**watch** 53:11 59:22
60:13 260:2

**watched** 9:10,21
10:6,19 11:2,21 12:10
13:3,19,22 79:14,23
80:2

**watching** 51:2

**ways** 17:8 135:23
179:4,10 180:9

**weapon** 76:10,11,24,
25

**wear** 159:14 160:18

**wearing** 146:10,11
159:23

**Weaver** 134:9

**web** 244:12

**website** 250:6

**Wednesday** 117:11
165:4 283:1 284:16,21,
23 285:2,7,13,17,19,21

**week** 79:5 136:10
262:7

**weeks** 92:5 105:10,
15,16,17 107:16 111:12
112:6,22 113:2 182:22
184:8

**West** 119:11 152:25
154:23 198:15,17
255:7,16 256:4,6
257:21

**What-** 63:19

**whatevers** 112:16

**Whatnot** 62:11
63:19,20,21 65:9,18
73:23

**whatsoever** 77:1
165:18 177:4 178:15
212:12 223:14 277:18

**whining** 277:9,11

**Whoa** 235:7

**willingly** 191:8,12
198:11 203:19 212:20
214:12,15

**Willis** 257:15,22

**win** 233:13 234:1

**wind** 235:9

**window** 87:13 190:4,
18 192:4 210:23 211:18

**windows** 211:17

**winning** 244:23

**witnessed** 271:22

**witnesses** 235:20
248:5

**wiz** 224:12

**woman** 139:23
241:15

**Won** 244:24

**wondering** 221:3

**Woods** 256:10
257:22

**word** 28:1 115:17
223:11

**words** 137:17 138:6
153:21 193:15

**work** 73:17 112:5
121:19 124:9 129:4
130:21 131:24,25 144:8
167:9 227:11 231:14
235:24 237:5 243:8
244:11

**worked** 69:7

**works** 243:8

**world** 108:2 124:19
175:11,12 244:4

**worried** 275:12,13

**Wow** 97:14,17,21
130:10,12,15,19 194:9

**wrapped** 208:20

**write** 20:9 169:23

**writer** 142:6 170:24

**writing** 33:18,21,24

34:5 42:6,21,22 51:5,7
59:1 70:3,5 150:10,13
151:22 153:13 187:5
268:18

**writings** 209:13

**written** 30:1 31:17
32:7,22 33:14 42:22
63:15 105:20 113:7
122:3 152:3 283:14

**wrong** 19:2 69:19
169:12 251:9,10 254:7
277:12

**wrote** 11:16 99:7
120:23 133:23 134:8
141:9,14 142:13 150:21
152:4 157:2,17 158:4,5,
8,10 168:10

---

**Y**

---

**ya** 66:18 67:10

**yards** 123:23

**year** 95:9,16 150:5,6

**years** 100:13 138:14
148:23 251:6 267:23

**yelling** 87:14 194:5

**yellow** 36:5

**yes-or-no** 226:2
231:9 278:9

**young** 277:21

**Youtube** 33:7 57:1,4,
5,9 59:22 60:13 61:22
62:2 65:14,15,16,19
68:1,3 77:10 104:7
153:5,8 155:8,11,21,24
157:18,23 159:15
182:21 215:14 222:12,
19 223:19 225:11,20,23
227:3 229:11 231:24
232:14,22 235:20
236:12 237:2,8 238:3
241:11,23,25 243:3
244:14,22,23 253:13
260:16 262:16,17
264:22 265:1,23 266:6
272:10 273:22,25
275:5,6

JEREMY B. HALES
DECEMBER 02, 2024

JOB NO. 1278527

## Z

**Zim**  102:20 103:5
  115:15,20 116:7 119:16
  121:6,7,11,22 122:6,12
  152:24 154:23

**Zip**  169:25

**Zoom**  147:3 182:7